## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

2005 NOV 28 P 1:

UNITED STATES OF AMERICA,     :

         Respondent,     :     Criminal No. PJM-98-0520

         v.     :     Peter J. Messitte, U.S.D.J.

DUSTIN JOHN HIGGS,     :     Greenbelt Division

         Petitioner.     :

    :

## PETITIONER'S MOTION FOR RELIEF PURSUANT TO
## 28 U.S.C. SECTION 2255
## OR IN THE ALTERNATIVE
## PURSUANT TO 28 U.S.C. 2241

MAUREEN KEARNY ROWLEY, ESQ.
Chief Federal Defender
By: MICHAEL WISEMAN, ESQ.
Supervisory Assistant Federal Defender
Federal Community Defender Office
for the Eastern District of Pennsylvania
Capital Habeas Corpus Unit
Suite 545 West – The Curtis Center
Philadelphia, PA 19106
215-928-0520
Michael_Wiseman@fd.org

STEPHEN H. SACHS, ESQ.
Wilmer Cutler Pickering Hale &
Dorr, LLP
c/o Sachs
5 Roland Mews
Baltimore, MD 21210
410-532-8405
Stephen.Sachs@wilmerhale.com

### COUNSEL FOR PETITIONER
### DUSTIN JOHN HIGGS

Dated: November 28, 2005
        Greenbelt, Maryland

RECEIVED

2005 NOV 28 P 1: 04

UNITED STATES ATTORNEY
GREENBELT, MD

**PRELIMINARY STATEMENT**

Petitioner was charged with the January 27, 1996 deaths of three women occurring on federal land. On October 11, 2000 Petitioner was convicted by a jury of three counts of first-degree premeditated murder (18 U.S.C.A. § 1111(a)), three counts of first-degree murder committed in the perpetration or attempted perpetration of a kidnapping (id.), three counts of kidnapping resulting in death, (18 U.S.C.A. § 1201(a)(2)), and three counts of use of a firearm (18 U.S.C. § 924(c)). Following a sentencing hearing, the jury recommended that Petitioner be sentenced to death on each of the nine death-eligible counts. On January 3, 2001 he was formally sentenced by this Court to nine death sentences and 45 years for the firearm convictions, consecutive to the death sentences.

In this Petition, Mr. Higgs demonstrates that his convictions and sentences, including each of his death sentences, were obtained in violation of the United States Constitution and federal law in multiple respects.

References to transcripts of the trial proceedings before this Court are cited as "TT" (Trial Transcript) followed by the date of the proceedings, and a page citation. Pre-trial proceedings are identified by "PTT" (Pre-Trial Transcripts), again followed by the relevant date and page citation. The two opinions of the United States Courts of Appeals rendered on direct appeal US v. Higgs, 353 F.3d 281 (4th Cir. Dec. 22, 2003) and U.S. v. Higgs, 95 Fed.Appx. 37, 2004 WL 835795 (4th Cir.(Md.) April 20, 2004)) are cited as Higgs 1 and Higgs 2, respectively. All other citations are either self-explanatory or are explained. All emphasis is provided unless otherwise noted.

# TABLE OF CONTENTS

Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

Table of Contents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

Jurisdiction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Procedural History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Grounds for Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Claims for Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Claim I.  Petitioner's Convictions and Sentences Were Obtained Through
the Government's Use of Scientifically Unsound Comparative
Bullet Lead Analysis. The Reliance on This Unsound Science
Violated Petitioner's Rights to Due Process of Law and Effective
Assistance of Counsel. Alternatively, the Lack of Scientific
Foundation is Newly Discovered and Petitioner is Entitled to
Relief Because of Newly Discovered Evidence . . . . . . . . . . . . . . . . . . . . . 3

A.  Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

B.  How CBLA was Used at Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

C.  CBLA is not Valid Science – Lundy's Opinions were Not
Supportable . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    i.  The Lead Smelting and Bullet Manufacturing Process . . . . . . . . . 9

    ii.  The Definition of "Source." . . . . . . . . . . . . . . . . . . . . . . . . . 10

    iii.  The Definition of "Analytically Indistinguishable"
and the Use of Chaining . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    iv.  The Assumptions of Uniqueness of the Source,
Homogeneity of the Source and that there Exists a
Pattern to the Geographic Distribution for Retail Sale . . . . . . . . 12

        a.  The Assumption that Each Source is Unique . . . . . . . . . 12

        b.  The Assumption That Each Source Is
Homogeneous . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

     c.  The Failure to Consider the Problem of
       Geographical Bullet Distribution ................. 16

    v.  Ms. Lundy's Theories Have Been Tested and Proven
      Invalid .......................................... 17

    vi. Ms. Lundy's and the FBI's Theory Has Not Been
      Subjected to Peer Review and Publication ................. 18

    vii. Ms. Lundy's Opinions Do Not Have an Acceptable
      Rate of Error ....................................... 18

    viii. Ms. Lundy's Theory Is Not Generally Accepted Within
      the Relevant Scientific Community ....................... 19

    ix. Use of Standard Deviations ........................... 19

  D. Conclusion ................................................ 20

Claim II. Petitioner's Trial Prosecutors Exercised Their Peremptory
Challenges in a Discriminatory Manner, on the Basis of
Gender in Violation of Petitioner's Rights under the Fifth
and Sixth Amendments to the United States Constitution ............ 21

  A. The Prosecutor's Strikes in Petitioner's Case ................... 22

  B. The Trial Prosecutors' Strikes in Other Capital Murder Cases ........ 28

  C. Conclusion ................................................ 29

Claim III. As a Result of Ineffective Assistance of Counsel, Court Error,
the Government's Suppression of Exculpatory Evidence and
Newly Discovered Evidence (Not Available at the Time of
Petitioner's Trial), Petitioner Was Wrongly Convicted of
Capital Murder; Petitioner Is Innocent of Capital Murder and
Should Be Granted a New Trial ................................. 29

  A. Trial Counsel Failed to Investigate or Present Evidence of
Victor Gloria's Prior Inconsistent Statements ................... 29

  B. Newly Discovered Evidence Exists Which Corroborates Gloria's
Prior Statements That He Was Sleeping During the Murders and
Testified Falsely at Petitioner's Trial ......................... 31

  C. The Government Suppressed Information Related to

Consideration Given to Gloria in Exchange for His
Testimony . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

D.  Trial Counsel Was Ineffective for Failing to Elicit from Victor
Gloria His Possession and Use of Weapons, Including .38
Caliber Guns  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

E.  Trial Counsel Ineffectively Failed to Present the Jury with
Evidence of Haynes Motive to Kill, Which was at Significant
Odds with the Government's Theory of Motive  . . . . . . . . . . . . . . . . . . 35

F.  Trial Counsel Failed to Investigate an Alleged, but Untrue,
Incident in Which Ms. Darby Testified That Petitioner
Threatened Her with a Gun; Proper Investigation Would Have
Revealed this Testimony to Be Unreliable.  The Government
Suppressed Evidence That Ms. Darby Was Untruthful . . . . . . . . . . . . . . 39

G.  The Government Suppressed Evidence of Consideration Given
to Richard Diolamou and Wondwossen Kabtamu, Both
Witnesses for the Prosecution Given Favorable Treatment in
Immigration Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

H.  Trial Counsel Failed to Obtain Records Proving That Domenick
Williams Testified Falsely, since He Was Not on the Cell Block
with Petitioner at All the Relevant Times  . . . . . . . . . . . . . . . . . . . . 43

Claim IV.  Trial Counsel Ineffectively Failed to Challenge the Admissibility
of Ballistics Testimony That Was of No Probative Value and
Which Failed to Prove Any Connection Between Petitioner and
the Crimes Charged  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

Claim V.  Trial Counsel Ineffectively Failed to Object to the Admission
of Evidence Concerning Co-defendant Willis Haynes'
Confessions During the Guilt Phase of Trial . . . . . . . . . . . . . . . . . . . 47

Claim VI.  Petitioner was Denied Effective Counsel During Capital
Sentencing in Violation of the Sixth and Eighth Amendments
to the United States Constitution . . . . . . . . . . . . . . . . . . . . . . . . . 50

A.  Introduction and Statement of the Claim . . . . . . . . . . . . . . . . . . . . . 51

B.  Counsel's Deficient Performance  . . . . . . . . . . . . . . . . . . . . . . . . 52

i.  The Investigation Stage  . . . . . . . . . . . . . . . . . . . . . . . . 52

a.      The School Records .................................... 52

b.      Counsel and Mr. Sickler's Abrogation of their
Investigative Responsibility to Lay People ........... 55

c.      The Failure to Interview Others Who Interacted
Daily with Petitioner or Otherwise Knew of Alphonso
Higgs' Life of Crime ............................... 60

d.      Failure to Provide Any Accurate Evidence About
the Emotional and Mental Health Impact Upon
Petitioner of the Tragic Loss of his Mother .......... 63

e.      The Failure to Provide Mental Health Experts with
the Actual Mitigating Evidence .................... 67

ii.      The Gutting of Petitioner's Penalty Phase, and Counsels'
Lack of a Response ................................. 73

C.      Counsels' Deficient Performance Caused Petitioner Prejudice ........ 80

Claim VII.      The Federal Death Penalty, as Administered, Violates the
Fifth and Eighth Amendments, and Trial Counsel Was
Ineffective for Failing to Challenge the Death Penalty on this
Ground ........................................................ 80

Claim VIII.      Trial Counsel Ineffectively Failed to Object to the Admission
of Co-defendant Willis Haynes' Confession During the Penalty
Phase of Petitioner's Trial on Fifth and Sixth Amendment
Grounds ...................................................... 83

Claim IX.      The Victim Impact Evidence, Argument and Instruction Allowed
the Sentencing Jury to Consider Victim Family Members' Views
as to the Appropriate Sentence, and Were Excessively Emotional
and Duplicative, in Violation of the Eighth Amendment ........... 85

A.      The Victim Impact Evidence ................................ 85
B.      The Victim Impact Argument ............................... 89
C.      The Victim Impact Instructions ............................. 90
D.      The Constitutional Violations .............................. 91

Claim X.      The Submission of Mr. Higgs' Prior Conviction for Assault
and Reckless Endangerment as a Statutory Aggravating Factor
under 18 U.S.C. § 3592(c)(2) (Previous Conviction for Felony

Involving Firearm) Violated the Eighth Amendment and Due Process Clause of the Fifth Amendment, because (1) These Offenses Did Not Necessarily Involve Use of a Firearm, and (2) the Conviction for These Offenses Did Not Take Place Previous to the Instant Offense. Defense Counsel Was Ineffective at Trial and on Appeal for Not Making the Proper Objections and Arguments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92

Claim XI.   The submission of Mr. Higgs' conviction for violation of the federal drug statute in 1997 as an aggravating factor under 18 U.S.C. § 3592(c)(12) violated the Eight Amendment because this subsection only applies to federal drug convictions for which Mr. Higgs "had previously been convicted," and this language means the conviction had to have taken place prior to the instant offense, which occurred in 1996 . . . . . . . . . . . . . . . . . . . . . . 95

Claim XII.   The Fourth Circuit Improperly Assumed That Presentation of the Invalid "Multiple Killings" Aggravating Factor to the Jury Did Not Infect the Jury's Weighing Process, in Violation of the Eighth and Fourteenth Amendments . . . . . . . . . . . . . . . . . . . . . . . . . . 97

Claim XIII.   Defense Counsel were Ineffective for Failing to Interview and Call as Witnesses Gerald Vaughn and Kevin Darnell Anderson . . . . . . . 99

Claim XIV.   Petitioner's Death Sentences Violated the Fifth and Eighth Amendments Because the Government Failed to Indict Mr. Higgs for the Aggravating Factors Required for a Capital Offense, or for the Additional Non-Statutory Factors Relied Upon by the Government During the Penalty Phase . . . . . . . . . . . . . . . 100

Claim XV.   Petitioner's Death Sentences Were Obtained in Violation of the Fifth, Sixth and Eighth Amendments Because the Court Failed to Instruct the Jury That in Reaching its Penalty Verdict, it must Determine Beyond a Reasonable Doubt Whether the Aggravating Factors Outweighed Mitigating Factors, and Because Counsel Ineffectively Failed to Object to the Improper Instruction or to Propose a Constitutional Instruction . . . . . . . . . . . . . . 101

Claim XVI.   The Trial Court Excluded from the Jury's Consideration as a Mitigating Factor the Fact That a Life Sentence Would Mean That Mr. Higgs Would Be Imprisoned till He Dies, in Violation of the Eighth Amendment; Appellate Counsel's Failure to Raise this Claim Deprived Petitioner of the Effective Assistance of Appellate Counsel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 102

Claim XVII.     The Fourth Circuit Erred in the Materiality Analysis of
                Petitioner's Claim under <u>Brady V. Maryland</u> .................... 104

Claim XVIII.    Testimony Regarding Petitioner's Post-Arrest Silence
                Violated Petitioner's Rights Under the Fifth and Sixth
                Amendments ........................................ 106

Claim XIX.      Petitioner's Rights Under the Fifth Amendment Were
                Violated During the Penalty Phase When the Court
                Neglected to Instruct the Jury to Draw No Adverse
                Inference from the Fact that Petitioner Did not Testify ............. 106

Claim XX.       Petitioner's Convictions Were Obtained in Violation of the
                Fifth and Sixth Amendments Because the Government Failed
                to Prove by Sufficient and Competent Evidence That the
                Offenses Occurred Within the Special Maritime and Territorial
                Jurisdiction of the United States. Counsel Ineffectively Failed
                to Challenge the Government's Insufficient Proof And/or to
                Object to the "Expert" Opinion Testimony of a Witness Who
                Was Neither Tendered Nor Accepted as an Expert Witness ......... 107

Claim XXI.      The Trial Prosecutors Violated the Due Process Clause When
                they Failed to Provide Trial Counsel with All Witness
                Statements and Reports Generated by the Park Police and
                the FBI ........................................... 110

Claim XXII.     Petitioner is Entitled to Relief Based Upon the Cumulative
                Errors Identified Above .................................. 110

Claim XXIII.    Petitioner is Entitled to and Request that the Court Provide an
                Evidentiary Hearing on All Disputed Issues of Material Fact ........ 111

Claim XXIV.     Jurors in Petitioner's Trial Engaged in Misconduct in Violation
                of Petitioner's Rights under the Fifth, Sixth, Eighth and
                Fourteenth Amendments to the United States Constitution .......... 111

Claim XXV.      The Execution of Petitioner Though Lethal Injection Pursuant
                to the Federal Government's Execution Protocol, Maryland's
                Execution Protocol, or Any Similar Protocol, Would Violate
                the Eighth Amendment's Prohibition Against Cruel and Unusual
                Punishment ........................................ 112

Request for Relief ................................................... 122

1.     This Court has jurisdiction to provide the relief requested herein pursuant to 28 U.S.C. § 2255.

## PROCEDURAL HISTORY

2.     On the morning of January 27, 1996 the bodies of three women (Mishann Chinn, Tanji Jackson and Tamika Black) were found on Route 197 as it passes through the Patuxent National Wildlife Refuge in Prince George's County, Maryland.  Following years of investigation, Petitioner along with Willis Haynes was charged in connection with these deaths.

3.     Pre-trial hearings pertaining to Petitioner and Haynes were conducted on November 15, 1999 and February 10 & 11, 2000.

4.     Petitioner and Haynes were tried separately.  Haynes was convicted of murder and related counts.  The jury did not sentence him to death, and accordingly, on August 24, 2000 this Court sentenced him to life imprisonment and 45 years consecutive.  Mr. Haynes' conviction was affirmed by the Court of Appeals.  U.S. v. Willis Mark Haynes, 26 Fed.Appx. 123,  2001 WL 1459702 (4th Cir. Nov. 19, 2001 (Md.)), cert denied, Haynes v. U.S., 535 U.S. 979 (April 1, 2002).

5.     Jury selection commenced in Petitioner's case on September 5, 2000 and concluded on September 26, 2000.  The empaneled jury was all male.

6.     Opening statements and the taking of evidence occurred on September 26, 2000.

7.     The jury returned its guilt phase verdict on October 11, 2000.

8.     Petitioner's penalty hearing commenced on October 18, 2000.  Evidence was taken on that date, and on October 19, 20 and 24, 2000.  Counsel closed to the jury on October 25, and penalty deliberations commenced that day.

1

9. On October 26, 2000, the jury returned its verdict recommending death on nine counts.

10. This Court formally sentenced Mr. Higgs on January 3, 2001 to nine death sentences and 45 years imprisonment consecutive to the capital sentences.

11. Petitioner took a direct appeal of the judgments of this Court to the United States Court of Appeals for the Fourth Circuit. While prosecuting Petitioner's direct appeal, his counsel discovered what it considered to be exculpatory evidence and filed a motion in this Court seeking a new trial. This Court denied that motion, which Petitioner also appealed to the Fourth Circuit.

12. Petitioner's direct appeals of his judgments of conviction and of the denial of his motion for a new trial, were affirmed in Higgs 1 and Higgs 2, respectively on December 22, 2003 and April 20, 2004. . .

13. Timely petitions for writ of certiorari were filed in the United States Supreme Court.

14. The petitions for certiorari were denied as to each case on the same day. See Higgs v. United States, 125 S.Ct. 627 (Nov. 29, 2004) (docket #03-10498); Higgs v. United States, 125 S.Ct. 608 (Nov. 29, 2004) (docket # 04-5226).

15. Petitioner was represented at trial by Harry J. Trainor, Esq. and Timothy J. Sullivan, Esq. The Government was represented by Deborah A. Johnston, Esq., Sandra Wilkinson, Esq. and Joseph Uberman, Esq.

16. Petitioner was represented on appeal, in his motion for a new trial and in his certiorari proceedings by Mr. Sullivan and Barbara Hartung. The Government was again represented by Ms. Wilkinson and Ms. Johnston.

17. Petitioner is currently incarcerated at the United States Penitentiary in Terre Haute, Indiana (Register #31133-037).

18. Petitioner is also serving a previously imposed sentence of 212 months imposed by this Court on December 12, 1997 for violations of federal drug laws. See United States v. Higgs, 8:96-cr-00153-PJM. That judgment is not the subject of this Petition.

GROUNDS FOR RELIEF

19. Petitioner herein alleges that his convictions and sentences, including his sentences of death, were obtained in violation of his rights under the Fifth, Sixth and Eighth Amendments to the United States Constitution. These violations relate to ineffective assistance of counsel and violations of his right to due process of law. Additionally, his judgments and convictions must be vacated in view of the newly discovered evidence discussed herein.

20. Petitioner moves for relief pursuant to 28 U.S.C. § 2255. However, should it be determined that any of Petitioner's claims are not cognizable under section 2255, he alternatively moves for relief pursuant to 28 U.S.C. § 2241 as to any claim for which section 2255 proves to be ineffective or inadequate to test the legality of his detention and sentences.

CLAIMS FOR RELIEF

CLAIM I. PETITIONER'S CONVICTIONS AND SENTENCES WERE OBTAINED THROUGH THE GOVERNMENT'S USE OF SCIENTIFICALLY UNSOUND COMPARATIVE BULLET LEAD ANALYSIS. THE RELIANCE ON THIS UNSOUND SCIENCE VIOLATED PETITIONER'S RIGHTS TO DUE PROCESS OF LAW AND EFFECTIVE ASSISTANCE OF COUNSEL. ALTERNATIVELY, THE LACK OF SCIENTIFIC FOUNDATION IS NEWLY DISCOVERED AND PETITIONER IS ENTITLED TO RELIEF BECAUSE OF NEWLY DISCOVERED EVIDENCE.

A. Introduction.

21. Petitioner's convictions and sentences were based in large measure upon junk science. The government relied on evidence of the now-discredited Comparative Bullet Lead

3

Analysis (hereafter, "CBLA"). Since the time of Mr. Higgs' trial, it has become apparent that CBLA is not valid science. New scientific data, proving the incredibility of CBLA, is newly discovered evidence that was not available at the time of Petitioner's trial. Petitioner is entitled to relief under the governing standards addressing claims of newly discovered evidence. Alternatively, since the Government knew, or should have known, about the lack of scientific foundation during Petitioner's trial and direct appeal, the Government's use of and on-going reliance on this evidence, constitutes a violation of Petitioner's right to due process of law, secured by the Fifth Amendment. Finally, and also alternatively, to the extent that trial counsel knew or should have known through thorough investigation about the lack of scientific validity of this "science," Petitioner moves for relief based upon the denial of his right to effective assistance of counsel, secured by the Sixth Amendment.

22. The CBLA evidence was an important and critical part of the Government's case, stressed by the prosecutors in closing argument. Thus, under whichever legal theory the use of this evidence is viewed, one thing is clear: the jury's verdict was based upon demonstrably false, misleading and inaccurate "science."

**B. How CBLA was Used at Trial.**

23. In this case, Willis Haynes shot and killed three young women. There is no allegation that Mr. Higgs fired the shots. There is no direct evidence that Mr. Higgs directed, desired, or intended the girls to be shot. Moreover, evidence had been presented that Mr. Higgs rarely stayed in the Briarwood apartment where the gun and ammunition were allegedly kept, tending to show that they did not belong to him TT 9/27/00, 167; TT 9/28/00, 129-132. It was therefore critical for the Government to prove a connection between Petitioner and the .38 caliber gun (which was never recovered) and the ammunition used to kill the victims. See TT

4

9/22/00, 119 (Government arguing that "it is absolutely critical for the government to put that .38 caliber handgun in Mr. Higgs' hands").[1]

24.     In order to make this critical, yet elusive, connection the Government presented evidence showing a CBLA "match" between bullets recovered from the Briarwood apartment when it was searched in March 1996, and bullets recovered from Cherry Lane and Chaconia shootings, and the crime scene. All of this ammunition was sent to the FBI Laboratory in Washington, D.C. for CBLA analysis.

25.     In order to show the CBLA match, the Government presented the expert testimony of Kathleen Lundy, who at the time had been employed by the FBI in the forensic lab elemental analysis group for approximately 15 years. TT 10/6/00, 5. She testified that she used Inductively Coupled Plasma-Optical Emission Spectroscopy (ICP-OES) to measure the presence of elements in lead samples taken from bullets from the victims in this case, as well as bullets from Cherry Lane, Chaconia, and the Briarwood apartment. TT 10/6/00, 9, 14, 21, 23.

26.     Based on those measurements, Lundy – using the then-current FBI definition for "analytically indistinguishable" (which, as shown below, arbitrarily fluctuated without any scientific basis) – claimed that one bullet from Haynes' victims and a bullet recovered from Cherry Lane were analytically indistinguishable from one another. TT 10/6/00, 18. She also contended that a bullet from Chaconia was analytically indistinguishable from bullets found at the Briarwood apartment. TT 10/6/00, 27-29.

27.     Lundy then concluded that because the bullets from the victim and the bullets

---

[1]Victor Gloria's testimony placing the gun in Mr. Higgs's hands on the night of the killings is also increasingly suspect in light of inconsistencies, his statement that he was sleeping at the time he said he saw Mr. Higgs hand a gun to Mr. Haynes, and the undisclosed consideration that he received in exchange for his testimony. This latter fact is addressed below in Claim III.

from the other scenes are "analytically indistinguishable," these bullets "likely originated from the same manufacturers' source (melt) of lead." TT 10/6/00, 29.

28.     Mr. Higgs pled guilty to the Cherry Lane incident. However, there were two assailants and it is entirely unclear which of the assailants used a .38 caliber weapon and which used a .9 millimeter weapon. In an unabashed bootstrap, the Government used the CBLA testimony to link the Cherry Lane bullet (Bullet B2/Q6) to one bullet recovered from the homicide (Bullet MC1/Q5). TT 10/6/00, 18. Thus, the Government tried to establish that Mr. Higgs wielded the .38 caliber weapon in the Cherry Lane case, while at the same time showing that the Cherry Lane case was relevant because it showed his access to the ammunition found at the homicide scene. In any event, these specious conclusions were supported only by the invalid, unreliable and flawed CBLA matches. In fact, the Government explicitly argued this point in its closing argument.[2] TT 10/20/00, 124-26.

29.     Similar linkage was attempted with regard to the Chaconia incident. Charges against Mr. Higgs in that incident were dropped as there was insufficient evidence to proceed to trial. Nonetheless, this shooting incident was introduced against Mr. Higgs in this capital trial. Flawed CBLA testimony linked a bullet found at the Chaconia incident (B3/Q206) to bullets found in the Briarwood apartment. TT 10/6/00, 28-29. This unchallenged CBLA evidence also

---

[2]In fact, the government also put on evidence that the ammunition used in both these incidents had some alleged link because both were .38 caliber bullets that were fired from a weapon that left the impression of five lands and grooves in a right twisting pattern. TT 10/5/00, 170-73. However, the probative value of this evidence is also nonexistent, as in Claim IV. The FBI ballistics examiner at trial was unable to say that the bullets were fired from the same weapon; only that they had the same general pattern. TT 10/5/00, 170-73. The fact that the bullets have similar markings is without probative value, since millions of weapons in circulation make these markings. Letter Report of William E. Conrad, dated November 17, 2005, copy contained in Petitioner's Appendix.

tended to prove a link between the Chaconia incident and the Briarwood apartment, which of course inculpated Mr. Higgs. TT 10/20/00, 126. The government specifically relied on the CBLA "science" in order to gain admission of the Chaconia event. PTT 9/22/00, 123.

30. The Government used CBLA as the basis for this evidence of bad acts that would otherwise have not been admissible against Petitioner. In a pre-trial motion, Petitioner attempted to preclude introduction of evidence showing that he was involved in the Chaconia shooting. PTT 9/22/00, 116. Petitioner argued it should be excluded since he was not found guilty of that offense, and that its probative value was far outweighed by its prejudicial impact. Id. at 116-119. The Government responded that as part of its "critical need" to put the .38 caliber weapon in Mr. Higgs' possession, it would prove that he was involved in the Chaconia and Cherry Lane shooting through the use of CBLA. The Government contended that these bad acts were admissible in its case-in-chief in order to make the "forensic connection" between the two shootings and the ammunition taken from the Briarwood apartment. Id., at 121 (bullets match through "metal element analysis"); id. at 122-23. The Government also pressed this forensic connection in its opening statement. TT 9/26/00, 45-46 (arguing that the bullets provided links between Mr. Higgs, the Cherry Lane and Chaconia shootings).

31. Thus, CBLA was utilized to draw a forensic link between bad acts, which were then admitted to establish the link. Had there been no comparative bullet lead analysis, there would have been a far weaker link between the bad act testimony and Petitioner, and the bad act evidence would not have been admissible.

**C.    CBLA is not Valid Science – Lundy's Opinions were Not Supportable.**

32. The FBI Laboratory has performed CBLA for many years, but, in the face of mounting scientific criticism of this practice, it announced on September 1, 2005 that it would no

7

longer perform such analysis for any purpose. See, http://www.fbi.gov/pressrel/ pressrel05/bullet_lead_analysis.htm (visited on November 27, 2005), copy of press release contained in Petitioner's Appendix.

33. The press release admits that "neither scientists nor bullet manufacturers are able to definitively attest to the significance of an association made between bullets in the course of a bullet lead examination." Id. Letters of the FBI's discontinuation of CBLA testing were sent to approximately 300 agencies that had received lab reports indicating positive CBLA results since 1996 so that those agencies may "take whatever steps they deem appropriate." Id.

34. Nonetheless, individuals from the FBI Laboratory, including Kathleen Lundy, for years were allowed to testify at trials as to their CBLA-based opinions. The "science" underlying this "expert" testimony went unchallenged for years.

35. Over the course of the last few years the science, analysis, and premises underlying CBLA have been closely scrutinized. This scrutiny reveals that CBLA and the testimony related to it contain numerous scientific questions that make "expert" testimony as to CBLA inadmissible under Rule 702 and Rule 403.[3]

36. There are many flaws in the CBLA methodology. First, the FBI's definition of "analytically indistinguishable" and the concurrent use of "data chaining" shifted without any

_____

[3]In fact, the recent scrutiny and the related pressure upon the use of this testimony resulted in the false testimony of Ms. Lundy in a state criminal prosecution that occurred after Petitioner's trial. Ms. Lundy was indicted for false swearing, to which she subsequently pled guilty. She later left the FBI and government service. This conviction not only undermines the opinions in this case, but shows that the FBI and Ms. Lundy have in at least one case admittedly resorted to perjury to justify their CBLA opinions. Therefore, this Court must carefully examine the Government's expert testimony in this case. (The record of Ms. Lundy's conviction is contained in Petitioner's Appendix)

8

order. At that time, they are assembled into cartridges and packaged into boxes. The date code on the box reflects only when the cartridges are packaged into boxes, not when they were manufactured.

### ii.    The Definition of "Source."

40.    In her testimony Ms. Lundy uses the term "manufacturers' source (melt) of lead." Lundy did not define that term or identify the source in this particular case. Petitioner assumes that the term refers to lead in its last molten state. Thus, "source" may refer to the melt or pour of lead at the secondary smelter from which ingots or billets are made and shipped to the manufacturer. Or "source" may refer to the remelting of ingots by the bullet manufacturer.

41.    In either event, the definition of source fails to consider the metallurgical phenomena that occur during the casting and solidification process which can lead to non-homogeneity in the billets and ingots. Tobin, ¶¶ 5, 6.

### iii.    The Definition of "Analytically Indistinguishable" and the Use of Chaining.

42.    In performing its ICP-OES measurements, the FBI took three small samples from each bullet and used the ICP-OES apparatus to measure the amounts of each of up to seven elements in each sample. The FBI then determined the mean of these measurements as to each element. The FBI categorized the bullets as "analytically indistinguishable" if the mean elemental concentrations of all of the elements measured in each bullet agreed within one or two standard deviations. Tobin, ¶ 20.

43.    However, at the time of Ms. Lundy's analysis and testimony in this case, the FBI allowed "chaining" of the data in determining compositional groups for bullets associated with the suspect (e.g. found in the suspect's possession). Chaining does not require that each bullet

be indistinguishable from every other bullet in the group. Instead, under the FBI practice at that time, if bullet A is indistinguishable from bullet B and bullet B is indistinguishable from bullet C, then bullet A is considered indistinguishable from bullet C even if their measurements vary by more than one or two standard deviations. This is data chaining. Tobin, ¶ 19.

44. Ultimately, by using this method the FBI cast a wider net than was justified by the science. It then used the average value of the elements from this group to compare to the crime scene bullets. Thus, each crime scene bullet is not being compared to each individual suspect's bullet. Chaining creates artificially large compositional groups, which increases the likelihood of "matching" a crime scene bullet to the suspect's bullets. As explained by Tobin, chaining is not a generally accepted practice in the scientific community:

> For example, only through imprecise analysis and the scientifically and forensically inappropriate practice of "data chaining" could Ms. Lundy claim, as she did through Government's Exhibit CH-6 ([T]T 10/6/00 [at] 19), that bullets Q1 and Q4 "match" for all analyses. One of the elements measured – silver – could only be citedc to prove a "match" between Bullet Q1 and Bullet Q4 pursuant to the most reliable of analyses if data chaining were used. Q2 provides the closest link that arguably (depending on how many digits to the right of the decimal place one carries out the evaluation) "chains" Q1 and Q4 together in the most reliable analyses (Q1-2 and Q4-2). Only with the forensically and statistically objectionable practice of "data chaining" could Q1 and Q4 be considered a match in the most reliable of analytical runs performed. "Data chaining" was confirmed objectionable by the NRC and discontinued by the FBI Laboratory immediately upon release of the NRC report in 2004.

Tobin, ¶ 19.

45. Furthermore, although the FBI generally measures six or seven elements, they have not shown that this number of elements is sufficient to establish that the same compositions come from a unique source. In addition, when an element is at or below the detection limit of that element in the ICP-OES apparatus, the reading is zero. The actual amount of that element is therefore unknown. This in effect results in reducing the number of elements available to be

11

compared in CBLA, and skews whatever limited accuracy existed in the practice.

    **iv. The Assumptions of Uniqueness of the Source, Homogeneity of the Source and that there Exists a Pattern to the Geographic Distribution for Retail Sale.**

46. CBLA assumes that determining the elemental composition of a bullet allows the bullet to be identified with a particular and unique source of lead. This assumption underlies the conclusion that if bullets are "analytically indistinguishable" they must have come from the same lead source and were therefore produced from the same melt and purchased at the same location. The major premise at the core of CBLA's major assumption is itself based on three subsidiary assumptions, none of which have ever been proven true, and which are highly unlikely to be true. The first assumption is that each lead source has a unique elemental composition that never repeats. The second assumption is that the elemental composition of each lead melt (which on average contain 50 tons of molten lead) is homogeneous throughout. The third assumption is that there is a discernable pattern regarding the geographic distribution for retail sale of the millions of individual bullets that are manufactured from one source of lead Tobin, ¶ 11.

    **a. The Assumption that Each Source is Unique.**

47. Ms. Lundy failed to identify any particular unique source for the examined bullets. A review of the literature reveals no data or studies to support the assumption that any such particular unique source of lead existed.

48. Indeed, the studies that have been done show the opposite. See, A METALLURGICAL REVIEW OF THE INTERPRETATION OF BULLET LEAD COMPOSITIONAL ANALYSIS" by authors Erik Randich, Wayne Duerfeldt, Wade McLendon, and William Tobin, published in Forensic Science International in 2002 (hereafter, "Randich"). In order to test the

premises behind CBLA,[4] the authors studied "molten source" composition data developed at two secondary lead refiners over approximately 18-month and two-year periods of time (1987-88 and 1998-2000).

49.    The *Randich* study establishes that the crucial assumption of uniqueness is invalid.  Their analysis of compositional data from secondary smelters showed instances of "repeats" – **compositionally indistinguishable lots of lead made at different times**.  Thus, their study shows that it is possible for bullets which are "analytically  indistinguishable" to have derived from different sources or lots of lead made at different times, and from different melts.[5]  Thus, the assumption of uniqueness that underlies the Government's comparative bullet lead analysis is not scientifically valid.

50.    The fact that "analytically indistinguishable" sources of lead occur even when the bullets came from different lead melts, done at different times, is also supported by the FBI's own studies.  In a 1991 FBI paper published for a Bureau conference,[6] the FBI found matching bullet compositions in boxes manufactured 7 months apart by one ammunition manufacturer (Federal) and matching bullet compositions in boxes manufactured 15 months apart by another manufacturer (Winchester).  In that study the FBI bought a total of only sixteen boxes of ammunition, and even in that small sample found compositional matches.  These studies showed

---

[4]In the article, CBLA is called "elemental analysis comparison" (EAC).

[5]The study shows that the  secondary lead refining industry aims to continually and consistently produce products of uniform composition within a relatively narrow range.  Thus,  it is quite logical to expect a reasonable number of compositional "repeats" in the bullet lead industry.

[6]E.R.Peele, Donald G. Havekost, Charles A. Peters, John P. Riley and R.C. Halberstam, "COMPARISON OF BULLETS USING THE ELEMENTAL COMPOSITION OF THE LEAD COMPONENT" in Proceedings of the International Symposium on the Forensic Aspects of Trace Evidence, FBI Academy, Quantico, VA, 1991.

**well before Petitioner's trial** that one of three bases for Lundy's conclusion was false. Thus, the Government had an obligation under the due process clause to advise the defense of this fact.

51. In 2002 Robert Koons and Diana Grant of the FBI at Quantico sampled wire from several different melts or "sources" cast the same day.[7] At bullet manufacturer "1," they sampled 12 total "sources" that day; six were for an alloy containing 1% antimony and six containing 2.5% antimony. The melts were cast in an alternating order, that is, one 1% melt was cast into billet molds, then a 2.5% melt was cast in the same billet molds, than another 1% melt was cast, etc.

52. Koons and Grant found that for the 1% antimony and 2.5% antimony alloys being cast that day into billets for extrusion at this manufacture, two out of the six "sources" or melts of each alloy were indistinguishable. It is, of course, impossible to determine when those "analytically indistinguishable" billets will be extruded into wire for bullets. In their article, Koons and Grant found two sets of paired indistinguishable groups. That means that 1/3 of their samples repeated in composition, when they came from different sources.

53. The FBI's attempts to establish the legitimacy of CBLA failed even when it went outside the FBI to seek validation. A team of Iowa State University statisticians, including Alicia L. Carriquiry, Associate Professor of Statistics, were funded by the FBI to examine the bullet collection data from the 1991 study as well as the collection of bullet data that the FBI has accumulated over their years of doing CBLA. The goal was to quantify the significance of finding a "match" among bullets. The ultimate conclusion was that no quantitative estimates of

---

[7]Robert D. Koons, Ph.D, and Diana M. Grant, Ph.D., "COMPOSITIONAL VARIATION IN BULLET LEAD MANUFACTURE", J. Forensic Sci. 47 (5) (2002).

the significance of a "match" could be made.[8]

54.     Thus, the studies done to date establish that there is no scientific validity to the assumption of uniqueness of the lead source  and a conclusion of a common origin from  a "match" in the elemental composition of  bullets is simply not supported by the data.  Tobin, ¶ 14.

### b.     The Assumption That Each Source Is Homogeneous.

55.     CBLA  as performed by Ms. Lundy and the FBI laboratory also assumed that the composition of each source of lead was homogeneous throughout.  Therefore, it was assumed that a bullet that comes from any part of a source of lead will contain the same elements in the same proportion as a bullet originating from another part of the source.  Tobin, ¶¶ 11-12.

56.     The  assumption of homogeneity requires that the entire source of lead have the same elemental composition throughout.  However, nothing in Lundy's testimony establishes that the lead source of the examined bullets was homogeneous.  Furthermore, a review of the literature again reveals no data or studies supporting that conclusion.  In fact, existing data show the opposite:  lead sources – often weighing in excess of 100,000 pounds – are **not** homogeneous.  Tobin ¶ 12.

57.     The *Randich* study revealed that the elemental composition of a single molten 50 ton lead source may be either homogeneous or heterogeneous. The study found that samples taken from different parts of a source of lead can be analytically distinguishable.  The study notes that as molten lead begins to solidify a metallurgical phenomenon known as segregation

---

[8]Alicia L. Carriquiry, Michael Daniels, Hal S. Stern, Department of Statistics, Iowa State University and Ames Laboratory, "STATISTICAL TREATMENT OF CLASS EVIDENCE: TRACE ELEMENT CONCENTRATIONS IN BULLET LEAD" (May 4, 2000).

can occur. This results in compositionally heterogeneous ingots or billets. Tobin ¶ 12.

58. Thus, the assumption of homogeneity on which CBLA is premised is scientifically invalid.

### c. The Failure to Consider the Problem of Geographical Bullet Distribution.

59. CBLA as practiced by the FBI and testified to by Lundy, also failed to analyze or consider the impact of geographical distribution of bullets on the conclusions rendered generally and by Ms. Lundy. The Government failed to provide any information regarding how many .38 caliber bullets have been shipped to the relevant area of Maryland during any relevant period of time, from where they were melted or manufactured. Each of these factors impacts on the validity – such as it was – of Lundy's testimony.

60. In this case, the Government has provided no information as to the distribution by Remington of .38 caliber bullets in the relevant area. Moreover, since the same lead smelters supply different ammunition manufacturers and the specifications of their lead alloys overlap in compositions, distribution information would have to be considered not just as to Remington ammunition but as to all ammunition manufacturers in order to determine the relevance or probative value of the examined bullets.

61. An average source size of lead from a smelter is 100,000 pounds. From that 50 ton source, millions of .38 caliber bullets are made. It is simply unknown how many bullets from the same source are distributed in the same geographical area. The number of bullets from the same source distributed in the geographical area is important to any evaluation of the significance of finding bullets which are analytically indistinguishable in that area. Given that repeats of elemental composition can be found in sources made at different times, the number of

bullets produced by sources with the same elemental composition and their geographical distribution would also have to be considered. Also unknown is the likelihood that random consumers would purchase .38 caliber bullets with this compositional analysis in Maryland in the months or years before the crime. However, studies conducted by Petitioner's CBLA expert, William A. Tobin, indicate that there is a very high probability of purchase of similar composition bullets by innocent purchasers in the same local area. In one study, "all innocent purchasers in a local area during the same period of time had no choice but to purchase similar composition bullets." Tobin, ¶ 15.

62. The Government's failure to provide such information and include it in the comparative lead bullet analysis renders such analysis meaningless.

**v.     Ms. Lundy's Theories Have Been Tested and Proven Invalid.**

63. There have been no scientific tests or studies to support Ms. Lundy's assumption that each source of lead has a unique elemental composition. Instead, the *Randich* study has demonstrated that the premise of uniqueness is false. A comprehensive review of the data from secondary refiners regarding the compositional qualities of molten sources of lead revealed instances of "repeats," or compositionally similar lots of lead. Studies by the FBI itself have confirmed the fact of repeats. The study of FBI data by the Iowa State statisticians has concluded that the finding of a "match" in elemental composition between bullets cannot support the conclusion that the bullets have the same origin.

64. Similarly, there have been no scientific tests or studies to support Ms. Lundy's assumption that every source of lead is homogeneous in composition. Instead, the *Randich* study based on reliable data obtained from secondary lead refiners regarding the elemental composition of molten sources of lead establishes that this premise is scientifically invalid.

17

Tobin, ¶¶ 12, 14.

65.     Because there exist no valid scientific data or empirical study by proponents of comparative bullet lead analysis to support their theories of homogeneity or uniqueness, and because other studies refute the validity of both premises, Ms. Lundy's testimony was non-scientific, was false and thus irreparably tainted Petitioner's trial proceedings.

### vi.     Ms. Lundy's and the FBI's Theory Has Not Been Subjected to Peer Review and Publication.

66.     Petitioner is not aware of any significant peer reviews of the principles and methodologies underlying Ms. Lundy's opinion or the FBI's theory that bullets which are "analytically indistinguishable" come from the same molten source of lead, other than by persons who are themselves advocates of the practice.

67.     It should be noted that FBI papers regarding CBLA are not published in peer reviewed journals, they are reviewed by other FBI personnel.  The whole purpose of peer review is to have other professional scientists, who have no vested interest in the technique or theory under review, either confirm or disprove another scientist's work.  The absence of any such meaningful peer review of CBLA is telling, and supports a finding that Mr. Lundy' opinions were flawed in this case.

### vii.     Ms. Lundy's Opinions Do Not Have an Acceptable  Rate of Error.

68.     In her testimony, Ms. Lundy did not identify the potential or actual error rate for her  opinions. This failure is itself a strong indication that the claim is not scientifically valid or reliable.

69.     The danger of unfair prejudice associated with the admission of such invalid scientific opinions is extreme.  This is especially true because this is a capital case.

70.     The *Randich* and FBI studies have demonstrated that Ms. Lundy could not reliably claim that bullets which are "analytically indistinguishable" come from the same molten source of lead at the manufacturer. While an error rate has not been quantified, it clearly exists. Given the fact that the Petitioner faces the death penalty, expert testimony with such an unknown error rate is constitutionally unacceptable.

### viii.     Ms. Lundy's Theory Is Not Generally Accepted Within the Relevant Scientific Community.

71.     The theory or technique by which Ms. Lundy reached her conclusion that bullets which are "analytically indistinguishable" come from the same source of lead does not have general acceptance in the relevant scientific community. It is important to keep in mind that, for the purpose of determining whether there is general consensus as to a validity of a particular scientific technique or theory, members of the relevant scientific field are not limited artificially to trained practitioners in the field in question. Even presuming near-unanimous acceptance and approval among Ms. Lundy's former colleagues at the FBI, the "relevant scientific field" encompasses the much broader category of those whose scientific background and training are sufficient to allow them to comprehend and understand the process and form a judgment about it. Accordingly, the relevant scientific community in this case is not limited to the universe of the FBI's bullet lead analysis specialists, but must also include others with sufficient training and experience in relevant technical or scientific fields, including forensic sciences, metallurgy, and statistics. When one looks to these specialists, one finds only skepticism regarding the reliability and validity of Ms. Lundy's opinions.

### ix.     Use of Standard Deviations.

72.     In addition to the flawed nature of the CBLA science, Ms. Lundy testified falsely

19

about her methodology used in the instant case. Prior to 1998, the FBI lab conducting CBLA was not accredited, and did not have a written standard protocol for the use of standard deviations in determining whether elemental composition "matched." Standard deviations are important in the practice of CBLA because they are the standard by which the expert would determine if two measurements were similar enough to one another to declare a "match" in composition. Tobin, ¶ 20. Before 1998, Ms. Lundy commonly used one standard deviation to determine if two measurements were similar enough to one another to declare a "match" in composition. Ms. Lundy conducted the analysis of bullets in this case in 1996, when there was no requirement for the use of a specified standard deviation. She used one standard deviation in much of Higgs' analysis, except where necessary to vary from the practice to declare a "match." In those instances she varied from the use of one standard deviation where there was a near "match" but not an actual "match." This practice alone calls into question the validity of her analysis. However, she falsely testified at Mr. Higgs' trial that she used two standard deviations in the analysis of this case, when in fact she did not. TT 10/6/00, 30.

**D.      Conclusion**

73.      The jury in this case was presented with opinions cloaked as scientific. They were not even close to reliable. The Government knew or should have known this, yet it remained mute as to the flaws inherent in the science. Trial counsel did almost nothing to explore these flaws. New scientific data, proving the incredibility of CBLA, is newly discovered evidence that was not available at the time of Petitioner's trial. Given that this evidence was not available at the time of trial, it is newly discovered and Petitioner is entitled to relief under the governing standards addressing claims of newly discovered evidence.

74.      Under whichever legal theory these facts are reviewed, the one clear fact remains:

the Government obtained Petitioner's conviction in large measure on the back of this junk science.[9] The Fifth and Sixth Amendments require that Petitioner's convictions and sentences be vacated.

**CLAIM II.** **PETITIONER'S TRIAL PROSECUTORS EXERCISED THEIR PEREMPTORY CHALLENGES IN A DISCRIMINATORY MANNER, ON THE BASIS OF GENDER IN VIOLATION OF PETITIONER'S RIGHTS UNDER THE FIFTH AND SIXTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

75.     The government prosecutors, Ms. Johnston and Ms. Wilkinson, exercised their peremptory challenges against Petitioner in a gender discriminatory manner to exclude all women from participation on the petit jury. The Government lacked legitimate gender-neutral justification for striking many of the prospective female jurors from the panel. Moreover, the Government's use of its peremptory challenges to strike female jurors in this case was part of, and entirely consistent with, a broader discriminatory policy and practice employed by Ms. Johnston and Ms. Wilkinson for other capital prosecutions since Petitioner's trial. Because of the discriminatory use of peremptory strikes in this case, Petitioner's petit jury consisted solely of men.

76.     The Equal Protection Clause of the United States Constitution forbids a prosecutor from striking potential jurors on account of their gender based on the assumption that such jurors will view the case in a particular way on the basis of their gender. The harm caused by a prosecutor's gender biased use of peremptory strikes is not limited to the denial of a fair trial to the defendant. The excluded juror also is harmed and the integrity of the judicial process is tainted. The exclusion of even a single juror from the petit jury on the basis of gender

_____

[9]See e.g. TT 10/10/00, 125-26 (prosecutor's closing argument showing link between the various ammunition in this case as established through CBLA).

21

violates the Equal Protection Clause of the Fifth Amendment and requires a new trial.

77. Petitioner's evidence showing gender discrimination falls into two categories that are relevant to his showing that the prosecutor discriminated in this case and over time. First, Petitioner will review the record facts of jury selection to show that the trial prosecutor engaged in discrimination. Second, he will discuss the evidence showing that Ms. Johnston and/or Ms. Wilkinson have engaged in a pattern of discrimination in capital juries.

78. This evidence will demonstrate that an Equal Protection violation occurred during Petitioner's trial, and that Petitioner is entitled to a new trial based upon these violations. At a minimum, Petitioner herein makes a *prima facie* showing of gender discrimination which entitles him to discovery and an evidentiary hearing.

A. **The Prosecutor's Strikes in Petitioner's Case.**

79. The record of Petitioner's voir dire shows that prosecutors Johnston and Wilkinson struck females at a highly disproportionate rate, consistent with their broader pattern. Because this jurisdiction uses "blind striking," Petitioner must have discovery on this matter. However, even without discovery, Petitioner is able to discern that the prosecutors used at least 15 of a possible 20 peremptory strikes. Out of the prosecutors' 15 strikes that can be identified, 11 were against women. This means that for those strikes that can currently be identified, 73.3% were used against women. Thus, in a situation where women made up only 36.5% of the pool for potential strikes, the prosecutors struck them at a grossly disproportionate rate.[10]

80. Put in other terms, if the prosecution had struck women at a rate roughly

---

[10]The jury of 12 was picked from a total of 44 prospective jurors who were deemed generally qualified for jury service in this case. Of the 44 prospective jurors, 28 (or 63.5%) were men and 16 (or 36.5%) were women.

equivalent to their representation on the jury panel, the prosecution would have used approximately six of their fifteen discernable strikes against women. Instead, they used nearly double this rate – eleven of fifteen – against women. Thus, the prosecution's rate of striking women is nearly double their representation on the qualified panel.[11]

81. This strike rate, which is grossly disproportionate to the representation of women on the venire, alone is strongly indicative of purposeful discrimination. Happenstance is unlikely to produce such a disparity, and consequently, statistical disparity such as this alone raises some debate as to whether the prosecution acted with a discriminatory purpose.

82. In this case, because this jurisdiction uses blind striking and all the government's strikes are not discernable without discovery, it is entirely possible that the government attorneys struck five more eligible female jurors, raising their female strike rate even further.

83. When the review of the prosecutors' peremptory jury strikes moves from the statistical realm to the actual exercise of those strikes in this case, the gender discriminatory purpose is apparent. Petitioner will next review the record facts regarding the use of those strikes to show that – on balance – the women struck by the prosecution were facially qualified and possessed characteristics that were either neutral or pro-prosecution.

84. **First Strike.** The Government's first identifiable strike was against juror number 6, Norman Kibby Nicholson, a white male. Mr. Nicholson works in Civil Service for the U.S. Government. This juror indicated that if there was any alternative to the death penalty, he would have difficulty voting for the death penalty and stated that he had a strong moral preference

[11]The defense in this case used their strikes roughly equivalent to the representation of males and females on the qualified jury panel. The defense used 9 of their 16 used peremptory strikes against males, or 56.25 percent. Men comprised 63.5 percent of the panel.

against the death penalty. The Government's vigorous motion to excuse this juror for cause was denied. TT 9/5/2000, 79-102.

85.     **Second Strike.** The Government's second identifiable strike was against juror number 14, Constance Eze, an African-American woman. Ms. Eze is a bus driver for Prince George's County public schools. This juror indicated varying answers on the death penalty. At one point she stated that the murder of three persons was the type of case where she would always vote to impose death. Then, Ms. Eze stated that she would always vote for life. After this second answer, the Government made a motion to excuse Ms. Eze for cause. This motion was denied when the defense and the court agreed that the juror meant that she would always impose at least a life sentence. The juror reiterated several times her ability to impose a death sentence and the fact that signing a death verdict in open court would not cause her any hesitation. TT 9/5/2000, 123-137.

86.     **Third Strike.** Juror 19 is a white female Emergency Room nurse who stated she believed in the sanctity of life, but was willing to set those beliefs aside and follow the judge's instructions. Ms. Sylvia Pulliam Lackey repeatedly stated that she could follow the judge's instructions and could impose the death penalty where necessary. TT 9/5/00, 157-170.

87.     **Fourth Strike.** Juror number 37 is another white female juror struck by the Government. This juror, Ms. Charlene Catherine Cherry, works for the Food and Drug Administration. She stated that she had no fixed opinion about the death penalty but could impose either life or death, depending on the circumstances of the case. TT 9/6/00, 77-83.

88.     **Fifth Strike.** The Government's fifth strike was yet another female juror, Mercedes M. Pellet, number 43. She has sons employed in law enforcement and a son that is a psychologist with troubled boys. She additionally is the chief financial officer and owner of a

24

company. She was undecided about her view on the death penalty, and confident she would make a decision based on facts, not emotions. She confirmed that she could vote for the death penalty or a life sentence, depending on the circumstances. TT 9/6/00, 137-143.

89. **Sixth Strike.** The sixth identifiable strike was against an African-American male, juror Charles Quint Keye, number 57. This juror indicated he was "iffy" on the death penalty, but was open-minded. He expressed that he **could** impose the death penalty, but might not. He initially stated that he might always vote to impose a life sentence for a premeditated, deliberate, unprovoked triple murder without considering other circumstances. He went on to clarify that he would always consider other circumstances, and would consider all mitigators and aggravators. A Government motion for further questioning of the juror on his eligibility was granted, but the juror merely stated further that he could vote for either life or death, depending on the circumstances. TT 9/6/00, 234-247.

90. **Seventh Strike.** The Government's seventh identifiable strike was used to strike juror number 64, Felicia Ann Peppins. Ms. Peppins is a Management Analyst with the U.S. EPA. She is an African-American woman with a nephew that had been convicted of manslaughter in Prince George's County. She did not believe that her nephew should have been convicted, though he received 10-20 years. However, she also stated that she had a cousin that was murdered, and she was able to view both sides of such cases. She did not believe these matters would make her biased. In fact, Ms. Peppins stated that she believed in some cases the death penalty **should** be applied. She affirmed that she could vote for either life or death, depending on the circumstances, and would always consider all the circumstances. TT 9/7/00, 15-25.

91. **Eighth Strike.** The Government's eighth strike was of another white female,

Karen Marie Warhurst. Ms. Warhurst has an older brother that is a Prince George's County Police officer. She stated that she might be willing to give more credence to the testimony of a police officer, but it would depend on the circumstances. Mr. Trainor revealed that he knows her brother well, as he defended him in a police brutality trial. However, he did not know this juror and this juror had not even realized that her brother had been charged with a crime. This juror stated that she was not opposed to the death penalty and could impose death after considering all circumstances of a case. TT 9/7/00, 45-59.

92. **Ninth Strike.** The Government's ninth strike was against a white male. Mr. Arthur Hugo Bennett was a management analyst with the U.S. Office of Government Ethics. He stated that he was undecided about whether he was for or against the death penalty. He was familiar with recent presidential campaign issues involving discussion of the death penalty in Texas. He stated that he could vote for the death penalty in an appropriate case after considering all circumstances. TT 9/8/00, 2-9.

93. **Tenth Strike.** The prosecution's tenth strike was against Sandra Michele Lee, an African-American female. Ms. Lee was a Station Manager for a mass transit station in Washington, D.C. She stated that at times she thinks the death penalty is warranted and at other times she thinks it is "just a little too harsh." However, she stated that she did not have strong feelings about the death penalty and might always vote for the death penalty for the murder of a child. She affirmed repeatedly that she could vote for the death penalty in an appropriate case. TT 9/8/00, 9-19.

94. **Eleventh Strike.** The Government's eleventh strike was of a white female named Jeannette R. Delawter. Ms. Delawter is a Program Specialist with NIH where she had worked for 32 years. She initially stated that she did not believe in the death penalty, but that

26

she could set aside her views and they would not interfere with her following the Court's instructions. She said the she could vote for a death sentence in an appropriate case, affirming that she would not always choose to impose a life sentence. TT 9/7/00, 159-176.

95. **Twelfth Strike**. The twelfth prosecution strike was of another white female Heidi M. Schrecengost. She is a Pension Analyst. She stated that she felt very strongly that she could vote for a death sentence where one were judged guilty beyond a reasonable doubt. While she would not vote for death in every case, she did state she might always vote death in some cases. She stated that there were no kinds of cases in which she would never vote for the death penalty. TT 9/7/00, 198-204.

96. **Thirteenth Strike**. The Government exercised its thirteenth peremptory challenge to strike an African-American female. Orletta J. Harley had a cousin charged with a drug offense, and her father had been charged with a crime in the past. Ms. Harley did not have any knowledge or involvement in either of those cases. Her husband was in the Marines and a cousin is a detective with the District of Columbia police. She stated that she believed that some people are deserving of the death penalty. She stated that she could impose the death penalty. TT 9/8/00, 38-49; 116-17; 125-32.

97. **Fourteenth Strike**. The Government used their fourteenth peremptory challenge to strike Ms. Terri Lynn Tubergen, a white female. Ms. Tubergen is a framer at Ben Franklin crafts store. Ms. Tubergen stated that she has always been "for the death penalty." She stated that she could follow the judge's instructions and impose a life or death sentence in an appropriate case. TT 9/18/00, 197-202.

98. **Fifteenth Strike**. The Government's fifteenth and final identifiable strike was against an African-American male, Don Vere Deabreu. He is an electrician with Montgomery

College. Mr. Deabreu had a planned nonrefundable vacation scheduled in October to Orlando. However, because he made these reservations after receiving his summons, he was not excused for hardship. This potential juror stated that he had no opinion either for or against the death penalty but could vote to impose the death sentence or a life sentence. He repeatedly stated that he might vote for the death penalty where the evidence was strong, but also indicated he could consider mitigating and aggravating circumstances. TT 9/18/00 223-31.

99.     Prosecutors Johnston and Wilkinson's exercise of peremptory challenges to exclude all female jurors from the petit jury in Petitioner's case establishes a violation of Equal Protection of law.

100.     Here, there is no question but that Petitioner has raised a *prima facie* case requiring the prosecutors to provide explanations for their strikes. Had trial counsel raised this constitutional claim at the time of jury selection, there would be a greater likelihood of receiving accurate responses. Trial counsel ineffectively failed to raise this claim. There was no conceivable tactic or strategy for failing to raise this claim and to permit an all male jury to sit in this case. Similarly, appellate counsel ineffectively failed to raise this claim on direct appeal.

**B.     The Trial Prosecutors' Strikes in Other Capital Murder Cases.**

101.     Upon information and belief, Ms. Johnston and Ms. Wilkinson have engaged in a pattern and practice of gender discriminatory peremptory strikes which has continued. In the recent capital prosecution of *U.S.A v. Lighty, et al*, PJM-03-00457 (D. Md.) tried by the same prosecutors, only 12 of the prosecution's possible 20 peremptory strikes are identifiable without discovery. This case was also subject to blind striking as exercised in this jurisdiction. Of the twelve identifiable strikes exercised by prosecutors Johnston and Wilkinson, 10 of those strikes were exercised against women. Thus, the prosecution used 83.33 percent of their identifiable

strikes against women. The final jury in the *Lighty* case was comprised of eleven men and only one woman. The fact that Ms. Johnston and Ms. Wilkinson have engaged in a similar practice of gender biased striking in at least one other case implies that this is fitting with a larger pattern and practice of striking women from capital juries. Petitioner requests discovery and a hearing on this practice.

**C.      Conclusion.**

102.      Petitioner was tried by a jury selected in violation of the Equal Protection clause. The evidence relating to the Government's gender discrimination in jury selection is significant and should have been explored by trial counsel. It merits exploration by this Court in the form of discovery and an evidentiary hearing.

**CLAIM III.      AS A RESULT OF INEFFECTIVE ASSISTANCE OF COUNSEL, COURT ERROR, THE GOVERNMENT'S SUPPRESSION OF EXCULPATORY EVIDENCE AND NEWLY DISCOVERED EVIDENCE (NOT AVAILABLE AT THE TIME OF PETITIONER'S TRIAL), PETITIONER WAS WRONGLY CONVICTED OF CAPITAL MURDER; PETITIONER IS INNOCENT OF CAPITAL MURDER AND SHOULD BE GRANTED A NEW TRIAL.**

103.      Willis Haynes shot and killed three young women. There is no allegation that Mr. Higgs fired the shots. There is no direct evidence that Mr. Higgs directed, desired, or intended the girls to be shot. The government insisted that "Mr. Higgs counseled, commanded, induced, procured, willfully caused or aided and abetted Willis Mark Haynes to kill the victims." TT 10/20/00, 92. Any evidence of Mr. Higgs' intent for the victims to die was very weak at the time of trial, and can now be shown to be even weaker. In fact, Mr. Higgs had no intent for the three victims to die. To the contrary, Mr. Higgs had no motive to kill the victims and no control over Mr. Haynes. Mr. Higgs is innocent of capital murder.

**A.      Trial Counsel Failed to Investigate or Present Evidence of Victor Gloria's Prior Inconsistent Statements.**

104. Codefendant and informant, Victor Gloria, was the centerpiece of the Government's proof that Petitioner orchestrated the killings. Gloria stated that Petitioner provided a gun to Haynes immediately before the shootings and he saw them talking as the car rolled toward the Wildlife Refuge. Gloria had previously stated that he had been asleep or passed out in the back of the vehicle during the relevant time period and thus had no information about Mr. Higgs' role. See FBI 302 interview of Gloria dated 10/6/98, included in Petitioner's Appendix. Gloria was not adequately cross examined on this initial statement.

105. However, Gloria told a number of witnesses that he had been asleep during the time he testified that Petitioner handed a gun to Haynes. These statements would have been admissible to impeach Gloria's testimony, yet trial counsel failed to present the jury with this critical information.

106. Trial counsel's investigator, Sharon F. Weidenfeld, interviewed Katrina Havenner and produced a report dated 9/27/00. Ms. Havenner and Mr. Gloria have a child together and were on good terms, though no longer romantically involved. Gloria told Ms. Havenner that he had been drunk and unconscious when the three women were killed, and had only been awakened by the sound of the gunshots. According to this statement, Gloria could not have seen Petitioner handing a gun to Haynes. Trial counsel was ineffective for failing to subpoena Ms. Havenner to testify and present Gloria's prior inconsistent statement to the jury.

107. In addition, Keon Dacosta has provided counsel with a declaration indicating that Gloria admitted to him that he was asleep and did not see any of the things he testified about that occurred in the vehicle. A copy of Dacosta's Declaration is contained in Petitioner's Appendix. Counsel failed to interview him with regard to Gloria's admissions. Yet, counsel should have

30

interviewed him, because he was a witness (noted in police paperwork) to the alleged incident in which Petitioner held a gun to the head of Ednisia Darby. Had trial counsel interviewed Mr. Dacosta, they would have learned that Gloria also gave this prior inconsistent statement to Mr. Dacosta, indicating that he was asleep during the car ride and the homicides. Trial counsel was ineffective for failing to interview Mr. Dacosta and elicit this information.

B. Newly Discovered Evidence Exists Which Corroborates Gloria's Prior Statements That He Was Sleeping During the Murders and Testified Falsely at Petitioner's Trial.

108. Newly discovered evidence exists that corroborates Victor Gloria's statements to Havenner and Dacosta that he was sleeping in the van. Gloria's own statements to Robert Durand, an investigator working for undersigned counsel, confirm that Gloria was asleep and **did not see** Petitioner hand any gun to Haynes prior to the murders.

109. This evidence is newly discovered evidence that was not available at the time of Petitioner's trial, but seriously undermines any confidence in the verdict against Petitioner.

C. The Government Suppressed Information Related to Consideration Given to Gloria in Exchange for His Testimony.

110. Victor Gloria has a significant criminal history. His criminal history, including a number of pending charges, was properly revealed to the jury. Also revealed was the fact that Gloria was facing a maximum of 15 years for accessory after the fact in this case, and that he had pled guilty. The jury was also advised that he faced up to 30 years incarceration on other federal drug charges before this Court; and up to 10 years on State drug charges. See, U.S. v. Gloria, PJM-98-482 (Md.D.) 98-CR; U.S. v. Gloria, PJM-98-0435 (Md. D.); and Maryland v. Gloria, CT981978X (Prince George's County Circuit Court, MD).

111. The only agreement with any prosecutor that was revealed to the jury in this case,

31

was that the Government agreed with Gloria that it would seek a lighter sentence for his involvement as an accessory after the fact in exchange for his satisfactory cooperation. In fact, only weeks after Petitioner's trial was completed Gloria was sentenced to only 7 years of time for accessory after the fact, with a recommendation that he be place in a bootcamp facility. This favorable treatment was primarily due to the Government's oral motion at sentencing that he receive a downward departure of two offense levels. Sentencing transcript in U.S. v. Gloria, PJM-98-482 (Md.D.), dated 11/22/00, 3.

112. However, the charges against Gloria in both other pending drug cases were also resolved in a highly favorably manner – a manner which was not disclosed to the jury. Though Gloria was facing up to 30 years in prison on these charges, Prosecutor Johnston dismissed the federal drug charges against Gloria on December 7, 2000. U.S. V. Gloria, PJM-98-0435 (Md.D.) Due to the extraordinarily favorable outcome of this case, it is apparent that this was additional consideration given to Mr. Gloria, that was not revealed at the time of Petitioner's trial.

113. In addition, Gloria received another extraordinarily favorable outcome in the state drug charges pending. In that case, Gloria was facing up to ten years in prison, due to a prior drug conviction. However, Gloria - unrepresented by counsel - was allowed to enter an Alford plea and given one year to serve on conspiracy to distribute cocaine, concurrent with the time he was already serving in federal prison. Maryland v. Gloria, CT981978X (Prince George's County Circuit Court, MD). The remaining charges were nolle prossed. Id.

114. The favorable disposition of the two other charges strongly suggests that there was undisclosed consideration offered to Gloria in exchange for his testimony, in violation of the due process clause.

32

115. Through a combination of prosecutorial misconduct and/or ineffective assistance of trial counsel, the jury also did not learn that Gloria also had open charges, and an open bench warrant, in Virginia. GC93-001182-01 (Smyth County General District Court, Virginia). Gloria was, and is to this day, a "fugitive" from Smyth County, Virginia. Id. It is particularly revealing that, although Gloria had numerous arrests and was facing numerous charges, and was in significant ongoing contact with law enforcement officers, a detainer was never placed on him and Virginia authorities were never notified that Mr. Gloria was in their custody. This is additional undisclosed consideration that was not revealed by the Government and which trial counsel failed to discover or elicit.

116. Finally, Gloria was a suspect, but never charged, in an unrelated homicide in Baltimore, Maryland. He was never charged with this homicide in an effort to preserve his status as a testifying witness in this federal capital triple homicide case. Thus, he received further consideration in the form of charges that were never brought against him. The Government's failure to disclose this consideration also violated due process, and counsels' failure to discover it on their own was ineffective.

**D.** **Trial Counsel Was Ineffective for Failing to Elicit from Victor Gloria His Possession and Use of Weapons, Including .38 Caliber Guns.**

115. Trial counsel ineffectively failed to cross examine Victor Gloria with his own possession and use of firearms. Gloria was familiar with .38 caliber weapons, and used and fired them in the past. As a participant in the murders, who certainly distanced himself from the use or possession of the murder weapon, this would have been impeaching evidence that Gloria himself may have had a bigger role in the murders than the one he admitted. Trial counsel had access to this information, and was ineffective in failing to present it to the jury.

33

116. Gloria testified at Willis Haynes' trial, which took place five months prior to Petitioner's. At Haynes' trial, Gloria testified that he had some familiarity with guns. U.S.A. v. Willis Mark Haynes, PJM-98-0520 (D. Md.), TT 5/10/00, 789. Gloria admitted that he himself had previously fired .38 caliber revolvers. Id. at 790.

117. Trial counsel had access to the transcript of Victor Gloria's testimony at the Haynes trial. However, trial counsel failed to elicit this information from Gloria during Petitioner's trial.

118. Trial counsel did elicit the fact that Gloria had a number of prior charges in his lengthy criminal record. However, trial counsel failed to cross examine Mr. Gloria on the fact that at least two of those charges involved possession of a handgun – at least one of which was a .38 caliber weapon. Mr. Gloria himself had access to and possession of guns like that used in these homicides. This impeaching evidence calls into further question Gloria's veracity in placing the possession and ownership of the .38 caliber murder weapon squarely in Petitioner's hands.

119. Trial counsel failed in this regard because they never independently sought Gloria's criminal conviction records. Trial counsel relied on Gloria's criminal history **as supplied by the Government**. Had trial counsel merely used the information provided by the Government to request the court files on Gloria's prior charges – as undersigned counsel have – they would have discovered the gun evidence.

120. The court file on Victor Gloria's Howard County drug charges reveals that Gloria's apartment was searched on February 11, 1995. Drugs and drug paraphernalia were seized and Gloria was ultimately charged with possession with intent to distribute, possession of cocaine, possession of marijuana, and two counts of possession of drug paraphernalia. The court

34

records additionally reveal that a "black handgun" was found during the search of the apartment, though Gloria was not charged with its possession. See, Maryland v. Victor Gloria, CR V31034 (Howard County, Md.).

121. Gloria was also charged in July 1994 with possession of a handgun in a vehicle on a public road or lot. These charges were ultimately nolle prossed in 1995, but the fact that Gloria possessed this gun would have been a permitted line of questioning. See, Maryland v. Victor Gloria, CR 62895 (Anne Arundel County, Md.) After receiving information that these charges to possession of a handgun existed, the natural next step would have been for trial counsel to request the police records on these charges, which undersigned counsel has done. The police report on this case shows not that Gloria was arrested for driving a vehicle without license plates, in which there was found a loaded blue steel .380 caliber semi-auto handgun, which was loaded. Anne Arundel County Police Department narrative report for case no 94-721801 dated 6/13/94, contained in Petitioner's Appendix.

122. Trial counsel could have indisputably placed firearms, including a .38 caliber loaded weapon, in Gloria's hands. Trial counsel failed to investigate or pursue this information, despite that Gloria's experience with firing .38 caliber weapons was brought out in Haynes' trial. Yet, in a case where evidence that Petitioner intended the killings and supplied the murder weapon was almost solely dependent on Gloria's testimony, the failure to investigate and present this evidence was egregious. After all, if Petitioner's possession of a .38 revolver was probative for the Government, then Gloria's possession of a .38 weapon was equally probative.

**E.      Trial Counsel Ineffectively Failed to Present the Jury with Evidence of Haynes Motive to Kill, Which was at Significant Odds with the Government's Theory of Motive.**

123. The Government's trial theory was that the three women were killed as a result of

35

an argument one of them had with Petitioner. Petitioner, so the Government proposed, then became alarmed because he happened to see one of the victims writing down his tag numbers, and feared that she would retaliate against him. As motives go for killing three human beings, this one was rather concrete, simplistic, and frankly, did not make a lot of sense.

124. Trial counsel ineffectively failed to investigate and present significant evidence that Haynes had a real motive to kill. The failure to conduct investigation is always egregious, but in this case, it was particularly so, as the Government had conducted most of the investigation that would have benefitted the defense, and the alternative motive evidence was largely available to counsel, but untapped.

125. Mishann Chinn, one of the three victims, was reported to have stolen money from "Black" a notorious drug dealer just weeks before her death. 000019-20 USPP report of 1/27/96 interview of Nikkia Skyria Jackson.[12] In addition, Black had threatened to kill Ms. Chinn with a gun several days after this threat, but Ms. Jackson's mother interceded and Black left the area. Id. Black's real name is Benny Cephus. 000029 USPP report of of 1/28/96 call from Sheena Chinn. Even Ms. Chinn's own parents confirmed that Mishann had been dating Black for several months prior to her death. 000052 USPP report of 1/29/96 conversation with Ms. Chinn's parents.

126. Ms. Jackson, another of the victims, was dating Chico, an associate of Black's. The four of them frequented hotel rooms together and were reportedly involved in numerous nefarious activities, including running drugs, selling drugs, prostitution, and check scams. In addition to Ms. Chinn having stolen money from Black, Ms. Jackson was blamed by Chico for

---

[12]"USPP" is an abbreviation for the United States Park Police.

his arrest in a hotel room when she let him in. 000025 USPP report of 1/27/96 interview of Derwana Mikiya Black.

127. A confidential informant, who had never provided false information in six years, additionally stated that Chico and Black killed the women in retaliation for Mishann's having stolen money from Black while he was passed out. 000107 USPP report of information related 2/2/96 by a confidential informant. Numerous other reports corroborate that Ms. Chinn and Ms. Jackson were dating Chico and Black, and had recently had a dispute with them at a hotel in Silver Spring, Maryland. 000071 USPP report of 1/30/96 interview of Patricia Boswell; 000079 USPP report of 1/31/96 call from Kim Garey; 000095 USPP report of 1/31/96 investigative activity including registration records from Days Inn in Silver Spring, Maryland; 000151 partially redacted USPP report of 2/7/96 interview of unnamed source.

128. Yet another confidential source confirmed Ms. Chinn's theft, and stated that the "...girls were killed because one of them ripped off a drug dealer of $60,000 in drugs." This source stated that Tanji Jackson stole the money and the "fat girl" was a drug carrier. 000074-75 USPP report of activities.

129. A third confidential source stated that women were drug couriers and were killed because one had stolen $60,000 worth of drugs from a dealer who then threatened to kill her. 000265 USPP report, 2/27/96, of 2/23/96 contact with a CI. Ms. Tamika Black, also was used to transport narcotics to New York City by an drug dealer known as Black. Tamika had confided in her friend that she owed a large amount of money to the drug trade and Black had stated he was going to kill her. 000049 USPP report of 1/29/96 call from Jermaine Shaw.

130. Thus, a motive existed — all three of the women were linked to money owed to drug dealers — for the killing of these women that had nothing at all to do with the alleged

37

argument with Petitioner. Indeed, these other motives were far more powerful than the one proposed by the Government and made a lot more sense.

131. However, there is more. Additional Park Police reports link **Willis Haynes, the actual killer of the three victims, to this same drug rip-off motive**. These sources state that **Haynes killed the victims over money**. 000461-462 USPP report of 5/29/96 interview with Sheree Marjorie Blake. This information was from Robert Henderson, Willis Haynes' brother. Both Ms. Sheree Blake and Ms. Patrice Birdine were present when Robert Henderson made these statements. Id. Ms. Blake and Ms. Birdine were interviewed separately and each confirmed that Henderson told them that Haynes had killed the three women over a theft of some money. 000459 USPP report of 5/29/96.

132. But, there is still more that ties Haynes to a motive that was quite different than the Government's "argument" motive. Haynes was reported to have been the "muscle" for a drug operation. 000557 report. **Haynes was the "muscle" for Black and Chico, to whom the victims owed a great debt.** Haynes carried out the murders of the three victims on his own account, and because of money stolen from himself, Black and Chico.

133. Despite the availability of this theory, as it was handed to counsel in discovery documents, trial counsel failed to investigate or pursue this theory. Instead, trial counsel had no theory of the crime, other than to generally dispute that Petitioner directed the killings. Yet, in a case in which there evidence that Petitioner ordered the killings was based almost entirely on the testimony of Victor Gloria – who as indicated above testified for significant consideration and told others that he was asleep during the relevant portions of the events – counsels' failure to exploit the available and far more plausible motive was ineffective.

134. At a minimum, trial counsel should have interviewed and assessed the credibility

38

of these witnesses. To failure to even investigate cannot be excused as a tactical decision.

Patrice Birdine, who apparently testified before the grand jury, but was not called to testify at Petitioner's trial, was not interviewed by trial counsel or an investigator for trial counsel. Declaration of Patrice Birdine, ¶ 6, included in Petitioner's Appendix. If she had been contacted she would have testified that Robert Henderson, Willis Haynes' brother, stated to her that Haynes had shot the women over money that was stolen by them, which they kept in a safe. Birdine, ¶ 4.

135. The failure to pursue the fact that Haynes had a far more plausible motive to kill obviously prejudiced Petitioner. This evidence is exonerating of Petitioner, as he had no intent or motive to kill the victims.

136. In assessing counsels' ineffectiveness in this regard, Petitioner has utilized only the documents provided to trial counsel by the Government, and the leads that flow from them. Further discovery is required, and Petitioner will move for it in the very near future. Without such discovery, Petitioner cannot now be certain that he has uncovered the full extent of the alternative motive for the killings.

**F. Trial Counsel Failed to Investigate an Alleged, but Untrue, Incident in Which Ms. Darby Testified That Petitioner Threatened Her with a Gun; Proper Investigation Would Have Revealed this Testimony to Be Unreliable. The Government Suppressed Evidence That Ms. Darby Was Untruthful.**

137. Enidsia Darby was called as a witness to testify for the Government during the guilt phase of Petitioner's trial. Ms. Darby testified that she dated Petitioner and lived with him, eventually giving birth to his child. TT 9/29/00, 117. She described an incident in which she discovered that Petitioner was dating another woman and she and Petitioner had an argument and fight. TT 9/29/00, 133-34. At trial, Ms. Darby stated that Petitioner "stuck a gun up to my

head," and stated that he would kill her. TT 9/29/00,134-35. Ms. Darby additionally testified that Petitioner threatened to kill Ms. Andrea Waters if Ms. Waters were to call the police about an alleged check fraud scheme. TT 9/29/00, 157. Both of these points were obviously very damaging and it was incumbent upon defense counsel to investigate them. They did not.

138. On cross-examination, Ms. Darby did agree that in the first incident, there was some mutual fighting involved. TT 9/29/00, 175. Trial counsel's cross examination even pointed out that the police, who were called in response to this incident, were unable to find a gun. TT 9/29/00, 178. However, trial counsel failed to make known to the jury other critical facts about the police involvement in this incident. The police statement from this incident indicates that the parties, Ms. Darby and Mr. Higgs, were "mutual combatants." According to the police report, made contemporaneously with the alleged event on September 13, 1995, there were no threats made to Ms. Darby and no allegation that Mr. Higgs held a gun to her head. See, Prince George's County Incident Report, 9/13/95, included as part of Petitioner's Appendix.

139. The police report also indicates that Ms. Darby told the police at that time that Petitioner "was in possession of a handgun" but does not indicate any threats or threatening behavior with the gun. Id. The obvious, but missing, cross examination of Ms. Darby would have been that the police report made at the time of the incident fails to indicate that Ms. Darby claimed the alleged violence at that time. This would have constituted powerful impeachment of her trial testimony – impeachment that did not occur because counsel did not have the statement.

140. Trial counsel did not make any attempts to interview Ms. Darby prior to her testimony against Petitioner. This failure was egregious. Undersigned counsel's representative has since interviewed Ms. Darby and confronted her with just this information - that she failed to allege that Petitioner had threatened her at the time of the September 13, 1995 dispute. In

40

Petitioner did not threaten Ms. Darby or hold a gun to her head. Declaration of Dacosta, ¶ 5. He also could have testified that Ms. Darby **did not** report to the police at the time that Mr. Higgs had threatened her with a gun. Id. Instead, Mr. Dacosta states that Ms. Darby attacked Mr. Higgs and he "put his hands up to protect his face, but he didn't hit back or grab her."[14] Id. ¶ 4. Because trial counsel failed to explore this allegation, they were unable to present the jury with this critical information.

143. Finally, Ms. Darby's close friend Shanta Doby was not interviewed by trial counsel. Had Ms. Doby been interviewed, she would have confirmed that Darby told her all about the incident with Higgs, but never stated that Petitioner pulled a gun on her, threatened her or hurt her in any way. Declaration of Shanta Doby, ¶ 7, included in Petitioner's Appendix. Ms. Doby was certain that she and Ms. Darby were so close that Ms. Darby would have told her about this incident if it had happened. Id. The failure to interview Ms. Doby and present this, yet another prior inconsistent statement about this incident, was ineffective assistance of counsel.

144. Ms. Doby also states that she was interviewed by the U.S. Park Police, and told them what Ms. Darby did and did not say to her about the incident with Mr. Higgs. Id. The government has never revealed to the defense that fact that Ms. Darby told Ms. Doby about this incident, but failed to allege to her close friend that she had been threatened by Petitioner. This

---

[14]If trial counsel had interviewed Mr. Dacosta, they would have uncovered additional information helpful to Petitioner's case in both the guilt and penalty phases. In fact, the government's most critical witness, Victor Gloria, admitted to Mr. Dacosta that his statements against Petitioner were untrue and he was asleep or passed out during the entire incident. Mr. Gloria admitted to Dacosta that he did not see Higgs pass any gun to Haynes, as he testified during Petitioner's trial. Dacosta, ¶7.

Mr. Dacosta additionally could have testified to Haynes's violent nature. He states that Willis wasn't afraid of anyone, including Mr. Higgs. ¶ 8.

prior inconsistent statement by Ms. Darby to Ms. Doby is important impeachment evidence suppressed by the Government. Petitioner should be given access to this information immediately. See Claim XXI below, addressing Government's failure to comply with their Brady obligations with regard to law enforcement statements.

### G. The Government Suppressed Evidence of Consideration Given to Richard Diolamou and Wondwossen Kabtamu, Both Witnesses for the Prosecution Given Favorable Treatment in Immigration Proceedings.

145. The government provided assistance to Richard Diolamou and/or Wondwossen Kabtamu in exchange for their testimony. Both of these witnesses received assistance with immigration matters in exchange for their providing testimony against Petitioner. Petitioner believes that Diolamou was actively in deportation proceedings at the time he testified against Petitioner at trial. However, both Mr. Kabtamu and Mr. Diolamou remain in this country legally.

### H. Trial Counsel Failed to Obtain Records Proving That Domenick Williams Testified Falsely, since He Was Not on the Cell Block with Petitioner at All the Relevant Times.

146. Domenick Williams is a jailhouse informant called to testify about incriminating statements that Petitioner allegedly made to him while in jail. TT 10/4/00, 21-114. Mr. Williams's statements cannot be completely true because Petitioner was not even housed in the same area as Mr. Williams during a portion of the time he allegedly made these incriminating remarks. Trial counsel was ineffective for failing to subpoena District of Columbia jail records to prove this point. The government suppressed this information. Petitioner must now have discovery and a hearing by which to prove that Mr. Williams was not on the cell block with Petitioner at all relevant times.

CLAIM IV.    TRIAL COUNSEL INEFFECTIVELY FAILED TO CHALLENGE THE ADMISSIBILITY

**OF BALLISTICS TESTIMONY THAT WAS OF NO PROBATIVE VALUE AND WHICH FAILED TO PROVE ANY CONNECTION BETWEEN PETITIONER AND THE CRIMES CHARGED.**

147. Much like the CBLA testimony, the ballistics testimony in this case was used to try and prove a link between Petitioner, the .38 caliber gun (which was never recovered) and the ammunition used to kill the victims. In order to make this critical, yet elusive connection, the Government presented ballistics evidence showing that the bullets fired at the murder scene by Willis Haynes, the bullet retrieved from the Chaconia shooting, and the bullet recovered from the Cherry Lane shooting had some common features. All of this ammunition was sent to the FBI Laboratory in Washington, D.C. for CBLA analysis.

148. FBI ballistics examiner Carlo Rosati testified that he conducted a comparison of the fired bullets submitted in this case and came to "no conclusion," indicating that there were not sufficient microscopic markings to draw a conclusion that these bullets were fired from the same weapon. TT 10/5/00, 169. Despite the fact that Mr. Rosati's results were inconclusive, the prosecution pressed further. Mr. Rosati testified that the bullets examined all have the impression of five lands and grooves with a right twist, and thus were "consistent with the same class of weapon." Id. at 172.

149. On cross examination, Mr. Rosati stated that he did not know how many .38 caliber firearms there are with these specific rifling characteristics, of five lands and grooves with a right twist, but conceded that it could be more than 1.5 million weapons. Id. at 175. Despite its lack of probative value, defense counsel did not challenge the admissibility of this evidence and did not hire an expert to evaluate the ballistics evidence in this case.

150. In addition, trial counsel did not cross examine Mr. Rosati with the fact that at least two different calibers of weapons (.38 Special and .357 Magnum) and eleven different

44

manufacturers of revolvers, would produce the same class characteristics found on the bullets. This failure occurred even though this information was found in the FBI ballistics report generated by Mr. Rosati and the Prince George's County laboratory report. In addition, these reports indicate that Smith & Wesson produced nineteen different models in two calibers that could have created these impressions. Mr. Rosati was not cross examined with this information.

151. This evidence was particularly damaging to Petitioner. It was stressed in closing arguments by the Government. TT 10/20/00, 127, 191. Despite that FBI examiner Rosati specifically stated that no conclusion could be drawn as to whether these bullets were fired from the same weapon, prosecutor Wilkinson specifically stated that based on this evidence the jury should draw the conclusion that the same gun was used in all three incidents. Id. at 127. Prosecutor Johnston again stressed this evidence to the jury, stating that "everything they are capable to looking at says that these weapons [sic], these bullets were fired from the same weapon." Id. at 191. The Court of Appeals also cited this unreliable evidence when it affirmed Petitioner's conviction in this case, without understanding the lack of probative value the lands and grooves testimony was able to offer. Higgs 1, at 293.

152. Undersigned counsel has since retained an expert, William E. Conrad, to consider the relative probative value of the fact that these bullets all were judged to have five lands and grooves with a right twist as general rifling characteristics. Letter report of William E. Conrad. Mr. Conrad has determined that of the nineteen models of weapons in two calibers that Smith & Wesson has manufactured that could have created these markings, there are over **two million** such weapons produced in the past twenty years alone. Id. This accounts only for the weapons produced in the past twenty years, though many weapons manufactured by Smith & Wesson prior to World War II could also create these impressions and are still in circulation and are

45

functional. Id. This also accounts for only one of the eleven manufacturers that create weapons that could have made these markings. Id.

153.    Thus, Mr. Rosati's testimony that there are likely more than 1.5 million weapons that could have made these markings is a gross understatement that is misleading and inaccurate. To the contrary, Smith & Wesson has singly manufactured more than this number of weapons in the past twenty years alone.

154.    Mr. Conrad's letter, and the testimony he could have provided at trial, put the lie to the Government's ballistics evidence and the inferences it wished the jury to draw:

> Based upon the above information one cannot reasonably infer that these submitted bullets were in fact fired from the same barrel. The fact that the class characteristics (5 land and grooves right twist) are one of the most common sets of class characteristics within the 38 caliber class would make this dangerous at best. . . Anyone who implies or infers more than what has been previously stated has left the area of science and entered into mere speculation.

Letter Report of William E. Conrad. The government's closing argument was then "mere speculation" not based on any science or evidence before the jury. Trial counsel was ineffective for failing to object to this argument, and for failing to put this alternative explanation of the lack of probative value before the jury.

155.    Had defense counsel obtained the services of a forensic ballistics expert, that expert could have provided testimony such as that given now by Mr. Conrad. Thus, defense counsel could have moved to preclude the testimony of FBI examiner Rosati for its lack of probative value, and prevented the government from implying that these bullets were fired from the same weapon. There is simply no evidence to support this claim. Defense counsel was ineffective for failing to hire a defense expert, for failing to object to the admissibility to Rosati's testimony, and for failing to object to the government's closing arguments.

159.    The Court's instruction to the jury that the content of the newspaper article "was not offered for the truth of anything stated in the article," (TT 10/10/00, 38), in no way mitigates the Sixth Amendment violation in this case.  Such Sixth Amendment violations cannot by their nature be remedied by a mere instruction.  Though the Court gave a limiting instruction concerning the *Washington Post* article, the effect is the same as if there had been no instruction at all.

160.    For a number of reasons, the admission of evidence of Mr. Haynes' confession was particularly prejudicial.  First, the United States attached great significance to the *Washington Post* article and relied on it extensively throughout the trial, including during its opening and closing arguments.  See TT 9/26/00, 51; TT 10/10/00, 136, 199.  The United States went so far as to argue during its closing argument in the guilt phase:  "Again, I refer you back to Transcript Number 1b, the conversation with Melvin Grayson, where he is read the newspaper article, learning about his co-defendant's conviction and **clear statements incriminating Mr. Higgs . . .** " TT 10/10/00, 136.  Indeed, due to the powerfully incriminating nature of the co-defendant's statement against Petitioner, Petitioner's counsel was forced to discuss this evidence and the Government's closing argument regarding it.  In counsel's opening statement, he admonished the jury to "consider the complete conversation," TT 9/26/00, 72.[15]  The prosecution's repeated references to the article during the most critical parts of Petitioner's trial demonstrate that the United States considered it to be one of its most important pieces of evidence.

---

[15]In admonishing the jury to "consider the complete conversation," Petitioner's counsel was clearly adverting to the Fifth Amendment admission-by-silence issue, and was, equally clearly, oblivious to the serious Confrontation Clause violation.

161.    Second, jurors generally place special emphasis on confessions. Jurors rely on confessions inordinately and place particular stock in what is said. For that reason, the introduction of a confession, and especially the confession of a non-testifying co-defendant, should be undertaken only with particular care.

162.    Third, the article's substantive content is particularly prejudicial. In the article, co-defendant Haynes accuses Petitioner of "trigger[ing] . . . the slayings." Given that Petitioner's role, if any, was the central issue throughout the guilt and penalty phases of trial, the prejudicial effect of this evidence, which accused Petitioner of instigating the murders, cannot be overstated. Mr. Haynes' statement lent critical weight to the Government's theory that Petitioner instigated and commanded Haynes to commit the killings.

163.    At the time of Petitioner's trial in 2000, clearly established law barred the admission of a co-defendant's out-of-court statement, especially where, as here, the co-defendant's statement shifted or spread the blame. Because co-defendant Haynes' confession clearly inculpated Petitioner, trial counsel had no reasonable or strategic basis for failing to object to the admission of the tape-recorded conversation on Sixth Amendment grounds. This is particularly so given that counsel tried hard to keep the article out of evidence on Fifth Amendment grounds.

164.    Counsel's failure to litigate these claims fully and appropriately at trial and on appeal constitutes deficient performance.[16] The deficiency in counsel's performance is

---

[16]Petitioner's appellate counsel made a fleeting reference to this claim on direct appeal, devoting to it a mere seven lines of their 189-page opening brief. The claim was also discussed in somewhat greater detail in Petitioner's reply brief. These passing mentions were insufficient to invoke appellate review, however. Appellate counsel's failure to frame or develop the Confrontation Clause challenge in Petitioner's opening brief precluded appellate review.

(continued...)

especially grave since, as noted above, counsel considered this evidence closely and discussed the *Washington Post* article at great length, but neither perceived nor identified the clear constitutional basis for objection — the Confrontation Clause of the Sixth Amendment. TT 10/10/00, 8-25.

165.    Counsel's deficient performance undermines confidence in the outcome of both the guilt and penalty phases of trial. Had trial counsel raised the appropriate objection, there is a reasonable probability that, pursuant to clearly established law of the Supreme Court, the *Washington Post* article would not have been admitted into evidence or the offending portion would have been redacted. Had that happened, there is a reasonable probability that the result of the guilt phase would have been different. With respect to the sentencing phase, had the article been excluded or redacted so as to remove the offending Sixth Amendment error, one or more jurors likely would have concluded that Petitioner's relative role in the killings was such that he did not deserve death. After so finding, one or more jurors likely would have voted against Petitioner's death sentence. In addition, had appellate counsel adequately presented these issues on direct appeal, there is a reasonable probability that Petitioner's guilt and/or death sentence would have been vacated. Trial and appellate counsel were ineffective, in violation of the Sixth Amendment.

**CLAIM VI.    PETITIONER WAS DENIED EFFECTIVE COUNSEL DURING CAPITAL SENTENCING IN VIOLATION OF THE SIXTH AND EIGHTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

---

[16](...continued)
Moreover, the discussion of the already-waived claim in Petitioner's reply brief was of no moment. Because Petitioner's Confrontation Clause claim was not properly before the Court of Appeals, the Fourth Circuit's determination that "[w]e find no error in the district court's decision to admit the recorded telephone conversation between Higgs and Grayson," Higgs 1, at 310, in no way addresses or resolves Petitioner's instant Sixth Amendment challenge.

## A. Introduction and Statement of the Claim.

166.    During her penalty phase closing argument, prosecutor Wilkinson challenged the lack of mitigating evidence in Petitioner's penalty phase presentation:

> Then he [defense counsel] stood before you just a couple of weeks ago . . . and he said to you we have been working to gain insight into Mr. Higgs. We are going to present that insight to you. **Where, ladies and gentlemen is the insight?** Were in the world is there any evidence that they have presented to you that says this man deserves a lesser sentence? What is it they have told you about this man that says he should be treated less harshly than where these aggravators put him? Where is it? That his mother died when he was ten, his caring loving mother, that his Aunt Connie is a caring, loving woman so that justifies what he did here? . . . He should be punished more harshly because this young man had people who loved him. He was raised by individuals who loved and cared and took care of him. He wasn't deprived as a child. He wasn't subject to child abuse. . . If anything, that fact of his background justifies more the reason for the ultimate penalty in this case.

TT 10/25/00, 76-77. Although prosecutor Wilkinson engaged in some oratorical flare – there was after all some mitigating evidence presented – her essential points were correct. The Eighth Amendment requires capital counsel to provide in the penalty phase "insight" into why their client killed, and these attorneys failed to do so. Regrettably, Prosecutor Wilkinson's critique of defense counsel was right on the money. Defense counsels' penalty phase presentation stopped far short of presenting the insight required by the Eighth Amendment.

167.    Indeed, overall, the penalty phase did Petitioner far more harm than good. But, this did not have to be. A compelling case for life existed – it was there for the picking. However, counsel failed to thoroughly investigate Petitioner's life history and background. The failure to investigate was exacerbated by other errors committed by capital counsel. Consequently, the jury was not provided with a true, accurate and complete picture of Petitioner's life, upbringing and mental health deficits, even though such an accurate and complete picture is required by the Eighth Amendment to the United States Constitution.

Counsel performed deficiently, and that performance cost Petitioner dearly. Examples of counsels' gross mishandling of the penalty phase abound. Prosecutor Wilkinson's challenge went unmet – counsel failed miserably to provide the jury with any insight into why their client was before the Court having been convicted of a premeditated triple killing.

168. Counsels' errors and omissions are clear. They failed to tap the existing mitigation. Instead, they presented a slap-dash penalty hearing. On the very day that they appeared to present penalty phase evidence, almost one half of their mitigating factors were struck by this Court. An agreement that they had made with the Government, which they thought would lead to the exclusion of a variety of bad acts, evaporated, and Petitioner was confronted with a cavalcade of bad act evidence. Yet, counsel – who was not expecting it to come in – was unprepared to counter this evidence. At the end of the day, Petitioner never had a chance.

**B.  Counsel's Deficient Performance.**

169. Petitioner will now demonstrate the errors made, and opportunities missed. This is a compelling record, and counsels' errors are disturbing.

**i.  The Investigation Stage.**

170. Counsels' errors started with the penalty investigation of this case. Counsel hired a so-called "mitigation specialist/social historian" (Joel Sickler) and essentially turned over the penalty phase investigation to him.

**a.  The School Records.**

171. Mr. Sickler testified that he was unable to locate Petitioner's elementary or middle school records and received only a two page transcript of Petitioner's high school records. TT 10/19/00, 176. Based upon this transcript he testified that Petitioner "did fairly

52

well" in school and was an "**average to fairly good student** and seemed to have the **aptitude for school**." Id. at 170, 176.

172. Nothing could have been further from the truth. Current counsel requested Petitioner's school records and received in excess of 300 pages. (These records are contained in Petitioner's Appendix). These records show that far from being an "average to fairly good student," Petitioner was diagnosed as learning disabled from an early age, was provided with an IEP (an Individual Education Plan, required by Federal law for disabled or handicapped students) and struggled simply to pass even his special education classes. These records also contain psychological reports showing that Petitioner was emotionally disturbed and depressed when he was just a young boy.

173. Counsel, themselves, did nothing to try to obtain the school records, which were obviously available. Had counsel tried to do so, they would have learned that their mitigation specialist failed to request them from the proper source and in the proper manner. Once Mr. Sickler received a letter from the authorities indicating that all records except for the two page transcript had been destroyed, he failed to follow up in any way. Counsel also failed to probe the alleged – and ultimately incorrect – assertion that these valuable records were destroyed. Consequently, Mr. Sickler received a two page transcript instead of the 300 plus pages post-conviction counsel have secured.

174. Mr. Sickler and trial counsels' errors in this regard, i.e. their deficient failure to secure one of the most basic building blocks of any capital mitigation investigation, is explained in a declaration from Joseph Gordon, Director of Guidance for the Hyde Park School District. As Mr. Gordon explains, New York State Department of Education policy dictates the maintenance of the School District's records, and its procedure for responding to requests for

53

them:

> I am employed by the Hyde Park Central School District (HPCSD) in Hyde Park, New York, at the Franklin Delano Roosevelt High School (FDR). I am the Director of Guidance for HPCSD. I have been with the District for 14 years.
>
> I have been asked by counsel for Dustin J. Higgs, a former student enrolled in our District, to explain our policies regarding the retention of school records, and responses to requests for such records.
>
> The New York State Education Department policy regarding the retention of student records is as follows: after a student would have normally graduated high school, the district must maintain his or her cumulative records for six (6) years. HPCSD follows this policy. The cumulative record includes report cards, progress reports, disciplinary information and any information regarding psychological adjustments and/or problems. At the end of that six-year period, the pupil's file is destroyed, and only the Permanent Record is retained. The Permanent Record consists only of a High School transcript, class rank and state-wide (Regents) testing information. The exception to this is when a student has been involved with Special Education. Special Education records are kept indefinitely and are maintained by the Administrative Office of the HPCSD.
>
> Requests sent to the High School for student records are processed by our secretary. If the student has been out of the HPCSD for more than six (6) years, we forward the requester the student's Permanent Record, as described above, with a note that the full cumulative records are no longer available.
>
> On the other hand, if a requester specifies that the student was involved in Special Education, or specifically asks for Special Education records, we forward the request to our Administrative Office for processing. The Administrative Office then forwards the student's Special Education records to the requester.
>
> However, unless the requester specifically requests Special Education records, we do not forward the request to our Administrative Office, where those records are maintained. Such a non-specific request will be responded to by only sending the Permanent Record.
>
> I have reviewed the file of Dustin Higgs, who was also known by his guardian's last name McKinnon during his time in the HPCSD. Mr. Higgs graduated from FDR in 1991. It appears that our office received a request from Brian Moon[17] at the National Center on Institutions and Alternatives (NCIA) on February 1, 1999. The request was directed to the Guidance Department at FDR High School. The request did not state that Mr. Higgs had been in Special Education, nor did it request Special Education records. Therefore, we only sent Mr. Moon a copy of Mr. Higgs' High School transcript. Because

---

[17]Mr. Moon assisted Mr. Sickler in his mitigation investigation.

Mr. Moon did not specify that Mr. Higgs had been in Special Education, nor ask for Special Education records, we did not forward the request to our Administrative Office, and accordingly, Mr. Moon was not provided with Mr. Higgs' Special Education records.

Mr. Higgs' file also reveals that on April 5, 2004 the HPCSD received a request from Katherine Suter at the Federal Court Division, Defender Association of Philadelphia, for Mr. Higgs' records. Ms. Suter's request specifically asks for Special Education records; as such, Ms. Joan Powers in our Administrative Office forwarded to Ms. Suter a complete copy of Mr. Higgs' Special Education records, along with a copy of his High School transcript. These included more than 300 pages of detailed records of Mr. Higgs' Special Education diagnoses, course work, reports, and other records. These records were available in 1999.

Declaration of Joseph Gordon, paragraphs 1-8, paragraph numbers deleted, copy contained in

Petitioner's Appendix.

> **b. Counsel and Mr. Sickler's Abrogation of their Investigative Responsibility to Lay People.**

175. Regrettably, the failure to secure Petitioner school records was not Mr. Sickler's, or trial counsels' only error. Mr. Sickler testified at trial that he was unable to contact Petitioner's father, despite his efforts to do so. However, **he never himself tried to find Petitioner's father**, but instead enlisted the assistance of untrained laymen to find this critical witness. As he testified, his efforts to find Petitioner's father, Alphonso Higgs, "proved not to be successful. He does have two other children from a relationship with another woman. We did make contact with both of those young men. . . . We used Alexa [Cave] at one point as an intermediary . . . Dustin's cousin and sister. Mr. Higgs, from what we understand, wanted no involvement and was unwilling to speak with us, which wasn't surprising." TT, 10/19/00, 166-67. Obviously, his "understanding" came from these deputized investigators, and not from any contact that Mr. Sickler had with Alphonso Higgs, Senior. Thus, Mr. Sickler and counsel abrogated this critical task of finding and speaking with Petitioner's father to a cousin and half brothers of Petitioner – they never established or tried to establish contact themselves.

55

176. Mr. Sickler, however, did not have to go through Mr. Higgs' children or relatives. Although Mr. Higgs had a history of drug use and dealing, at the time of Petitioner's trial and for years before, Alphonso Higgs, Senior was living in the Poughkeepsie community, was readily accessible and willing to testify on his son's behalf – his post-conviction declaration says so:

> I did not know that Dustin was in trouble with the law at the time of his trial in Maryland in 2000. Nobody ever contacted me about it. I understand that somebody claims to have contacted my other sons to see if I'd get involved in his defense. But that is not true. I was not contacted by anybody, including my family, to let me know that my help was needed. Given how I had turned my life around by that time, I would have done all that I could to help my son to whom I did so much harm.

Declaration of Alphonso Higgs, Senior, paragraph 9, copy contained in Petitioner's Appendix.

177. Not having spoken to this highly relevant mitigation witness, Mr. Sickler again presented inaccurate and not particularly helpful testimony regarding Alphonso Higgs' impact on the life of his son. He testified that Petitioner and his dad, "never had a relationship" and that the contact between them was limited to "a couple of visits with Dustin when he was a small boy . . . [but] otherwise was completely absent from his life." TT, 10/19/00, 165-66. Thus, Mr. Sickler's testimony implied that Alphonso Higgs' impact on his son's life was notable only for his absence.

178. Again, Mr. Sickler's testimony was far from the truth. As Alphonso Higgs' post-conviction declaration indicates, he had a dramatic impact on his young son – an impact that would leave durable psychological scars:

> My name is Alphonso Higgs, Sr. I am 63 years old (d.o.b. 9/10/42) and I am the natural father of Dustin J. Higgs. I have been told that he is on death row and I am giving this statement at the request of his current lawyers.
>
> I met Dustin's mother, Marilyn Bennett about two years before Dustin was born in 1972. At the time that we met, and for many years afterward, I was a drug user and small time drug dealer in Poughkeepsie, New York. At the time that Dustin was born, I lived across the street from Marilyn, in Poughkeepsie. It was from that location that I ran my drug

56

business. At that time I was also living with and seeing many other women. During the time between Dustin's birth, and Marilyn's death, I sold and used many different drugs, including heroin, cocaine, marijuana, and PCP.

During this time period I would sell my drugs usually on the street. I would hang on the corner, usually getting high, and selling to people who'd drive or walk up to me. I sometimes would sell out of my house. Selling drugs was a hard business, and you had to be tough to survive. I usually carried a weapon of some sort, and when I didn't have one, I acted as though I did. I developed a reputation as a tough guy.

I was arrested a number of times. I had two felony convictions in Dutchess County, New York. In the first I was busted for selling heroin and coke to an undercover state trooper in June, 1981. I took a felony conviction, but did one year of county time. The second time, I was busted for selling coke to a Poughkeepsie cop. I was sent to state prison for 2-4 years. This last arrest was in 1983. In addition, I was arrested for a number of assaults, fights and larcenies.

While I was living this life I would do a lot of my own drugs. I also drank. When I was high, I would act crazy. I was abusive to whatever women were in my life at the time. I would use them for my own needs, and when they complained I would beat them. I would yell and scream insults at them, and usually my yelling turned to hitting. It was no different with Marilyn Bennett. I would go over to her place for sex and food. If things weren't just the way I wanted them, and sometimes even if they were, I would go off and start yelling, throwing stuff and hitting her. I did this while Dustin was a child, and he often got into the middle of it. I am ashamed to say that I even laid my hands on that young child.

I did not have any real relationship with Dustin. I didn't do any father-son type of activities with him, and I am sure that I showed him no love or affection. I would see him on the street, while I was earning my living. Sometimes I'd say hi and other times I wouldn't. I would beat his mother, and sometimes him. He'd get it the worst when he got older and tried to protect his mother from my beatings. I'd be in such a rage, that I'd just swat or smack him.

I know that Marilyn got sick in around 1980 and she died in 1982. She had cancer. I was arrested in 1981, and so I was in jail when she was at the worst of her illness. I provided no emotional or financial support to her or Dustin during that time. Her family hated me, as I was not much of a father or boyfriend. I cannot blame them for disliking me, but as a result I had little contact with Dustin after Marilyn's death. He moved away and his aunt Connie would never let me near him. I only saw him a couple times while he was a teenager.

Since 1993 my life changed. I found Jesus Christ and devoted my life to Him. I am a regular church-goer and I am very active within my church. I have been a sober, righteous and law abiding person ever since. When I look back at my life I am ashamed

57

| | |
|---|---|
| Higgs: | You got no problem, I live at 33, second floor on the right hand side. I always come right down and look for . . . . . . . . . . . Terry, he claims he just bought one from me right, and then he claims he lost it. He ain't lost it, heck. |
| Third person (unidentified): | He ain't lost shit. He always trying to . . . . . . he always beat somebody. |
| Informant: | Let me get a dime. |
| Higgs: | And he always . . . . . . . . . . . . . trying to earn from somebody. |
| Informant: | Yeah, what you got? Dimes or twenties? |
| **Higgs:** | **I got dimes.** |
| Informant: | Come on, give me one dime. |
| Higgs: | Mumbles inaudible sentence. |
| Informant: | It's good? |
| **Higgs:** | **It's good. No doubt about it, it's good. You know where I live, you know where I am, there goes somebody right there, right here.** |
| Informant: | What's going on man? |
| Fourth person (unidentified): | What's up? |
| Higgs: | Ask him if it's good. |
| Fourth person: | It's alright. |
| Third person: | I ask you is that coke good. |
| Fourth person: | This mother fucker don't give it back though. |
| Informant: | If it's good I'll be back. |
| Higgs: | I'll be up here. |
| Higgs: | Anytime you want to feel good . . . . . . . . . . . I'm waiting on my man out here, but he ain't, he ain't ahh, ahh, don't waste it man. |
| Informant: | No, I ain't gonna waste it man, I ain't gonna waste it. |
| Higgs: | You ain't gotta open it up. I do you right, ain't no problem with it. |
| Informant: | Yeah, it's all right there. |
| Higgs: | You ain't got to worry bout liking that. |
| Informant: | Smells good. |
| **Higgs:** | **I'm telling you it's good, I leave it like that.** |
| Informant: | Yes Sir. |
| **Higgs:** | **I don't tramp it, I just, ha, ha, ha, one and a half or two, I could fuck you. I put one in. That way people will come to you direct. They like it. They'll find ya, and alright people. I used old Paulette, she bought a dime, that bitch came back begging. I know it was smokin then. I ain't even worried now. Keep it like that and you're alright.** |
| Informant: | Yeah. |
| Higgs: | I been working for a number of mother fuckers and I don't like it, I like . . . . . . . . . I don't care if I gotta pay one hundred dollars. I don't make eighty or seventy-five. I want the people to like it that I give. Anyway, they gonna come to me first. Coke ain't anything like the sickness. I'll wait two or three hours knowing I'm gonna get something good, before I go back out there. You know especially if I know somethings gonna hit. |

| | |
|---|---|
| Informant: | Yeah. |
| Higgs: | You know I get that . . . . . good, make you feel good.  I wait for it. Knowing somebody else has something better that me. . . . . . . . . Can't see it.  Got a smoke man? |
| Third person: | Stay down there all day. |
| **Higgs:** | **Especially you know he's coming, coke, you don't get sick behind coke, you just want it.  Ain't nothing you wake up hurting and your sick . . . . . . . . . . . you know, I ain't like that but I don't like mother fucking shit like dope man.  You got to try and cop some somewhere feelin bad.  But like coke you ain't going nowhere.** |
| Person Yelling up the Street: | Alphonso!! |
| Higgs: | Yeah!! |
| Informant: | I'll see you later man. |
| Higgs: | Okay man, I'll be out here. |
| Informant: | Alright. |

**Informant leaves immediate area but is stopped enroute back to officers location. Following conversation ensues:**

| | |
|---|---|
| Informant: | What's going on man.  Yeah.  What's going on with your case man. |
| Other Person: | I gotta go back next week, she's gonna decide whether she's going to dismiss it or not. |
| Informant: | Hillary? |
| Other Person: | Yeah. |
| Informant: | I'm going to tell you one thing man, a lot of people think that she's right, she goes by the book, man. |
| Other Person: | Got a dollar Joe? |
| Informant: | No man, no, no, no, I don't fuck with that man. |
| Other Person: | Alright, I hear ya. |
| Informant: | Alright, take care man. |

**Informant completes return to officers location and enters police vehicle.**

Transcript of drug sale contained in court file People v. Alphonso Higgs, Indictment # 212/83

County Court, Dutchess County, New York, contained in Petitioner's Appendix.

> **c.    The Failure to Interview Others Who Interacted Daily with Petitioner or Otherwise Knew of Alphonso Higgs' Life of Crime.**

180.    Even if Alphonso Higgs could not be located – a highly dubious proposition –

60

there were others who knew the story, and could have provided gripping accounts of how

Alphonso Higgs was a gun-toting thug, who beat and abused Petitioner and his mother. Nancy

Riley was Petitioner's aunt, and the younger sister of his mother. She lived **one floor above**

**Petitioner and his mother and saw them on a daily basis before her sister's death.** She

recounts that Alphonso Higgs indeed had a "relationship" with Dustin Higgs and his mother – a

relationship of abuse and trauma:

> My name is Nancy Lee Riley and I am the younger sister of Marilyn Bennett. Marilyn died of cancer in 1982. If she were still alive she would have been 60 years old this year. I am currently 55.
>
> Marilyn moved to 350 Mansion Street in Poughkeepsie in around 1970 – before Dustin Higgs was born.[18] At that time I lived at 172 Winnikee Avenue, which was another part of the same building. She began to see Alphonso Higgs, Senior and became romantically involved with him.
>
> At the time that my sister began to date Alphonso Higgs, I knew of his reputation in the neighborhood as being a drug user and dealer. He was not a working man, but made his living selling drugs. When he was not selling drugs, he was using them. He spent his days on the corner engaged in his business, or else he was in a bar drinking. Marilyn was also aware of his background, but she believed that she could change him. Anybody walking on the street would be able to look at Alphonso and see him engaged in selling and using drugs.
>
> As her sister, I had daily contact with her. I was able to see that from the beginning of the relationship, Alphonso was abusive towards her verbally and physically. He would argue and abuse her over a number of issues, including his involvement with other women and with drugs.
>
> Marilyn moved from 350 Mansion to 168 Winnikee when Dustin was about 7 years old. This was again in the same building in which I lived and I continued to have daily interaction with Marilyn and Dustin.
>
> Throughout the course of her relationship with Alphonso, he engaged in abusive conduct toward Marilyn and Dustin. I recall one instance when I heard a commotion going on in

---

[18]Alphonso Higgs' other drug arrest occurred for a sale that occurred at 339 Mansion Street in Poughkeepsie, across the street from 350 Mansion Street, where Petitioner resided with his mother.

Marilyn's apartment. I could hear Alphonso screaming. I ran down to her apartment (I lived one floor above) to find that she was bleeding from the head and she told me that Alphonzo had hit her with a pot. Alphonso was still present, and I found Dustin in the same room crying his eyes out. He was obviously very scared and upset. I stayed with Dustin while Marilyn went to the hospital. It took quite a while to calm him down and I sent him to bed.

I personally witnessed Alphonso being verbally and physically abusive toward Marilyn. Although his abusive conduct was never directed toward Dustin, Dustin was very protective of his mother, and he would try to get between Alphonso and his mother. During these occasions Alphonso – who was in a rage – would push or slap Dustin to get him to back away.

Alphonso's drug use was consistent throughout the time that Marilyn was alive. He used heroin, free-based cocaine, smoked marijuana and drank. He was very erratic and was seldom sober. The more drugs he used, the more abusive he was toward his wife and child.

Alphonso was living with two different women during the time that he was also seeing my sister. His carrying on with other women was often the spark for his abusive behavior. I saw him being physically abusive to Novalene Johnson (one of his live in girlfriends) on many occasions. I can only assume that young Dustin was also able to witness this conduct, which was happening in public view.

Dustin never received anything from his "father." He only got the bad and abusive conduct. Alphonso never took Dustin anywhere or did anything with him. He barely acknowledged him as his child, and showed him no love or affection, or even any attention.

Declaration of Nancy Lee Riley, paragraphs 1-8, 10, & 12, contained in Petitioner's Appendix.

181.    Another sibling of Petitioner's mother, Richard Bennett, also knew about

Alphonso's life of crime. He too was never interviewed:

My name is Richard Bennett and I am the older brother of Marilyn Bennett. Marilyn died of cancer in 1982. I am currently 66 years old, and I was six years older than Marilyn.

I worked for years as a bartender at the Paradise Grill in Poughkeepsie. It was located in the same neighborhood in which Marilyn and Alphonso Higgs lived in the 1970s and early 1980s. As a result of this job in a local bar, I ran into Alphonso Higgs, Sr. on many occasions. It was well-known in the neighborhood that Alphonso was a drug dealer. I knew this to be the case as I saw him selling drugs as cars would pull up to him on the corner, and things would be exchanged. He had no "regular" job, always had lots of

62

cash, and was living the life of a person in the drug scene. I personally had to run him out of the bar, because he was trying to sell drugs there. People in the neighborhood were afraid of him, and I knew that he carried a gun. His drug business was carried on in plain view in the neighborhood on an on-going basis.

My view of Dustin's life is that he had no stability. He was the child of a single mother. His natural father provided no role model, and the only role that he modeled was that of a drug dealing, gun toting thug. He was a horribly violent man, who was known to be the neighborhood smack dealer. Marilyn's death shattered what stability there was in Dustin's life. When he went to live with Constance, he was put into an environment which went between strict discipline and regimentation to hanging out and getting high with his cousins. In sum, Dustin did not have a childhood that even came close to normal.

Declaration of Richard Bennett, paragraphs 1, 2 & 8, contained in Petitioner's Appendix.

### d. Failure to Provide Any Accurate Evidence About the Emotional and Mental Health Impact Upon Petitioner of the Tragic Loss of his Mother.

182. Counsel also had Mr. Sickler testify about Petitioner's tragic loss of his mother when he was just age 10, and how he had cared for her in the last months of his life. Yet, even this testimony fell far short of providing the gripping details of the emotional impact of this death on a ten year old and the durable scars it would leave.

183. After providing some historical information about Petitioner's mother, Marilyn Bennett, TT 10/19/00, 167-68, he provided further information about her illness and subsequent death. Id., at 172. He described what he learned about Marilyn's fears and concern for what would happen to her son. Id., at 173. He described where Petitioner went to live following his mother's passing. Id., at 173-74. However, neither Mr. Sickler, nor any other witness called by counsel, provided testimony regarding the psychological and emotional impact on Petitioner of his mother's death.

184. Although Constance McKinnon testified, she was asked little about the impact of his mother's death upon Petitioner, and what little she said on the topic was simply belied by the

63

school records that trial counsel never obtained. Ms. McKinnon testified that she was Petitioner's aunt and his mother's eldest sister, with whom Petitioner went to live following his mother's death. In response to a question about how Petitioner reacted to his mother's death and moving in with the McKinnon family, aunt Constance testified that she "thought that he had adjusted well. . ." TT 10/20/00, 56.

185. In reality, the school records contain stark evidence to the contrary. Petitioner had not "adjusted well." Rather, the records show the profound impact that his mother's death had on his psychological development and his inability to achieve in school. His emotional disturbance over the loss of his mother, and his continuing inability to perform his school work were noted in a variety of Child Study Team Reports. On December 2, 1982 (about 9 months after his mother's death), the evaluator noted that he has "low functioning in classroom, poor reading skills, poor small muscle coordination (handwriting) . . . poor language skills, limited vocabulary, difficulty expressing himself in writing cannot construct more than simple sentences. Poor speller." At the time he was noted to be reading at the second grade level, which was two grades below his then-current placement. In regard to his "social functioning," it was noted that Petitioner "tends to be a loner, quiet-withdrawn."

186. In a Confidential Psychological Evaluation conducted on March 29, 1983 (age 11 years – about 1 year after his mother's death) by School Psychologist James E. Lennon, Petitioner's difficulties with learning were well-documented. In particular, the evaluator sought to explain why he had a significant drop in recent testing, and offered two potential explanations, including that:

> Dustin has had significant losses over the last few years of his life . . . He reports that his
> dad doesn't visit him at the present time. Secondly, his mother's death in May 1983

64

[sic][19] has left him as an only child in the care of his aunt. While Dustin feels particularly comfortable and secure in the care of his aunt, a woman who has four children of her own older than Dustin and who has succeeded in making Dustin feel a part of her family. **Nevertheless, these events have important implications on Dustin's social/emotional development and quite possibly on his overall cognitive development.**

Dr. Lennon concluded that Petitioner was in need of counseling "in order to help him deal with some of the tragic events that have occurred in his life."

187.    In another Child Study Team Report generated on September 20, 1983 the reporter noted that Mr. Higgs "presently seems to be depressed but that seems to be separate from his basic learning problems." In the section calling for "Specific problems to be addressed" the evaluator noted that assistance was needed in three areas: "1) Disability in expressive language, both verbal and written, 2) Poor reading skills [and] 3) emotional problems following family disintegration **(related counseling services)**." Another portion of this document states that Petitioner's "language deprivation is extremely evident. He has trouble expressing thoughts orally and written [sic]. Appears as if their [sic] may be a visual perception problem."

188.    Petitioner's apparent need for counseling (addressed in both the March 1983 and September 1983 documents) was again addressed in a note written on March 28, 1984. The note is from "Don" to "Sandy" and it reads:

> In a meeting with Arlene and Ruth, Arlene raised a question about counseling for Dustin – feeling that we should have some counseling contacts. Have you kept in touch with Dustin in any way? Should we consider him for counseling? Maybe in a group? Let me know what you think.

In a handwritten response written on April 4, 1984 Sandy rejected the counseling option:

> Don- Re: Dustin Higgs. He doesn't seem to need counseling more than twenty other

---

[19]Ms. Bennett died in May, 1982.

students I could name. . . .He might at sometime benefit from some counseling to work thru the feelings that must have come with his mother's death – but that's not really a school job and it certainly is not a crisis situation. Sandy

189.    Because Petitioner did not present as a "crisis," he did not receive the supportive counseling that was recommended by the school psychologist, or the Child Study Team. He received it neither from or through the school system, nor through his family. His mental health needs were left unattended, with a resultant deterioration in all spheres.

190.    Even without the school records, his aunt Nancy Riley and uncle Richard Bennett, who as noted above, Mr. Sickler never spoke with, provided graphic descriptions of the impact of his mother's death on Petitioner. Ms. Riley recounts:

> Marilyn eventually became ill with cancer and she quickly deteriorated and died. During this time Dustin was a great help to his mother. Although he tried to put up a brave front, it was clear that he was overwhelmed by his mother's condition. He loved his mother dearly and he would cry all of the time about her illness. He was present when she passed, and he saw them place her body in a "body bag." He literally was present to hear her body fall to the bottom of the bag. I was also present and could see that this caused a physical reaction in Dustin. He was out of control and upset on that day, and he took her death very hard. He became withdrawn from the world. I would see him weekly in church after he went to live with Constance McKinnon, and it was clear to me that he never recovered emotionally from watching his mother die. Before her death, he was an outgoing and fun-loving youngster. After her death, he was never the same.

Declaration of Nancy Lee Riley, paragraph 13.

191.    Uncle Richard Bennett had similar observations of this impact of this event:

> When my sister became ill with cancer, I was working nights for the post-office. As a result, I was responsible for taking her to many of her doctor appointments. As she became more sick over time, I was able to see the impact of her illness and eventual death on the young Dustin Higgs. At the same time that he tried to shoulder the burden of being the "man of the house," I could see that it was having a significant impact on him emotionally. Dustin simply shut down verbally. He became non-responsive when I would try to speak with him. Marilyn's death hit Dustin very hard. He literally picked out the dress that she was buried in, and insisted that her eyeglasses be placed on her coffin.

> Marilyn's death shattered what stability there was in Dustin's life.

66

Declaration of Richard Bennett, paragraphs 3 & 8.

### e. The Failure to Provide Mental Health Experts with the Actual Mitigating Evidence.

192.    Despite having deficiently failed to locate the school records, or interview critical witnesses about Petitioner's traumatic childhood and mental health and emotional deficits, counsel could still have meet their constitutional obligations to conduct a thorough mitigation investigation by enlisting the aid of mental health experts. Counsel took a step in that direction, however, as events unfolded, it is clear that counsel aborted that journey before following it to its logical conclusion.

193.    During their pre-trial preparation, trial counsel retained two mental health experts, Lawrence Donner, Ph.D and Susan Fiester, M.D. Despite having taken this step in the right direction, counsel again failed in their constitutional duty to provide these experts with access to relevant records or lay witnesses who could have provided the needed information. As each expert has declared, they were provided with no collateral records outlining Petitioner's childhood history:

> I was contacted by Harry Trainor, Esq. in February, 2000 about consulting in the case of United States of America v. Dustin John Higgs. I understood from Mr. Trainor that this was triple homicide being prosecuted by the United States Attorney in the Federal Court in Greenbelt, Maryland. I was made aware that this was a capital prosecution. Accordingly, Mr. Trainor requested that I conduct a psychological evaluation of Mr. Higgs. I particularly understood that I was to focus on whether there was any psychological or neuropsychological mitigating evidence that could be useful in a capital sentencing phase. As I always do with such referrals, I was looking to unearth evidence of childhood trauma, abuse, neglect, family dysfunction or major mental illness. I was also concerned with determining whether there were any psychological dynamics present in Mr. Higgs' history that could be used as mitigating evidence at his sentencing hearing.
>
> As is my custom, at the time of the referral from Mr. Trainor, I requested **all records that counsel had or could obtain relevant to the subject's childhood and upbringing**. Typically, such records include school records, incarceration records, medical records and any other record of mental health or medical treatments. These records are critical in

a forensic setting, because a practitioner cannot rely on the memory or honesty of the subjects of such evaluations. For the same reasons, I typically request either access to family and friends who knew the subject as a child or young person, or else summaries of such contacts generated by a social historian. **In this instance, I received very limited, and in my view, inadequate records.** I received the federal indictment against Mr. Higgs; a pre-sentence report generated in regard to a then-recent federal drug charge and a Memorandum written by Brian Moon dated February 28, 2000 entitled "Preliminary Investigation United States v. Dustin Higgs." According to my records it took me only 30 minutes to review these rather limited and rudimentary sources.

Declaration of Lawrence Donner, Ph.D., paragraphs 3-4, contained in Petitioner's Appendix.

Dr. Fiester has provided a similar declaration:

In early 1999, I was retained by attorney Harry Trainor to conduct an evaluation of Dustin Higgs in preparation for a capital murder trial. I conducted a forensic psychiatric exam of Mr. Higgs at the D.C. jail on March 19, 1999. I was not asked to review or obtain any records, nor was I asked to conduct any further evaluation of Mr. Higgs or conduct any collateral interviews.

Declaration of Susan Fiester, M.D., paragraph 2, contained in Petitioner's Appendix.

194. Thus, neither expert was ever provided by counsel with Petitioner's school records.

195. Despite having been provided with inadequate records, each mental health expert conducted a forensic evaluation of Petitioner. Dr. Donner evaluated Petitioner for about 8 hours on March 7, 2000. He administered a series of neuropsychological and psychological tests and conducted a clinical interview. Based upon this evaluation, Dr. Donner strongly suspected the presence of mental health mitigating evidence:

I saw Mr. Higgs for my evaluation on March 7, 2000 at the Supermax facility in Baltimore. The evaluation lasted from 9:00 a.m. until 5:00 p.m. Based upon my overall evaluation (which included my testing, clinical interview and review of the sparse documents presented to me), I learned a number of things about Mr. Higgs, his neuropsychological makeup and his history that could be mitigating. I will summarize those findings below. However, in the absence of additional records about Mr. Higgs, I was unable to formulate opinions about Mr. Higgs to a reasonable degree of psychological certainty.

68

First, it was apparent to me from my observations of Mr. Higgs and from the validity scales contained within some of the testing that I administered, that Mr. Higgs tried to do his best on the tests. He did not exaggerate his mental health pathology. In fact, some of the testing and interview responses showed him to be masking pathology. In short, he was not malingering in his responses in order to "look bad." Therefore, I considered my testing of him to be valid.

I administered a standardized IQ test (the WAIS–III) to Mr. Higgs. He scored a full scale IQ of 91, which places him in the 27th percentile of the population or, in other words, in the low-average range of intellectual functioning. The WAIS–III is comprised of two parts: the Verbal and Performance Subtests. The WAIS–III contains thirteen subtests. It is expected that a subject's subtest scores will be roughly equivalent to the full scale IQ, and that the scores on each of the subtests will be more or less equivalent. This was not the case with Mr. Higgs. In the Verbal Scale his subtest scores ranged from a high of a scaled score of 12 (on the Similarities and Comprehension subtests, which is the equivalent to an IQ score of about 112) to a low of a scaled score of 2 on digit span (equivalent to an IQ of about 54). This degree of difference, sometimes referred to as "scatter" is a red flag for brain dysfunction. Similar scatter was also seen on the Performance Scale, where his scaled scores ranged from a high of 11 (in Digit Symbol and Matrix Reasoning) to a low of 7 in Picture Arrangement. Again, this level of disparity between subtests on the same scale raises concern and suspicions that the subject may be organically impaired, emotionally disturbed or both. At the time of my evaluation, I believed that both might be causes of Mr. Higgs' uneven performance.

Similar anomalies occurred with regard to his score on an achievement test that I administered (the WRAT-3). All things being equal, one would expect a person with a full scale IQ of 91 to score in the mid-percentiles (e.g. 40-50th percentile) on the WRAT-3. That did not occur with Mr. Higgs. He was in the 8th percentile in reading, 10th percentile in spelling and 7th percentile in arithmetic. These scores correspond to 7th, 6th and 5th grade levels, respectively. In the presence of proper corroborative documentation – which I did not have at the time of my evaluation – these scores would establish that Mr. Higgs suffers from a learning disability (defined as two or more grade levels below the last grade completed, which in Mr. Higgs case was a year or two of community college). Moreover, such a discrepancy between performance on an achievement test and one's IQ score shows that Mr. Higgs had either an emotional, organic or combined deficit that effected his achievement.

I administered the Bender Gestalt test. This test requires a subject to reproduce nine designs that are placed before him, and then requires him to again reproduce the designs after periods of delay, but without the stimuli cards in view. In assessing performance on this test, one looks at the number of designs that are recalled, the accuracy of the reproductions, and the manner in which the designs are placed on the page. The results can provide insight into a number of areas, including memory, concentration, organicity, and psychological and personality traits. Overall, Mr. Higgs' responses on this test showed him to be easily frustrated, have problems with impulse control and to have

difficulties with some aspects of his working memory.

I administered the Booklet Categories Test. This test is particularly sensitive to the presence of organic brain damage, and in particular frontal lobe damage. The frontal lobes are responsible for executive functioning, and impairment in that area can result in significant emotional and impulse dyscontrol. Mr. Higgs scored in the impaired range (59 errors) on this test. This result also supports a conclusion that Mr. Higgs suffers from organic impairments.

I administered the Reitan Aphasia Screening Test to Mr. Higgs who showed "nervousness" in taking the test, and difficulty with simple math problems. This nervousness is consistent with some aspects of his personality and the difficulty he appeared to have is consistent with his lack of achievement on the WRAT-3.

Psychological testing that I administered showed that Mr. Higgs' emotional development was arrested at about age 10, which I understand to have been the time that his mother passed away. He sees the world in a rather simple and child-like way. He does not see complexity, and combined with his learning disability, he has a difficult time in navigating his way. Testing also shows that he experiences a degree of suspiciousness and paranoia in his dealings with others.

I administered the MMPI-II, which is a widely administered and reliable psychological test. The MMPI-II contains a set of validity scales which indicate whether the subject is responding accurately, or is trying to fake to look either mentally ill or mentally healthy. As noted above, the validity scales did not show that Mr. Higgs was faking, but that his responses were valid. The most significant result from this test for purposes of a capital penalty phase, showed that Mr. Higgs did not score a typical psychopathic profile. In other words, this test did not show Mr. Higgs to be a sociopath. This finding is important as it relates to the question of his "future dangerousness" which can be an issue in a capital case.

Based upon my evaluation and the sparse documents that were provided to me by Mr. Trainor, I had several suspicions about Mr. Higgs and about the mitigating evidence that could have been presented at his trial. I suspected that he was learning disabled and likely suffering from organic brain damage. I also suspected that he was suffering from the lasting psychological effects of losing his mother at a tender age after having been her caregiver for the last months of her life. As a result, I also believed that he suffered from impulse control problems and judgment. I could not offer opinions to a reasonable degree of certainty at that time because I had no corroboration of my suspicions.

Declaration of Dr. Lawrence Donner, paragraphs 4-13. As noted, Dr. Donner could not provide opinions to a reasonable degree of certainty at that time, because he did not have corroborative data.

70

196.     Dr. Fiester also found valuable and compelling mitigating evidence based upon

her evaluation:

> The results of my evaluation show that Dustin Higgs likely suffered from a Learning
> Disability and childhood trauma (related to his mother's illness and death from cancer)
> which may have precipitated Posttraumatic Stress Disorder; from Pathological Gambling,
> Alcohol Dependence, and Substance Abuse. In addition, Mr. Higgs also expressed
> significant remorse about the fact that the victims in the January 27, 1996 incident died.
> These disorders are long-standing, significant, and can substantially affect cognitive and
> emotional functioning.

> \*       \*       \*

> Mr. Higgs reported to me that he had graduated from high school and attended
> approximately two years of Community College. He did reveal that he had been in
> special education and was diagnosed with a Learning Disability, which he thought was
> because he was not reading "up to speed."

> \*       \*       \*

> Mr. Higgs' mother died when he was age 10 after a long illness with breast cancer. His
> mother suffered a protracted period of illness that lingered for over a year before her
> death. She was debilitated and bed-ridden at home for long periods. During this time,
> Mr. Higgs was at home with her, caring for her and attending to her as she gradually
> deteriorated. This would have been extremely traumatic for a child of ten. Mr. Higgs
> was fearful and recognized that his mother was sick, however, he did not know that she
> was dying. Her death came as a shock. Since he was not told that his mother was dying
> and had no idea of what to expect, her illness was even more frightening. When his
> mother's hair fell out, presumably a result of chemotherapy treatments, he knew that this
> was not "normal" and became very fearful.

> Mr. Higgs reported enuresis with an onset at age 10, approximately at the time of his
> mother's death. The enuresis was present for three years. Bedwetting at this delayed age
> can be precipitated by psychosocial stress. The onset of enuresis coinciding with the
> death of Mr. Higgs' mother further suggests that her death was an enormously traumatic
> event for him.

> Mr. Higgs additionally described having witnessed a death in 1993 at the age of 19 that
> was traumatic for him. This death prompted the onset of his escalating use of alcohol,
> drugs and gambling. While he did not admit to experiencing symptoms of PTSD as a
> response to witnessing this death, his alcohol and drug use may have masked the
> presentation of these symptoms, as the significant escalation of alcohol and marijuana
> use coincides with witnessing this death. If a person has experienced a significant trauma
> in their past, related to illness or death, a later trauma, such as witnessing another death,

71

may prompt the reemergence of the emotional pain from the previous event.

\*       \*       \*

Finally, my evaluation of Mr. Higgs revealed the existence of several additional mitigating circumstances in this case in addition to the mitigating diagnoses discussed above.

During Mr. Higgs' mother's protracted illness, Mr. Higgs recalled spending evenings after school sitting on her bed, caring for her, and helping to take care of her while she was experiencing increasingly poor health. Mr. Higgs was a "parentified" child, who took on responsibilities of caregiving for his own caregiver. The role reversal that took place robbed Mr. Higgs of his own childhood. Because he was in the role of caregiver between the ages of 8 and 10, he was unable to be a child himself. His role of caregiver resulted in feelings of guilt regarding his mother's pain and suffering, as he felt responsible for her but was unable to relieve her pain and suffering.

In addition to the significant trauma of his mother's illness, Mr. Higgs' father was an "absent" father figure/parent. His father did not show interest or take an active role in parenting Mr. Higgs, being present only intermittently. Further, Mr. Higgs recalled seeing his father being violently abusive toward his mother to the extent he inflicted lacerations. When his father beat his mother, Mr. Higgs recalled crying hysterically, feeling that he was unable to protect his mother. Mr. Higgs continues to experience a sense of loss over the fact that his father showed no interest in his life. Having a father who is an intermittent presence in one's life, who is unable to provide emotional love, affection or even attend to Mr. Higgs, can be more stressful that the total absence of a father. Mr. Higgs' father's substance abuse problems may have played a role in his inability/unwillingness to provide constant contact and appropriate parenting for Mr. Higgs.

Declaration of Fiester, M.D., paragraphs 4, 6, 10-12, 15-17.

197. However, like Dr. Donner, Dr. Fiester was unable to provide certainty about her impressions because she was never provided with the required corroborative data.

198. Trial counsel met with both Dr. Fiester and Dr. Donner on April 11, 2000 – about six months before trial. In that meeting the doctors shared their initial findings with counsel. See Declaration of Dr. Donner at ¶ 14; Declaration of Dr. Fiester at ¶ 3. As set forth above in each of their declarations, each expert told counsel that there was mitigating evidence that could be presented. However, neither mental health expert was called to testify.

72

### ii. The Gutting of Petitioner's Penalty Phase, and Counsels' Lack of a Response.

199. As the following account of the events leading up to the penalty phase show, the Government had its way with defense counsel. Petitioner's lawyers relied on the Government's dropping the future dangerousness aggravating factor and tailored their presentation so as not to open doors to bad act evidence, while all the time being apprised that virtually anything they presented would open those doors. At the same time, the Government succeeded in having most of Petitioner's mitigating factors struck. What followed was a last minute attempt to salvage something from the penalty phase. The proceedings from Petitioner's perspective were not pretty.

200. The Government provided pre-trial notice that it intended to seek the death penalty based upon, among other factors, that Petitioner would remain a future danger if sentenced to life imprisonment. See *Government's Notice of Intention to Seek Death Penalty as to Defendant Dustin Higgs*, filed on or about October 23, 1999, at pages 4-5. Whether the Government would be permitted to argue the future dangerousness circumstance, and what evidence it could present in support of it, was the subject of extensive pre-trial argument. PTT 2/10/00, 133-186. This Court held that the Government would be permitted to present evidence to support that circumstance, and would be permitted to argue it to the jury.

201. However, in a letter dated October 10, 2000 the Government memorialized an earlier conversation with counsel indicating that it would not present pursue the future dangerousness factor, or present evidence of it. A copy of this letter is contained in Petitioner's Appendix.

202. It was obvious why the Government decided to drop the future dangerousness

circumstance, and it was not out of beneficence! The Government had a plan: by offering to drop the future dangerousness factor, they hoped to limit Petitioner's penalty presentation, all the while ready with even more bad act evidence to charge through any doors opened by defense counsel. The Government had already presented many of Petitioner's bad acts that would have come in under the future dangerousness factor to the jury in the guilt phase of trial (e.g., the Chaconia and Cherry Lane shootings; the bad check schemes; threatening of witnesses; the incident in which Petitioner allegedly put a gun to Enidsia Darby's head), and the remaining bad acts that they had in store for Petitioner could come in under the obstruction of justice factor (e.g. intimidation of Mr. Dialomou in connection with the Chaconia shooting) and in rebuttal to the slim penalty presentation that defense counsel had in mind.

203. There is significant evidence that the Government's strategy worked. Following the delivery of the jury's verdict on the guilt phase, the Court and parties discussed the upcoming penalty hearing. The Government placed on the record that it would not seek to present evidence on, or argument about, the future dangerousness circumstance (TT 10/11/00, 15-16), indicated that it had notified counsel of this the preceding Friday (October 6, 2000), and followed up with the October 10, 2000 letter. Counsel took the bait: they indicated that in view of this development, "we are rethinking our whole case because of the government's decision to withdraw the statutory aggravator of future dangerousness." Id., at 19.

204. While the Government's plan was creative and effective, it was far from a secret plan. Indeed, the record is replete with warnings from the prosecution and the Court that various presentations from Petitioner would open doors to the bad act rebuttal. This can be seen, for instance, in the argument that ensued on the day the penalty hearing was to commence. Following the guilt phase verdict, on October 14, 2000 defense counsel filed a motion styled:

74

*Defendant's Motion to Limit Argument by the Government During the Penalty Phase and for Other Appropriate Relief.* In this *Motion*, counsel pointed out that in view of the Government's dismissal of the future danger factor, Petitioner was entitled to a limitation on the Government's evidentiary presentation and argument, so as not to permit the introduction of this factor through other aggravating factors. The defense articulated their concern as follows:

> The very real danger for Dustin Higgs is that the government, having dismissed the future dangerousness aggravating circumstance will nevertheless try to convince the sentencing jury that Dustin Higgs would be a continuing threat to the lives and safety of others, or has demonstrated a lack of remorse because of information that the government presents in support of another aggravating circumstance alleged in the death notice, such as obstruction of justice.

*Motion* at 3-4. Accordingly, Petitioner's counsel requested that limits be placed on the Government's ability to present argument and/or evidence in support of aggravating circumstances that **were not** withdrawn that might have a bearing on future dangerousness. Petitioner's counsel further argued that the Government should be precluded from introducing evidence or making argument that the "defendant has engaged in a continuing pattern of violent conduct, including but not limited to one or more of the" eight acts that the Government had alleged were evidence of Petitioner's future dangerousness.

205. The Government answered this *Motion*, in a pleading styled: *Government's Response to Defendant's Motion to Limit Argument by the Government During the Penalty Phase* (filed on or about October 17, 2000). In this *Response*, the Government reiterated that it did not intend to pursue the future dangerousness factor, including the related points regarding Petitioner's "low rehabilitative potential" or his "demonstrated lack of remorse." *Response* at 1-2. The Government also stated that it did not intend to introduce in its case-in-chief evidence of 7 of the 8 acts that it had alleged constituted the evidence supporting future dangerousness, but

10/18/00, 37. Petitioner's counsel voluntarily withdrews circumstance number eight because of fears that it would open the door to bad act evidence.[20] This left Petitioner with precious little to offer, and nothing related to the real mitigating evidence extant in Petitioner's background.

209. After the Government's motion to strike, Petitioner was left with only 6 factors, only one of which was related to Petitioner's childhood upbringing and background:

1. An equally culpable defendant in this case received a life sentence;

2. Petitioner was not the sole proximate cause of the victims' deaths;

7. Petitioner was intoxicated at the time of the offense;

9. Petitioner's family history, including the loss of his mother at an early age and abandonment by his father, influenced the direction of his life;

10. A sentence of death will have an adverse impact on Dustin's son.

11. There are other factors in Petitioner's background that mitigate against a death sentence.

In view of counsels' deficient penalty investigation, it is no surprise that only one of the eleven proposed mitigating factors related to Petitioner's background and history.

210. With that, the Court returned to a discussion of what mitigating factors the defense would produce and argue. When the defense indicated that it might offer evidence that Petitioner's life in prison would have value, for instance, because of an on-going relationship with his son, the Court noted that such a presentation could be "risky" and would likely open the door to bad act rebuttal:

---

[20]The mitigating circumstances that the Government successfully had stricken were: 3) that death would be arbitrary because Petitioner did not know he was on federal land; 4) life without parole was a fitting punishment; 5) life without parole will mean that Petitioner would die in prison; and 6) execution of Petitioner would not act as a deterrent to others. Number 8, which was withdrawn, was that there was potential value in the remainder of Petitioner's life.

I mean, you propose it and there's still got to be a historical predicate for saying that there is anything positive about this man's relationship. You have to say something about good things he's done in the past, or positive things, to be able to argue that.

Id. at 35. The Government agreed with the Court's assessment:

[I]f counsel is going to argue or present as a mitigator that there is potential value in the remainder of Dustin Higgs' life as a federal prisoner, we are entitled to show why there is not value, and the best way to do that is to show how he has behaved as a prisoner in facilities in the past.

Id. The Court reiterated its agreement with the Government's position: "I don't know how you escape it . . . I don't know how you keep it out." id. at 36. Accordingly, defense counsel withdrew the mitigating circumstance regarding the value of Petitioner's life in prison. Id., 37. But, the Court still wanted to address what other mitigating factors would be presented, and whether they would open any doors to a Government rebuttal. Id.

211. The parties did not dispute that the Government would be permitted to introduce evidence regarding the Cherry Lane shooting. Id., at 40. However, there was argument regarding whether evidence could be introduced regarding Petitioner's alleged intimidation of Mr. Diolamou in regard to the Chaconia shooting, as it related to Petitioner's obstruction of justice. The Court permitted introduction of this evidence. Id., at 41-50.

212. The Court next addressed Petitioner's motion seeking an instruction that he was not a future danger, and that he did have rehabilitative potential and was remorseful. Id. at 51-2. The Court correctly noted that such an instruction would be premature because "I don't know where you are going to go in your case." Id., at 52.

213. Thus, through the Government's proffers and arguments, and the Court's repeated warnings about how Petitioner's presentation could open doors to damaging rebuttal evidence, defense counsel persisted in their hope that they could keep out the damaging evidence while

78

salvaging something of a presentation. Petitioner's counsel had made "decisions" based upon the Government's withdrawal of future dangerousness, yet, as it turned out, those decisions were mere hollow wishes.

214.    Following Petitioner's presentation, the Government was prepared to begin its rebuttal case. Counsel attempted to preclude the introduction of certain bad act evidence, which counsel believed was not to be introduced because it was relevant only to future dangerousness. TT 10/24/00, 7 ("What they are seeking to do is to introduce everything that they had in support of future dangerousness now as rebuttal. It puts us in an impossible situation to rebut that"). Counsel argued that since their mitigation presentation only addressed Petitioner's life from before the age of 18, that somehow, this limited the Government's right of rebuttal. This was correctly rejected by the Court. Instead, the Court summarized the mitigation presentation, and showed how the Government's proposed rebuttal case was relevant and proper:

> When you put on your case about who he was, I got the impression, and fairly from the way you put it on, that he had this childhood, that there was some trouble that he went through with loss of figures close to him, that he has a child that he cares about. I mean all these sort of positive things about who Higgs is, Mr. Higgs is you went through. The government only wants to show that is not who Higgs is. Now, you call it future dangerousness.

Id., at 8-9. As the argument proceeded, defense counsel admitted that perhaps they had opened the door to the Government's rebuttal. Id., at 11 ("maybe perhaps we have opened the door to rebuttal evidence").

215.    In the final analysis, the Government was able to introduce all of the evidence that they had noticed in the their death notice related to future dangerousness, along with many other bad acts that occurred while Petitioner was incarcerated. TT 10/25/00, 83-102. Defense counsel was utterly and deficiently unprepared to deal with what had occurred. They presented

79

little by way of mitigating evidence, and they did not have any mental health evidence available to counter the Government's rebuttal case.

**C.      Counsels' Deficient Performance Caused Petitioner Prejudice.**

216.      There are two clear measures of the prejudice caused by counsels' deficient performance. First, counsel's closing argument in penalty covered almost nothing about mitigating factor nine (which had been renumbered as **four** on the verdict sheet: that Petitioner's family history and loss of his mother at an early age and abandonment by his father, influenced the direction of his life). Instead, closing argument consisted almost entirely of generalized appeals against capital punishment and arguments that Willis Haynes was equally culpable and did not receive a death sentence. That counsel did not address Petitioner's background and history comes as no surprise – there was nothing to talk about since counsel failed to prove much if anything in this regard. The second measure is that not one juror found mitigating factor number **four**: that Petitioner' early life experiences "influenced the direction of his life." TT 10/26/00, 9-10.

217.      In assessing prejudice, this Court need only keep in mind the powerful unpresented mitigation discussed herein, and ask whether there was a reasonable probability (defined as less than a preponderance of the evidence) that even one juror would have been persuaded to vote for life had the unpresented mitigation been shared with the juror.

218.      The answer to this question is a resounding "yes." Petitioner's penalty phase was far from constitutionally adequate and the reason for that rests with trial counsel.

**CLAIM VII.      THE FEDERAL DEATH PENALTY, AS ADMINISTERED, VIOLATES THE FIFTH AND EIGHTH AMENDMENTS, AND TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO CHALLENGE THE DEATH PENALTY ON THIS GROUND.**

219.      Some twenty years ago, the federal death penalty was reintroduced; since then it

80

has been used as a tool of federal law enforcement with escalating frequency. Statistics maintained by the Federal Death Penalty Resource Counsel (FDPRC) as a part of its mandate to facilitate the effective defense of federal capital cases demonstrate that the authorization process by which the Department of Justice (DOJ) selects those defendants who will face the death penalty, and subsequent Government decision-making regarding whether to accept pleas to sentences less than death, are impermissibly influenced by the defendant's race, in violation of equal protection and the Eighth Amendment. The statistics maintained by FDPRC as of the time of Petitioner's prosecution, indicate the following:

- Of the one hundred and ninety-nine (199) individuals against whom the DOJ has authorized or directed local authorities to seek the death penalty, seventy-six percent (76%) are non-white and fifty-two percent (52%) are black;

- The death penalty is authorized by the DOJ more than three times as often against non-whites as against whites; the death penalty is authorized by the DOJ more than twice as often against blacks as against whites;

- Of those cases for which DOJ has authorized the death penalty to be sought, 47.5% of all white defendants obtain a plea resulting in a sentence less than death, while only 27.2% of all blacks are permitted to plead to sentences less than death and only 29.1% of non-whites as a whole are permitted to plead guilty in exchange for a sentence less than death;

- White defendants thus receive non-death sentences in exchange for pleas at 1.7 times the rate of black defendants and 1.65 times the rate of non-white defendants as a whole;

- There are three times as many blacks, and four times as many non-whites, as whites among the condemned on the federal death row.

220. Current statistics from the FDPRC show that matters have not changed for the better. As of November 15, 2005 of the 362 people for whom the DOJ authorized a capital prosecution, 52% are African American, 17% are Latino, while only 26% are Caucasian. Thus, of the 392 prosecutions, 69% were against people of color.

221. These statistics create a startlingly strong inference that Government decisions regarding who will face the death penalty – at both the selection stage and the plea bargaining stage – are impermissibly influenced by the race of the defendant. The disparate impact of these decisions is clear – despite the fact that whites are arrested for homicide in roughly the same numbers as blacks, they occupy only twenty percent of those condemned to die under federal law, while blacks account for sixty percent of federal death row.

222. The information cited above was available to trial counsel from the Federal Death Penalty Resource Counsel by or before the time of trial. Trial counsel's failure to obtain the information and pursue a viable pre-trial challenge to the Government's racially discriminatory actions was deficient performance. Had counsel performed effectively, it is reasonably likely that the Government would have been precluded from seeking death.

223. Alternatively, the current statistics regarding the application of the federal death penalty constitute new evidence that warrants review of this claim. Although a racially disproportionate pattern of capital charging, standing alone, may be insufficient to demonstrate purposeful discrimination on the basis of race, the numbers here warrant discovery and an evidentiary hearing concerning the Government's authorization process and plea bargaining decisions. Accordingly, Petitioner will pursue both remedies in a to-be-filed motion.

224. Petitioner has proffered evidence that shows that the racial discrepancy present in the administration of the Federal Death Penalty Act, is the work of a single decision maker, i.e. the DOJ. This fact renders the numbers revealed by the attached statistics all the more probative of discrimination. The Court should grant relief from Mr. Higgs' death sentence because the Government's charging and plea practices are influenced by the race of defendants and victims, in violation of the Fifth, Eighth, and Fourteenth Amendments.

**CLAIM VIII.  TRIAL COUNSEL INEFFECTIVELY FAILED TO OBJECT TO THE ADMISSION OF CO-DEFENDANT WILLIS HAYNES' CONFESSION DURING THE PENALTY PHASE OF PETITIONER'S TRIAL ON FIFTH AND SIXTH AMENDMENT GROUNDS.**

225.    Trial counsel failed to object properly during the penalty phase of trial to the admission of statements of co-defendant Willis Haynes, admitted through the testimony of Captain Robert Rule of the United States Park Police.  Captain Robert Rule testified that, according to co-defendant Willis Haynes: "After they returned to Mr. Higgs' apartment at the end of the evening . . . they went into the apartment, began cleaning up the apartment and throwing out various items" TT 10/18/00, 150.  As to the "murder weapon . . . Mr. Higgs drove the van down to Anticostia [sic] Park and pulled over on a spot on Anticostia [sic] Drive not far from the Anticostia [sic] Rec Center pool, and [Mr. Haynes] ran and threw the gun into the river." Id. at 150-51.  Captain Rule thus supplied critical evidence concerning the obstruction of justice aggravating circumstance, eventually found and weighed by the jury.

226.    Mr. Haynes' statements were made to a law enforcement officer in the midst of a custodial interrogation.  TT 10/18/00, 149-50.  They therefore fall within the core class of statements deemed testimonial by the Supreme Court.  Petitioner had no opportunity to cross-examine Mr. Haynes.  Accordingly, the admission of Mr. Haynes' statements violated Petitioner's right to Confrontation under the Sixth Amendment of the United States Constitution. id. at 68-69.  Moreover, since Haynes – as any codefendant – had a strong motive to place blame on his codefendant and to curry favor with law enforcement, that portion of his confession which implicated Petitioner is presumptively unreliable.

227.    Though the rules of evidence do not apply at sentencing, see 18 U.S.C. § 3593(c), it did not — and does not — follow that the Confrontation Clause does not apply.  It does apply, and prohibits the introduction of a co-defendant's confession during sentencing in a capital case,

especially where that confession inculpates the defendant. This is particularly so, since such evidence is presumptively unreliable. Evidence too unreliable to be considered during a guilt phase proceeding, cannot be constitutionally considered during a penalty hearing, when the need for reliable decision making is at its apex. The admission of co-defendant Haynes' presumptively unreliable confession during the penalty phase of Petitioner's trial violated Petitioner's Sixth Amendment right to Confrontation.

228. The introduction of Mr. Haynes' presumptively unreliable confession during sentencing also violated Petitioner's Due Process right under the Fifth Amendment to be sentenced on the basis of reliable information.

229. At the time of Petitioner's trial, clearly established law barred the admission of presumptively unreliable evidence during the penalty phase of a capital case. Because Mr. Haynes' confession clearly inculpated Petitioner and was an important piece of evidence establishing the obstruction of justice aggravating circumstance, trial counsel had no reasonable basis for failing to object to the admission of Captain Rule's testimony on Fifth and especially Sixth Amendment grounds.

230. The deficiency in counsel's performance is especially pronounced because counsel raised other objections to the admission of this evidence. TT 10/18/00, 149 (objecting that the admission of Willis Haynes' statement is "more prejudicial than probative"). Counsel thus considered this evidence, recognized its substantial prejudicial effect, and sought to prevent its admission. Yet counsel failed to articulate a Fifth and/or Sixth Amendment basis for the objection. Counsel's failure, especially considered alongside counsel's unreasonable failure to object to the admission of Mr. Haynes' confession during the guilt phase of the trial, constitutes constitutionally deficient performance.

84

231. Petitioner acknowledges that the Fourth Circuit considered his Sixth Amendment claim on direct appeal. However, because trial counsel never raised the Fifth and/or Sixth Amendment grounds, those arguments were waived in the Court of Appeals. Thus, the Court's review was conducted under the more rigorous plain error doctrine. Since one of the trial counsel also represented Petitioner on direct appeal, he was precluded from raising his own ineffective failure to raise this claim under the proper legal theory. Now that Petitioner can and is raising this claim as one of ineffectiveness, *de novo* review by the Fourth Circuit's ruling is required. Counsels' failure to raise the correct objection, alone or in combination with other of counsels' errors, was ineffective, and the death sentences must be vacated.

**CLAIM IX.** **THE VICTIM IMPACT EVIDENCE, ARGUMENT AND INSTRUCTION ALLOWED THE SENTENCING JURY TO CONSIDER VICTIM FAMILY MEMBERS' VIEWS AS TO THE APPROPRIATE SENTENCE, AND WERE EXCESSIVELY EMOTIONAL AND DUPLICATIVE, IN VIOLATION OF THE EIGHTH AMENDMENT.**

**A.      The Victim Impact Evidence.**

232. The Government presented six victim impact witnesses at the penalty phase of the trial – Tamika Black's mother, Joyce Gaston, and paternal grandfather, Robert Black; Tanji Jackson's mother, Denise Thompson, and aunt, Deborah Blue; and Mishann Chinn's parents, Krishana and Michael Chinn. The testimony of these witnesses consumed sixty-seven (67) pages of transcript and involved introduction of videotapes and photographs of the victims and their families, as well as writings by the victims. See TT 10/19/00, 81-148.

233. Taken together, the evidence presented by these witnesses interjected a constitutionally intolerable level of emotion into the sentencing proceeding and created a corresponding risk that Mr. Higgs' sentence was the product of emotion overwhelming reason.

234. No reasonable person could fail to be affected by the emotional impact of this

testimony, which focused primarily on describing in detail the many good qualities of the victims, and the suffering their family members had endured since each victim's death.

a.      **Joyce Gaston** read a lengthy prepared statement. The entire statement is highly emotional; on several occasions, Ms. Gaston had to pause while reading it to control her own emotions. In her statement, Ms. Gaston told the jury that, as a child, Tamika played with stuffed animals and called them "her good students, " TT 10/19/00, 83; that she "loved kids" and "wanted to be a child psychologist," id. at 84; that Tamika's brother, Sterling, "till this day would not talk about what happened to his sister to me," id. at 85-86; that she had been "saying my daughter was murdered for four years," but that the "pain hurts me like it was yesterday." Id. at 86. Ms Gaston also talked at length about her phobia concerning the color yellow and the yellow jacket Tamika was wearing the night she was killed, id. at 88; described how "when the detective told me what happened I fell to the ground and I screamed," id. at 89; and concluded, "I'm looking for the day when our hearts have some joy, not despair." Id. at 90.

b.      **Robert Black** gave additional details about the emotional effect of Ms. Black's death on her extended family. He told the jury that Ms. Black's father had been unable to attend the trial because "he just couldn't handle it, it is too much of a hurt." TT 10/19/00, 93. He also told the jury about the "big sister" role Tamika played with her younger siblings and cousins. Id. at 95-96. He talked about Tamika's work as a teacher's aide, saying, "It was what she was put on this earth for, to help others, and children was really her dream." Id. at 97-98. He introduced and read excerpts from a package of letters from fourth grade children at the school where she worked, id. at 98-100, and a letter of commendation from her supervisor. Id. at 102. Mr. Black also introduced and described video and still photographs of Tamika and her extended family. Id. at 104-06. Mr. Black read an obituary notice prepared by the family. Id. at

106-08. Finally, he told the jury that the entire family "will never be the same because of this terrible loss." Id. at 109.

c. **Denise Thompson** introduced a videotape of Tanji Jackson with family members, TT 10/19/00, 112-13, and read a statement. Id. at 114-15. In the statement, Ms. Thompson described how she "had to identify [Tanji's body] by her thumb because she sucked her thumb as a child"; described how after Tanji's death she "became dehydrated" and "ended up in the hospital" because she "had stopped enjoying life, stopped doing things"; and concluded:

> Right now I feel like a mother not only with a child that is dead, but also missing. She had no face for me to place with her body. I have yet to say good-bye.
>
> I am not ready to deal with this reality yet. I cannot at this time deal with the hurt. I do not want to think about the fear and pain yet.

Id. at 115.

d. **Deborah Blue** described the closeness of Tanji's extended family. In particular, she described that her husband was "like a father" to Tanji, and how Tanji took care of him when he was dying of cancer. TT 10/19/00, 118. She also told the jury that Tanji and her mother, Denise, had an argument the night Tanji was killed, "and this time they didn't have that chance to make up. My sister, from then on, she stopped doing everything." Id. at 120. Ms. Blue described how Tanji's sister Nikki "right to this day is still devastated over the loss of her sister." Id. Ms. Blue introduced photographs of Tanji and family members, and read the obituary composed by Tanji's family. Id. at 121-22. Finally, Ms. Blue read a religious poem written by Tanji. Id. at 123-24.

e. **Krishana Chinn** described her daughter's many good qualities: "family-oriented"; "trusting"; her love for children and senior citizens; how she helped with her

grandmother who had Alzheimer's. TT 10/19/00, 127-28. After Mishann was killed, Krishana "couldn't take care of myself" or her own mother, and therefore:

> [H]ad to do what I always thought in my life was unspeakable. I had to put my mother in a nursing home. That's the second hardest thing I ever had to do in my life, the first one being having to bury my child.
>
> But I put my mother in a nursing home. Alzheimer's and all, from time to time when I visit her, she is still asking me about Mishann. Where is Mishann? It used to really, really emotionally just disturb me.

Id. at 129.

Krishana further described how devastated she was personally by Mishann's death, and how her "marriage almost didn't survive," because her husband Michael "had no tolerance" for their younger daughter, Sheena, since "he couldn't make her be Mishann." TT 10/19/00, 130. As a result, she described their house as "like a morgue, ... just like a constant wake." Sheena moved away because "it was overwhelming for her." Id. at 130-31. After moving out, Sheena would bring her son over, but still "can't spend any significant time in the house." Id. at 131. Krishana blames herself for having rebuked Sheena for signing Christmas cards "from Sheena and Mishann in spirit," and "cannot stand Mother's Day." Id. at 132.

Krishana introduced a videotape and photographs of Mishann and other family members. Id. at 134-36. She read an obituary notice that emphasized Mishann's many good qualities. Id. at 136-38. Finally, she read a poem in Mishann's handwriting, about love. Id. at 138-40.

    f.  **Michael Chinn** told the jury that the words "always loving, always caring" on Mishann's grave summed up her life. TT 10/19/00, 142. He described Mishann as "the one that pulled everybody together" when there was conflict in the family. Id. at 143. He told the jury that Mishann was his friend as well as his daughter, and that she was getting her life together at the time she was killed. Id. at 145. He finished by telling the jury that even when she

88

was angry at him, she slipped him a card telling him how much she loved him.  Id.

**B.  The Victim Impact Argument.**

235.  Emotional features of the victim impact evidence were the centerpiece of the

Government's argument for death.  Prosecutor Wilkinson introduced the topic as follows:

> Mr. Chinn told you how he lost a friend and Mrs. Chinn a daughter, Mr. Black a granddaughter, and they tried to be as honest and forthcoming as they were, knowing that their hearts had been blown away and they were living in hell as a result of this man's actions.
>
> How do I get you to take that back, that **feeling** back into the jury room with you so you can **weigh** it?  I can't put an exhibit sticker on Mrs. Chinn's heart.  I can't put an exhibit sticker on Mrs. Gaston's pain or Mrs. Thompson's guilt.  How can you weigh, how does one weigh the impact of a child's death upon a parent and the other siblings?
>
> When I was driving to work all I could think of was this analogy, that this is what these family members are carrying around with them.[21]  This, this is the weight of the death of those families because of this man's actions.  This is what you must carry back with you to the jury room.  You might as well put this on a chain around Mrs. Chinn's neck for the rest of her life.  The guilt and the pain is so heavy, we cannot imagine that.

TT 10/25/00, 15.

236.  After a brief digression, Ms. Wilkinson returned to this theme:

> And you are entitled under the law to weigh that, the impact of that.  You are entitled to take this rock with you back there and **feel what these families are going through now** five years after these girls are dead **and relive it**, seeing the autopsy pictures, seeing the clothing, having to describe going to the morgue and identifying your daughter by her thumb because she has no face.  You are entitled to take that back with you to your jury deliberations.

TT 10/25/00, 16.

237.  The Government then used the victim impact evidence to denigrate the mitigating

---

[21]At this point, Ms. Wilkinson apparently brought out a heavy rock.  See TT 10/25/00, 16 ("You are entitled to take this rock with you back [to the jury room]").

evidence offered by Petitioner. For example, Ms. Wilkinson argued that the proffered mitigating factor that Mr. Higgs was not the sole proximate cause of the victims' death "doesn't mitigate, doesn't make less what happened, doesn't chip one little bit off of this rock." TT 10/25/00, 18. She told the jury that the mitigating circumstance that Mr. Higgs' mother died when he was ten was a "cowardly mitigating circumstance." Id. at 19. And she told the jury that the impact of Mr. Higgs' execution on his own son was irrelevant because Mr. Higgs "ripped the right of these three young women to have children." Id. at 21. Finally, Ms. Wilkinson argued that the proffered statutory mitigating circumstance that Petitioner's equally culpable co-defendant received a life sentence should not be considered because it "does not do justice" to the victims. Id. at 24.

238. The Government returned even more egregiously to its theme of victim impact in its rebuttal argument. There, the prosecution strongly implied that the family members wanted Mr. Higgs to be executed, thus tying together all of the emotional testimony and evidence that preceded it in one unifying plea for death:

> [The defense] says [life imprisonment is] punishment....
>
> You ask each one of the family members here what they wouldn't give for their daughters to be in Lewisburg Penitentiary rather than where they are.

TT 10/25/00, 73.

### C. The Victim Impact Instructions.

239. This Court instructed the jury as follows concerning the victim impact aggravating factor:

> The defendant, it is alleged, caused injury, harm or loss to the victim and the victim's family because of the effect of the offense on the victim, the victim's personal characteristics as an individual human being, and the impact of the death upon the victim and the victim's family....

*    *    *

To establish this factor, the government must prove that the defendant caused injury, harm and loss to the victim and the victim's family as a result of killing the victim.

The effect of the offense on the victim means the specifically (sic) harm to the victim caused by the defendant.

The victim's personal characteristics as an individual human being means who the victim was in life and those aspects of the victim's character and personality that her family would miss the most.

The impact of the death upon the victim and the victim's family means the extent and scope of the injury and loss suffered by the victim and the victim's family.

TT 10/25/00, 168-70.

**D.    The Constitutional Violations.**

240.    Based on the evidence presented, the Government's arguments, and the jury court's instructions, the jurors unanimously found the victim impact aggravating factor and weighed it against the mitigating factors. Relying in part on the victim impact aggravating factor, the jury unanimously imposed nine death sentences on Petitioner (three for each victim). See Higgs-1, 353 F.3d at 295. The victim impact aggravating factor was constitutionally invalid, for several reasons.

241.    First, the level of emotion presented by the impact evidence violated the Eighth Amendment. While such evidence is not precluded by the Eighth Amendment, the prohibition against cruel and unusual punishment still requires that the capital jury return a reliable and individualized sentence. That function was impeded by the highly emotional presentation.

242.    Second, the prosecutors' closing argument in effect told the jury to impose a death sentence because that is what was desired by the victims' families. That sort of an appeal is also precluded by the Eighth Amendment.

91

243. Third, under the Eighth Amendment, an aggravating factor is invalid if it fails to guide the sentencing jury's discretion. Here, both the victim impact aggravating factor itself, and the instructions provided by the trial court, gave the jury no guidance whatsoever as to how to apply the victim impact factor.

244. Not only does the victim impact aggravating factor, as described by the trial court – a showing that "the defendant caused injury, harm and loss to the victim and victim's family as a result of killing the victim," TT 10/25/00, 170 – obviously apply in every case of murder, but that factor was also portrayed by the Government as an enormous rock that per se outweighed any mitigation that the defense had produced or could produce. The result was that the tail wagged the dog – the fact that Mr. Higgs committed a murder virtually required that the death sentence be imposed, according to the Government. This Court gave the jury no instruction to guide it or mitigate the impact of the Government's argument. The resulting death sentence violates the Eighth Amendment.

245. Finally, trial and appellate counsel were ineffective for failing to object to the introduction of the evidence and testimony, for failing to object to the arguments and for failing to object to this Court's instructions on the victim impact evidence.

**CLAIM X. THE SUBMISSION OF MR. HIGGS' PRIOR CONVICTION FOR ASSAULT AND RECKLESS ENDANGERMENT AS A STATUTORY AGGRAVATING FACTOR UNDER 18 U.S.C. § 3592(C)(2) (PREVIOUS CONVICTION FOR FELONY INVOLVING FIREARM) VIOLATED THE EIGHTH AMENDMENT AND DUE PROCESS CLAUSE OF THE FIFTH AMENDMENT, BECAUSE (1) THESE OFFENSES DID NOT NECESSARILY INVOLVE USE OF A FIREARM, AND (2) THE CONVICTION FOR THESE OFFENSES DID NOT TAKE PLACE PREVIOUS TO THE INSTANT OFFENSE. DEFENSE COUNSEL WAS INEFFECTIVE AT TRIAL AND ON APPEAL FOR NOT MAKING THE PROPER OBJECTIONS AND ARGUMENTS.**

246. During the penalty phase, the Government was permitted to submit as an aggravating factor Mr. Higgs' prior conviction for assault and reckless endangerment arising

92

from an incident at Cherry Lane in Laurel, Maryland, on December 10, 1995, for which Mr. Higgs was convicted in April, 1997. TT 2/10/00, 10-35; 10/24/00, 157. The Government submitted this conviction as a statutory aggravating factor under 18 U.S.C. § 3592(c)(2), which applies if the defendant "has previously been convicted of [a felony offense] involving the use or attempted or threatened use of a firearm . . . against another person."

247. The use of this prior conviction as a statutory aggravating factor violated the Fifth and Eighth Amendments for two reasons. First, the state charges of assault and reckless endangerment do not necessarily involve use of a gun. The guilty plea therefore did not constitute a conclusive judicial determination that a gun was "involved." Indeed, Mr. Higgs denied he possessed a .38 caliber gun during the guilty plea colloquy, and then stated, "It was the other way around." TT 10/04/00, 178. The state court judge never addressed or clarified Mr. Higgs' denial of the possession of the gun, and thus this factual dispute was not resolved. Second, this conviction was not previous to the instant offense.

248. Regarding the first reason, both this Court and Court of Appeals did not apply a "categorical approach," for determining whether this prior conviction involved the use of a firearm. Under this approach, the court should look only to the elements of the offense of conviction to determine whether the fact in question – in this case use of a firearm – was necessarily found by the fact-finder. In the context of a guilty plea, the court can also consider the statement of the factual basis for the plea, to the extent that the defendant admitted or adopted those factual allegations in admitting to the elements of the offense. The court should not rely on other allegations in the record that were not judicially determined to be true.

249. The Court of Appeals rejected the application of the categorical approach on the ground that this approach is not required for § 3592(c)(2) since this section applies to prior

93

convictions "**involving** the use or attempted use or threatened use of a firearm." The Court of Appeals concluded that the use of the word "involve[s]" requires the court to look beyond the elements of the offense to the offense conduct itself. Higgs -1, at 316.

250.   But in a recent published opinion, the Court of Appeals has taken a contrary position. In United States v. Washington, 404 F.3d 834 (4th Cir. 2005), the Fourth Circuit recognized that the categorical approach is of "Sixth Amendment significance," and held that it applies even when the word "involves" is used. Id. at 840-41. The Court ruled that, for purposes of enhancement under the federal sentencing guidelines, the categorical approach applies to the determination of whether the defendant has a conviction for an offense which "otherwise *involves* conduct that presents a serious potential risk of physical injury to another." USSG § 4B1.2(a)(2), Washington, 404 F.3d at 842.

251.   The Fourth Circuit's ruling in Washington applies to the federal death penalty statute and constitutes an intervening change in the law cognizable on a § 2255 motion. This ruling compels the conclusion that the offenses of assault and reckless endangerment do not necessarily involve the use of a firearm, and that therefore Mr. Higgs' conviction for these offenses should not have been presented to the jury as an aggravating factor under 18 U.S.C. § 3592(c)(2). Given Washington's clear application to the statutory language involved here, moreover, the failure to apply this ruling would render the death penalty in this case arbitrary and capricious in violation of the Eighth Amendment.

252.   Thus the jury's finding and weighing of this statutory aggravating factor violates the Eighth Amendment. In a weighing death penalty statute, such as the FDPA, statutory aggravating factors play two roles: 1) they limit the universe of those eligible for death; and 2) they are weighed against mitigating factors to determine death-selection. When the scope of an

94

aggravating factor is expanded beyond its plain meaning, as the factor was in this case, both roles are arbitrarily compromised. The jury's finding and weighing of the factor, thus violates the Eighth Amendment.

253. Although counsel did object to this factor and argued that the categorical approach applied, to the extent that counsel did not also argue in the district court and on appeal that Mr. Higgs' Sixth Amendment rights were violated by consideration of this prior conviction as a statutory aggravator, counsel was ineffective.

254. The second reason for which the assault and reckless endangerment conviction should not have been submitted as an aggravating factor is that Mr. Higgs did not receive this conviction **previous to** the instant offenses. The word "previously" as used in the statute can only be understood as meaning "previous to" the "offense" for which death is sought, since this "offense" is the only other event referred to in § 3592(c)(2) and § 3592(c). Moreover, to interpret this term as requiring only that the conviction be previous to the instant penalty phase hearing would be to reduce the word "previously" to mere surplusage. When the scope of an aggravating factor is expanded beyond its plain meaning, as the factor was in this case, both roles that the factor plays are arbitrarily compromised. The jury's finding and weighing of the factor, thus violates the Eighth Amendment.

255. Counsel was ineffective for failing to raise these arguments either before this Court or in the Court of Appeals.

**Claim XI.** THE SUBMISSION OF MR. HIGGS' CONVICTION FOR VIOLATION OF THE FEDERAL DRUG STATUTE IN 1997 AS AN AGGRAVATING FACTOR UNDER 18 U.S.C. § 3592(C)(12) VIOLATED THE EIGHT AMENDMENT BECAUSE THIS SUBSECTION ONLY APPLIES TO FEDERAL DRUG CONVICTIONS FOR WHICH MR. HIGGS "HAD PREVIOUSLY BEEN CONVICTED," AND THIS LANGUAGE MEANS THE CONVICTION HAD TO HAVE TAKEN PLACE PRIOR TO THE INSTANT OFFENSE, WHICH OCCURRED IN 1996.

256. The homicides in this case occurred on January 27, 1996. Mr. Higgs was subsequently convicted of violating the federal drug statutes for conduct that post-dated January 27, 1996. On May 12, 1997, Mr. Higgs pleaded guilty to these federal drug offenses, and the judgment was entered on December 9, 1997. The Government was allowed to submit this conviction as a statutory aggravating factor under 18 U.S.C. § 3592(c)(12), which applies only if the defendant "had **previously** been convicted of" a federal drug offense for which the sentence could be five or more years in prison. TT 2/10/00 78-104; 10/24/00 157-58. Under the plain language of the statute and a recent decision of the Court of Appeals for the Fourth Circuit, this conviction should not have been permitted as a statutory aggravating factor because it did not occur prior to the instant offense.

257. Counsel raised this issue in the district court and the Court of Appeals, arguing that under a plain reading of the statute, the phrase "had previously" must be interpreted as requiring that the federal drug conviction have been entered prior to the commission of the instant offense. Any other interpretation renders these words mere surplusage. The Court of Appeals rejected this argument, reasoning that this provision applies to all federal drug offenses occurring prior to sentencing. Higgs -1, at 317-18.

258. More recently, however, the Fourth Circuit has taken a contrary position with regard to the similar recidivist enhancement language in the Armed Career Criminal Act, 18 U.S.C. § 924(e)(1). In United States v. Pressley, 359 F.3d 347 (4th Cir. 2004), the court ruled that the phrase "three previous convictions," which triggers a 15 year mandatory minimum sentence for a § 922(g) violation, must be read as requiring that the three convictions be *previous to* the § 922(g) violation, since this is the only event mentioned in the statute that the word "previous" could refer to. Moreover, as the court explained, any other interpretation would

render the word "previous" mere surplusage.  Id. at 350.

259.    There is no principled reason that Pressley's reasoning and interpretation of the word "previous" should not be equally applicable to § 3592(c)(12).  The words "had previously been convicted of" can only be read as being in reference to the instant "offense" mentioned in § 3592(c), for which a sentence of death is justified by the enumerated factors, including § 3592(c)(12).  The drug felony conviction thus must be **previous to** the instant "offense" for which death is sought.  As in Pressley, any other interpretation would render the words "had previously" mere surplusage.

260.    The jury's finding and weighing of this statutory aggravating factor violates the Eighth Amendment.  In a weighing death penalty statute, such as the FDPA, statutory aggravating factors play two roles: 1) they limit the universe of those eligible for death; and 2) they are weighed against mitigating factors to determine death-selection.  When the scope of an aggravating factor is expanded beyond its plain meaning, as the factor was in this case, both roles are arbitrarily compromised and this element of arbitrariness violates the Eighth Amendment.

261.    Moreover, Pressley constitutes an intervening change in the law cognizable in a § 2255 motion.  Given Pressley's clear application to the statutory language involved here, the failure to apply this ruling would also render the death penalty in this case arbitrary and capricious in violation of the Eighth Amendment.

CLAIM XII.    THE FOURTH CIRCUIT IMPROPERLY ASSUMED THAT PRESENTATION OF THE INVALID "MULTIPLE KILLINGS" AGGRAVATING FACTOR TO THE JURY DID NOT INFECT THE JURY'S WEIGHING PROCESS, IN VIOLATION OF THE EIGHTH AND FOURTEENTH AMENDMENTS.

262.    The Fourth Circuit found that the "'multiple killings' aggravator was improperly

97

submitted to the jury as a statutory aggravating factor." Higgs 1, at 319. The Fourth Circuit held, however, that the error was harmless because the jury also found other statutory aggravating factors. Id. (citing and quoting Zant v. Stephens, 462 U.S. 862, 884 (1983)). In so ruling, the Fourth Circuit committed Eighth Amendment error.

263. The Federal Death Penalty Act is a weighing statute. In contrast, Georgia's sentencing statute, the application of which was reviewed in Zant, is a non-weighing statute. The difference is critical. In a weighing jurisdiction, the sentencer must weigh the aggravating factor or factors against the mitigating evidence, while in a non-weighing state such as Georgia, the factfinder takes into consideration all circumstances before it from both the guilt-innocence and the sentence phases of the trial.

264. Here, the Fourth Circuit incorrectly applied Zant to support its conclusion that no harm was caused by the weighing of an invalid aggravating factor. In other words, the Fourth Circuit held that presentation of an invalid statutory aggravating factor did not affect the sentencing decision, given the presence of other valid statutory aggravating factors. While such an assumption is permissible in a non-weighing state, it violates the Eighth Amendment in a weighing state.

265. Here, the Fourth Circuit simply assumed that the invalid "multiple killings" aggravating factor would not have made a difference in the weighing process. Such an assumption violates the Eighth Amendment in a weighing scheme like the Federal Death Penalty Act.

266. Since this error was committed by the Court of Appeals on direct review, Petitioner could obviously not raise it on direct appeal. He did, however, raise this in his *Petition for Rehearing and Suggestion for Rehearing En Banc* at 12-13. He also raised it in his

98

*Petition for Certiorari to the United States Supreme Court* at 28-31. However, since both rehearing and rehearing en banc, and a petition for certiorari, are highly discretionary, this is the first opportunity for Petitioner to present this plain legal error for review.

**CLAIM XIII. DEFENSE COUNSEL WERE INEFFECTIVE FOR FAILING TO INTERVIEW AND CALL AS WITNESSES GERALD VAUGHN AND KEVIN DARNELL ANDERSON.**

267. Willis Haynes was tried before Mr. Higgs, and during the Haynes trial the government identified two witnesses, Gerald Vaughn and Kevin Darnell Anderson, who had been incarcerated with Haynes at the Charles County Detention Center. Both Vaughn and Anderson told the government that they had conversations with Haynes about the murders. Defense counsel were ineffective for failing to interview and call these two witnesses.

268. Vaughn, who was called as a witness at the Haynes trial, testified that shortly after Haynes's arrest in the fall of 1998, Haynes told Vaughn that he had tricked the three women into getting into Higgs's van, and that Haynes had used a .38 caliber gun to kill them. United States v. Haynes, 26 Fed. Appx. 123, 128 (4th Cir. 2001) (unpublished opinion). Vaughn has also stated to Robert Durand, an investigator for counsel on the instant § 2255 motion, that Haynes never said that he had been ordered or forced to kill the women by someone else. Vaughn said Haynes bragged about the murders and said, "Them bitches ain't shit." Recalling a book which both Vaughn and Haynes had read in which a female character cheated on her boyfriend, Haynes told Vaughn, "That's exactly why I killed those bitches."

269. Kevin Anderson was not called as a witness at the Haynes trial, but notes of his statements to government attorneys were submitted to the court under seal. According to these notes, Anderson told the prosecutors that he had seen a confrontation between Haynes and another inmate over use of a telephone. In response to the inmate's comment that "you think

99

[you're] big stuff because you killed [three] women," Haynes replied, "I'll kill whoever the f— I want to kill." Anderson also said that Haynes told him "he had to kill" one of the women because she may have "set him up." <u>Higgs -2</u>, at 6.

270. The testimony of Vaughn and Anderson would have been exculpatory at the guilt phase of Petitioner's trial because it would have supported the defense theory that Haynes, the actual triggerman, was acting for his own reasons and of his own accord in shooting the three women, and not at the behest of Petitioner. The testimony of these two witnesses would have similarly been mitigating during the penalty phase of Mr. Higgs's trial because it would have shown that Haynes was more culpable than Mr. Higgs, or at least that they were equally culpable. Their testimony thus would have been powerful support for the mitigating factor advanced by the defense that an equally culpable co-defendant had received a life sentence, and it would have helped to diminish Petitioner's overall level of culpability. In either event, these witnesses would have provided mitigating evidence.

271. Given the exculpatory and mitigating nature of these witnesses, counsel were ineffective under the Sixth Amendment for failing to interview and call them at either phase of trial.

**CLAIM XIV. PETITIONER'S DEATH SENTENCES VIOLATED THE FIFTH AND EIGHTH AMENDMENTS BECAUSE THE GOVERNMENT FAILED TO INDICT MR. HIGGS FOR THE AGGRAVATING FACTORS REQUIRED FOR A CAPITAL OFFENSE, OR FOR THE ADDITIONAL NON-STATUTORY FACTORS RELIED UPON BY THE GOVERNMENT DURING THE PENALTY PHASE.**

272. The indictment in this case made no mention of the federal death penalty and did not charge the aggravating factors required for a capital offense under 18 U.S.C. § 3592(c) or any of the additional non-statutory aggravating factors relied upon by the government during the penalty phase. This violated the Fifth and Eighth Amendments to the Constitution because any

100

facts that increase the penalty for a crime beyond the prescribed statutory maximum must also be charged in an indictment. The failure of the government to allege the aggravating factors in the indictment renders the death penalty in this case unconstitutional.

CLAIM XV. **PETITIONER'S DEATH SENTENCES WERE OBTAINED IN VIOLATION OF THE FIFTH, SIXTH AND EIGHTH AMENDMENTS BECAUSE THE COURT FAILED TO INSTRUCT THE JURY THAT IN REACHING ITS PENALTY VERDICT, IT MUST DETERMINE BEYOND A REASONABLE DOUBT WHETHER THE AGGRAVATING FACTORS OUTWEIGHED MITIGATING FACTORS, AND BECAUSE COUNSEL INEFFECTIVELY FAILED TO OBJECT TO THE IMPROPER INSTRUCTION OR TO PROPOSE A CONSTITUTIONAL INSTRUCTION.**

273. Although this Court instructed the jury that it must determine whether the government has proven the aggravating factors beyond a reasonable doubt, the court failed to instruct the jury that this reasonable doubt standard must also apply to the weighing of the aggravating and mitigating factors. The jury was provided with the following penalty phase instruction regarding the weighing process:

> You must decide in regard to each capital offense for which you have found the defendant guilty whether the aggravating factor or factors which have been found to exist for that offense sufficiently outweigh the mitigating factor or factors found to exist for that offense so as to justify imposing a sentence of death on the defendant for that offense; or in the absence of any mitigating factor or factors, whether the aggravating factors alone **are sufficient to justify** imposing a sentence of death on the defendant for that offense.

TT 10/24/00, 148. Further on, the jury was similarly instructed as follows:

> After you have decided upon the aggravating and mitigating factors that are present as to the defendant with regard to each offense, the law then requires you to weigh those factors and to decide whether you are unanimously persuaded that the aggravating factors sufficiently outweigh any mitigating factors to justify imposing a sentence of death.
>
> Even if you determine that no mitigating factors have been proven to exist, you must consider whether the aggravating factors that have been proven are themselves sufficient to justify imposing a sentence of death.

    *                *                *

This is not a mechanical process. You should not simply count the number of aggravating and mitigating factors and reach a decision based upon which number is greater. Instead, you must consider the weight and value of each factor in making your decision.

TT 10/24/00, 176-77.

274. The failure to instruct the jury that it must determine beyond a reasonable doubt whether the aggravating factors sufficiently outweighed any mitigating factors, violated Mr. Higgs' Fifth Amendment right to due process and his Eighth Amendment right to be free of the arbitrary and capricious imposition of the death penalty. Before a statutory sentence enhancement can be imposed, the jury is required to have made all findings necessary for that enhancement beyond a reasonable doubt. Under the federal death penalty statute, no death penalty can be imposed unless the jury first finds that the aggravating factors "sufficiently outweigh" any mitigating factors. See 18 U.S.C. § 3593(e). Thus, since this weighing determination is one that triggers the enhanced penalty of death, it is a determination that must be made beyond a reasonable doubt.

275. Defense counsel for Mr. Higgs were ineffective for failing to object to this Court's weighing instruction, and for failing to propose a correct instruction requiring that this determination be made under the reasonable doubt standard.

276. Additionally, to the extent that the Court's instructions mirrored the Federal Death Penalty Act (see 18 U.S.C. § 3593(e)(3)) (requiring only that the aggravating factors "found to exist sufficiently outweigh" mitigating factors that are found), the FDPA unconstitutionally diminishes the Government's penalty phase burden and thus violates the Fifth and Eighth Amendments.

**CLAIM XVI. THE TRIAL COURT EXCLUDED FROM THE JURY'S CONSIDERATION AS A MITIGATING FACTOR THE FACT THAT A LIFE SENTENCE WOULD MEAN THAT**

**MR. HIGGS WOULD BE IMPRISONED TILL HE DIES, IN VIOLATION OF THE EIGHTH AMENDMENT; APPELLATE COUNSEL'S FAILURE TO RAISE THIS CLAIM DEPRIVED PETITIONER OF THE EFFECTIVE ASSISTANCE OF APPELLATE COUNSEL.**

277. Under the Eighth Amendment, a capital sentencing jury may not be precluded from considering and giving effect to all relevant mitigating evidence.

278. The defense requested that the jury be instructed that it could consider the fact that Mr. Higgs, if sentenced to life in prison, would be imprisoned in a federal penitentiary until the day he dies. TT 10/18/00 at 19-20. The trial court declined to provide the requested instruction. Id. at 29.

279. A capital defendant's ineligiblity for parole is in itself a mitigating factor. Moreover, the reasonable inference that a life sentenced defendant would not pose a future danger to society is mitigating in the sense that it might serve as a basis for a sentence less than death. Therefore, evidence that the defendant would not pose a danger if spared (but incarcerated) must be considered mitigating.

280. The trial court's refusal to instruct the jury that Petitioner's ineligibility for parole could be considered as a mitigating factor prevented the jury from considering and giving effect to relevant mitigating evidence, in violation of the Eighth Amendment.

281. The trial court's error was preserved and available to be raised on appeal. Appellate counsel, however, ineffectively failed to raise it.

282. Appellate counsel had no reasonable basis for failing to raise this obvious Eighth Amendment error. The Eighth Amendment requirement that the jury not be precluded from considering and giving effect to all relevant mitigating evidence was long-standing at the time of Petitioner's trial.

103

283. Petitioner was prejudiced by appellate counsel's failure to raise this claim. Had appellate counsel raised the claim, it is reasonably likely that Petitioner's death sentence would have been vacated on direct appeal. Appellate counsel's ineffective failure to raise the claim deprived Petitioner of his due process right to the effective assistance of appellate counsel. Petitioner's death sentence should be vacated.

**CLAIM XVII. THE FOURTH CIRCUIT ERRED IN THE MATERIALITY ANALYSIS OF PETITIONER'S CLAIM UNDER BRADY V. MARYLAND.**

284. In the course of preparing his direct appeal to the Fourth Circuit, appellate counsel became aware of two witnesses – undisclosed by the Government to trial counsel – who had heard Petitioner's co-defendant Haynes make statements that cast Haynes' participation in the offense in a more culpable light than did the testimony of key Government witness Victor Gloria. Upon learning of these witnesses' statements, appellate counsel moved for a new trial and new sentencing hearing, alleging that the Government's failure to disclose the statements violated Brady v. Maryland, 373 U.S. 83 (1963). See Higgs-2, at 40-41. The trial court denied the motion, and the Fourth Circuit affirmed. Id. at 44.

285. With respect to Petitioner's sentencing claim, the Fourth Circuit ruled that Petitioner was required to make the following showing as to materiality:

> [T]o establish materiality, Higgs was required to demonstrate a reasonable probability that the evidence would have persuaded a juror to reach the conclusion that Haynes was "equally culpable" to Higgs in the murders, *and* that this mitigating factor, combined with the others, would have tipped the balance and led the juror to also conclude that the mitigating factors outweighed the aggravating factors so as to foreclose the sentence of death.

Higgs-2, 95 Fed. Appx. at 43 (emphasis in original). The Fourth Circuit found that Petitioner could not meet that standard, and affirmed the district court's denial of relief on that basis. Id. at 44.

286. The standard applied by the Fourth Circuit, however, is incorrect. <u>Brady</u> materiality analysis does require a showing that it is reasonably probable that the result of the proceeding would have been different, had the evidence been disclosed to the defense.

287. In order to obtain a different result at sentencing, moreoever, Petitioner would not have been required to convince a juror "that the mitigating factors **outweighed** the aggravating factors so as to **foreclose** the sentence of death." Rather, as the trial court properly instructed the jury, any juror could have voted for life (requiring the imposition of a life sentence) if **not** "persuaded that the aggravating factors **sufficiently outweigh** any mitigating factors **to justify** imposing a sentence of death." TT 10/25/00, 176.

288. This is not a matter of mere semantics; how the inquiry is phrased is critically important, given the nature of the mitigating circumstance at issue – that Mr. Haynes and Mr. Higgs were equally culpable, but Mr. Haynes had received a life sentence. That mitigating circumstance – if established, as it likely would have been had the evidence been disclosed – does not in itself diminish the defendant's culpability. Rather, it shows that, despite the defendant's culpability, imposing death on him would be unfair – and therefore unjustified – given the more lenient treatment afforded his equally culpable co-defendant. Thus, its effect is at least as much on the justification for the death sentence as on the relative weight of the aggravating and mitigating factors.

289. Here, the Fourth Circuit opined that establishing the equal culpability mitigating factor would not have been sufficient to outweigh the aggravating factors. Assuming *arguendo* that is true, however, it is still reasonably likely that showing the equal culpability of Mr. Haynes would have convinced at least one juror that imposing a death sentence on Mr. Higgs was not

justified. On that basis, Petitioner has established materiality as to the sentencing hearing. Mr. Higgs is entitled to a new sentencing proceeding.

**CLAIM XVIII.** **TESTIMONY REGARDING PETITIONER'S POST-ARREST SILENCE VIOLATED PETITIONER'S RIGHTS UNDER THE FIFTH AND SIXTH AMENDMENTS.**

290. Dominic Williams was incarcerated with Petitioner during a portion of his pre-trial proceedings. He testified to various conversations between himself and Petitioner during which Petitioner's allegedly made admissions. TT 10/4/00, 29-53. One such conversation, however, implicated Petitioner's right to remain silent and his right to counsel.

291. Mr. Williams testified that Petitioner told him that he was visited by officers who wanted to see if he would cooperate against his co-defendant. According to Williams, Petitioner told him that he did not speak with the officers because he did not wish to. Id., at 42-43.

292. Petitioner had a Fifth Amendment right to remain silent at the time of this visit from law enforcement officials and he had a right to counsel under the Sixth Amendment. Accordingly, his rights under each were violated when Williams testified to his refusal to speak with them.

293. Trial and appellate counsel both failed to raise this claim either by objecting at trial or by raising it on direct appeal. There could have been no tactic or strategy for failing to object and/or raise this claim on appeal.

**CLAIM XIX.** **PETITIONER'S RIGHTS UNDER THE FIFTH AMENDMENT WERE VIOLATED DURING THE PENALTY PHASE WHEN THE COURT NEGLECTED TO INSTRUCT THE JURY TO DRAW NO ADVERSE INFERENCE FROM THE FACT THAT PETITIONER DID NOT TESTIFY.**

294. Petitioner did not testify at either the guilt or penalty phase of trial. During its guilt phase instruction, this Court told the jury to draw no adverse inference against Petitioner from the fact that he did not testify. TT 10/10/00, 44. This instruction was particularly

appropriate in view of the testimony and instructions that the Court gave in regard to adverse inferences that the jury could draw from Petitioner's silence during his conversation with Grayson. See TT 10/5/00, 49.

295. Counsel apparently did not see fit to request the same adverse inference instruction in the penalty phase. Petitioner's right to remain silent still applies in the sentencing phase of a capital prosecution. However, since the Court instructed the jury not to draw such an inference in the guilt phase, there was a constitutionally unacceptable risk that the jury would have found that the lack of such instruction meant that it **could** draw an adverse inference against Petitioner in the penalty phase.

296. Counsels' failure to request this instruction was ineffective, as there could be no sound tactic or strategy for not requesting this instruction in the second phase of trial after having requested it in the first. Again, counsels' failure in this regard was particularly egregious in view of the guilt phase instruction that the jury could draw such an adverse inference in regard to the Grayson conversation.

297. To the extent that Appellate counsel could raise trial counsels' ineffectiveness in view Mr. Sullivan's on-going representation of Petitioner on direct appeal, appellate counsel ineffectively failed to raise this claim on direct appeal as either one of ineffectiveness or for review as plain error.

**CLAIM XX. PETITIONER'S CONVICTIONS WERE OBTAINED IN VIOLATION OF THE FIFTH AND SIXTH AMENDMENTS BECAUSE THE GOVERNMENT FAILED TO PROVE BY SUFFICIENT AND COMPETENT EVIDENCE THAT THE OFFENSES OCCURRED WITHIN THE SPECIAL MARITIME AND TERRITORIAL JURISDICTION OF THE UNITED STATES. COUNSEL INEFFECTIVELY FAILED TO CHALLENGE THE GOVERNMENT'S INSUFFICIENT PROOF AND/OR TO OBJECT TO THE "EXPERT" OPINION TESTIMONY OF A WITNESS WHO WAS NEITHER TENDERED NOR ACCEPTED AS AN EXPERT WITNESS.**

298.    As this Court is well aware, the killings of the three women took place in the Patuxent Wildlife Refuge.  Equally clear, the defense did not concede the Government's jurisdiction over these offenses, but instead put the Government to its proof.

299.    Federal jurisdiction over an offense is an element of a federal offense that must be proven beyond a reasonable doubt.  Like any other element, jurisdiction must be proven by sufficient evidence.  Here, there was a dearth of competent evidence proving the jurisdictional element.

300.    The only proof of jurisdiction was introduced through the testimony of Douglas Vandergraft, who at the time of his testimony was the Chief Cartographer for the United States Fish and Wildlife Service.  He had been in that position for less than one year at the time of his testimony.  TT 10/5/00, 2.  In response to a Government question as to whether he oversees the production of the Government's maps, he explained his duties as such:

> I am actually a one person section.  The mapping is done by different regional offices. There are several of those throughout the United States and they send their maps into me and I maintain them in a National Status Atlas so that anytime we can look up the current land ownership of a particular holding by the Fish and Wildlife Service and **hopefully** that map will be current and up-to-date.

Id., at 3.  Thus, at most – and assuming as Mr. Vandergraft "hoped" – the maps provided an up-to-date and current recording of who "owned" the land in question.

301.    After reviewing the maps introduced by the Government (id., at 4-5), Mr. Vandergraft testified that they accurately reflected the "ownership and jurisdiction" of the United States over the lands in question in this case.  Id., at 5.  In response to a question as to whether a state easement for Route 197 "changed ownership or jurisdiction" Mr. Vandershaft opined that it did not.  Id., at 7.  He also testified to his opinion that the fact that the State of Maryland maintains the roadbed of Route 197 does not "effect" jurisdiction.  Id.

108

302.     He provided further opinions about the significance of the date that certain lands were acquired.  Those acquired by the Federal Government before 1940 (such allegedly as the land in issue in this case) were subject to the exclusive jurisdiction of the United States and those after, were subject only to proprietary jurisdiction.  Id., at 8.  Finally, he was asked whether the maps he reviewed would reflect if the land under Route 197 was owned by the State of Maryland, and he testified that in his opinion, the maps "probably" would reflect that ownership.  On redirect examination, he testified to a further opinion, that the fact that the State of Maryland has a "right of access" has nothing to do with "ownership or jurisdiction."

303.     Several glaring flaws leap from Mr. Vandergraft's testimony.  First, he was never qualified as an expert witness, and therefore his opinions about land ownership and jurisdiction, and changes thereto, were incompetent.  Second, whether the United States has jurisdiction over a piece of land is a legal conclusion.  While such conclusions are permitted under Fed.R.Evid. 704, they can only be admitted by a duly qualified expert.  Third, Mr. Vandergraft's opinions were based upon hearsay.  Admittedly, they were theoretically admissible under the exception to the hearsay rule embodied in Fed.R.Evid. 803.  However, in this instance, the requirements of Rule 803 were not met because Mr. Vandergraft failed to testify that the records were accurate.  In this respect, it must be recalled that his testimony was that "hopefully" the maps were accurate and that the potential ownership of the State of Maryland would "probably" be reflected on the maps admitted by the Government.

304.     Counsel ineffectively failed to object to these flaws and simply permitted him to go forward with his incompetent testimony.  Had counsel challenged him or moved for dismissal at the conclusion of the Government's case, the motion would have had to have been granted.  Hence, counsels' deficient performance caused Petitioner prejudice.

109

305. Matters were not helped by the fact that this Court's instructions to the jury on the element of jurisdiction were not consistent. In various points of the charge, the Court instructed the jury that it must find that the offenses occurred within the special maritime and territorial jurisdiction of the United States. See e.g. TT 10/11/00, 65. However, at other points the Court told the jury that it could find jurisdiction if it found that the offense were committed within the Wildlife Refuge. See e.g., id..

306. Trial counsel ineffectively failed to object to the confusion engendered by these instructions. Appellate counsel ineffectively failed to raise this claim on direct appeal. Neither could have possessed tactical or strategic reasons for not raising these claims.

**CLAIM XXI. THE TRIAL PROSECUTORS VIOLATED THE DUE PROCESS CLAUSE WHEN THEY FAILED TO PROVIDE TRIAL COUNSEL WITH ALL WITNESS STATEMENTS AND REPORTS GENERATED BY THE PARK POLICE AND THE FBI.**

307. The due process clause of the Fifth Amendment requires the prosecution to provide to the defense with all evidence that is exculpatory as to guilt or that mitigates punishment. Undersigned counsel believes that trial counsel was not provided with all such exculpatory material in the hands of the Government. Petitioner will move for such discovery, but for now alleges that the Government has not met this due process requirement.

308. Undersigned counsels' belief is based in part on the above-described violations of Petitioner's due process rights.

**CLAIM XXII. PETITIONER IS ENTITLED TO RELIEF BASED UPON THE CUMULATIVE ERRORS IDENTIFIED ABOVE.**

309. Claims of constitutional error are to be considered cumulatively as well as individually, and that cumulative error or prejudice may provide a basis for relief whether or not the effect of individual deficiencies warrants relief. The circumstances of this case demonstrate

110

the cumulative effect of counsel's serious and inexplicable failures, and the other constitutional errors by the Court and prosecutors, so undermined the fairness of the trial and sentencing proceedings that Petitioner's convictions and sentences must be vacated. Given the magnitude and quantity of errors described above, there can be no doubt that Petitioner was prejudiced at both phases of trial.

**Claim XXIII. PETITIONER IS ENTITLED TO AND REQUEST THAT THE COURT PROVIDE AN EVIDENTIARY HEARING ON ALL DISPUTED ISSUES OF MATERIAL FACT.**

310. A post-conviction court is vested with wide discretion to conduct evidentiary hearings with regard to dispute material facts in a section 2255 or habeas corpus proceeding. When a petition pleads facts which would entitle him to relief if they are established, the court should conduct such a hearing. As demonstrated above, Petitioner has alleged a multitude of facts which, if proven, would require relief. Therefore, he is entitled to an opportunity to prove them, and hereby requests that the Court provide him with that chance.

**CLAIM XXIV. JURORS IN PETITIONER'S TRIAL ENGAGED IN MISCONDUCT IN VIOLATION OF PETITIONER'S RIGHTS UNDER THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

311. Petitioner's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution were violated by misconduct involving the jury. Such misconduct included, but was not limited to, improper consideration of matters extraneous to the trial, improper exposure to publicity and community sentiment, improper exposure to witnesses and others who claimed to have knowledge or opinions about Petitioner and the case, false or misleading responses of jurors on voir dire, improper biases which infected the jury's deliberations, improper exposure to the prejudicial opinions of third parties, improper communications with third parties, and/or the trial judge, and improperly prejudging the

111

guilt/innocence and penalty phases of Petitioner's trial.

312. Petitioner's rights to a fair trial and to due process were violated when the jury was not sequestered in such a way as to avoid contact with prejudicial publicity and hostility to the defendant, and to avoid contact and communications with third parties, in contravention of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

313. The Sixth and Fourteenth Amendments to the United States Constitution require that a defendant be tried by an impartial jury that is free from any extraneous influences that could subvert the fact finding process. Where jurors consult information that was not introduced during the course of the trial or that conflicts with the trial judge's instructions, the jurors become unsworn witnesses against the defendant in violation of the Sixth Amendment. Petitioner had no opportunity to confront the extraneous information to which the jurors were exposed, denying Petitioner her Sixth and Fourteenth Amendment rights to a fair trial and due process.

314. The introduction of extraneous materials or evidence has consistently been held to mandate a new trial. Petitioner should be granted a new trial which can be conducted free of extraneous and prejudicial influences.

315. Counsel provided ineffective assistance in failing to litigate this issue in the trial court and by failing to raise it on direct appeal, to Petitioner's prejudice. Counsel's ineffective assistance resulted in the deprivation of Petitioner's rights under the Sixth, Eighth and Fourteenth Amendments. Relief is appropriate.

**CLAIM XXV. THE EXECUTION OF PETITIONER THOUGH LETHAL INJECTION PURSUANT TO THE FEDERAL GOVERNMENT'S EXECUTION PROTOCOL, MARYLAND'S EXECUTION PROTOCOL, OR ANY SIMILAR PROTOCOL, WOULD VIOLATE THE EIGHTH AMENDMENT'S PROHIBITION AGAINST CRUEL AND UNUSUAL PUNISHMENT.**

316. The United States proposes to execute Petitioner by lethal injection. The United States Government's Execution Protocol promulgated by the Bureau of Prisons ("Protocol" copy contained in Petitioner's Appendix), which sets forth the Government's lethal injection procedures, creates a substantial and unreasonable risk Petitioner will consciously suffer excruciating and unnecessary pain. Because the Government Protocol inflicts foreseeable and gratuitous suffering, lethal injection pursuant to that protocol, or any similar protocol, violates the Eighth Amendment.

317. Upon information and belief, the Government Protocol relies on the injection of three chemicals: sodium pentothal (also known as "thiopental" and "sodium thiopental") (an ultra short-acting barbiturate); pancuronium bromide or "Pavulon" (a curare-derived agent which paralyzes all skeletal or voluntary muscles, but which has no effect whatsoever on awareness, cognition or sensation); and potassium chloride (an extraordinarily painful chemical which activates the nerve fibers lining the condemned prisoner's veins and which can interfere with the rhythmic contractions of the heart and cause cardiac arrest).[22]

318. This particular combination of chemicals creates a substantial risk that Petitioner will consciously suffer an excruciatingly painful death. The procedure adopted by the Government, which defines the manner in which the chemicals are administered, significantly increases that risk.

319. The first chemical, sodium pentothal, is an ultra short-acting barbiturate which is

---

[22]What follows is drawn from the declaration of Dr. Mark Heath, as well as an independent review of the execution protocols promulgated by the United States Bureau of Prisons and the State of Maryland (copies of which are contained in Petitioner's Appendix). Counsel does not yet have access to the current protocols in unredacted form. This challenge therefore relies only on information that is publicly available.

ordinarily used to render a surgical patient unconscious for mere minutes, only in the induction phase of anesthesia, specifically so that the patient may re-awaken and breathe on his own power if any complications arise from the insertion of a breathing tube prior to the surgery. Because of its brief duration, sodium pentothal likely does not provide a sedative effect throughout the entire execution process. In addition, if sodium pentothal mixes with Pavulon in the intravenous tubing, the sodium pentothal will precipitate out of the solution and become inactivated.

320. The second chemical, pancuronium bromide, or "Pavulon," acts as a neuromuscular blocking agent. Though Pavulon paralyzes skeletal muscles, including the diaphragm, it has no effect on consciousness or the perception of pain or suffering. Rather, in the lethal injection context, the function of pancuronium bromide is primarily cosmetic. It causes the muscles to become relaxed and thereby generates an impression of tranquility. The prisoner's muscles cannot move or contract to show pain, suffering, or emotion.

321. The third chemical, potassium chloride, is intended to cause death by stopping the heart from beating. Potassium chloride affects the nerve fibers lining the prisoner's veins and, to a person who is conscious, causes an extraordinarily painful burning sensation, akin to the sensation of a hot poker being inserted into and up the arm and then the chest. For a person who has regained consciousness but is paralyzed and hence unable to communicate, it is, simply put, torture.

322. If sodium pentothal is given in insufficient quantity, is given using procedures that do not deliver the complete dose, wears off, is neutralized by the Pavulon, or otherwise is ineffective, the Pavulon will completely mask the fact that Petitioner has regained consciousness and feeling. Petitioner will be unable to communicate the fact that he is conscious, and the executioners and witnesses will be unable to observe any signs of consciousness, distress, or

114

agony.

323. It is likely that an insufficient quantity of sodium pentothal will be administered. Although the Protocol is not entirely clear, it appears that 5,000 mg (5 grams) of sodium pentothal, in a powdered form, are mixed with 50 cc's of sterile water. Then, it appears that a mere 10 cc's of the pentothal/water mixture are administered to the condemned prisoner, delivering to the prisoner a mere 1 gram of pentothal. That meager dose creates a high risk that the prisoner will not be rendered unconscious for the duration of the execution and will instead experience the excruciating agony of intravenous concentrated potassium chloride administration. To the best of counsel's knowledge and belief, this dose of sodium pentothal is the lowest administered anywhere in the United States in the course of execution by lethal injection.

324. From post-mortem autopsies, there is reason to believe that a number of condemned prisoners have received doses of sodium pentothal inadequate to produce unconsciousness, even after being administered more pentothal than apparently called for under the Government Protocol.

325. As noted, the procedure adopted by the Government, which defines the manner in which the chemicals are administered, substantially exacerbates the risk that Petitioner will suffer an agonizing death. Upon information and belief, the Government's procedures do not include safeguards regarding the manner in which the execution is to be carried out, do not establish the minimum qualifications and expertise required of the personnel performing the critical tasks in the lethal injection procedure, do not establish appropriate criteria and standards that these personnel must rely upon in exercising their discretion, and do not provide for any contingencies related to the difficulties of administering drugs intravenously. There is, in fact,

no indication or reason to believe that qualified and trained personnel capable of handling the risks of intravenous drug administration are present for the execution.

326. The fact that sodium thiopental is dispensed as a powder that must be mixed with water increases the risk for human error. Drug mixing errors are common in IV therapy. Errors are especially likely if the mixing is done by personnel without adequate training and experience.

327. Problems are also likely because the Government intends to administer one or more of these chemicals without considering any individualized factors that affect the appropriate dosage. These factors include, but are not limited to, Petitioner's body weight, gender, age, previous drug use, and/or individual sensitivity to or tolerance of these chemicals. Individual sensitivity to sodium pentothal varies widely. Some individuals, particularly those who have been taking anti-anxiety medication, are particularly resistant to sodium pentothal.

328. The Government Protocol further compounds the risk of inflicting unnecessary pain and suffering upon Petitioner because it requires that the IV lines be flushed between doses of drugs with a saline fluid altered with food coloring. *See* BOP Chemical Substances Preparation (step 4) (copy contained in Petitioner's Appendix). A saline flush is an advisable process, intended to prevent adverse drug interactions. It is usually accomplished by simply flushing the lines with saline fluid. Yet for unexplained reasons, the Protocol states that the saline flush shall be laced with food coloring. Food coloring, contaminated with a variety of additives, is not approved for intravenous processes.

329. It is impossible to predict how the contaminated saline will affect the flushing process or interact with the drugs already introduced through the IV lines. Moreover, the Government's reliance on food coloring indicates that its personnel need a visual aid to know when a line is flushed, which suggests that they lack adequate training and expertise.

116

330. Because of legal, moral, and ethical restrictions on human euthanasia, the best model and most reliable source of information about humane protocols for extinguishing life is studies of methods for euthanasia of animals.

331. Many states, including Maryland, have banned the usage of curariform drugs such as pancuronium bromide or "Pavulon" in the euthanasia of animals. *See* Md. Crim. Law § 10-611(a) (stating that "a person may not kill or allow a dog or cat to be killed by use of (1) a decompression chamber; (2) carbon monoxide gas; or (3) curariform drugs").

332. The American Veterinary Medical Association Panel on Euthanasia continually studies various protocols for the euthanasia of animals to determine whether they are humane. It periodically issues a report identifying acceptable and unacceptable protocols for euthanasia. Its most recent report explicitly forbids the use of a neuromuscular blocking agent in combination with a sedative because this protocol is deemed inhumane. *See* 2000 Report of the AVMA Panel on Euthanasia, Vol. 218, No. 5 at 680 (2001) ("A combination of pentobarbital with a neuromuscular blocking agent is not an acceptable euthanasia agent.") (copy contained in Petitioner's Appendix); *see also* Humane Society of the United States, General Statement Regarding Euthanasia Methods for Cats and Dogs (1999) ("The methods that The HSUS considers inhumane, disapproves of, and campaigns against include . . . any combination of pentobarbital with a neuromuscular blocking agent.") (copy contained in Petitioner's Appendix). In addition, the AVMA's report states: "It is of utmost importance that personnel performing this [injection] technique are trained and knowledgeable in anesthetic techniques, and are competent in assessing anesthetic depth appropriate for administration of potassium chloride intravenously." AVMA Report at 681. In contrast, the Government Protocol does not require qualified and trained personnel capable of handling the risks of intravenous drug administration

117

to be present for the execution. Using methods, techniques, or chemicals to execute human

beings which have been banned for use in euthanizing animals violates contemporary standards

of decency and therefore the Eighth Amendment.

333. The Government Protocol should also be invalidated because it is an

administrative action in excess of statutory right. Title 18 U.S.C. § 3596(a) requires that a

federal sentence of death be carried out in the manner prescribed by the state in which the

sentence of death is imposed. It states:

> A person who has been sentenced to death pursuant to this chapter shall be committed to
> the custody of the Attorney General until exhaustion of the procedures for appeal of the
> judgment of conviction and for review of the sentence. When the sentence is to be
> implemented, the Attorney General shall release the person sentenced to death to the
> custody of a United States marshal, who shall supervise implementation of the sentence
> in the *manner prescribed by the law of the State in which the sentence is imposed.* If the
> law of the State does not provide for implementation of a sentence of death, the court
> shall designate another State, the law of which does provide for the implementation of a
> sentence of death, and the sentence shall be implemented in the latter State in the manner
> prescribed by such law.

18 U.S.C. § 3596(a).

334. The Department of Justice has violated § 3596(a) by delegating to the Director of

the Bureau of Prisons the responsibility to promulgate its own Protocol for the execution of

federal prisoners, rather than relying on the protocol in place in the State in which the federal

prisoner is sentenced. *See* 28 C.F.R. § 26.3(a)(4). Section 3596(a) does not empower the

Federal Bureau of Prisons to enact an execution Protocol or prescribe the precise means of death.

Instead, it unequivocally requires that the sentence be implemented in the "manner prescribed by

the law of the State in which the sentence is imposed." 18 U.S.C. § 3596(a). Maryland, the state

in which Petitioner was sentenced to death, has its own Execution Procedures, and these

Procedures vary from the Government Protocol in significant respects (although, for reasons

explained below, also violate the Eighth Amendment).

335. Tellingly, Congress considered legislation which would have amended § 3596(a) to vest the Bureau of Prisons **with** such authority. Specifically, Representative McCollum of Florida introduced H.R. 2359, which would have amended 18 U.S.C. § 3596 to provide that "the Attorney General will prescribe by regulation a uniform method of execution for any person sentenced to death in federal court." Congressional Testimony, Subcommittee on Crime of the House Committee on the Judiciary, September 28, 1995. This legislation was not enacted, however. *See* H.R. Rep. 104-879 at 204 (1997). Rep. McCollum introduced a similar bill in the following Congress, H.R. 1087, which met the same fate. The failure to enact legislation to grant the Bureau of Prisons with specific authority to regulate the means of death is powerful evidence that the Bureau of Prisons currently lacks such authority.

336. Because Congress has not given the Bureau of Prisons the power it seeks to exercise in executing Petitioner, its exercise of such power is *ultra vires*. The Bureau of Prisons' promulgation of an execution protocol in contravention of 18 U.S.C. § 3596(a) violates Petitioner's substantial rights.

337. The Government Protocol constitutes a "rule" subject to the notice and comment provisions of the Administrative Procures Act ("APA"). Because the Protocol was promulgated without notice-and-comment, the Protocol violates the APA. See 5 U.S.C. § 553.

338. To the extent the Maryland Execution Procedures ("Maryland Protocol"), rather than the Government Protocol, will regulate Petitioner's precise means of execution, the Maryland Protocol suffers from many of the same disabilities as does its federal counterpart. Like the Government Protocol, the Maryland Protocol violates the Eighth Amendment of the United States Constitution.

339. Upon information and belief, the State of Maryland also uses sodium pentothal in powdered form, Pavulon, and potassium chloride. All of the problems associated with the use of those chemicals, as described above, apply with equal force. Accordingly the above described problems with the sue of these agents are repeated and realleged as if fully set forth herein.

340. The Maryland Protocol calls for the administration of only 2 grams of sodium thiopental, by way of a single injection from a single syringe. This dose is considerably lower than that administered in many states. This relatively low dose of thiopental elevates the risk that the condemned prisoner will suffer in excruciating pain masked by the Pavulon.

341. Like the Government Protocol, the Maryland Protocol also fails to include safeguards regarding the manner in which the execution is to be carried out and fails to establish the minimum qualifications and expertise required of the personnel performing the critical tasks in the lethal injection procedure. Consequently, the above paragraphs discussing the deficenices in the Government Protocol are realleged as if set forth entirely herein.

342. Maryland's failure to enlist adequately trained personnel was on gruesome display during the execution of Maryland prisoner Tyrone X. Gilliam in 1998. During that execution, fluid from Mr. Gilliam's IV ran down the exterior surface of the IV line, and by the time of Mr. Gilliam's death, a puddle of liquid had formed on the floor of the lethal injection chamber immediately below where the IV line was located. The State later conceded that "the IV in fact was maladministered and dripped." Oken v. Sizer, 321 F. Supp. 2d 658, 667 n.7 (D. Md. 2004). Because Mr. Gilliam's IV leaked, he did not receive full doses of the pentothal, Pavulon, and/or potassium chloride. There is therefore reason to believe Mr. Gilliam experienced a cruel and agonizing death.

343. The Maryland Protocol is itself inconsistent with the Maryland statute, which

120

regulates the means of death. The relevant Maryland provision is Md. Corr. Serv. § 3-905. This statute provides:

> (a) The manner of inflicting the punishment of death shall be the continuous intravenous administration of a lethal quantity of an ultrashort-acting barbiturate or other similar drug in combination with a chemical paralytic agent until a licensed physician pronounces death according to accepted standards of medical practice.

This statute thus requires the "continuous intravenous administration" of an "ultrashort-acting barbituate." The requirement of "continuous . . . administration" is essential to ensure continued and sustained unconsciousness during the administration of Pavulon and potassium chloride. In clear violation of this statute, however, the Maryland Protocol calls for the administration of a single injection of a 2 gram dose of sodium thiopental from a single syringe. In addition, Maryland administers three drugs, rather than two, as mandated by § 3-905.

The Eighth Amendment prohibits punishments that involve the unnecessary and wanton infliction of pain, that involve torture or a lingering death, that do not accord with the dignity of man, or fail to comport with evolving standards of decency. Both the Government Protocol, as promulgated by the Bureau of Prisons, and the Maryland Protocol, as promulgated by the State of Maryland, risk the infliction of excruciating pain and suffering and fail to comport with evolving standards of decency. They are therefore facially unconstitutional. Accordingly, the execution of Petitioner pursuant to either protocol, or any similar protocol, would violate the Eighth Amendment of the Constitution of the United States.[23]

---

[23] Although Petitioner raises a facial objection to lethal injection in this 2255 motion, Petitioner submits that an as-applied challenge under Title 42, section 1983 of the United States Code is also appropriate. Petitioner reserves his right to raise such a challenge in a later civil proceeding. Petitioner moreover recognizes that this Court may decline to reach the merits of this claim in the present proceeding as it is not yet ripe, and may not become ripe. Petitioner is raising this challenge now to ensure that it is preserved if the challenge should ever become ripe.

**REQUEST FOR RELIEF**

Based upon all of the above allegations and the entire record of this prosecution,

Petitioner respectfully requests that the Court provide the following relief:

A. That Petitioner be permitted to file a Brief in Support of this Petition within 90 days;

B. That the Government be required to answer this Petition and file a responsive Brief;

C. That the Court permit such discovery as will be requested in Petitioner's to-be-filed Motion for Discovery;

D. That upon such discovery litigation, that Petitioner be permitted to Amend this Petition;

E. That the Court conduct an evidentiary hearing addressing all material and disputed issues of fact;

F. That the Court permit oral argument as appropriate and required;

G. That at the conclusion of the proceedings that the Court vacate Petitioner's convictions and sentences, including his sentences of death and order that appropriate retrial and/or new sentencing hearings be conducted.

Respectfully Submitted,


Michael Wiseman, Esq.
Signing for All Counsel


Dated: November 28, 2005
        Greenbelt, Maryland

122

**CERTIFICATE OF SERVICE**

I, Michael Wiseman, hereby certify that on this 28th day of November, 2005 I served two copies of the foregoing upon the following person by hand delivery:

Deborah A. Johnston
Assistant United States Attorneys
Office of the United States Attorney
6500 Cherrywood Lane, Suite 400
Greenbelt, MD 20770-1249

Michael Wiseman

123

## VERIFICATION

I verify and declare under penalty of perjury that the facts, allegations and statements contained in the foregoing Motion Under 28 U.S.C. § 2255 are true and correct.

/s/
Dustin John Higgs

Dated: u|28|05