# EXHIBIT 3

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

ℍ

United States District Court,
D. Maryland.
Dustin John HIGGS, Petitioner,
v.
UNITED STATES of America, Respondent.
**Civil No. PJM 05-3180.**
**Criminal No. PJM 98-0520.**

April 6, 2010.

**Background:** Defendant was convicted in the United States District Court for the District of Maryland, Peter J. Messitte, J., of first-degree premeditated murder and kidnapping resulting in death, among other crimes, and he appealed. The Court of Appeals, Traxler, Circuit Judge, 353 F.3d 281, affirmed, and defendant moved to vacate, set aside, or correct his sentence.

**Holdings:** The District Court held that:
(1) government did not violate *Brady* in failing to disclose internal studies concerning reliability of comparative bullet lead analysis;
(2) defendant's *Batson* claim was procedurally defaulted;
(3) defendant failed to demonstrate that government engaged in purposeful discrimination in allegedly using its peremptory challenges against prospective female jurors; and
(4) trial counsel did not render ineffective assistance in failing to present defendant's school records as mitigation evidence at sentencing.

Motion denied.

West Headnotes

[1] Criminal Law 110 ⬤⟿ 1995

110 Criminal Law

110XXXI Counsel
110XXXI(D) Duties and Obligations of Prosecuting Attorneys
110XXXI(D)2 Disclosure of Information
110k1993 Particular Types of Information Subject to Disclosure
110k1995 k. Diligence on part of accused; availability of information. Most Cited Cases
Government did not violate *Brady* in failing to disclose internal studies conducted by FBI and state university concerning reliability of comparative bullet lead analysis in prosecution for first-degree premeditated murder; studies' strongest critiques of comparative bullet lead analysis were available in at least one publicly accessible study, and thus defendant could have obtained identical or nearly identical information through exercise of reasonable diligence. U.S.C.A. Const.Amend. 5.

[2] Constitutional Law 92 ⬤⟿ 4594(1)

92 Constitutional Law
92XXVII Due Process
92XXVII(H) Criminal Law
92XXVII(H)4 Proceedings and Trial
92k4592 Disclosure and Discovery
92k4594 Evidence
92k4594(1) k. In general. Most Cited Cases
Under *Brady*, the suppression by the prosecution of evidence favorable to the accused violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecutor. U.S.C.A. Const.Amends. 5, 14.

[3] Criminal Law 110 ⬤⟿ 2004

110 Criminal Law
110XXXI Counsel
110XXXI(D) Duties and Obligations of Prosecuting Attorneys
110XXXI(D)2 Disclosure of Information
110k2002 Information Within Knowledge of Prosecution

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

110k2004 k. Duty to locate information.
Most Cited Cases

**Criminal Law 110 ☞ 2005**

110 Criminal Law
  110XXXI Counsel
    110XXXI(D) Duties and Obligations of
Prosecuting Attorneys
      110XXXI(D)2 Disclosure of Information
        110k2002 Information Within Knowledge
of Prosecution
          110k2005 k. Responsibility of and for
police and other agencies. Most Cited Cases
The duty of disclosure under *Brady* applies not only to
evidence actually known to the trial prosecutor, but also
evidence known to those acting on the government's
behalf. U.S.C.A. Const.Amends. 5, 14.

**[4] Criminal Law 110 ☞ 1992**

110 Criminal Law
  110XXXI Counsel
    110XXXI(D) Duties and Obligations of
Prosecuting Attorneys
      110XXXI(D)2 Disclosure of Information
        110k1992 k. Materiality and probable effect
of information in general. Most Cited Cases
The mere possibility that an item of undisclosed
information might have helped the defense does not
establish materiality in the constitutional sense for
purposes of a *Brady* claim. U.S.C.A. Const.Amends. 5, 14.

**[5] Constitutional Law 92 ☞ 4594(1)**

92 Constitutional Law
  92XXVII Due Process
    92XXVII(H) Criminal Law
      92XXVII(H)4 Proceedings and Trial
        92k4592 Disclosure and Discovery
          92k4594 Evidence
            92k4594(1) k. In general. Most Cited
Cases
Under *Brady*, the prosecution's failure to disclose evidence

gives rise to a due process violation only where the
favorable evidence could reasonably be taken to put the
whole case in such a different light as to undermine
confidence in the verdict. U.S.C.A. Const.Amends. 5, 14.

**[6] Constitutional Law 92 ☞ 4594(1)**

92 Constitutional Law
  92XXVII Due Process
    92XXVII(H) Criminal Law
      92XXVII(H)4 Proceedings and Trial
        92k4592 Disclosure and Discovery
          92k4594 Evidence
            92k4594(1) k. In general. Most Cited
Cases
Where a defendant could have obtained the same
information through the exercise of reasonable diligence,
the prosecution's failure to disclose does not violate due
process under *Brady*. U.S.C.A. Const.Amends. 5, 14.

**[7] Criminal Law 110 ☞ 1457**

110 Criminal Law
  110XXX Post-Conviction Relief
    110XXX(B) Grounds for Relief
      110k1457 k. Criminal liability; innocence. Most
Cited Cases
Even assuming actual innocence was valid basis for
post-conviction relief, defendant failed to demonstrate that
he was actually innocent of first-degree premeditated
murder based on discovery of allegedly new evidence
concerning unreliability of comparative bullet lead
analysis; evidence of defendant's guilt was overwhelming,
including witness's detailed account of murders. 28
U.S.C.A. § 2255.

**[8] Criminal Law 110 ☞ 1536**

110 Criminal Law
  110XXX Post-Conviction Relief
    110XXX(B) Grounds for Relief
      110k1536 k. Newly discovered evidence. Most
Cited Cases
Newly discovered evidence may open the door to

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

post-conviction relief if it can form the basis of an actual innocence claim. 28 U.S.C.A. § 2255.

**[9] Criminal Law 110 ☞ 1931**

110 Criminal Law
    110XXXI Counsel
        110XXXI(C) Adequacy of Representation
            110XXXI(C)2 Particular Cases and Issues
                110k1921 Introduction of and Objections to Evidence at Trial
                110k1931 k. Experts; opinion testimony. Most Cited Cases
Trial counsel's failure to offer studies or experts to question reliability of comparative bullet lead analysis in prosecution for first-degree premeditated murder did not prejudice defendant, and thus could not amount to ineffective assistance; evidence adduced at trial overwhelmingly pointed to defendant's guilt. U.S.C.A. Const.Amend. 6.

**[10] Criminal Law 110 ☞ 1590**

110 Criminal Law
    110XXX Post-Conviction Relief
        110XXX(C) Proceedings
            110XXX(C)1 In General
                110k1590 k. Discovery and disclosure. Most Cited Cases
Defendant was not entitled to discovery of FBI reports concerning its decision to discontinue use of comparative bullet lead analysis in seeking to vacate, set aside, or correct his sentence for first-degree premeditated murder; additional discovery would not demonstrate defendant's entitlement to relief on claim that trial counsel rendered ineffective assistance in failing to offer experts to question reliability of analysis. U.S.C.A. Const.Amend. 6.

**[11] Criminal Law 110 ☞ 1429(2)**

110 Criminal Law
    110XXX Post-Conviction Relief
        110XXX(A) In General
            110k1428 Presentation of Issue in Prior Proceedings
            110k1429 In General
                110k1429(2) k. Post-conviction proceeding not a substitute for appeal. Most Cited Cases
Defendant's *Batson* claim, challenging government's use of peremptory strikes against prospective female jurors in prosecution for first-degree premeditated murder, was procedurally defaulted on his motion to vacate, set aside, or correct his sentence; defendant failed to raise claim before seeking post-conviction relief. U.S.C.A. Const.Amend. 5.

**[12] Jury 230 ☞ 33(5.15)**

230 Jury
    230II Right to Trial by Jury
        230k30 Denial or Infringement of Right
            230k33 Constitution and Selection of Jury
                230k33(5) Challenges and Objections
                230k33(5.15) k. Peremptory challenges. Most Cited Cases
A *Batson* challenge requires a three-step inquiry: (1) the court first determines whether the defendant has made a prima facie showing that the prosecutor exercised a peremptory challenge on the basis of race or gender; (2) the prosecutor must then present a gender-neutral explanation for striking the juror in question; and (3) the court must then determine whether the defendant has carried his burden of proving purposeful discrimination. U.S.C.A. Const.Amends. 5, 14.

**[13] Jury 230 ☞ 33(5.15)**

230 Jury
    230II Right to Trial by Jury
        230k30 Denial or Infringement of Right
            230k33 Constitution and Selection of Jury
                230k33(5) Challenges and Objections
                230k33(5.15) k. Peremptory challenges. Most Cited Cases
A defendant may satisfy his initial burden of demonstrating a prima facie case of discrimination on a *Batson* claim by showing that: (1) the defendant was a member of a cognizable group; (2) the prosecution exercised peremptory challenges to remove from the venire members of defendant's race or gender; and (3)

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

other relevant facts and circumstances give rise to an inference of discrimination. U.S.C.A. Const.Amends. 5, 14.

**[14] Jury 230 ☜ 33(5.15)**

230 Jury
    230II Right to Trial by Jury
        230k30 Denial or Infringement of Right
            230k33 Constitution and Selection of Jury
                230k33(5) Challenges and Objections
                    230k33(5.15) k. Peremptory challenges.
Most Cited Cases
Defendant failed to demonstrate that government engaged in purposeful discrimination in allegedly using its peremptory challenges against prospective female jurors in prosecution for first-degree premeditated murder, as required to prevail on his *Batson* claim; there was no evidence that government treated potential male and female jurors differently, and lack of women on jury was partly due to strikes made by defendant. U.S.C.A. Const.Amend. 5.

**[15] Criminal Law 110 ☜ 1890**

110 Criminal Law
    110XXXI Counsel
        110XXXI(C) Adequacy of Representation
            110XXXI(C)2 Particular Cases and Issues
                110k1890 k. In general. Most Cited Cases
Where an objection to evidence would have been futile, counsel is not constitutionally ineffective for failing to make it. U.S.C.A. Const.Amend. 6.

**[16] Criminal Law 110 ☜ 1992**

110 Criminal Law
    110XXXI Counsel
        110XXXI(D) Duties and Obligations of Prosecuting Attorneys
            110XXXI(D)2 Disclosure of Information
                110k1992 k. Materiality and probable effect of information in general. Most Cited Cases
Promises made by the government in consideration for

testimony may be material under *Brady* if they create a reasonable probability of a different outcome at trial. U.S.C.A. Const.Amends. 5, 14.

**[17] Criminal Law 110 ☜ 1999**

110 Criminal Law
    110XXXI Counsel
        110XXXI(D) Duties and Obligations of Prosecuting Attorneys
            110XXXI(D)2 Disclosure of Information
                110k1993 Particular Types of Information Subject to Disclosure
                    110k1999 k. Impeaching evidence. Most Cited Cases
Defendant's conclusory allegation that government offered to dismiss unrelated drug charges against co-defendant in exchange for his testimony in prosecution for first-degree premeditated murder was insufficient to establish *Brady* violation based on government's alleged failure to disclose its offer prior to trial; there was no evidence that government ever offered to dismiss co-defendant's drug charges. U.S.C.A. Const.Amend. 5.

**[18] Criminal Law 110 ☜ 1999**

110 Criminal Law
    110XXXI Counsel
        110XXXI(D) Duties and Obligations of Prosecuting Attorneys
            110XXXI(D)2 Disclosure of Information
                110k1993 Particular Types of Information Subject to Disclosure
                    110k1999 k. Impeaching evidence. Most Cited Cases
Government did not violate *Brady* in failing to disclose alleged alias used by witness that was tied to criminal charges pending against him at time he testified in prosecution for first-degree premeditated murder; witness's criminal conduct was fully apparent to jury during his testimony, and thus there was no reasonable probability of different outcome at trial. U.S.C.A. Const.Amend. 5.

**[19] Criminal Law 110 ☜ 1935**

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

110 Criminal Law
    110XXXI Counsel
        110XXXI(C) Adequacy of Representation
            110XXXI(C)2 Particular Cases and Issues
                110k1921 Introduction of and Objections to
Evidence at Trial
                    110k1935 k. Impeachment or
contradiction of witnesses. Most Cited Cases
Trial counsel's failure to call witnesses to testify that co-defendant told them he was asleep at time of murder in effort to impeach his testimony that he saw defendant give murder weapon to another co-defendant did not prejudice defendant, and thus could not amount to ineffective assistance in prosecution for first-degree premeditated murder; counsel effectively cross-examined co-defendant with his prior inconsistent statements. U.S.C.A. Const.Amend. 6.

[20] Criminal Law 110 &#9740; 1871

110 Criminal Law
    110XXXI Counsel
        110XXXI(C) Adequacy of Representation
            110XXXI(C)1 In General
                110k1871 k. Presumptions and burden of
proof in general. Most Cited Cases
In assessing an ineffectiveness of counsel claim, the court presumes counsel's conduct was within the range of reasonable professional assistance. U.S.C.A. Const.Amend. 6.

[21] Criminal Law 110 &#9740; 1923

110 Criminal Law
    110XXXI Counsel
        110XXXI(C) Adequacy of Representation
            110XXXI(C)2 Particular Cases and Issues
                110k1921 Introduction of and Objections to
Evidence at Trial
                    110k1923 k. Investigating, locating, and
interviewing witnesses or others. Most Cited Cases
Claims of ineffective assistance of counsel based on failure to investigate potential witness testimony must show that the witness would have been willing to testify and that the testimony would have created reasonable doubt as to the defendant's guilt. U.S.C.A. Const.Amend. 6.

[22] Criminal Law 110 &#9740; 1923

110 Criminal Law
    110XXXI Counsel
        110XXXI(C) Adequacy of Representation
            110XXXI(C)2 Particular Cases and Issues
                110k1921 Introduction of and Objections to
Evidence at Trial
                    110k1923 k. Investigating, locating, and
interviewing witnesses or others. Most Cited Cases
Failure to investigate a crucial witness may suggest ineffectiveness of counsel, but failure to investigate every single person mentioned by the defendant is not tantamount to ineffective assistance. U.S.C.A. Const.Amend. 6.

[23] Criminal Law 110 &#9740; 1923

110 Criminal Law
    110XXXI Counsel
        110XXXI(C) Adequacy of Representation
            110XXXI(C)2 Particular Cases and Issues
                110k1921 Introduction of and Objections to
Evidence at Trial
                    110k1923 k. Investigating, locating, and
interviewing witnesses or others. Most Cited Cases
Trial counsel's alleged failure to investigate co-defendant's prior unrelated gun charges in prosecution for first-degree premeditated murder did not prejudice defendant, and thus could not amount to ineffective assistance; co-defendant's unrelated gun charges were not exculpatory evidence in defendant's case. U.S.C.A. Const.Amend. 6.

[24] Criminal Law 110 &#9740; 1923

110 Criminal Law
    110XXXI Counsel
        110XXXI(C) Adequacy of Representation
            110XXXI(C)2 Particular Cases and Issues
                110k1921 Introduction of and Objections to

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

Evidence at Trial

110k1923 k. Investigating, locating, and interviewing witnesses or others. Most Cited Cases
Trial counsel did not render ineffective assistance in failing to interview government witness prior to trial in prosecution for first-degree premeditated murder concerning her claim that defendant violently assaulted her several years prior to trial; during cross-examination, witness conceded that her altercation with defendant was mutual, and there was no evidence that pre-trial interview would have caused witness to say anything different from what she said at trial. U.S.C.A. Const.Amend. 6.

[25] **Criminal Law 110** 1457

110 Criminal Law
110XXX Post-Conviction Relief
110XXX(B) Grounds for Relief
110k1457 k. Criminal liability; innocence. Most Cited Cases
Even assuming actual innocence was valid basis for post-conviction relief, defendant failed to demonstrate that he was actually innocent of first-degree premeditated murder based on co-defendant's post-trial recantation of his testimony that he witnessed defendant give murder weapon to another co-defendant; evidence of defendant's guilt was overwhelming, including witness's detailed account of murders. 28 U.S.C.A. § 2255.

[26] **Criminal Law 110** 1880

110 Criminal Law
110XXXI Counsel
110XXXI(C) Adequacy of Representation
110XXXI(C)1 In General
110k1879 Standard of Effective Assistance in General
110k1880 k. In general. Most Cited Cases

On a claim of ineffective assistance of counsel, the question is not what the best lawyer would have done or even what most good lawyers would have done, but merely whether a reasonable lawyer could have made the same decision under the circumstances. U.S.C.A. Const.Amend. 6.

[27] **Criminal Law 110** 1931

110 Criminal Law
110XXXI Counsel
110XXXI(C) Adequacy of Representation
110XXXI(C)2 Particular Cases and Issues
110k1921 Introduction of and Objections to Evidence at Trial
110k1931 k. Experts; opinion testimony. Most Cited Cases
Trial counsel's decision not to further cross-examine government's ballistics expert after he conceded that 1.5 million firearms could have produced the markings on bullets found at crime scene was reasonable trial strategy, and thus was not ineffective assistance in prosecution for first-degree premeditated murder; expert's concession was highly important to counsel's defense, and counsel reasonably decided not to spend more time questioning expert. U.S.C.A. Const.Amend. 6.

[28] **Criminal Law 110** 1931

110 Criminal Law
110XXXI Counsel
110XXXI(C) Adequacy of Representation
110XXXI(C)2 Particular Cases and Issues
110k1921 Introduction of and Objections to Evidence at Trial
110k1931 k. Experts; opinion testimony. Most Cited Cases
Trial counsel did not render ineffective assistance in prosecution for first-degree premeditated murder by failing to call expert witness to estimate higher number of firearms that could have produced the markings on bullets found at crime scene after government's ballistics expert conceded that 1.5 million firearms could have made the markings; impact of such testimony would have been minimal. U.S.C.A. Const.Amend. 6.

[29] **Criminal Law 110** 1939

110 Criminal Law
110XXXI Counsel
110XXXI(C) Adequacy of Representation
110XXXI(C)2 Particular Cases and Issues

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

110k1939 k. Confrontation. Most Cited Cases

Trial counsel did not render ineffective assistance in failing to object on confrontation grounds to introduction of tape-recorded telephone conversation during which defendant remained silent after news article was read to him stating that co-defendant admitted that murder took place at defendant's apartment; there was ample legal basis for counsel to believe that introduction of defendant's adoptive admission would not violate Confrontation Clause, and thus counsel's decision not to raise Sixth Amendment objection was reasonable. U.S.C.A. Const.Amend. 6.

**[30] Criminal Law 110** ⌐⇝ **1961**

110 Criminal Law
    110XXXI Counsel
        110XXXI(C) Adequacy of Representation
            110XXXI(C)2 Particular Cases and Issues
                110k1958 Death Penalty
                    110k1961 k. Presentation of evidence in sentencing phase. Most Cited Cases

Trial counsel did not render ineffective assistance in failing to present school records describing defendant's learning disabilities and emotional issues as mitigation evidence at sentencing in capital murder prosecution; counsel requested defendant's school records but only received transcript from school system indicating that his records had been purged, and counsel had no reason to know that school system actually retained special education records indefinitely. U.S.C.A. Const.Amend. 6.

**[31] Criminal Law 110** ⌐⇝ **1961**

110 Criminal Law
    110XXXI Counsel
        110XXXI(C) Adequacy of Representation
            110XXXI(C)2 Particular Cases and Issues
                110k1958 Death Penalty
                    110k1961 k. Presentation of evidence in sentencing phase. Most Cited Cases

Trial counsel was not deficient in failing to obtain testimony from defendant's father about his abusive conduct toward defendant during childhood as mitigation evidence at sentencing in capital murder prosecution, as

element of claim of ineffective assistance; counsel's mitigation specialist testified that he attempted to reach defendant's father prior to trial but received information that he did not want to participate in his son's defense. U.S.C.A. Const.Amend. 6.

**[32] Criminal Law 110** ⌐⇝ **1961**

110 Criminal Law
    110XXXI Counsel
        110XXXI(C) Adequacy of Representation
            110XXXI(C)2 Particular Cases and Issues
                110k1958 Death Penalty
                    110k1961 k. Presentation of evidence in sentencing phase. Most Cited Cases

Trial counsel's failure to obtain testimony from defendant's father about his abusive conduct toward defendant during childhood as mitigation evidence at sentencing in capital murder prosecution did not prejudice defendant, and thus could not amount to ineffective assistance; father's credibility would have been challengeable based on his relationship with defendant and his criminal history, and jury considered fact that father was absentee parent who had drug problem. U.S.C.A. Const.Amend. 6.

**[33] Criminal Law 110** ⌐⇝ **1961**

110 Criminal Law
    110XXXI Counsel
        110XXXI(C) Adequacy of Representation
            110XXXI(C)2 Particular Cases and Issues
                110k1958 Death Penalty
                    110k1961 k. Presentation of evidence in sentencing phase. Most Cited Cases

Trial counsel was not deficient in failing to obtain testimony from defendant's maternal aunt to corroborate other testimony concerning defendant's abusive childhood as mitigation evidence at sentencing in capital murder prosecution, as element of claim of ineffective assistance; counsel was never made aware that aunt possessed information concerning defendant's childhood. U.S.C.A. Const.Amend. 6.

**[34] Criminal Law 110** ⌐⇝ **1961**

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

110 Criminal Law
    110XXXI Counsel
        110XXXI(C) Adequacy of Representation
            110XXXI(C)2 Particular Cases and Issues
                110k1958 Death Penalty
                    110k1961 k. Presentation of evidence in sentencing phase. Most Cited Cases
Trial counsel's failure to obtain testimony from defendant's maternal aunt to corroborate other testimony concerning defendant's abusive childhood as mitigation evidence at sentencing in capital murder prosecution did not prejudice defendant, and thus could not amount to ineffective assistance; aunt would have offered no more than generalizations about defendant's abusive childhood, and her credibility was open to question. U.S.C.A. Const.Amend. 6.

[35] Criminal Law 110 &#9900;&#8594; 1961

110 Criminal Law
    110XXXI Counsel
        110XXXI(C) Adequacy of Representation
            110XXXI(C)2 Particular Cases and Issues
                110k1958 Death Penalty
                    110k1961 k. Presentation of evidence in sentencing phase. Most Cited Cases
Trial counsel's decision to limit mitigation evidence to events that occurred before defendant's eighteenth birthday, at sentencing in capital murder prosecution, was reasonable trial strategy, and thus was not ineffective assistance; counsel fairly decided to minimize emphasis on defendant's multiple bad acts in adulthood. U.S.C.A. Const.Amend. 6.

[36] Criminal Law 110 &#9900;&#8594; 1962

110 Criminal Law
    110XXXI Counsel
        110XXXI(C) Adequacy of Representation
            110XXXI(C)2 Particular Cases and Issues
                110k1958 Death Penalty
                    110k1962 k. Argument and comments. Most Cited Cases
Trial counsel did not render ineffective assistance in failing to raise equal protection and Eighth Amendment challenges to government's decision to pursue death penalty in prosecution for first-degree premeditated murder; there was no evidence that government decided to pursue death penalty because defendant was African American. U.S.C.A. Const.Amends. 5, 6, 8.

[37] Criminal Law 110 &#9900;&#8594; 1963

110 Criminal Law
    110XXXI Counsel
        110XXXI(C) Adequacy of Representation
            110XXXI(C)2 Particular Cases and Issues
                110k1958 Death Penalty
                    110k1963 k. Other particular issues in death penalty cases. Most Cited Cases
Trial counsel did not render ineffective assistance in failing to object on confrontation grounds to introduction of police captain's testimony during sentencing in capital murder prosecution that co-defendant told him defendant drove murder weapon to park and threw it into river; state of law was unclear as to whether Confrontation Clause applied to capital sentencing proceedings at time of defendant's trial. U.S.C.A. Const.Amend. 6.

[38] Criminal Law 110 &#9900;&#8594; 1882

110 Criminal Law
    110XXXI Counsel
        110XXXI(C) Adequacy of Representation
            110XXXI(C)1 In General
                110k1879 Standard of Effective Assistance in General
                    110k1882 k. Deficient representation in general. Most Cited Cases
In evaluating a claim of ineffective assistance of counsel, the court judges the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct. U.S.C.A. Const.Amend. 6.

[39] Criminal Law 110 &#9900;&#8594; 1961

110 Criminal Law
    110XXXI Counsel
        110XXXI(C) Adequacy of Representation

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

110XXXI(C)2 Particular Cases and Issues
110k1958 Death Penalty
110k1961 k. Presentation of evidence in sentencing phase. Most Cited Cases
Trial counsel's decision to limit mitigation evidence in response to government's decision to drop future dangerousness as aggravating circumstance at sentencing in capital murder prosecution was reasonable trial strategy, and thus was not ineffective assistance of counsel; counsel made decision so as not to open door to bad act rebuttal evidence. U.S.C.A. Const.Amend. 6.

[40] Sentencing and Punishment 350H ☞ 1763

350H Sentencing and Punishment
350HVIII The Death Penalty
350HVIII(G) Proceedings
350HVIII(G)2 Evidence
350Hk1755 Admissibility
350Hk1763 k. Victim impact. Most Cited Cases
The Eighth Amendment does not prohibit prosecutorial argument on the subject of victim impact evidence in capital proceedings. U.S.C.A. Const.Amend. 8.

[41] Constitutional Law 92 ☞ 4744(2)

92 Constitutional Law
92XXVII Due Process
92XXVII(H) Criminal Law
92XXVII(H)6 Judgment and Sentence
92k4741 Capital Punishment; Death Penalty
92k4744 Matters Considered
92k4744(2) k. Evidence and witnesses. Most Cited Cases
Only where victim impact evidence would be so unduly prejudicial as to render the defendant's trial unfair does due process mandate its exclusion in capital proceedings. U.S.C.A. Const.Amends. 5, 14.

[42] Constitutional Law 92 ☞ 4744(2)

92 Constitutional Law
92XXVII Due Process

92XXVII(H) Criminal Law
92XXVII(H)6 Judgment and Sentence
92k4741 Capital Punishment; Death Penalty
92k4744 Matters Considered
92k4744(2) k. Evidence and witnesses. Most Cited Cases

Sentencing and Punishment 350H ☞ 1763

350H Sentencing and Punishment
350HVIII The Death Penalty
350HVIII(G) Proceedings
350HVIII(G)2 Evidence
350Hk1755 Admissibility
350Hk1763 k. Victim impact. Most Cited Cases
Victim impact evidence, including mother's testimony that her marriage nearly dissolved in wake of her daughter's murder and videotapes chronicling victims' lives, did not render capital defendant's trial fundamentally unfair in violation of due process. U.S.C.A. Const.Amend. 5.

[43] Courts 106 ☞ 100(1)

106 Courts
106II Establishment, Organization, and Procedure
106II(H) Effect of Reversal or Overruling
106k100 In General
106k100(1) k. In general; retroactive or prospective operation. Most Cited Cases
Rule announced in *United States v. Washington,* which held that judges must apply categorical approach in determining whether defendant's prior conviction satisfied requirements for sentence enhancement, was not watershed rule, and thus did not fall within exception to *Teague* rule barring retroactive application of new rules of criminal procedure.

[44] Courts 106 ☞ 100(1)

106 Courts
106II Establishment, Organization, and Procedure
106II(H) Effect of Reversal or Overruling
106k100 In General

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

106k100(1) k. In general; retroactive or prospective operation. Most Cited Cases
Courts employ a three-step analysis to determine whether a new rule of criminal procedure should apply retroactively under *Teague*: first, the conviction for which the defendant filed a motion to vacate his sentence must have been final when the new law was enunciated; second, the new law must in fact be new; and third, the new rule must be of watershed magnitude.

[45] Courts 106 &#8634; 100(1)

106 Courts
    106II Establishment, Organization, and Procedure
        106II(H) Effect of Reversal or Overruling
            106k100 In General
                106k100(1) k. In general; retroactive or prospective operation. Most Cited Cases
To qualify as a watershed rule for purposes of *Teague* retroactivity analysis, a new rule of criminal procedure must seriously diminish the likelihood of obtaining an accurate conviction and must alter one's understanding of the bedrock procedural elements essential to the fairness of a proceeding.

[46] Criminal Law 110 &#8634; 1961

110 Criminal Law
    110XXXI Counsel
        110XXXI(C) Adequacy of Representation
            110XXXI(C)2 Particular Cases and Issues
                110k1958 Death Penalty
                    110k1961 k. Presentation of evidence in sentencing phase. Most Cited Cases
Trial counsel did not render ineffective assistance in failing to object when government submitted defendant's previous firearm conviction as aggravating factor at sentencing in capital murder prosecution based on fact that defendant was not convicted of firearm offense until after he committed murders; state of law was unclear whether word "previous" in statute allowing jury to consider previous convictions as aggravating factor referred only to convictions occurring prior to subject offense or to all previous convictions. U.S.C.A. Const.Amend. 6; 18 U.S.C.A. § 3592(c)(2).

[47] Sentencing and Punishment 350H &#8634; 1788(10)

350H Sentencing and Punishment
    350HVIII The Death Penalty
        350HVIII(G) Proceedings
            350HVIII(G)4 Determination and Disposition
                350Hk1788 Review of Death Sentence
                    350Hk1788(10) k. Harmless and reversible error. Most Cited Cases
Jury's consideration of invalid aggravating factor, specifically defendant's involvement in multiple killings, in sentencing him for capital murder did not invalidate his death sentence, where jury's consideration of victim impact aggravating factor allowed it to give weight to same facts and circumstances as invalid multiple killings factor. 18 U.S.C.A. § 3592(c)(16).

[48] Criminal Law 110 &#8634; 1433(2)

110 Criminal Law
    110XXX Post-Conviction Relief
        110XXX(A) In General
            110k1433 Matters Already Adjudicated
                110k1433(2) k. Affirmance of conviction. Most Cited Cases
Defendant was procedurally barred from arguing that trial counsel rendered ineffective assistance in failing to interview inmates that were incarcerated with co-defendant concerning co-defendant's alleged admissions of guilt to murders in seeking to vacate, set aside, or correct his sentence for capital murder; defendant already litigated issue in context of *Brady* violation on direct appeal of his conviction. U.S.C.A. Const.Amends. 5, 6.

[49] Criminal Law 110 &#8634; 1433(2)

110 Criminal Law
    110XXX Post-Conviction Relief
        110XXX(A) In General
            110k1433 Matters Already Adjudicated
                110k1433(2) k. Affirmance of conviction. Most Cited Cases
In seeking to vacate, set aside, or correct his sentence for capital murder, defendant was procedurally barred from

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

arguing that his conviction should be retroactively invalidated under *Blakely* on ground that his indictment failed to allege any of aggravating factors considered during sentencing; defendant previously litigated issue on direct appeal of his conviction. 28 U.S.C.A. § 2255.

**[50] Criminal Law 110 &#9901;  1963**

110 Criminal Law
    110XXXI Counsel
        110XXXI(C) Adequacy of Representation
            110XXXI(C)2 Particular Cases and Issues
                110k1958 Death Penalty
                    110k1963 k. Other particular issues in death penalty cases. Most Cited Cases
Trial counsel did not render ineffective assistance in failing to seek instruction at penalty phase of capital murder prosecution that jury could only recommend death sentence if it found aggravating factors outweighed mitigating factors beyond reasonable doubt; court was not required to give reasonable doubt instruction at penalty phase of capital trial, and thus counsel was reasonable in not requesting instruction. U.S.C.A. Const.Amend. 6.

**[51] Criminal Law 110 &#9901;  1429(2)**

110 Criminal Law
    110XXX Post-Conviction Relief
        110XXX(A) In General
            110k1428 Presentation of Issue in Prior Proceedings
            110k1429 In General
                110k1429(2) k. Post-conviction proceeding not a substitute for appeal. Most Cited Cases
Defendant was procedurally barred from arguing that trial court violated his Eighth Amendment right to have jury consider all mitigation evidence by failing to instruct jury that he was ineligible for parole, in seeking to vacate, set aside, or correct his sentence for capital murder; defendant failed to raise issue on appeal from his conviction. U.S.C.A. Const.Amend. 8; 28 U.S.C.A. § 2255.

**[52] Sentencing and Punishment 350H &#9901;  1780(3)**

350H Sentencing and Punishment
    350HVIII The Death Penalty
        350HVIII(G) Proceedings
            350HVIII(G)3 Hearing
                350Hk1780 Conduct of Hearing
                  350Hk1780(3) k. Instructions. Most Cited Cases
Trial court's failure to instruct jury that defendant was ineligible for parole did not violate his Eighth Amendment right to have jury consider all mitigation evidence in sentencing him for capital murder; parole ineligibility did not meet criteria for being mitigating factor, since it related neither to defendant's character or record. U.S.C.A. Const.Amend. 8.

**[53] Sentencing and Punishment 350H &#9901;  1653**

350H Sentencing and Punishment
    350HVIII The Death Penalty
        350HVIII(C) Factors Affecting Imposition in General
            350Hk1653 k. Mitigating circumstances in general. Most Cited Cases
A capital sentencing jury must unquestionably give effect to all relevant mitigating evidence, as required by the Eighth Amendment. U.S.C.A. Const.Amend. 8.

**[54] Criminal Law 110 &#9901;  412.1(2)**

110 Criminal Law
    110XVII Evidence
        110XVII(M) Declarations
            110k411 Declarations by Accused
                110k412.1 Voluntary Character of Statement
                  110k412.1(2) k. Statements while in custody; persons to whom made. Most Cited Cases
Defendant was not in custody for *Miranda* purposes when he told another inmate that he remained silent when police officers approached him to cooperate against co-defendant, and thus inmate's testimony at defendant's capital murder trial recounting what defendant told him did not violate defendant's right to remain silent; police officers were not using inmate to elicit incriminating responses from defendant. U.S.C.A. Const.Amend. 5.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

**[55] Sentencing and Punishment 350H 🗝 1780(3)**

350H Sentencing and Punishment
   350HVIII The Death Penalty
      350HVIII(G) Proceedings
         350HVIII(G)3 Hearing
            350Hk1780 Conduct of Hearing
               350Hk1780(3) k. Instructions. Most Cited
Cases
Defendant was not entitled to instruction at penalty phase of capital murder prosecution that jurors were not permitted to draw adverse inference of guilt from defendant's decision not to testify; defendant never requested instruction and court gave same instruction at guilt phase of trial. U.S.C.A. Const.Amend. 5.

**[56] Criminal Law 110 🗝 1159.2(7)**

110 Criminal Law
   110XXIV Review
      110XXIV(P) Verdicts
         110k1159 Conclusiveness of Verdict
            110k1159.2 Weight of Evidence in General
               110k1159.2(7) k. Reasonable doubt. Most
Cited Cases
A court considering the sufficiency of evidence underlying a conviction will uphold a guilty verdict and deny post-conviction relief if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

**[57] Criminal Law 110 🗝 465**

110 Criminal Law
   110XVII Evidence
      110XVII(R) Opinion Evidence
         110k449 Witnesses in General
            110k465 k. Facts forming basis of opinion.
Most Cited Cases
A lay witness may testify about information from records of which he has personal knowledge and over which he maintains personal control.

**[58] Criminal Law 110 🗝 1580(9)**

110 Criminal Law
   110XXX Post-Conviction Relief
      110XXX(C) Proceedings
         110XXX(C)1 In General
            110k1574 Petition or Motion
               110k1580 Particular Issues
                  110k1580(9) k. Argument and
conduct of prosecutor. Most Cited Cases
Postconviction petitioner's conclusory allegation that government withheld evidence in form of witness statements and police reports was insufficient to demonstrate *Brady* violation in prosecution for first-degree premeditated murder. U.S.C.A. Const.Amend. 5.

**[59] Criminal Law 110 🗝 1575**

110 Criminal Law
   110XXX Post-Conviction Relief
      110XXX(C) Proceedings
         110XXX(C)1 In General
            110k1574 Petition or Motion
               110k1575 k. In general. Most Cited Cases

A defendant seeking to vacate, set aside, or correct his sentence must set forth specific facts in support of each ground of relief asserted. 28 U.S.C.A. § 2255.

**[60] Criminal Law 110 🗝 1652**

110 Criminal Law
   110XXX Post-Conviction Relief
      110XXX(C) Proceedings
         110XXX(C)3 Hearing and Determination
            110k1651 Necessity for Hearing
               110k1652 k. In general. Most Cited Cases

A court may grant an evidentiary hearing to a defendant seeking post-conviction relief when the defendant has pled facts that, if established, entitle him to relief, and there is a material dispute regarding those facts. 28 U.S.C.A. § 2255.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

**[61] Criminal Law 110 ☞ 1618(8)**

110 Criminal Law
    110XXX Post-Conviction Relief
        110XXX(C) Proceedings
            110XXX(C)2 Affidavits and Evidence
                110k1616 Sufficiency
                    110k1618 Particular Issues
                        110k1618(8) k. Conduct of trial. Most
Cited Cases
Defendant could not obtain post-conviction relief from his capital murder conviction based on his conclusory allegation that jurors engaged in misconduct by considering matters extraneous to trial; defendant failed to substantiate his misconduct allegation. 28 U.S.C.A. § 2255.

**[62] Criminal Law 110 ☞ 1557(2)**

110 Criminal Law
    110XXX Post-Conviction Relief
        110XXX(B) Grounds for Relief
            110k1557 Matters Arising After Sentencing or
Conviction
                110k1557(2) k. Execution of sentence. Most
Cited Cases
Defendant's motion to vacate, set aside, or correct his sentence for capital murder was improper vehicle to challenge use of lethal injection under Eighth Amendment; defendant was not contesting validity of his conviction or sentence, but rather method of imposing his sentence. U.S.C.A. Const.Amend. 8; 28 U.S.C.A. § 2255.

*486 Michael Wiseman, Federal Defender of Philadelphia, Capital Habeas Corpus Unit, Federal Court Division, Philadelphia, PA, Stephen H. Sachs, Wilmer Cutler Pickering Hale and Dorr LLP, Baltimore, MD, for Petitioner.

Deborah A. Johnston, Office of the US Attorney, Greenbelt, MD, Sandra Wilkinson, Office of the US Attorney, Baltimore, MD, Jeffrey B. Kahan, Department of Justice, Capital Case Unit, Washington, DC, for Respondent.

***OPINION***

PETER J. MESSITTE, District Judge.

After finding Dustin Higgs guilty of the kidnapping and murder of Tamika Black, Mishann Chinn, and Tanji Jackson, a jury determined that he should receive the death penalty. The Court thereafter entered judgment on the verdict and Higgs appealed to the United States Court of *487 Appeals for the Fourth Circuit, which affirmed the conviction and sentence. *See United States v. Higgs*, 353 F.3d 281 (4th Cir.2003) ("*Higgs I*"). The Supreme Court denied Higgs' petition for writ of certiorari. *Higgs v. United States*, 543 U.S. 999, 125 S.Ct. 627, 160 L.Ed.2d 456 (2004).

During the pendency of his appeal, Higgs filed a Motion for a New Trial, which this Court denied, a decision which the Fourth Circuit also affirmed. *See United States v. Higgs*, 95 Fed.Appx. 37 (4th Cir.2004), *cert. denied*, *Higgs v. United States*, 543 U.S. 1004, 125 S.Ct. 608, 160 L.Ed.2d 465 (2004) ("*Higgs II*"). Higgs has now filed a Motion for Relief Pursuant to 28 U.S.C. § 2255 or in the Alternative Pursuant to 28 U.S.C. § 2241, asserting twenty-five claims of error. This filing is accompanied by a motion seeking additional discovery as to certain issues. The Court considers the pending motions.

**I.**

**Background**

The relevant facts, as set forth by the Fourth Circuit in *Higgs I*, are as follows:

**A. The Murders**

On Friday evening, January 26, 1996, Higgs, Willis Mark Haynes and Victor Gloria drove from Higgs's apartment at 13801 Briarwood Drive in Laurel, Maryland, to Washington D.C. to pick up Tanji Jackson, Tamika Black, and Mishann Chinn. Higgs knew Jackson and they had arranged dates for Haynes

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

and Gloria with Black and Chinn. They were traveling in Higgs's blue Mazda MPV van. After stopping at a liquor store, the three couples returned to Higgs's apartment to drink alcohol and listen to music. While there, the men also smoked marijuana.[FN1]

> FN1. After he was arrested in the fall of 1998 on federal charges of illegal distribution of crack cocaine, Victor Gloria agreed to cooperate with the government in the murder case against Higgs and Haynes. Most of the facts surrounding the murders of the three women were obtained from his eyewitness testimony. However, Gloria's testimony was partially corroborated by a friend of the Jackson family and Chinn's mother, both of whom observed the girls being picked up by a man or men in a blue Mazda MPV van. Gloria ultimately pled guilty to being an accessory after the fact to the murders and was sentenced to eighty-four months incarceration with three years supervised release.

At some point during the early morning hours of January 27, Higgs and Jackson began to argue. Jackson retrieved a knife from the kitchen and Haynes, who had been in the bedroom with Black, heard the commotion and came out to break up the fight. Haynes talked to Jackson and got the knife away from her. However, Jackson was still angry and the three women left the apartment. According to Gloria, as Jackson was walking out, "she stopped at the door and said something like I am going to get you all f---ed up or robbed" or made "some kind of threat." J.A. 473. In response, Higgs commented to the other two men that Jackson "do know a lot of n-s." J.A. 474. As Higgs was watching the women leave, he saw Jackson stop and appear to write down the license plate number of his van. This angered Higgs, who commented to Haynes and Gloria that Jackson was "writing down [his] sh-." J.A. 474. Gloria interpreted Higgs's comments as concern that Jackson intended to retaliate against Higgs.

At that point, "Higgs said f that, and grabbed his coat and said come on." J.A. 474. He also retrieved a silver .38 caliber firearm from the end table drawer and put it in his pocket. The three *488 men got into Higgs's van,

with Higgs driving, Haynes in the front passenger seat, and Gloria sitting behind Higgs. Higgs drove the van to where the three women were walking on the side of the road and told Haynes to get them in the vehicle. After Haynes spoke to them, the three women got into the back seat of the vehicle and Higgs started driving towards Washington, D.C. Neighbors in the area heard and saw the three girls laughing and talking around 3:30 that morning.

According to Gloria, while en route to Washington, D.C., Higgs and Haynes leaned towards each other and engaged in a quiet conversation that Gloria could not hear. The women were whispering in the back of the van and apparently believed they were being taken home. Higgs, however, drove past the Baltimore-Washington Parkway exit, which would have taken them directly into Washington, D. C., and instead drove the van into the Patuxent National Wildlife Refuge, a federal property within the jurisdiction of the United States Park Police. Eventually, Higgs pulled over at a secluded location. One of the girls asked if they were trying to "make [them] walk from there," and Higgs responded, "something like that." J.A. 482. After the women got out of the van, Higgs pulled out the pistol and handed it to Haynes, who put it behind his back and also exited the van. Within moments, Gloria heard a gunshot and wiped the mist off the back window in time to see Haynes shoot one of the women in the chest. Gloria turned to ask Higgs what he was doing, but saw Higgs holding the steering wheel and watching the shootings from the rearview mirror. Gloria put his head down, heard more shots, and heard a woman screaming.

After firing a few more shots, Haynes got into the van and closed the door. According to Gloria, either Higgs or Haynes then commented that they had to "get rid of the gun," J.A. 485, and Higgs drove to the Anacostia River where, according to Gloria, either Higgs or Haynes got out and threw the gun into the water. Higgs then drove back to his apartment where the three men began to clean up. Among other things, they wiped down the patio doors and "everything else, the bathroom, the doorknobs, the stereo," and threw away any items the women might have touched, such as liquor bottles, CDs, and rented videotapes. J.A. 487. The men then left the apartment and dropped the trash by a

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

dumpster. Higgs and Haynes dropped Gloria off at a fast food restaurant, where he was told by Higgs to "keep [his] mouth shut." J.A. 489.

At about 4: 30 a.m., a motorist found the bodies of the three women strewn about the roadway and contacted the Park Police. Jackson's day planner was found at the scene with Higgs's nickname-"Bones"-and telephone number recorded in it. On another page was written "13801 'MAZDA' 769GRY"-Higgs's address number on Briarwood Drive and the tag number for his Mazda van. A .38 caliber wadcutter bullet was also found there. According to the medical examiner, Jackson and Black had each been shot once in the chest and once in the back. Chinn had been shot once in the back of the head.

**B. The Investigation**

Although Higgs was almost immediately a suspect, the investigation into the murders continued for nearly three years before an arrest was made. On March 21, 1996, Park Police officers first interviewed Higgs at his apartment. At that time, Higgs acknowledged that he knew *489 Jackson and that he may have talked to her the night before she died, but he denied that she had ever been in his apartment. Higgs told the officers that he first heard about the murders while watching the ten o'clock news on Saturday, January 27, while attending a party at the home of Phyllis Smith, who was his girlfriend at the time. Higgs also told the officers that he had immediately commented to a party guest that he thought he knew "that Tanji girl." J.A. 672. According to the chief investigator, however, the names and photographs of the three victims were not released to the media until January 28.

After the interview of Higgs was concluded, the officers executed an arrest and search warrant arising from Higgs's suspected involvement in unrelated bank fraud violations. In addition to a variety of documents and cash bundles, the officers seized crack cocaine, a .380 semiautomatic firearm, and boxes of ammunition for .380, .45 and .38 caliber weapons. Higgs was arrested on federal drug charges and, on May 12, 1997, pled guilty to possession with intent to distribute cocaine

base. He was ultimately sentenced to seventeen years imprisonment for the charge. Higgs has remained in the custody of either state or federal law enforcement officials since that arrest.

After Higgs was interviewed and arrested, the Park Police turned their attention to Phyllis Smith. Smith initially provided a false alibi for Higgs on the night of the murders. She claimed that Higgs had been with her and her family members the entire night of January 26, helping her clean her home in preparation for the party that was to be held the following night. She also instructed her family members to confirm the alibi. In April 1996, however, Smith testified before the grand jury that Higgs was only with her at 5 a.m. on January 27.

Ultimately, Smith recanted both accounts. She testified that Higgs called her when he was arrested in March 1996 and asked her to tell officials that he had been with her the entire night of January 26. She did as she was instructed, but believed at the time that she was being interviewed in connection with the drug charges that had been filed against Higgs. When Smith later learned that the questions pertained to the triple murder investigation, Higgs told her that he did not know the murdered women, but that Haynes had known them. When Smith was called before the grand jury in late 1998, she admitted her earlier lies about Higgs's whereabouts that night. Although she and several of her family members had been cleaning her home on the evening of January 26, Higgs was not with them. Nor was Higgs at her house in the early morning hours of January 27. At trial, Smith again testified that Higgs had not helped her prepare for the party that night and was not with her when she went to bed at 1: 30 a.m. on January 27. Nor was he in her home when she awoke, as she routinely did, at 5 a.m. to care for her disabled son. Smith returned to bed shortly thereafter and awoke at 10: 00 a.m., when she first found Higgs and Haynes present in her home. Thus, Higgs must have arrived at Smith's home sometime between 5 a.m. and 10 a.m. on the morning of January 27. Smith did confirm that Higgs and Haynes were at her house that night for the party and that the television was on during the party.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

Officers also interviewed Enidsia Darby, a former girlfriend of Higgs and the mother of his son, Daquon. Darby testified that Higgs contacted her by telephone after his March 1996 arrest and *490 told her that he had been arrested for drugs. Darby, however, had seen news reports of Higgs's arrest that contained photographs of the three murdered women and she asked Higgs about them. In response, Higgs asked Darby if she remembered that he had been with her at the hospital on the night of the murders, which was not true. When Darby visited Higgs in jail, Higgs admitted that he had been present when Haynes shot the women. He told Darby that Jackson had been invited over to his house to smoke and drink because she had been "snitching on one of them." J.A. 759. He told her that he did not know the other two girls; "they were just for his friends." J.A. 761.

In addition to her testimony regarding Higgs's drug activities, Darby offered testimony regarding a bank fraud scheme and credit card scheme that she and Higgs had conducted in the fall of 1995. Higgs deposited checks into accounts that had been opened by Darby and Andrea Waters, one of Darby's friends. The women, in turn, would withdraw the cash and give it to Higgs. Waters was paid a portion of the money withdrawn from her account, but when the checks deposited in her account bounced and Higgs refused to return the money, she threatened to go to the police. Higgs responded with a threat to kill her. Darby also testified that, while employed in the electronics department of a retail department store, she charged merchandise for Higgs to a credit card number Higgs had given her. Months later, when Darby was contacted by the police about the matter, Higgs threatened to kill her if she identified him from the surveillance photographs.

The investigation into Higgs's possible involvement in the murders also uncovered his participation in two prior shooting incidents involving a .38 caliber weapon. The incidents were significant because the same caliber weapon had been used to murder the three women.

The first incident occurred on November 20, 1995, approximately two months before the murders. Higgs got into an argument outside the Chaconia Nightclub in Washington, D. C., and shot out the windows of a vehicle in a drive-by shooting. After Higgs's arrest on the federal drug charges and while the murder investigation was still underway, the vehicle was searched and the police recovered a .38 caliber bullet. Wondwossen Kabtamu, who was with Higgs at the time of the Chaconia shooting, testified that he drove Higgs's Mazda MPV van while Higgs did the shooting. Kabtamu threw the gun out the window after the shooting, but they returned to get it at Higgs's insistence.

Higgs was ultimately charged with the Chaconia shooting in the D.C. Superior Court. In late 1998, while housed at a D.C. jail, Higgs had a number of discussions about the Chaconia charges with Domenick Williams, a fellow inmate and "jailhouse lawyer." Higgs never admitted involvement in the Chaconia shooting to Williams, but he did tell Williams "that he didn't want to plead guilty because they would try to use the gun in another case." J.A. 975. After Williams learned through a press report that Higgs was being indicted for the murders of the three women, Higgs commented to Williams, "you see why I can't plead guilty to that charge?" J.A. 979. Higgs also advised Williams that he had rebuffed the authorities' attempts to strike a deal with him to cooperate against his codefendant Haynes. When Williams advised Higgs that the authorities would likely offer Haynes a deal to cooperate if Higgs refused, Higgs told Williams "that his *491 youngan would hold up," J.A. 984, and "that the government wouldn't offer a deal to the trigger man," J.A. 985.

Williams also testified that Higgs asked him what the chances would be "if the witness after the fact wasn't there," J.A. 982, referring to Gloria. Williams told him that "his chances would be good." J.A. 983. Higgs later "explained to [Williams] that he wasn't worrying about the [murder] case because Mel and T would be out there." J.A. 987. Melvin Grayson and "T" were former inmates at the jail where Williams and Higgs were incarcerated. Higgs told Williams "that Mel would be out there to handle anything that he needed and that he could rely on him." J.A. 992.

Williams later notified the authorities of his conversations with Higgs and produced letters that

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

Higgs had written to him in which Higgs reported that the Chaconia case had been dismissed, that Higgs had not heard from "T", but that "Mel has been in my corner." J.A. 1011. Through visitation records, authorities learned that Melvin Grayson had visited *Higgs* In the D.C. jail in February 1999 and again in March 1999. The Chaconia charges against Higgs were dismissed in D.C. Superior Court in May 1999.

The second shooting incident occurred on December 10, 1995, approximately a month after the Chaconia nightclub shooting. Haynes went to the home of Rodney Simms on Cherry Lane in Laurel, Maryland, and argued with Simms about a woman. During the argument, Haynes took out a 9mm handgun and began shooting. Higgs came out from a nearby shed and also began firing shots. Haynes and Higgs were charged in Maryland state court for the shooting. Police recovered 9mm and .38 caliber bullets and bullet casings from the Cherry Lane crime scene. Forensic evidence revealed that the .38 caliber bullets fired from the weapons at the Cherry Lane and Chaconia sites had five "lands and grooves," with a right twist.[FN2] Although forensics could not definitively conclude that the bullets had been fired from the same weapon, the .38 caliber bullets recovered from the Patuxent murder scene and the murder victims were also .38 caliber bullets shot from a gun with five lands and grooves with a right twist.

> FN2. According to the testimony, "lands and grooves" refer to the rifling marks that are "pressed onto a bullet when it travels down a barrel of a firearm." J.A. 1137. Because "different manufacturers will have different numbers of lands and grooves, different directions of twist, right or left, and different sizes," J.A. 1123-24, the marks allow forensic investigators to compare firearms with fired bullets and cartridge cases, and to compare fired bullets and cartridge cases from different crime scenes to one another.

In April 1997, Higgs pled guilty to the Cherry Lane shooting and was sentenced to 18 months imprisonment. During the plea hearing, the prosecutor stated that Haynes had fired the 9mm handgun and that Higgs had fired the .38 caliber handgun. Higgs offered no contest to the facts underlying the Cherry Lane shooting, with the single exception of gratuitously asserting that he "didn't have a .38. It was the other way around." J.A. 1104.

## C. The Indictment

On December 21, 1998, Higgs and Haynes were indicted for three counts each of first-degree premeditated murder, see 18 U.S.C.A. § 1111(a), first-degree murder committed in the perpetration or attempted perpetration of a kidnapping, see id, kidnapping resulting in death, see 18 U.S.C.A. § 1201(a), and using a firearm in the commission of a crime of violence, see *492 18 U.S.C. § 924(c). On October 22, 1999, the government filed the statutorily-required notice of its intent to seek a death sentence for the murder and kidnapping charges. See 18 U.S.C.A. § 3593(a). On December 20, 1999, the grand jury returned a second superseding indictment, and the government filed an amended death notice on February 8, 2000.[FN3]

> FN3. All references made to the indictment or death notice hereafter refer to the amended documents.

The cases were severed for trial. Haynes was tried first and convicted of first-degree murder, kidnapping, and use of a firearm during a crime of violence. During the penalty phase of Haynes's trial for the murder and kidnapping counts, however, the jury was unable to reach a unanimous verdict on the death sentence. Accordingly, on August 24, 2000, the district court sentenced Haynes to concurrent life terms for the first-degree murder and kidnapping counts and to a forty-five year consecutive sentence for the firearm offenses. His convictions and sentences were affirmed on appeal. *See United States v. Haynes*, 26 Fed.Appx. 123 (4th Cir.2001), *cert. denied*, 535 U.S. 979, 122 S.Ct. 1455, 152 L.Ed.2d 396 (2002).

## D. The Trial

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

Jury selection in Higgs's trial began on September 5, 2000, and the jury returned guilty verdicts on all charges on October 11, 2000. The case then proceeded to the penalty phase. On October 26, 2000, after hearing evidence on aggravating and mitigating factors, the jury returned a sentence of death for each of the murder and kidnapping counts.

In order to impose a sentence of death under the FDPA, a jury is required to find at least one "intent" factor enumerated by Congress, see 18 U.S.C.A. § 3591(a)(2), and at least one statutory "aggravating" factor, see 18 U.S.C.A. § 3592(c). Once the jury finds the requisite intent and statutory aggravating factors, the crime is death-eligible. The jury must then determine the existence of any nonstatutory aggravating factors submitted to it for consideration, provided the government has given the appropriate notice of its intent to submit such additional factors, see 18 U.S.C.A. § 3592(c), as well as any mitigating factors, see 18 U.S.C.A. § 3592(a), and "consider whether all the aggravating factor or factors found to exist sufficiently outweigh all the mitigating factor or factors found to exist to justify a sentence of death," 18 U.S.C.A. § 3593(e).

As to all victims and offenses, the jury in Higgs's case determined that the government had proven two intent factors beyond a reasonable doubt: (1) that Higgs had "intentionally participated in ... acts, contemplating that the [lives] of [the victims] would be taken or intending that lethal force would be used in connection with [the victims]"; and (2) that Higgs had "intentionally and specifically engaged in ... acts of violence, knowing that the acts created a grave risk of death to the [victims]." See 18 U.S.C.A. § 3591(a)(2)(C) & (D).

The jury also found that the government had proven beyond a reasonable doubt four statutory aggravating factors: (1) that the deaths occurred during the commission of another crime (kidnapping), for the first-degree murder counts only, see 18 U.S.C.A. § 3592(c)(1); (2) that Higgs had a previous conviction of a *493 violent felony involving a firearm, based on Higgs's guilty plea to assault and reckless endangerment for his participation in the Cherry Lane shooting, see 18

U.S.C.A. § 3592(c)(2); (3) that Higgs had a previous conviction for a serious federal drug offense, based on Higgs's March 1996 arrest and subsequent conviction for possession with intent to distribute cocaine base, see 18 U.S.C.A. § 3592(c)(12); and (4) that the crime for which he was on trial involved multiple killings in a single criminal episode, see 18 U.S.C.A. § 3592(c)(16). The jury found that the government had also proven two nonstatutory aggravating factors beyond a reasonable doubt: (1) that Higgs had caused harm and loss to each victim and their families, based on the effect of the offense on the victims, their personal characteristics as individual human beings, and the impact of the death upon the victims and their families ("victim impact"); and (2) that Higgs obstructed the investigation into the kidnappings and murders by tampering or attempting to tamper with evidence and witnesses ("obstruction of justice").

Members of the jury also found three mitigating factors by a preponderance of the evidence: (1) that Higgs was not the sole proximate cause of the victims' deaths (12 jurors); (2) that Higgs was impaired by alcohol and marijuana at the time of the murders (2 jurors); and (3) that a sentence of death would have an adverse impact on Higgs's son (4 jurors). See 18 U.S.C.A. § 3592(a). However, the jury unanimously rejected three additional mitigating factors: (1) that Haynes was an equally culpable defendant who had not been sentenced to death for the murders; (2) that Higgs's family history, including the abandonment by his father and the death of his mother at a young age, influenced the direction of his life had taken; and (3) that other factors in Higgs's background, record, or character or other circumstances of the offense mitigated against imposition of the death sentence.

Ultimately, the jury recommended that Higgs be sentenced to death for each death-eligible conviction and, on January 3, 2001, the district court imposed nine death sentences. The district court also imposed sentences of five years, twenty years, and twenty years for the three § 924(c) convictions, respectively, directing that the sentences be served consecutively. Additionally, the court imposed a three-year term of supervised release and directed Higgs to pay restitution of $ 13,687.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

*United States v. Higgs*, 353 F.3d 281, 289-295 (4th Cir.2003).

## II.

### Claim 1: Comparative Bullet Lead Analysis

One item of evidence not discussed in the Fourth Circuit's recitation of the facts in *Higgs I* was the Comparative Bullet Lead Analysis (CBLA) which the Government offered at trial to suggest that bullets found at the crime scene and at Higgs's home could be linked to bullets Higgs fired during the Cherry Lane and Chaconia Nightclub shootings. Higgs claims that he is entitled to a new trial or sentencing because the CBLA was a discredited scientific analysis which, since the trial, the FBI has in fact abandoned.

CBLA is a process that measures the elemental composition of the lead found in one bullet and compares it to that of the lead found in another bullet. *See* Edward J. Imwinkelried & William A. Tobin, *Comparative Bullet Lead Analysis (CBLA) Evidence: Valid Inference or Ipse Dixit?*, 28 OKLA. CITY U.L.REV. 43, 44-45 (2003). *494 Pursuant to CBLA, two bullets with statistically significant similarities in their elemental composition may be declared "analytically indistinguishable," the implication being that they were manufactured during a single process by a single manufacturer and thereafter found their way into the same box of bullets purchased by a person who, inferentially, fired both.[FN4] *See* Imwinkelried & Tobin, *supra*, at 47; *see also Ragland v. Commonwealth*, 191 S.W.3d 569, 576 (Ky.2006).

> FN4. The typical inference is that two "analytically indistinguishable" bullets originated from the same source or melt of lead at a manufacturing plant.

At Higgs' trial, Kathleen Lundy of the FBI Laboratory's Elemental Analysis Group testified that a bullet recovered from Mishann Chinn's head and a bullet recovered from

the Cherry Lane shooting scene were "analytically indistinguishable." TT. Oct. 6, 2000 at 32. She also testified that a bullet recovered from the Chaconia nightclub shooting was indistinguishable from 18 bullets found at Higgs' Briarwood apartment. *Id.* at 33.

More than three years after the trial in this case, the National Research Council of the National Academy of Sciences released the results of a study criticizing the reliability of CBLA. Committee on Scientific Assessment of Bullet Lead, National Research Council, *Forensic Analysis: Weighing Bullet Lead Evidence* (2004). The study, which had been commissioned by the FBI in 2002, led to the FBI's September 1, 2005, announcement that it had discontinued the use of CBLA. *See* FBI, Press Release (Sept. 1, 2005), http:// www. fbi. gov/ pressrel/ pressrel 05/ bullet_ lead_ analysis. htm. In its September 1, 2005, announcement, the FBI admitted that "neither scientists nor bullet manufacturers are able to definitively attest to the significance of an association made between bullets in the course of a bullet lead examination." *Id.*

Citing the FBI's decision to abandon CBLA as well as other scholarly papers challenging the reliability of the analysis, Higgs argues that CBLA was "inadmissible [as] junk science." This proposition is the launching point for three arguments that his constitutional rights were violated: (A) the Government's failure to disclose evidence of CBLA's unreliability violated the Due Process Clause of the Fifth Amendment; (B) defense counsel's failure to challenge the CBLA evidence amounted to Sixth Amendment ineffective assistance of counsel; and (C) recent revelations about CBLA's unreliability amount to new evidence entitling Higgs to relief under 28 U.S.C. § 2255 or 28 U.S.C. § 2241. The Court addresses these arguments in turn.

### A. *Brady v. Maryland*

[1] Higgs' first CBLA argument is that the prosecution violated *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) when it failed to apprise him of two studies available to the FBI but not to the public that could have been used to impeach Lundy's CBLA testimony-one study conducted by the FBI in 1991 ("FBI Study"),[FN5] and a second conducted by Iowa State

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

University researchers at the request of the FBI in 2000 ("Iowa State Study"). [FN6] The Court will discuss *495 the findings of these studies presently, but the threshold question is whether an internal law enforcement study of the general reliability of a forensic tool (in contrast to the tool's reliability *vel non* in a particular defendant's case) can ever be deemed *Brady* material. The Court concludes that it can.

> FN5. E.R. Peele, D.G. Havekost, R.C. Halberstam, R.D. Koons, C.A. Peters, and J.P. Riley, *Comparison of Bullets Using the Elemental Composition of the Lead Component,* PROCEEDINGS OF THE INT'L SYMPOSIUM ON THE FORENSIC ASPECTS OF TRACE EVIDENCE (1991).

> FN6. Alicia Carriquiry, Michael Daniels, and Hal S. Stern, *Statistical Treatment of Class Evidence: Trace Element Concentrations in Bullet Lead* (May 4, 2000) (unpublished study, Iowa State University) (on file with Ames Laboratory, Iowa State University).

[2][3] Under *Brady,* the suppression by the prosecution of evidence favorable to the accused "violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87, 83 S.Ct. 1194. The duty of disclosure applies not only to evidence actually known to the trial prosecutor, but also evidence known to those acting on the Government's behalf. *See Kyles v. Whitley,* 514 U.S. 419, 437, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) (holding that the "individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police"); *see also United States v. Munson,* No. 03-1153, 2004 WL 1672880, at *2, 2004 U.S. Dist. LEXIS 15465, at *7-*8 (N.D.Ill. Aug. 5, 2004) ("As a general rule, the government's *Brady* obligation extends to all members of the prosecution's team, which may include the DEA, police, or other agencies, such as the FDA or Postal Service."), *accord United States v. Pelullo,* 399 F.3d 197, 218 (3d Cir.2005) *and United States v. Chalmers,* 410 F.Supp.2d 278, 290 (S.D.N.Y.2006).

[4][5][6] However, "the mere possibility that an item of undisclosed information might have helped the defense ... does not establish 'materiality' in the constitutional sense." *United States v. Agurs,* 427 U.S. 97, 109-110, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). The prosecution's failure to disclose gives rise to a due process violation only where "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles,* 514 U.S. at 435, 115 S.Ct. 1555. Moreover, where the defendant could have obtained the same information through the exercise of reasonable diligence, the prosecution's failure to disclose does not violate due process. *See Hoke v. Netherland,* 92 F.3d 1350, 1356 (4th Cir.1996) (citing *United States v. Meros,* 866 F.2d 1304, 1308 (11th Cir.1989) ("[t]o establish a *Brady* violation a defendant must prove ... that the defendant does not possess the evidence nor could he obtain it himself with any reasonable diligence....")).

The Court accepts that certain internal studies and reports generally relevant to the reliability of evidence introduced against an accused may be material to guilt or innocence. For example, in *United States v. Wood,* the Ninth Circuit determined that Investigational New Drug applications ("INDs") [FN7] released by the Federal Drug Administration ("FDA") "were *Brady* material, which the government had a duty to disclose...." 57 F.3d 733, 737 (9th Cir.1995). In that case, Wood had been convicted of distributing gamma hydroxybutrate and gamma hydroxybutyric acid sodium salt (collectively *496 "GHB") in violation of 18 U.S.C. § 371-defrauding the FDA by obstructing its function of ensuring that prescription drugs are safe and effective and dispensed pursuant to a prescription from a practitioner licensed by law to administer such drugs. *Id.* at 735.

> FN7. The FDA's website describes INDs as follows:

> > Current Federal law requires that a drug be the subject of an approved marketing application before it is transported or distributed across state lines. Because a sponsor will probably want to ship the investigational drug to clinical investigators in many states, it must seek an exemption from that legal requirement. The

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

IND is the means through which the sponsor technically obtains this exemption from the FDA.

United States Food and Drug Administration, Center for Food Drug Evaluation and Research, htt p:// www. fda. gov/ Cder/ regulatory/ applications/ ind_ page_ 1. htm.

At trial, controversy arose over whether GHB could be considered a prescription drug, a point that turned on whether it could be deemed dangerous to humans. Subsequent to trial, Wood learned that INDs had been filed with the FDA that included "a fair amount of ... material ... [showing] ... that GHB, if properly taken by humans, was not dangerous to them." *Id.* The appellate court concluded that those INDs would have been useful in impeaching the Government's expert's testimony on GHB's dangerousness, and accordingly remanded the case to the district court to determine whether the INDs were "material" under *Brady. Id.* at 738-39. The district court's determination that the INDs were not material was later overturned in an unpublished Ninth Circuit opinion. *See United States v. Wood,* 1997 WL 207973, 1997 U.S. App. LEXIS 9077 (9th Cir. Apr. 25, 1997).

*Wood* thus stands for the proposition that studies or reports available to an agency involved in a prosecution and useful to a defendant may be *Brady* material. That said, such information is not always *Brady* material. For example, in *United States v. Bhutani,* 175 F.3d 572 (7th Cir.1999), the Seventh Circuit rejected the materiality of data numerous drug manufacturing companies had submitted to the FDA. There, husband and wife defendants, the Bhutanis, manufactured a generic form of Lactulose, a prescription drug used to combat advanced liver disease. The court described the relevant attributes of Lactulose as follows.

One way of testing the stability of Lactulose is to measure its pH level. The pH scale measures the acidity or baseness of a chemical on a scale of 0 to 14. A chemical with a pH below 7 is an acid, while one with a pH above 7 is a base. At the time of the trial, the accepted pH range in which Lactulose was considered

most effective, as set forth by the U.S. Pharmacopeia ("U.S.P."), also known as the "bible" of the pharmaceutical industry, was 3.0 to 7.0. The U.S.P. based this determination on stability data provided by various drug manufacturers to the FDA. As Lactulose ages and begins to degrade, it becomes more acidic, i.e. its pH drops. Thus, the older Lactulose gets, the lower its pH reading will become. If the pH level becomes too low, the drug will no longer be effective to fight the liver disease.

*Id.* at 575. The jury found that the Bhutanis were "spiking" their Lactulose "with the foreign substance sodium hydroxide in order to conceal [its] age. Sodium hydroxide is a base, and, when combined with a more acidic substance, will raise its pH level." *Id.*

Following their conviction, the Bhutanis filed a motion for a new trial based on the following alleged *Brady* violation:

They claimed that the government, at the time of the trial, had in its possession stability data from numerous drug manufacturing companies that showed that the effective range for Lactulose was not in fact 3.0 to 7.0, and that Lactulose was still perfectly effective with a pH level as low as 2.5. Furthermore, they asserted that the U.S.P. released a proposal [following the trial] to change the effective pH range for Lactulose from 3.0 to 7.0 to 2.5 to 6.5.

*Id.* at 575-76. This drug company data, the Bhutanis argued, could have been used at trial to show that they had no reason to spike the Lactulose because the drug was effective at its pH level prior to the alleged spike (4.6). *Id.* at 576.

*497 The court concluded that the data in the FDA's possession was not material under *Brady,* reasoning that the FDA did not know that the U.S. Pharmacopeia would alter the effective range for Lactulose.

The real evidence that the defendants rely on in their motion is the eventual publication of the U.S.P.'s

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

proposal to lower the effective range of Lactulose. This was not published until well after the trial had ended. Simply because the FDA had stability data from other pharmaceutical companies does not mean that they had any knowledge that the U.S.P. was going to recommend the proposed change in Lactulose's effective pH range. The government cannot be held responsible for failing to disclose merely speculative evidence.

Id. at 577. In short, the Seventh Circuit found that the data in the Government's possession was too speculative to be deemed material.[FN8]

> FN8. Notably, the U.S.P.'s reevaluation of the effective range of Lactulose occurred after the trial and, therefore, could not have been Brady material. Had this policy change occurred prior to the Bhutanis' convictions and not been produced, the Seventh Circuit could conceivably have found a violation.

As Bhutani suggests, not every shred of general scientific information available to the prosecution constitutes Brady evidence. Indeed, the Court is mindful that a rule requiring the disclosure of all studies, reports, data, or communications in any way related, no matter how tangentially, to the reliability of forensic procedure would be overly burdensome, if not totally impractical. Instead, the Court must remain focused on scientific evidence that is truly material, and therefore capable of undermining confidence in the verdict. Determining materiality will often require evaluating the reliability and level of scientific refinement of the evidence as well as the strength of other evidence offered at trial,[FN9] among other considerations. A stray remark by a government scientist, for example,*498 will presumably carry less weight than the printed results of a study or a marked change in agency policy. Similarly, raw data such as that in Bhutani is less likely to potentially undermine the government's case than the studies available to the prosecution in Wood.

> FN9. On the issue of the strength of the evidence, see United States v. Mitchell, 365 F.3d 215, 254-57 (3d Cir.2004). There, the Third Circuit considered the application of Brady to the

Government's solicitation of studies on the reliability of the fingerprint identification analysis used to inculpate the defendant. At trial, Mitchell had challenged the admissibility of the Government's evidence linking him to fingerprints obtained from the gear shift of the getaway car that he had been accused of driving from the scene of an armored car robbery. Subsequent to his conviction, Mitchell learned of a research proposal solicitation released by the National Institute of Justice (an arm of the United States Department of Justice) entitled "Forensic Friction Ridge (Fingerprint) Examination Validation Studies" (the "solicitation"). Id. at 232. "The solicitation sought proposals for research studies on 'validation of the basis for friction ridge individualization [the process used to match the fingerprints on the gear shift to Mitchell's fingerprints on file with law enforcement] and standardization of comparison criteria.' Creation of the solicitation had been underway before Mitchell's trial, but the solicitation was not released until March 2000-after Mitchell's trial had concluded." Id. Certain evidence suggested, however, that the NIJ had delayed the solicitation's release until after Mitchell's conviction.

> Mitchell first raised the issue of the solicitation's discovery in a Motion for a New Trial, which the district court denied following a four day hearing. Mitchell again raised the issue on appeal in the context of a Brady claim, but the Third Circuit deferred to the District Court's finding on materiality.

> In ruling on Mitchell's Rule 33 motion, the District Court credited "the testimony of the Government's witnesses at the Solicitation Hearing that the Solicitation does not change their testimony regarding fingerprint technology." In other words, the District Court discounted the impeachment value of the solicitation even after having seen Mitchell's actual cross-examination of the government's experts both with the solicitation (at the new

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

trial hearing) and without it (at trial). The District Court had the best vantage point, at both proceedings, to assess the government's witnesses ... and we defer to its finding.

*Id.* at 257 (citations omitted). In deferring to the district court, the Third Circuit concluded that the impeachment value of the solicitation was simply not strong enough to undermine confidence in the verdict and, thus, could not signal a *Brady* violation.

Against this background, the Court turns to Higgs' case. Higgs' *Brady* claim derives from the prosecution's failure to divulge the FBI study and the Iowa State study, which he claims contained information that would have helped him impeach the Government's expert testimony with respect to CBLA. While the Court accepts that these studies raise questions as to the validity of CBLA, it concludes that they were not required to be disclosed. The Court reasons thus: (1) the studies' strongest critiques of CBLA were available in at least one published study which was publicly available at the time of Higgs' trial, strongly suggesting that, through the exercise of reasonable diligence, Higgs could have obtained identical or nearly identical information; (2) the studies' remaining critiques do not consist of strong, definitive conclusions, but at most suggest areas for possible additional study; (3) by his own admission, Higgs could have called live witnesses capable of offering conclusions nearly identical to those offered in the Government's studies; and (4) other evidence presented at trial provided a firm link between Higgs and the bullets found at the murder scene.

**1. The availability of CBLA critiques offered by the FBI and Iowa State studies.**

A review of both Government studies reveals that their critiques of CBLA fall into two general categories: (1) challenges based upon bullet manufacturing and distribution processes, suggesting the possibility that bullets from the same lead source could make their way into separate boxes and ultimately into the possession of different individuals; and (2) challenges to the validity of the chemical and statistical analyses used to determine if two bullets-*e.g.*, a bullet found at a crime scene and a

bullet found in a suspect's possession-are "analytically indistinguishable."

The Court finds that the critiques based upon the bullet manufacturing and distribution processes, *i.e.* those in the first category, were accessible in at least one published study available at the time of Higgs' trial, strongly suggesting that, through the exercise of reasonable diligence, Higgs could have obtained identical or nearly identical information. As the FBI Study and the Iowa State Study both note, bullets from a single source of lead can-while being sorted, packaged, and distributed downstream to parties in the supply chain-end up in separate boxes and, quite possibly, the possession of different buyers. *See* Peele et al. at 57; Carriquiry et al. at 30. As a result, per that study, even where a bullet from a crime scene is analytically indistinguishable from another bullet found in the possession of a suspect, one may not be able to conclude that the suspect ever possessed, let alone fired, the bullet involved in the crime.

Nevertheless, this finding does not constitute an automatic *Brady* violation. The Court, based on its own search, was able to *499 locate at least one publicly available study-published in September 1999, well before Higgs' trial-that offered essentially the same conclusion: "The extent of each particular source (i.e., the number of identical boxes by each manufacturer) and the bullets available in a particular geographic area at a particular time are all unknown factors. As a result, bullet lead analysis ... *does not generate individualizing information.*" R.O. Keto, *Analysis and Comparison of Bullet Leads by Inductively Coupled Plasma Mass Spectrometry,* 44 J. FORENSIC SCI. 1020, 1026 (1999) (emphasis added). Given the availability of a critique such as this,[FN10] the Court finds that the nonproduction of the FBI and Iowa State studies did not amount to a *Brady* violation. *See Hoke v. Netherland,* 92 F.3d 1350, 1356 (4th Cir.1996); *United States v. Orzechowski,* 547 F.2d 978, 985 (7th Cir.1976) (no *Brady* violation where information in unproduced DEA studies on what tests should be performed to determine if a substance is a cocaine isomer was available to defense in other forms and used during cross-examination of government expert).

FN10. Arguably the 1991 FBI Study itself was

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

publicly available at the time of Higgs' trial. Although the Court need not reach a conclusion as to that, it does note that the publicly-available *Journal of Forensic Sciences* article cited the FBI Study, a fact which appears to weaken Higgs's claim that the FBI Study was not reasonably available at the time of his trial. *See* Keto at 1026 n. 16. Moreover, the Court notes that the FBI Study had been assigned an International Standard Book Number (ISBN) by 1999, *id.,* a fact which further erodes Higgs's contention that it was not externally available by the time of trial in 2000.

**2. Uncertainty of studies with respect to chemical and statistical analysis per CBLA.**

The Court further finds that the critiques which fall into the second category-challenges to the validity of the chemical and statistical processes that comprise the essence of comparative bullet lead analysis-involve no strong, material conclusions but at best suggest areas for possible additional study. The 1991 FBI Study, for example, actually did more to confirm the validity of CBLA processes than to discredit them, finding that "[a]ccurate, reproducible elemental concentration determinations in bullet leads can be obtained using both [Neutron Activation Analysis] and [Inductively Coupled Plasma-Atomic Emission Spectrometry] methods." Peele et al. at 65. At the same time, the Iowa State study never actually concluded that CBLA's chemical or statistical processes were invalid, finding instead that the two methods the researchers employed to assess the quality of bullet lead evidence produced indeterminate results, in large part because of limited data availability. *See* Carriquiry et al. at 30. These less than ringing conclusions do not suffice to undermine confidence in the outcome of Higgs' trial. They appear instead to be comparable to the speculative information available in *Bhutani, supra.* The Court concludes that the two Studies' findings did not constitute favorable evidence that "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles,* 514 U.S. at 435, 115 S.Ct. 1555.

**3. Availability of expert witnesses.**

It is also noteworthy that Higgs, by his own admission, could have called witnesses capable of stating conclusions nearly identical to those he characterizes as present in the Government's studies. His petition, for instance, notes that, "[a]s early as 1970, metallurgists began writing about the techniques the FBI was using to compare *500 the elemental composition of bullets. Analysis of these techniques began to appear in published case law well before Petitioner's trial in 2000." Indeed, such critiques were also making their way into court proceedings as early as 1981. Higgs himself cites a 1981 dissent by Justice Hunter of the Indiana Supreme Court arguing that a CBLA technique similar to the technique relied upon in Higgs' case was unreliable and inadmissible. *See Jones v. State, 425 N.E.2d 128, 134-37 (Ind.1981)* (Hunter, J., dissenting). Ultimately, then, Higgs concedes that "any competent metallurgist in 2000 could have made many of the points made by [William A.] Tobin," the former employee of the FBI Laboratory whose affidavit Higgs has filed with the Court, who characterizes Government witness Lundy's conclusions as "unsupported by scientific foundation" and "not reliable." In light of these concessions, the Court finds unpersuasive Higgs' claim that the Government studies contained information not reasonably available elsewhere.

**4. Other bullet-related evidence.**

Finally, the Court notes that the FBI's CBLA analysis was not the only evidence that served to establish a link between Higgs and the .38 caliber bullets retrieved from the crime scene. In addition to the CBLA analysis, the Government presented: (1) eyewitness testimony linking Higgs to the firing of a .38 caliber weapon outside the Chaconia Nightclub in 1995; (2) ballistics evidence showing forensic similarities between a bullet recovered from the Chaconia Nightclub shooting and bullets recovered from the bodies of the murder victims in the present case; (3) statements by Higgs implying that he owned the .38 caliber weapon used in the Chaconia shooting; (4) the .38 caliber bullets found in Higgs's apartment upon execution of a search warrant; (5) evidence showing that a .38 caliber weapon was used in the Cherry Lane shooting, a crime to which Higgs pleaded guilty; and (6) the eyewitness testimony of Victor Gloria, who testified that Higgs owned a .38 caliber handgun which Higgs retrieved from a drawer on the night of the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

murders and later handed to Haynes, who used it to kill the three victims. In light of this substantial evidence linking Higgs and a .38 caliber weapon, the Court concludes that the largely inconclusive information relative to CBLA offered in the Government studies, whether or not otherwise reasonably available at the time of the trial, did not comprise evidence that "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles,* 514 U.S. at 435, 115 S.Ct. 1555.

### B. Newly Discovered Evidence

[7] Higgs's *Brady* argument is but the first of three arising from admission of the CBLA evidence at trial. The second is that the discovery of "new evidence" about the reliability of CBLA, including the National Research Counsel study that led to the FBI's abandonment of the practice, entitles him to a new trial. The Court disagrees.

[8] Newly discovered evidence may open the door to habeas corpus relief if it can form the basis of an actual innocence claim. *Herrera v. Collins,* 506 U.S. 390, 404, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993) (" 'Actual innocence' is ... a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits."); *Schlup v. Delo,* 513 U.S. 298, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995); *see also Buckner v. Polk,* 453 F.3d 195, 199-200 (4th Cir.2006). While it is not entirely clear whether Higgs' actual innocence claim is brought as a means to reach a procedurally barred constitutional claim under *Schlup,* or *501 whether he intends it as a "free-standing" claim of innocence which purportedly entitles him to relief under *Herrera,* it appears that he is alleging his actual innocence, in and of itself, as the basis for collateral relief. That is to say, he would like the Court to overturn his conviction because he submits he is actually innocent, on the grounds that pivotal evidence adduced against him at trial was unreliable.

The Supreme Court has never squarely held that actual innocence is a viable independent collateral claim. *See Herrera,* 506 U.S. at 417, 113 S.Ct. 853 ("We may assume, for the sake of argument in deciding this case, that

in a capital case a truly persuasive demonstration of "actual innocence" made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there were no state avenue open to process such a claim."). But if such a claim exists, the Court has said, the threshold showing would "necessarily be extraordinarily high." *Id.* Higgs' showing in this case falls far short of such a high threshold. The evidence adduced against him at trial was extensive and strong. First and foremost, Victor Gloria provided a detailed account of the murders and Higgs' role in them, testimony which in large part was corroborated by the testimony of several other witnesses as well as physical evidence. In addition to Gloria's testimony, highly damaging evidence included:

1. Enidsia Darby's statement that Higgs told her that the victims were killed because Tanji Jackson was "snitching on one of them [Higgs or Haynes]." TT. Sept. 29, 2000 [Paper No. 355], at 33-35;

2. Higgs' attempt to manufacture alibis for himself by urging Phyllis Smith and Enidsia Darby to lie to investigators as to his whereabouts at the time of the murder, *Id.* at 31; TT. Sept. 29, 2000 [Paper No. 426], at 31-37;

3. Higgs' statement to Dominick Williams that he could not plead guilty to the Chaconia Nightclub shooting because he feared that the bullets found at that crime scene could be linked to those used to kill Black, Chinn, and Jackson-a statement tantamount to a confession, TT. Oct. 4, 2000, at 34;

4. Higgs' admission to Williams that the women were killed because they were "tripping," TT. Oct. 4, 2000, at 44-46;

5. Higgs's suggestion to Williams that his friends would stop Gloria from testifying, presumably by intimidating or killing him, *Id.* at 44, 49; and

6. Testimony from various witnesses that Higgs owned

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

and had previously fired a .38 caliber gun, the same caliber used in the murders.

This evidence, the Court finds, effectively demolishes Higgs' claim of actual innocence. In light of this evidence, Higgs also fails to meet what appears to be the less restrictive standard for actual innocence suggested in *Schlup*, 513 U.S. at 327-28, 115 S.Ct. 851 (holding that in order to demonstrate actual innocence, a movant must establish that based on the evidence, "it is more likely than not that *no reasonable juror* would have convicted him") (emphasis added).

### C. Ineffective Assistance of Counsel

[9] Higgs' third CBLA argument is that defense counsel was ineffective for failing to offer available studies or experts critical of CBLA.

Claims of ineffective assistance of counsel are governed by the two-part test outlined in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), which requires a showing (1) "that counsel's performance was deficient," and; **\*502** (2) "that the deficient performance prejudiced the defense." *Id.* at 687, 104 S.Ct. 2052. Representation is deficient if it "falls below an objective standard of reasonableness." *Id.* at 688, 104 S.Ct. 2052. A showing of prejudice requires "that counsel's errors were so serious as to deprive the defendant of a fair trial ... whose result is reliable," *id.* at 687, 104 S.Ct. 2052, and that there was a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. 2052. Put differently, "[t]he benchmark of an ineffective assistance claim must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* at 686, 104 S.Ct. 2052. *See also, Roach v. Martin*, 757 F.2d 1463 (4th Cir.1985) (adopting the *Strickland* test for the Fourth Circuit).

Passing the question of deficiency *vel non* of counsel's performance, the Court concludes that there was no

reasonable probability that, absent counsel's alleged errors, the result of the proceeding would have been different. The multiplicity and the strength of the evidence previously catalogued establish that proposition beyond peradventure.

### D. Motion for Discovery

[10] For the same reason, the Court finds Higgs' discovery request for any FBI reports, studies, and scientific data related to the validity of CBLA or the FBI's decision to discontinue its use on September 1, 2005 without merit. Discovery in connection with a habeas petition may be given only upon a showing of "good cause." *See* RULES GOVERNING SECTION 2255 PROCEEDINGS FOR THE UNITED STATES DISTRICT COURTS 6(a). "Good cause" exists when there is "reason to believe that [the defendant] may, if the facts are fully developed, be able to demonstrate that he is ... entitled to relief." *Bracy v. Gramley*, 520 U.S. 899, 908-09, 117 S.Ct. 1793, 138 L.Ed.2d 97 (1997). As discussed, there is no reason to believe that such additional facts as Higgs might hope to mine during discovery would demonstrate his entitlement to relief at this juncture.

### III.

### Claim 2: Peremptory Challenges

In his second claim, Higgs argues his entitlement to a new trial because of the allegedly discriminatory manner in which the prosecution exercised its peremptory strikes against women. This, he says, violated the Equal Protection Clause of the Fifth Amendment. He cites *Batson v. Kentucky*, 476 U.S. 79, 89, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), in which the Supreme Court held that litigants may not use peremptory challenges "solely on account of race," a holding extended to gender-based challenges in *J.E.B. v. Alabama*, 511 U.S. 127, 128-29, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994). As evidence of gender discrimination, Higgs submits that, despite the fact that over one-third of the jury pool was comprised of women, the final jury contained only men.[FN11] He further submits that the actions of the prosecutors in this case were part of a pattern of discriminatory behavior, as

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

evidenced by their elimination of a disproportionate number of women in another death penalty case heard by this Court following Higgs' trial.[FN12] Because of this jurisdiction's practice *503 of "blind striking" the jury, [FN13] Higgs says he has been unable to ascertain the exact number of strikes the Government exercised against potential female jurors.[FN14] He therefore argues that evidence relating to the Government's gender discrimination justifies discovery and an evidentiary hearing. He further complains that he was deprived of effective assistance when counsel failed to object to the prosecution's supposed gender bias in exercising its peremptory challenges.

FN11. The jury of 12 was picked from a total of 44 prospective jurors. Of the 44 prospective jurors, 28 (63.5%) were men and 16 (36.5%) were women.

FN12. See United States v. Lighty, PJM-03-00457 (D.Md.)

FN13. Under this practice, after the Court conducts voir dire, each side is given a clean juror list with all strikes for cause noted. Counsel then make their peremptory strikes from their respective lists, without seeing which jurors are being struck by the opposing side. The Courtroom Deputy (CRD) then takes up the lists from counsel and prepares a master list incorporating both sides' strikes. Counsel are advised by the Court that, starting from the top of the list, the CRD will call into the jury box the first 12 unstruck names (or more, depending on the number of alternates to be chosen). After the prospective jurors are called into the jury box, counsel are given a final opportunity to object before the jury is sworn.

FN14. While the prosecution and defense have not seen each others' strikes, they should be able to reconstruct those strikes by noting which of the first 28 names on the list (10 defense strikes and 6 prosecution strikes and 12 remaining jurors) have or have not been struck.

The Government argues that Higgs' claim is procedurally defaulted, but submits that even on the merits, he is unable to establish a *prima facie* case of discrimination or rebut the Government's legitimate, non-discriminatory reasons for its strikes. Because the underlying claim would have been futile, says the Government, the Sixth Amendment claim of ineffective assistance also fails.

**A.**

[11] The Court agrees that this claim is procedurally defaulted. Before now, Higgs has never argued that the prosecution exercised its peremptory strikes in violation of the Equal Protection Clause. Though a procedural default will be excused upon a demonstration of cause and prejudice, *see Massaro v. United States*, 538 U.S. 500, 504, 123 S.Ct. 1690, 155 L.Ed.2d 714 (2003), and while it may be assumed *arguendo* that Higgs has shown "cause," *Murray v. Carrier*, 477 U.S. 478, 488, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986) (noting that ineffective assistance of counsel is "cause" for a procedural default), he has not shown "prejudice." The Court explains.

**B.**

[12] A *Batson- J.E.B.* challenge requires a three-step inquiry: (1) the court first determines whether the defendant has made a *prima facie* showing that the prosecutor exercised a peremptory challenge on the basis of-in this case-gender, (2) the prosecutor must then present a gender-neutral explanation for striking the juror in question, and (3) the court must then determine whether the defendant has carried his burden of proving purposeful discrimination. *Rice v. Collins*, 546 U.S. 333, 338, 126 S.Ct. 969, 163 L.Ed.2d 824 (2006).

**1.**

[13] *Batson* provides that a defendant may satisfy his initial burden of demonstrating a *prima facie* case of discrimination by showing that: (1) the defendant was a member of a cognizable group, (2) the prosecution

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

exercised peremptory challenges to remove from the venire members of defendant's gender, and (3) other relevant facts and circumstances give rise to an inference of discrimination. *504 *Batson,* 476 U.S. at 96, 106 S.Ct. 1712; *J.E.B.,* 511 U.S. at 144-45, 114 S.Ct. 1419 (suggesting that analysis of gender-based discrimination claims should follow the approach outlined in *Batson* ). While *Batson- J.E.B.* challenges were originally limited to discrimination claims regarding one's own race or gender, this has since been expanded to allow defendants who are of a different cognizable group than the stricken jurors to establish a *prima facie* case. *See Powers v. Ohio,* 499 U.S. 400, 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991) (holding that racial identity between the objecting defendant and the excluded jurors does not constitute a relevant precondition for a *Batson* challenge). Because Higgs does not allege that members of his own gender, *i.e.* men, were improperly stricken from his jury, he must show that other relevant facts and circumstances give rise to an inference of discrimination involving women. *United States v. Joe,* 928 F.2d 99, 102 (4th Cir.1991) (citing *Batson,* 476 U.S. at 96, 106 S.Ct. 1712). He embarks upon a tortuous, ultimately unsuccessful course in his effort to do so.

Higgs begins by presenting statistics which he believes evidence discrimination by the prosecution during jury selection. He argues, from the limited information available to him, that it "appears" that the prosecution exercised eleven of its fifteen peremptory strikes, or 73.3%, to eliminate prospective female jurors, whereas women made up only 36.5% of the venire. [FN15]

> FN15. Of at least 15 strikes Higgs believes were used, he has determined that 11 of them were used against women.

The Government submits that these statistics are speculative and cannot suffice to establish a *prima facie* case of discrimination. *See United States v. Tipton,* 90 F.3d 861, 881 & n. 11 (4th Cir.1996) (rejecting a gender-discrimination claim where the defendants produced no evidence to support their argument other than "raw figures" of two men versus eight women stricken). It notes that four female jurors who were not excluded by the Government would have been seated if they had not been

stricken by Higgs' own counsel.

The Court is not prepared to say that statistics alone can never suffice to establish a *prima facie Batson* violation. *See, e.g., Howard v. Moore,* 131 F.3d 399, 407 (4th Cir.1997) (*en banc* ) (concluding that "prosecutor's striking of six out of the seven black prospective jurors"-without more-"constituted a *prima facie* case of discrimination"); *see also Allen v. Lee,* 366 F.3d 319, 359 (4th Cir.2004) ("When determining whether a *prima facie* case of discrimination has been shown, the district court may consider the proportion of black jurors stricken compared with the composition of the venire."). On the other hand, neither is it necessarily suspect that the prosecution exercised 73.3% of its strikes against women, when women constituted 36.5% of the venire. But assuming without deciding that such numbers could form the basis for a *prima facie* case of discrimination, Higgs nonetheless has failed to rebut the Government's proffered neutral, non-discriminatory reasons for its strikes.

**2.**

The Supreme Court has made clear that the prosecution's burden of establishing a legitimate reason for its strikes is not heavy. *See Rice,* 546 U.S. at 338, 126 S.Ct. 969 ("[a]lthough the prosecutor must present a comprehensible reason, the second step of this process does not demand an explanation that is persuasive, or even plausible; so long as the reason is not inherently discriminatory, it suffices") (internal citations and quotations omitted). *505 To satisfy this burden, the prosecutors may provide a variety of reasons for their strikes, including among others the prospective juror's prior criminal jury service, the fact of the prospective juror having relatives who have served prison time, business concerns, and relationships between the prospective juror's relatives and trial counsel. Given this lenient standard, the prosecution easily satisfies its burden in this case. [FN16] *See Rice,* 546 U.S. at 338, 126 S.Ct. 969.

> FN16. The Government has explained that female Jurors 19, 43, 64, 69, 100, 112, and 124 were stricken for neutral reasons justifying their exclusion-separate and apart from their death

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

penalty views. Jurors 19 and 112 were stricken as a result of their prior criminal jury service. Juror 43 was stricken due to her concerns about her business, which was going public, where she was the chief financial officer. Juror 64 had a nephew whom she believed had been wrongly convicted of manslaughter and who had received a 10-to-20 year prison sentence. Juror 124 had a cousin who was currently being prosecuted for drug offenses in Maryland and a father who had served time in federal prison. Juror 69's brother was a police officer who was successfully defended against criminal charges by Harry Trainor, Esquire, Higgs' trial counsel. At the time of trial, Trainor still had a professional relationship with the juror's brother. Juror 100 failed to establish eye contact during voir dire and also had a 22-year-old son, which the Government believed might make her unduly sympathetic to the similarly-aged defendant. Juror 100 also stated, without explanation, that she would not apply the death penalty in some cases.

[14] Once a non-discriminatory reason is offered, step three of a *Batson* inquiry requires the trial court to determine whether the defendant has rebutted the stated rationales in order to prove intentional discrimination. *Batson,* 476 U.S. at 98, 106 S.Ct. 1712.

A variety of circumstances may be considered in determining whether the prosecution discriminated in its jury selection. In *Miller-El II,* the Supreme Court was persuaded by six indicia of discrimination where prosecutors: (1) struck a high percentage of veniremen on the basis of their being part of a cognizable group; (2) proffered reasons for striking the members of the cognizable group that applied equally to veniremen who were not members of the cognizable group; (3) repeatedly "shuffled" potential jurors when confronted with eligible veniremen who were part of the cognizable group; (4) used different scripts depending on whether the veniremen were part of the cognizable group; (5) made written notes about the veniremen being part of the cognizable group; and (6) were part of an office with a systematic policy of discrimination. *Miller-El II,* 545 U.S. at 239-66, 125 S.Ct. 2317.

The present case stands in marked contrast to *Miller-El II.* The percentage of strikes against women here, arguably high enough to make a *prima facie* case, ultimately does not persuade the Court that the prosecution engaged in intentional discrimination, particularly given that the lack of women on the jury was due at least in part to strikes made by the defense.[FN17] Furthermore, unlike in *Miller-El II,* the "shuffling" of jurors and the asking of different questions of male and female jurors did not occur here. There is no indication that the prosecution in its voir dire treated potential male and female jurors differently.

> FN17. The prosecution in *Miller-El II* struck 91% of the black veniremen, *id.* at 2325, while the prosecution in this case struck only 75% of the females on the venire.

Still, Higgs argues that under *Miller-El v. Cockrell,* a petitioner claiming discrimination in jury selection may prove that the prosecutor has engaged in systematic discrimination against a particular group of venire members as part of a "culture" of *506 discrimination. 537 U.S. 322, 347, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003) (*Miller-El I* ); see also *Miller-El v. Dretke,* 545 U.S. 231, 240, 125 S.Ct. 2317, 162 L.Ed.2d 196 (2005) (*Miller-El II* ). A "culture" of discrimination can be established by a showing that the prosecutor discriminated "in case after case." *Swain v. Alabama,* 380 U.S. 202, 224, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965). Higgs alleges such a culture was in place here because his prosecutors, five years after his trial, tried another capital case together, *United States v. Lighty,* PJM-03-00457 (D.Md.2006), in which they purportedly exercised 10 of their 12 identifiable peremptory strikes against women.

Higgs also fails in his attempt to rely on *Swain.* As indicated, under *Swain* "an inference of purposeful discrimination would be raised on evidence that a prosecutor, 'in case after case' ... is responsible for the removal" of women who have been selected as potentially qualified jurors. *Batson,* 476 U.S. at 91-99, 106 S.Ct. 1712 (citing *Swain,* 380 U.S. at 224, 85 S.Ct. 824). Jury statistics from the *Lighty* case alone, which was tried five years after Higgs, whatever they might show, fall far short

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

of demonstrating a pattern of discrimination in "case after case." [FN18]

> FN18. For what it is worth, the Court notes that the two prosecutors charged with discriminating against females in their jury selection in this case and the *Lighty* case are themselves female.

### C.

Higgs' proposal that discovery be allowed and an evidentiary hearing held to explore his claim of gender discrimination in jury selection is rejected.

The Court finds no "good cause" to engage in discovery or hold a hearing based on the highly speculative ruminations Higgs has engaged in. A defendant may not use discovery to go on a "fishing expedition" through the Government's files in search of evidence to support an imagined and fanciful claim. *See United States v. Wilson,* 901 F.2d 378, 381 (4th Cir.1990).

### D.

Higgs' argument that trial counsel's failure to raise the *Batson* challenge in response to the prosecution's purported gender discrimination violated his Sixth Amendment right to effective assistance necessarily falls.

[15] Where an objection to evidence would have been futile, counsel is not constitutionally ineffective for failing to make it. *See Harris v. United States,* 204 F.3d 681, 683 (6th Cir.2000). Since counsel's decision to raise a constitutional challenge based on gender discrimination would have been futile, their failure to do so did not violate Higgs' Sixth Amendment right to effective assistance.

### IV.

**Claim 3: Brady Issues as to Witness Testimony;**

## Ineffective Assistance as to Witnesses; and Investigation

Higgs asserts that the Government failed to disclose certain evidence, denying him his Fifth Amendment Due Process rights and that trial counsel were ineffective in failing to call certain witnesses, denying him his Sixth Amendment right to counsel. He also believes, based on newly discovered evidence, that he should be exonerated of the charges against him.

The testimony of several trial witnesses is relevant to these claims.

Victor Gloria gave eyewitness testimony with respect to the murders. He stated that, on the night of the murders, he rode *507 in the backseat of Higgs' vehicle while Higgs drove and Haynes sat in the passenger seat. He testified that he saw Higgs hand a gun to Haynes while whispering something to Haynes. At the same time, Gloria conceded he had initially told investigators and several witnesses that he had been asleep immediately prior to the murders, later explaining he had lied about being asleep. During cross-examination at trial, Higgs' counsel attacked Gloria's credibility, eliciting statements about his criminal past (including his use and sale of drugs and his violation of probation), as well as his willingness to lie to authorities.

Two other witnesses, Wondwossen Kabtamu and Richard Diolamou, testified as to the November 1995 incident that occurred outside the Chaconia Nightclub where Higgs shot out the windows of a vehicle in a drive-by shooting while Kabtamu drove. This testimony was used to demonstrate Higgs' participation in one of two prior shooting incidents involving a .38 caliber weapon.

Domenick Williams testified as to a discussion he had with Higgs while they were housed in the same block in D.C. jail (Northwest 1.).[FN19] Specifically, Williams stated that, while Higgs did not expressly admit his involvement in the Chaconia shooting, he told Williams he did not want to plead guilty to it "because they would try to use the gun in another case." According to Williams, Higgs also asked him what his chances would be if "the witness after the fact [Gloria] wasn't there." The Government offered this

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

testimony to demonstrate one of several acts evincing "consciousness of guilt" on Higgs' part.

> FN19. Williams was later moved to the sentencing block (Southwest 2).

The Court concludes that the Government did not withhold material evidence that would have had a reasonable probability of affecting the outcome of the trial. Moreover, Higgs' trial counsel engaged in a thorough investigation and presentation of this evidence such that any claim of ineffective assistance of counsel is unwarranted. Finally, there is no new evidence that would justify overturning Higgs' conviction.

### A. Suppression of Evidence and Due Process

Higgs claims that the Government withheld evidence with respect to benefits it purportedly offered to Victor Gloria, Enidsia Darby, Richard Diolamou, Wondwossen Kabtamu and Domenick Williams in exchange for their testimony. This non-disclosure, he argues, violated his Fifth Amendment Due Process rights.

[16] As previously stated, in order for the prosecution's suppression of evidence to violate a defendant's due process rights, the evidence must be material. *Brady*, 373 U.S. at 87, 83 S.Ct. 1194. To be "material," evidence must be such as would create a "reasonable probability" of a different outcome at trial. *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). Promises made by the Government in consideration for testimony can be material if they meet this "reasonable probability" standard. *Giglio v. United States*, 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). Prosecutors therefore have a duty to disclose any consideration offered to a witness where the witness' credibility is crucial to the case. *Id.* at 154-55, 92 S.Ct. 763.

### 1. Gloria

[17] Higgs claims the Government failed to disclose

extensive information it had regarding its dealings with Gloria both in Maryland and other jurisdictions. He acknowledges that the jury knew Gloria faced 15 years in prison for his involvement*508 in the present case, plus 30 years on other federal drug charges and up to 10 years on State drug charges, and that it also knew that the Government had offered Gloria a lighter sentence for his role in this case in exchange for his cooperation. But Higgs argues that the jury never understood that Gloria might actually receive a lower sentence. As the Government correctly points out, however, the record squarely refutes this contention. Gloria himself testified that he could receive a sentence as low as 7 years, the sentence he in fact ultimately received based on the Government's motion at his sentencing that he receive a downward departure of two offense levels for substantial assistance under the sentencing guidelines. But Higgs says the jury did not know of additional consideration being offered to Gloria, i.e. that the charges he faced in connection with other federal drug violations would be dismissed and that, as to the state drug charges, he would only receive a sentence of one year concurrent with the time he was already serving in federal prison.

All this said, assuming Gloria actually received these benefits, there is no evidence that the Government offered any of the benefits to Gloria before he testified at the Higgs trial. That charges in a separate federal case against Gloria may have been dismissed 5 years after Higgs' trial in the present case in no sense establishes that the Government had determined not to pursue those charges at the time of Higgs' trial or that it had agreed with Gloria that it would do so. At the time of Higgs' trial, to the extent other federal claims may have been pending against Gloria, the Government may have had no intention whatsoever of dropping those charges, while 5 years later it may well have decided to drop the charges for wholly unrelated reasons. In short, Higgs has no basis, other than sheer speculation, for suggesting that the Government's dismissal of drug charges against Gloria, if indeed that is what happened, had any connection with Higgs' conviction and sentence. *See U.S. v. Roane*, 378 F.3d 382, 400-401 (2004) (finding that "airy generalities [and] conclusory assertions" are not sufficient to meet the defendant's burden in a § 2255 claim).

Higgs also claims that the Government offered Gloria

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

benefits in relation to state charges pending against him in Virginia as well as charges he potentially faced in Baltimore. Specifically, he submits that Virginia officials were never notified of Gloria's whereabouts during the Higgs prosecution, when presumably they should have been, and that state charges were never brought against Gloria for a homicide in Baltimore. Again, pure speculation about supposed benefits cannot substitute for hard facts. *See Roane, 378 F.3d at 401.* Higgs, quite simply, has failed to demonstrate any causal connection between Gloria's testimony in this federal case and whatever treatment he may have received in the state jurisdictions.

Even were the Court to find that the prosecution failed to turn over any of this evidence, and again assuming the factual accuracy of the supposed benefits, Higgs has not demonstrated its materiality. Gloria's credibility as a witness was thoroughly explored and impugned by Higgs' counsel through vigorous cross-examination. Gloria openly confessed to an extensive criminal history, going so far as to state that "if it is going to help Victor Gloria, Victor Gloria will do whatever he has to do." Unquestionably counsel established that Gloria was a witness of dubious reliability, whose testimony the jury could weigh accordingly. In other words, any evidence that Gloria may have received consideration for his testimony beyond that disclosed by the Government could **\*509** not have further undermined his already low credibility, nor would it have created a "reasonable probability" of a more favorable verdict. *See Kyles, 514 U.S. at 434, 115 S.Ct. 1555* (quoting *United States v. Bagley, 473 U.S. at 678, 105 S.Ct. 3375*).

### 2. Others

Higgs' contentions that the Government failed to disclose information relating to consideration offered to Diolamou, Kabtamu and Williams in exchange for testimony are similarly infirm.

Factual claims must be established by a preponderance of the evidence. *Miller v. United States, 261 F.2d 546, 547 (4th Cir.1958); Martin v. United States, 395 F.Supp.2d 326, 328 (D.S.C.2005).* Higgs surmises, but presents no

hard evidence, to support his claim that Diolamou and Kabtamu received favorable treatment in immigration proceedings in exchange for their testimony in this case. His claim of Government nondisclosure of benefits as to Diolamou rests on the fact that Diolamou was involved in deportation proceedings at the same time as Higgs' trial. But the mere fact that these legal proceedings were occurring simultaneously does not show that Diolamou received benefits in one in exchange for testimony given in the other. There is no evidence in the record that Diolamou was in fact facing deportation or that he understood that he would be receiving any sort of immigration benefits in exchange for his cooperation here, or indeed that he actually received any benefits. As to Kabtamu, Higgs offers nothing more than an unfounded assertion that Kabtamu received an immigration benefit.

[18] As to Williams, Higgs claims the Government violated his due process rights when it failed to disclose evidence of an alias used by Williams that was tied to charges pending against him at the time he testified, or that there was an open bench warrant for Williams as to those charges, or that Williams and Higgs in fact did not share the same cellblock at the time of the incident about which Williams testified.

But assuming the existence of these facts or that the Government knew of them-which Higgs has by no means demonstrated-there is no reason to conclude that these facts established a "reasonable probability" of a different outcome at trial. Williams' criminal ways were fully apparent to the jury at all times, as evidenced by the fact that Williams spoke of being in jail with Higgs. Even then, the suggestion that Williams and Higgs may have been housed in different sections of jail at the time the conversation about which Williams testified took place is of negligible consequence. The records show that defense counsel were well aware of the times Williams and Higgs were housed together on the Northwest cellblock and when Williams was moved to the Southwest block. Since counsel knew there were times when Higgs and Williams were housed together and when they were in different locations, it is not clear how the records of their precise locations within the jail would have helped Higgs' case at all, much less that their production would have been reasonably probable to affect the outcome of the proceeding. *See Fullwood v. Lee, 290 F.3d 663, 685-87*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

(4th Cir.2002) (finding that a defendant's claim of suppression cannot stand when the information is known to the defendant).

### B. Ineffectiveness of Counsel

Higgs faults counsel for allegedly failing to investigate or present evidence regarding: (1) inconsistencies in Gloria's statements as to whether he was asleep at the time of the murders, including additional witnesses who could have testified to this issue; (2) Gloria's prior use and possession *510 of a .38 caliber pistol; (3) Haynes' motive for the murders in this case other than the one the Government ascribed to him; (4) Higgs' supposed violent assault on Enidsia Darby; and (5) custodial records from the DC jail to impeach Williams' testimony and the supposed undisclosed benefits the Government offered to Williams. The Court agrees with the Government and rejects all these claims.

Per *Strickland,* counsel not only acted reasonably in regard to each of these claims, such that the claims for ineffective assistance of counsel fail; the Court finds no prejudice with respect to any of them.

### 1.

[19] Higgs alleges that two possible witnesses, Keon Dacosta and Katrina Havenner, the mother of Higgs' child, should have been called to impeach Gloria's testimony that Higgs put the murder weapon in Haynes' hands, because Gloria purportedly made statements to both Dacosta and Havenner that he was asleep during the murders. Dacosta has submitted a declaration stating that Gloria told him he was "asleep, or passed out" during the murders.

Higgs does not, however, suggest that his counsel knew about Dacosta. What he says is that Dacosta had witnessed an incident in which Higgs allegedly held a gun to the head of his former girlfriend Enidsia Darby. Higgs claims that counsel had a duty to interview Dacosta regarding that incident, and that if they had done so, counsel would have learned that Dacosta also had a connection with Gloria which, in turn, would have led to Dacosta's testimony that

Gloria told him he had been asleep at the time of the murders.

As for Havenner, she supposedly told a defense investigator that Gloria also told her he was unconscious at the time of the murders.

Higgs claims that had the statements of these witnesses been introduced, Gloria's credibility as a witness would have been further weakened. Although he acknowledges that his counsel were able to use Gloria's prior inconsistent statements to the police (i.e. that he was asleep during the murders) on cross-examination, he submits that counsel were ineffective for failing to establish a pattern of inconsistency in Gloria's statements. The Court finds none of these arguments persuasive.

[20][21][22] In assessing an ineffectiveness of counsel claim, the court presumes counsel's conduct was "within the range of reasonable professional assistance." *See Rose v. Lee,* 252 F.3d 676, 693 (4th Cir.2001) (quoting *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052). Counsel's decision not to embark on certain investigations is "assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland,* 466 U.S. at 691, 104 S.Ct. 2052. Claims of ineffective assistance of counsel based on failure to investigate potential witness testimony must show that the witness would have been willing to testify and that the testimony would have created "reasonable doubt" as to the defendant's guilt. *Spencer v. Murray,* 18 F.3d 229, 233-34 (4th Cir.1994). Failure to investigate a "crucial" witness may suggest ineffectiveness of counsel, but failure to investigate every single person mentioned by the defendant is not tantamount to ineffective assistance. *Huffington v. Nuth,* 140 F.3d 572, 580 (4th Cir.1998) (quoting *Gray v. Lucas,* 677 F.2d 1086, 1093 n. 5 (5th Cir.1982)).

Assuming *arguendo* that counsel ought to have interviewed Dacosta because he had been a witness to Higgs' assault on Darby, it is difficult to see how or why counsel would have had reason to know of Dacosta's relationship with Gloria. And if *511 counsel had no reason to know that one witness had a connection with

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

another witness, they can hardly be faulted for failing to learn about the second witness because they failed to ask the first witness about the second. *See Ames v. Endell,* 856 F.2d 1441, 1444-45 (9th Cir.1988) (finding that counsel had no duty to investigate "what hypothetically might have happened"); *see also Alcala v. Woodford,* 334 F.3d 862, 893 (9th Cir.2003).

Ultimately, however, with respect to counsel's failure to call these various witnesses, Higgs must still show that their testimony would have been likely to alter the outcome of the trial. *See Strickland,* 466 U.S. at 694, 104 S.Ct. 2052 (1984). This he has not done. While the testimony of Dacosta and Havenner may have further impeached Gloria, as previously noted, defense counsel did a very effective job undermining Gloria's credibility; they even got Gloria to impeach himself when he admitted he had lied in his initial statements that he was sleeping at the time of the murders. Counsel also had Gloria lay out before the jury his "history of deception and criminality." The testimony of Dacosta and Havenner would have been of marginal significance. Counsel were not remiss in failing to interview them or call them to the stand.

**2.**

[23] Higgs next claims that counsel ought to have investigated Gloria's prior possession and use of .38 caliber pistols because this would have suggested that Gloria had a more prominent role in the murders in this case. Specifically, prior to the murders in this case, Gloria faced charges in two incidents involving handguns: In July 1994, he was charged with possession of a .38 caliber handgun in a vehicle and, in February 1995, during a search of his apartment for drugs and drug paraphernalia, the Howard County authorities discovered a handgun in the apartment (although Gloria was not charged with possession of the weapon.) Higgs also notes that Gloria had admitted to having fired .38 caliber pistols.

The Court finds that these facts would have contributed virtually nothing to Higgs' defense. Mere familiarity with the type of weapon used in the murders would not necessarily have increased the likelihood that it was Gloria who used the weapon in this case nor would it have affected his credibility. Although counsel have a duty to conduct a reasonable investigation, Higgs must show that counsel's failure to perform an appropriate investigation led to a failure to present exculpatory evidence. *See Spencer,* 18 F.3d at 233. In the July 1994 situation, although Gloria was charged with possession of the weapon, it was the other individual in the vehicle who ultimately claimed ownership of the weapon. Nor, again, was Gloria charged with possession of the weapon in the 1995 incident. In sum, Gloria's potential association with a .38 caliber weapon, attenuated as it was, was hardly exculpatory evidence as far as Higgs was concerned.

**3.**

Higgs claims counsel were ineffective for failing to investigate evidence of motives that Haynes or other individuals may have had to murder the women in this case. He suggests that the victims owed money to two drug dealers, Cephus and Chico, which gave those two men a motive to kill them. Higgs then argues that Haynes had a strong motive to kill the women because Haynes was serving as the "muscle" for Cephus and Chico. In support of this theory, Higgs proffers a declaration from Patrice Birdine claiming that Haynes' brother told her that Haynes shot the women over money. These proffers, however, do nothing to assist Higgs. Anything Birdine says is rank hearsay, and the *512 same appears be true of the statement of Haynes' brother, since the brother does not say he heard Haynes make what at best might have been a declaration against penal interest. *See* Fed.R.Evid. 803(8)(B). Haynes' supposed motive to commit the murders in this case is speculation of the highest order. More to the point, there is no basis for concluding that the existence of this recently proffered motive on the part of Haynes should have occurred to Higgs' counsel at the time of trial.

**4.**

[24] Higgs also faults counsel for failing to investigate Enidsia Darby's claims that Higgs violently assaulted her in 1995. In testifying about the incident, Darby initially claimed Higgs put a gun in her face and threatened to kill her. During trial counsel's cross-examination, however, Darby conceded that the altercation had been mutual. Defense counsel also established that the police failed to

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

find a gun when they responded to the incident. But Higgs claims that the police report regarding the assault would have further impeached Darby's testimony, particularly because, at the time of the event, Darby made no mention of Higgs being violent. Higgs claims counsel ought to have interviewed Darby before trial because, having recanted her testimony since trial, she was presumably lying at trial.

The police report itself, of course, is inadmissible hearsay evidence. *See* Fed.R.Evid. 803(8)(B). In addition, there is no basis for concluding that a pre-trial interview of Darby would have caused her to say anything different from what she said at trial, notwithstanding what she apparently says today. Darby's current credibility is highly doubtful. Her most recent statement that she lied at trial because she believed the Government would give her benefits strongly suggests that even if she had been lying at trial, it is unlikely she would have sacrificed the hoped-for benefits she was lying for, simply because Higgs' counsel might have contacted her. Counsel's decision not to investigate Darby's claims did not amount to ineffective assistance.

### 5.

Higgs also contends that trial counsel failed to investigate Williams' precise location in the D.C. jail, the outstanding charges against him, or the outstanding warrant against him in Philadelphia. For the same reasons Higgs fails to prevail on his claim that the Government failed to disclose this evidence, there is no merit to his claim that counsel failed to investigate the matters. Counsel's performance was not deficient and nothing they did or did not do in this regard prejudiced the defense.

### C. New Evidence

[25] Finally, Higgs asserts his innocence based on alleged new evidence, *viz.*, the post-trial recantation of Victor Gloria with respect to his trial testimony that Higgs handed Haynes the murder weapon, supposedly reviving Gloria's one-time claim that he slept through the moments before the murder, as he originally told police.[FN20] Higgs asserts that § 2255 relief is required because Gloria's recantation exonerates him and demonstrates that his

conviction amounts to a fundamental miscarriage of justice. The Court is unpersuaded.

> FN20. Gloria is said to have made this recantation in a discussion with Robert Durand, an investigator working for Higgs' habeas counsel.

A claim of actual innocence standing alone has never been deemed to present a constitutional issue justifying habeas relief, although the Supreme Court has acknowledged the theoretical possibility of such a *513 claim. *See Herrera, 506 U.S. at 417, 113 S.Ct. 853.* Clearly, however, a petitioner may assert a claim of actual innocence based on newly discovered evidence in an attempt to rescue an otherwise procedurally defaulted constitutional claim. *Id. at 404, 113 S.Ct. 853* (" 'Actual innocence' is not itself a constitutional claim ... but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits."); *see also* Randy Hertz & James Liebman, *Federal Habeas Corpus Practice and Procedure* § 2.5 (5th ed., Vol. 1 1998).

If a petitioner seeks to use newly discovered evidence as a gateway to revive a defaulted claim, he still must prove "that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." *Schlup, 513 U.S. at 327, 115 S.Ct. 851.* But in the present case Higgs does not appear to cite Gloria's purported recantation in an effort to revive an otherwise procedurally defaulted constitutional claim. He appears to offer it to demonstrate his actual innocence, on the basis of which he seeks to have his guilty verdict overturned. But having not yet held that a free-standing innocence claim is sufficient in a habeas proceeding, as the Supreme Court itself nevertheless noted in *House v. Bell, 547 U.S. 518, 555, 126 S.Ct. 2064, 165 L.Ed.2d 1 (2006),* the "threshold for any hypothetical freestanding innocence claim" would be "extraordinarily high".

Here it makes little difference whether Higgs must meet the "extraordinarily high" standard alluded to in *House* or the "no reasonable juror would have convicted him" standard of *Schlup.* True, a declaration has been filed

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

stating that the conversation between Gloria and a defense investigator took place.[FN21] But, generally speaking, recantations are highly suspect: they are not subject to cross-examination, they are generally offered years after the crime and the trial, and witnesses offering recantations are often facing radically different pressures than they were at the time of the initial trial. *See United States v. Johnson*, 487 F.2d 1278, 1279 (4th Cir.1973) (finding that recantations are viewed with great skepticism). The Government has outlined several incriminating actions Higgs took following the murders which were totally independent of what Gloria had to say (*e.g.* Higgs "sanitized his apartment, lied to police, attempted to create a false alibi, tried to silence Gloria"), all of which militate strongly against Higgs' claim of innocence based on a recantation made years after the crimes he was convicted of took place. His claim of actual innocence is totally unconvincing; the evidence of his guilt remains overwhelmingly strong. He has failed to meet either the *House* or *Schlup* standards.

> FN21. Initially, Higgs simply relied on the mere assertion in his briefing that such a recantation had taken place. After the Government filed its response noting the lack of a declaration, Higgs filed the Declaration of Robert Durand in which Durand deposes that "Mr. Gloria stated that he had been imprisoned 'for nothing,' because he had been asleep in the van when the murders were committed." (Durand Aff. ¶ 3; 2d Supplemental App. to Pet'r's Mot. for Relief)

**Claim 4: Ballistics Testimony**

Higgs next contends that trial counsel rendered ineffective assistance by failing to challenge the Government's ballistics testimony.

At trial, FBI ballistics examiner Carlo Rosati testified that the microscopic markings on the bullets fired by Willis Haynes at the murder scene, those found at the Chaconia shooting, and those found at the *514 Cherry Lane shooting shared common features, specifically five right-hand twisting lands and grooves. Rosati testified that the bullets were fired from the same class of weapon, but conceded that he could not determine whether or not the bullets were fired from the same gun. When cross-examined by defense counsel, Rosati conceded that more than 1.5 million weapons could have left the same microscopic markings found on each of the bullets. Even so, this testimony was used by the Government to argue that the bullets were fired from the same weapon used in all three shootings, a conclusion which, *inter alia,* was cited by the Fourth Circuit in affirming the conviction.

Higgs argues that his counsel were ineffective for failing to cross-examine Rosati based on information in the FBI ballistics report generated by Rosati himself and by the Prince George's County crime laboratory. The report, Higgs says, indicated that at least two different calibers of weapons produced by eleven different revolver manufacturers would produce the same markings as those found on the bullets in question and that a single manufacturer, Smith & Wesson, produced 19 different models in two calibers that could have created the same impressions. Use of such information on cross-examination, Higgs continues, would have discredited Rosati's testimony.

Higgs also contends that counsel were ineffective for failing to hire a defense expert to evaluate and challenge the ballistics evidence and Rosati's testimony. In fact, he says, the purported ballistics expert retained by Higgs' current counsel, William Conrad, has provided a letter stating that Smith & Wesson alone, one of the eleven potential firearms manufacturers, produced over two million weapons that could have created the markings on the bullets in question. Higgs argues that an expert such as Conrad could have been called at trial to show that Rosati's testimony underestimated the number of possible firearms that could have left the markings on the bullets.

Higgs also argues that counsel were ineffective for failing to contest the admissibility of Rosati's testimony. The testimony, in Higgs' view, lacked probative value because it shed no light on the allegations in the case and was not determinative as to whether or not the various bullets examined were fired from the same weapon.

Finally, Higgs argues that counsel were ineffective for

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

failing to object to the prosecution's misleading characterizations of Rosati's testimony during closing argument, specifically the statement that "[Higgs and Haynes] had done a shooting before.... [Higgs] knew Mr. Haynes would get out of that car and use that gun. Doesn't that make him more responsible for what happened that night?" TT 10/25/00, 23. These statements, according to Higgs, misled the jury and prevented them from fairly deciding the issue of his guilt or innocence.

## A.

[26] Again, to prevail on an ineffective assistance claim, Higgs must establish that counsel's performance "fell below an objective standard of reasonableness," that prejudiced his defense. *See Strickland,* 466 U.S. at 687-88, 104 S.Ct. 2052 (1984). The Court presumes "that counsel's conduct [fell] within the wide range of reasonable professional assistance." *Rose,* 252 F.3d at 693. The question is not "what the best lawyer would have done or even what most good lawyers would have done," but merely whether a reasonable lawyer could have made the same decision under the circumstances. *See Gilbert v. Moore,* 134 F.3d 642, 655 (4th Cir.1998) (citing *Waters v. Thomas,* 46 F.3d 1506, 1512 (11th Cir.1995) (en banc)). "There are countless *515 ways to provide assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052. Under the second prong of *Strickland,* the petitioner must demonstrate that counsel's alleged substandard performance actually prejudiced the outcome of the case.

## B.

## 1.

[27] The claim of ineffective assistance with respect to counsel's failure to cross-examine Rosati is without merit.

Counsel had in hand the FBI ballistics report which clearly stated that at least two different calibers of weapons produced by eleven different revolver manufacturers would have produced the same markings found on the bullets, and that Smith & Wesson alone produced 19 different models in two calibers that could have created these impressions. In consequence, defense counsel, on cross-examination, got Rosati to concede that more than 1.5 million firearms could have produced the markings on the bullets. TT 10/5/00, 175. This was a highly important concession. The extensive numerical possibilities gave counsel wide latitude to argue to the jury that, based on the microscopic markings, it was not reasonable to infer that all the bullets came from the same weapon. It is difficult to envision how a more extensive cross-examination of Rosati could have benefitted the defense. Defense counsel constantly must decide what questions to ask and how much time to spend on a particular witness. These are precisely the types of tactical decisions a court is not supposed to second guess. *Byram v. Ozmint,* 339 F.3d 203, 209 (4th Cir.2003) (quoting *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052) (The Fourth Circuit has been "highly deferential" to strategy decisions of lawyers, and there is a presumption that "counsel's conduct falls within the wide range of reasonable professional assistance."). Given the extraordinarily meaningful concessions counsel did elicit, they were not ineffective for their strategic decision not to further cross-examine Rosati with information from the FBI ballistics report.

## 2.

[28] The claim of counsel's alleged failure to engage an expert to estimate an even higher number of potential weapons that could have made the markings found on the bullets in question suffers a similar fate. As an initial matter, the letter Higgs offers authored by his recently retained "expert" is of questionable admissibility because Higgs has failed to establish the expert's qualifications. *See generally Miller v. United States,* 261 F.2d 546, 547 (4th Cir.1958) (reciting a collateral attacker's evidentiary burden). But even if a qualified expert on Higgs' behalf had been called to make a higher estimate of possible weapons than Rosati did, the impact of such testimony would have been minimal. Conrad's estimate that at least 2 million guns could have made the markings, as compared to Rosati's estimate of 1.5 million, could hardly have made a difference with respect to the jury's evaluation of the likelihood that the same gun was used in all three shootings.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

Higgs' trial counsel, in fact, had designated a firearms expert for possible use at trial. The decision whether or not to rely on testimony adduced from Rosati as opposed to calling the defense's own firearms examiner was a reasonable tactical decision. Counsel apparently decided that it would be more compelling to elicit damaging evidence from the prosecution's witness himself rather than from an expert brought in by the defense to contradict *516 him, where the expert's motives and expertise could be challenged. There is no basis to find ineffective assistance with respect to counsel's failure to call a firearms expert.

3.

Higgs' claim that counsel rendered ineffective assistance for failing to object to the admission of Rosati's testimony also fails. As just discussed, Rosati's testimony permitted the defense to affirmatively demonstrate, without calling an expert of its own, that a substantial number of guns could have produced the markings on the bullets. *Byram, 339 F.3d at 209.* That alone was a sufficient tactical reason not to seek exclusion of the testimony.

4.

Finally, Higgs claims that trial counsel were ineffective for failing to object to the Government's closing argument that the same gun was used in all three incidents. But while Rosati's testimony may have permitted the Government to make this argument, it simultaneously gave the defense ample leeway to refute the argument. Beyond this, the Court specifically instructed the jury that its findings had to be based on an evaluation of the *evidence* presented and that "the arguments of the attorneys and the comments and rulings of the Court are not evidence." TT 10/24/2000, 142. Counsel's failure to object to this argument by the Government did not prevent the jury from fairly deciding the similarity *vel non* of the bullets and the weapon in this case and on other occasions. The absence of an objection by counsel was not unreasonable under the circumstances.

C.

Beyond this, Higgs has not shown that any of the claimed errors would have created a reasonable likelihood of acquittal. *See Spencer v. Murray, 18 F.3d 229, 233 (4th Cir.1994).* His own conduct, particularly his statement to jailhouse informant Domenick Williams that he refused to plead guilty to another case "because [the Government] would try to use the gun in another case," did far more to support the inference that the same weapon had fired all the pertinent bullets than did Rosati's testimony. This evidence fairly permitted the prosecution to argue and the jury to conclude that Higgs had committed several crimes, including the three murders in this case, using a single .38 caliber firearm. In addition, counsel's cross-examination of Rosati potentially neutralized any suggestion that only a handful of weapons could have fired the bullets. No reasonable probability exists that the defense counsel would have secured a more favorable verdict had they performed in the manner Higgs now promotes.

### Claim 5: Admissibility of Co-Defendant Haynes' Confessions During Guilt Phase

Higgs contends that both trial and appellate counsel provided ineffective assistance by failing to raise a Sixth Amendment Confrontation Clause objection when the Government introduced evidence of Co-Defendant Haynes' confessions pertaining to the slayings.

During the guilt phase of Higgs' trial, the Government offered into evidence a tape-recorded telephone conversation in which Melvin Grayson, who was incarcerated with Higgs, read to Higgs the contents of a *Washington Post* article that recounted the statements made by Haynes. The article stated: "[A]ccording to testimony and Haynes' confessions to U.S. Park Police and FBI agents, the slayings were triggered by an argument between Higgs and Jackson during a party at Higgs' Laurel apartment just before the attack." In response to Grayson's reading, *517 Higgs remained silent. The Government argued that this silence constituted Higgs' recognition of the accuracy of Haynes' confessions. Higgs' trial counsel objected to admission of the reference to Haynes' confessions on Fifth Amendment grounds but did not raise an objection on Sixth Amendment Confrontation Clause grounds. The Court overruled the Fifth Amendment objection, admitting the recorded conversation as a potential adoptive admission. *See Fed.R.Evid.*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

801(d)(2)(B).

Nonetheless, in their opening brief on appeal Higgs' counsel raised not only the Fifth Amendment objection, but the Sixth Amendment Confrontation Clause objection as well, developing the Sixth Amendment argument in detail in their reply brief. The Fourth Circuit affirmed this Court's decision to admit the recorded telephone conversation. *See Higgs I*, 353 F.3d at 310 (holding that this Court did not err in admitting the telephone conversation between Grayson and Higgs).

Higgs now submits that trial counsel's failure to object to the recorded conversation on Confrontation Clause grounds constituted ineffective assistance. He argues that the admission of the recording violated his right to confrontation because Haynes' confessions were testimonial in nature and Higgs never had the opportunity to cross-examine him. *See Crawford v. Washington*, 541 U.S. 36, 68, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004) (holding that testimonial statements made out of court are barred unless the witness is unavailable and the defendant had a prior opportunity to cross-examine the witness). Higgs says counsel had no reasonable or strategic basis for failing to object on Sixth Amendment grounds when clearly established law barred the admission of a co-defendant's out-of-court testimony. *See Bruton v. United States*, 391 U.S. 123, 126, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968) (holding that the admission of a co-defendant's confession implicating the defendant violates the latter's Sixth Amendment right to cross-examination). Counsels' deficient performance, he says, "had substantial and injurious effect or influence in determining the jury's verdict" because the Government heavily relied on the recorded conversation throughout trial since the conversation implicated Higgs as the individual who "triggered" the killings, a central issue in the case. *Brecht v. Abrahamson*, 507 U.S. 619, 623, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) (citing *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)) (holding that the standard for determining habeas relief is whether the error had "substantial and injurious effect or influence in determining the jury's verdict"). Though the Court instructed the jury that the newspaper article was not offered for the truth of its substance, Higgs argues that this instruction did not cure the Sixth Amendment violation. *See Bruton*, 391 U.S. at

137, 88 S.Ct. 1620 (ruling that limiting jury instructions are not an adequate substitute for petitioner's constitutional right of cross-examination).

As for appellate counsel, Higgs argues that their fleeting reference to the Confrontation Clause issue in their opening brief, despite their more extensive development in the reply brief, was insufficient to invoke adequate appellate review. Higgs contends that, had appellate counsel adequately presented this issue on direct appeal, there would have been a reasonable probability that his guilt and/or death sentence would have been vacated.

The Government continues to maintain that Higgs' silence in the face of an incriminating statement constituted an adoptive admission. Fed.R.Evid. 801(d)(2)(B); *see United States v. Duval*, 496 F.3d 64, 76 (1st Cir.2007) (holding that adoptive admissions,*518 including admissions by silence or acquiescence, are admissible pursuant to Federal Rules of Evidence). Because, at the time of Higgs' trial, there was legal support for admitting a defendant's adoptive admissions irrespective of the Confrontation Clause, *see, e.g., United States v. Allen*, 10 F.3d 405, 413 (7th Cir.1993), the Government contends that Higgs' counsel reasonably have decided to abstain from objecting and therefore did not render ineffective assistance by failing to do so.

**A.**

As before, the Court considers (1) whether counsels' "representation fell below an objective standard of reasonableness," considering all the circumstances, and (2) whether the deficiencies in counsels' performance were prejudicial. *See Strickland*, 466 U.S. at 688, 692, 104 S.Ct. 2052. The Court finds that Higgs has failed to satisfy the first prong with respect to the performance of both trial and appellate counsel, mooting the second prong analysis.

**B.**

[29] The Sixth Amendment protects a defendant's right to confront the witnesses against him. U.S. Const. amend. VI. In 2004, four years after the trial in this case, *Crawford*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

held that defendants have the right to confront third parties who make out-of-court statements that are testimonial in nature. 541 U.S. at 68, 124 S.Ct. 1354. What effect, if any, does *Crawford* have in the present case?

To begin, the Supreme Court has held that *Crawford* does not apply retroactively to cases that were final when the decision issued. *Whorton v. Bockting,* 549 U.S. 406, 417-21, 127 S.Ct. 1173, 167 L.Ed.2d 1 (2007). Since *Crawford* was decided in March 2004, and the Supreme Court did not deny Higgs' petition for certiorari until November 2004, *Crawford* remains in play for him. That said, it was and remains unclear whether and how *Crawford* might affect adoptive admissions because the Supreme Court explicitly left "for another day any effort to spell out a comprehensive definition of 'testimonial.' " 541 U.S. at 68, 124 S.Ct. 1354.

But whatever *Crawford's* impact may ultimately have on the use of adoptive admissions against defendants, at the time of Higgs' trial there was ample legal basis for Higgs' attorneys to believe that introducing an adoptive admission would not violate the Confrontation Clause. Both the Sixth and the Seventh Circuits had expressly found that admitting a defendant's adoptive admission did not violate the Confrontation Clause. *See Neuman v. Rivers,* 125 F.3d 315, 320 (6th Cir.1997) (finding no Confrontation Clause violation when party adopted incriminating statement); *United States v. Allen,* 10 F.3d 405, 413 (7th Cir.1993) (holding defendant has no right to confrontation with respect to an adoptive admission because it is "a statement that the defendant has adopted as his own" and therefore the defendant is effectively the witness against himself). *But see United States v. Monks,* 774 F.2d 945, 952 (9th Cir.1985) (stating that "adoptive admissions do not automatically satisfy the Confrontation Clause, at least where the third party statements alleged to have been adopted have probative value independent of the fact that they may have been adopted by the defendant"). Because case law at the time of trial supported the proposition that adoptive admissions do not violate the Confrontation Clause, counsel's decision not to raise a Sixth Amendment objection to the admission Higgs' response to the reading of the *Washington Post* article was not unreasonable.

**\*519 C.**

Similarly, appellate counsel's performance did not fall "below an objective standard of reasonableness." *Strickland,* 466 U.S. at 688, 104 S.Ct. 2052. As noted on direct appeal, counsel in fact raised the Sixth Amendment Confrontation Clause objection in their opening brief, developing the claim more fully in their reply brief. Although Higgs contends that counsel's failure to extensively develop the issue in the opening brief precluded appellate review, the Fourth Circuit had no trouble finding that "the recording demonstrates that Higgs not only heard and understood the statements made by Grayson, but commented upon them to some extent." *Higgs I,* 353 F.3d at 310. Thus, the Fourth Circuit was able to conclude that "the district court did not abuse its discretion in admitting the [recorded telephone conversation between Higgs and Grayson] and charging the jury that Higgs' silence could be considered an admission." *Id.* In other words, appellate counsel's Sixth Amendment argument on direct appeal, which the Fourth Circuit was certainly aware of, gave it no pause and presented no obstacle.

Even if appellate counsel failed to adequately raise the Sixth Amendment objection, their performance would still have been reasonable. As of the time of Higgs' direct appeal in 2003, there was clear legal support for the admission of the recording as an adoptive admission because, not long before, the Fourth Circuit had ruled that "a party may manifest adoption of a statement in any number of ways, including [through] words, conduct, or silence." *United States v. Robinson,* 275 F.3d 371, 383 (4th Cir.2001) (citing *Marshall v. Young,* 833 F.2d 709, 716 n. 3 (7th Cir.1987)). Furthermore, as just observed in the context of trial counsel's failure to raise a Sixth Amendment objection, case law suggested that, when a statement forms the basis for an adoptive admission, the defendant has no claim under the Confrontation Clause. Accordingly, any further argument by appellate counsel would in all likelihood have been similarly futile. Appellate counsel could have reasonably decided to forego any further Sixth Amendment objection in this case. *See Harris v. United States,* 204 F.3d 681, 683 (6th Cir.2000) (holding that failure to make a futile objection does not amount to ineffective assistance).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

Because both trial and appellate counsel did not perform deficiently in respect of Confrontation Clause and due process issues, there was no prejudice to Higgs as to the probable outcome of his case.

## Claim 6: Denial of Effective Assistance of Counsel at Sentencing

Higgs next argues his trial attorneys rendered ineffective assistance at sentencing by failing to: 1) obtain his school records, which would have illustrated that he was diagnosed as learning disabled from an early age and was emotionally disturbed and depressed due at least in part to his mother's death; 2) obtain a pre-sentence report from a criminal fraud proceeding against Higgs that was prepared in 1996; 3) secure the testimony and criminal records of Higgs' father, Alphonso Higgs, who would have admitted that he was an absentee father with serious drug addictions, who would have testified that he verbally and physically abused both Higgs' mother and Higgs himself; 4) locate and present testimony of Higgs' mother's younger sister, Nancy Lee Riley, and her older brother, Richard Bennett, who would have corroborated the testimony regarding Alphonso Higgs' abuse, and who would have testified to the impact Higgs' mother's death had on 10-year-old Higgs; and 5) provide the defense's retained mental health experts with mitigating*520 evidence in the form of Higgs' school records and testimony from Higgs' father, aunt, and uncle detailing Higgs' abusive upbringing. Higgs also argues that his trial attorneys rendered ineffective assistance during the penalty phase by deciding to limit mitigating evidence when the Government decided to drop a claim of future dangerousness from its presentation of aggravating circumstances. Specifically, he says trial counsel's decision to limit evidence of his personal history to events before he was 18, in order to avoid opening the door to bad acts evidence in rebuttal, was strategically unsound because evidence of his past bad acts had already been introduced during the guilt phase and already suggested through evidence of other aggravators, and because the decision was the result of a less than thorough investigation.

The Government argues that Higgs has failed to demonstrate that counsel erred or that he was in any way prejudiced by counsel's acts or omissions.

### A.

Higgs must establish that counsel's performance "fell below an objective standard of reasonableness" and that in the absence of counsel's errors a reasonable probability exists that "the result of the proceeding would have been different." *See Strickland,* 466 U.S. at 687-88, 104 S.Ct. 2052. Again, when analyzing the unreasonableness prong, the Court must defer to counsel's decisions and tactical judgments made after full investigation, though to be sure the Court need not defer when such decisions and judgments are based upon less than a full investigation. *Wiggins v. Smith,* 539 U.S. 510, 522, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003). As for prejudice, Higgs must show a reasonable probability that, but for counsel's allegedly deficient performance, the outcome of the case would have been different. *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052. The Court weighs the totality of reasonably available mitigation evidence presented at trial against the totality of evidence presented in aggravation. *Williams v. Taylor,* 529 U.S. 362, 397-98, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).

### B.

The Court considers the various ways in which counsel's investigation for and presentation at sentencing were allegedly deficient.

### 1.

[30] Higgs argues first that counsel failed to obtain certain school records, which would have demonstrated his troubled childhood and youth.

Higgs is correct that an attorney representing a capital defendant has a constitutionally-mandated duty to conduct a thorough investigation of any potential mitigation evidence in preparation for a capital sentence proceeding. *Id.* at 415, 120 S.Ct. 1495 (O'Connor, J., concurring). A "thorough investigation" requires diligent "efforts to discover *all reasonably available* mitigating evidence."

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

*Wiggins,* 539 U.S. at 524, 123 S.Ct. 2527 (emphasis in *Wiggins;* citation omitted). However, the duty only arises where an attorney has information suggesting that such investigation is necessary. *See Ames v. Endell,* 856 F.2d 1441, 1444-45 (9th Cir.1988) (failure to investigate a plausible scenario in defense of client when attorney and client agreed the scenario had not happened was not ineffective); *see also Hedrick v. True,* 443 F.3d 342, 350 (4th Cir.2006) (failure to investigate potentially mitigating evidence at sentencing regarding defendant's difficult childhood after a psychological expert did not suggest that further exploration was warranted was not ineffective); *521Bacon v. Lee,* 225 F.3d 470, 481 (4th Cir.2000) (failure to fully investigate defendant's difficult childhood was not ineffective because counsel could have reasonably concluded that the evidence presented was sufficient).

Here, counsel in fact pursued Higgs' school records, but had no reason to believe further investigation was necessary. Higgs does not dispute that when counsel requested the records, the school system provided only a transcript indicating that it purged "full cumulative" student records six years after high-school graduation, the implication being that Higgs' records had been purged. Though in fact it appears the school system retained special education records indefinitely, counsel had no reason to know or suspect that. Indeed, even if counsel had researched the district's policies, there is no reason to suppose they would have found any basis for contradicting the school system's stated policy that the record-retention schedule required only a six-year retention of special education records. Nor would counsel's knowledge that Higgs was a special education student have necessarily prompted further investigation. The school system's response regarding "full cumulative" records and its stated policy led counsel to reasonably believe that Higgs' records had been destroyed. It was not, therefore, unreasonable for counsel to fail to search further.

In any event, Higgs cannot show prejudice. Though the school records might have provided additional information indicating Higgs' struggles passing his courses as well as instances of emotional disturbance and depression, they also demonstrated that he consistently rejected efforts to assist him to grow into responsible adulthood. No reasonable probability exists that the jury would have returned a more favorable verdict had the special

education records been discovered. *Williams v. Taylor,* 529 U.S. 362, 397-98, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).

**2.**

In his Brief, Higgs also faults counsel for failing to obtain a pre-sentence investigation report prepared by the Maryland Department of Parole and Probation in connection with 1996 fraud charges. Here Higgs defeats his own argument that counsel's omission-assuming it occurred-was constitutionally deficient, since he concedes that the report "would have confirmed and corroborated [his] history of drug and alcohol abuse." Petitioner's Brief at 75. In other words, the evidence in the report would simply have tracked other evidence already in the case, hardly a compelling argument that counsel's performance should be judged to be constitutionally sub-standard.

**3.**

[31] Higgs' next claim relates to counsel's failure to secure testimony and criminal records of Higgs' father.

Here, too, Higgs fails to demonstrate that counsel's performance "fell below an objective standard of reasonableness." *See Strickland,* 466 U.S. at 687-88, 104 S.Ct. 2052. Though Alphonso Higgs now claims that he would have offered testimony on behalf of his son, the defense's mitigation/specialist, Joel Sickler, testified that he had attempted to reach Alphonso Higgs prior to the trial, but received information from two of Alphonso Higgs' children that he did not want to participate in his son's defense. Higgs fails to acknowledge his own investigator's unsuccessful attempts to contact Alphonso Higgs directly.

[32] Higgs also fails to demonstrate that he was prejudiced by the absence of his father's testimony. Alphonso Higgs' credibility would certainly have been challengeable, not only because of his relationship*522 to Defendant Higgs, but also because he was a convicted felon who admitted he was abusing drugs during the time period to which he would testify. In any event, the jury considered the fact

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

that Higgs' father was an absentee parent who had a drug problem. Investigator Sickler testified that Alphonso Higgs had problems with a narcotics addiction, had a substantial criminal history including time in jail for trafficking a controlled substance, and had provided little financial or emotional support to his son. There is no reason to believe that Alphonso Higgs' verbally recounted recollections of physical abuse he was responsible for would have significantly changed the jury's verdict in this case.

### 4.

[33] Higgs claims that counsel provided ineffective counsel by failing to present the testimony of Nancy Lee Riley (his mother's sister) and Richard Bennett (his mother's brother).

There is, however, no evidence that Higgs' lawyers were ever made aware of any particular information that these witnesses possessed that should have led the lawyers to further investigation. Beyond stating in general terms that Alphonso Higgs on occasion abused Marilyn Bennett in Defendant Higgs' presence, the witnesses' declarations would have offered no new concrete facts or specific incidents relevant to Defendant Higgs' background. Their purported testimony would have essentially tracked that of Investigator Sickler. The cases Higgs cites-which have found counsel ineffective where reasonable diligence would have *added* relevant undiscovered mitigating evidence-are distinguishable because here the additional evidence would either have been irrelevant or substantially similar to that already introduced. *See Williams,* 529 U.S. at 391-99, 120 S.Ct. 1495; *Wiggins,* 539 U.S. at 510, 123 S.Ct. 2527; *Rompilla v. Beard,* 545 U.S. 374, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005).

[34] Not only has Higgs failed to demonstrate that his counsel's performance was deficient, he again fails to demonstrate prejudice. No reasonable probability exists that inclusion of the Riley-Bennett testimony would have altered the jury's understanding of Higgs' upbringing or how it may have affected his actions on the night of the murders, such that a more favorable penalty-phase verdict would have resulted. *See Williams,* 529 U.S. at 397-98, 120 S.Ct. 1495. Riley and Bennett offer at best

generalizations, not specific instances of abuse. Moreover, the credibility of both is open to question, given that only now, years after trial, have they come forward with statements. Finally, the jury heard testimony regarding the heavy impact Higgs' mother's death had on Higgs. Constance McKinnon, who lived with Higgs after his mother's death, specifically testified regarding the emotional impact on Higgs.

No ineffective assistance was rendered when counsel did not pursue or present the testimony of Alphonso Higgs, Nancy Lee Riley, or Richard Bennett.

### 5.

Higgs' argument regarding mental health experts Lawrence Donner, Ph.D. and Susan Feister, M.D. is somewhat hard to follow.

In his opening Motion, Higgs argues that counsel were deficient because they failed to "[enlist] the aid" of these experts. Petitioner's Motion at 67. But counsel did in fact consult these experts, which Higgs concedes was "a step in the right direction." *Id.* What Higgs apparently contends was deficient on counsel's part is that the experts were not provided "access to relevant records or lay witnesses"-*523 presumably the school records, Alphonso Higgs, Nancy Lee Riley, and Richard Bennett. *Id.* The short answer to that argument, of course, is that since counsel were not deficient in not accessing the records or witnesses themselves, they would not be deficient for failing to transmit them to the mental health experts.

Higgs also appears to fault counsel for not calling either of these experts to testify-they were not in fact called-but this argument is not carried forward in his Brief in Support of his Motion or his Memorandum in Reply to the Government's Opposition. But, again, the failure to call argument, insofar as it has not been abandoned, is still premised on the fact that the experts were not provided with information that counsel cannot be faulted for not obtaining.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

**6.**

[35] As for the suggestion that counsel made an unsound decision to limit Higgs' mitigating evidence to events before his eighteenth birthday, that clearly was a matter of tactical choice. Certainly evidence of Higgs' wayward life after age eighteen was already in the mix, but counsel could fairly have decided to minimize emphasis on the multiple bad acts of Higgs adulthood, especially in recognition of the fact that future dangerousness would not be pursued as aggravation. Counsel's decision in this regard did not constitute ineffective assistance.

### Claim 7: Racial Discrimination in the Administration of the Death Penalty

[36] Higgs's seventh claim is that trial counsel were ineffective for failing to raise equal protection and Eighth Amendment challenges to the Federal Government's decision to pursue the death penalty against him. In support of this claim, he cites statistics maintained by the Federal Death Penalty Resource Counsel which, he maintains, suggest that the Department of Justice has sought the death penalty in a racially discriminatory manner during the years since its reintroduction.

The Court finds the equal protection and Eighth Amendment claims to be procedurally defaulted. As he concedes, until now Higgs has never argued that the Federal Government's decision to pursue the death penalty against him violated these rights. Though a procedural default can be excused upon a demonstration of cause and prejudice, *see Massaro,* 538 U.S. at 504, 123 S.Ct. 1690, no such relief is warranted here. Higgs has shown neither cause nor prejudice.

Statistics alone do not support a finding of discriminatory intent sufficient to strike down a death penalty scheme on equal protection grounds. *McCleskey v. Kemp,* 481 U.S. 279, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987); *see also United States v. Bin Laden,* 126 F.Supp.2d 256, 261 (S.D.N.Y.2000) ("At its core, therefore, *McCleskey* stands for the notion that, by themselves, systemic statistics cannot prove racially discriminatory intent in support of an equal protection claim by a particular capital defendant.").

Since petitioner has offered no proof that the Government actually decided to pursue the death penalty *in this case* for biased reasons, he may not show that his attorneys were ineffective for choosing not to raise the issue.

Nor is there the slightest basis for concluding that discovery would reveal any racial bias on the part of prosecutors. Accordingly, Higgs' request for discovery on Claim 7 is denied.

### Claim 8: Admissibility of Portions of Co-Defendant Haynes' Statements During Penalty Phase

Higgs next says that trial counsel rendered ineffective assistance during the *524 penalty phase when they failed to raise Fifth Amendment Due Process and Sixth Amendment Confrontation Clause objections to testimony with respect to several statements made by his Co-Defendant Haynes.

Specifically, United States Park Police Captain Robert Rule testified that, according to Haynes, "[a]fter they returned to Mr. Higgs' apartment at the end of the evening ... they went into the apartment, began cleaning up the apartment and throwing out various items." TT 10/18/00, 150. As to the "murder weapon ... Mr. Higgs drove the van down to Anticostia [sic] Park and pulled over on a spot on Anticostia [sic] Drive not far from the Anticostia [sic] Rec Center pool, and [Mr. Haynes] ran and threw the gun into the river." *Id.* at 150-151. Captain Rule thus supplied critical evidence concerning the aggravating factor of obstruction of justice eventually found by the jury.

Higgs continues:

Haynes' statements were made to a law enforcement officer in the midst of a custodial interrogation and accordingly fall within the core class of statements deemed "testimonial" by the Supreme Court under *Crawford,* 541 U.S. at 68, 124 S.Ct. 1354. Because he had no opportunity to cross-examine Haynes, the admission of Haynes' statements violated Higgs' right to confrontation under the Sixth Amendment. Moreover, since Haynes had a strong

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

motive to place blame on Higgs rather than himself, his testimony implicating Higgs was presumptively unreliable.

While trial counsel objected to this evidence, unsuccessfully as it turned out, arguing that it was more prejudicial than probative, it is true that they did not specifically base their objections on Fifth or Sixth Amendment grounds. Appellate counsel, for the first time, attempted to argue that the evidence violated Higgs' Sixth Amendment Confrontation Clause right, but the Fourth Circuit deemed the argument waived because it was not raised at trial. The Fourth Circuit, in any event, rejected the claim under the plain-error doctrine, finding that the evidence was harmless. *See Higgs I*, 353 F.3d at 323-25.

Higgs now argues that trial counsel were ineffective for failing to raise the Fifth and Sixth Amendment objections at trial.

Of the two, he appears to rely principally on his Sixth Amendment Confrontation Clause argument. While he concedes that the Federal Rules of Evidence do not ordinarily apply at sentencing, he suggests that this does not mean that the Confrontation Clause is inapplicable at sentencing, especially the sentencing phase of a capital case when the proffered statements inculpate the defendant. Such evidence, says Higgs, is "presumptively unreliable," citing *Lee v. Illinois*, 476 U.S. 530, 545, 106 S.Ct. 2056, 90 L.Ed.2d 514 (1986), and, as such, it also violated his due process rights. Because Haynes' statement clearly inculpated Higgs, and was an important piece of evidence establishing the obstruction of justice aggravator, Higgs submits that trial counsel's failure to object to the admission of the testimony on Fifth and Sixth Amendment grounds fell below an objective standard of reasonableness.

Higgs concedes, as he must, that the Fourth Circuit considered the Confrontation Clause argument on direct appeal, and found, given other overwhelming evidence of Higgs' guilt, that Officer Rule's testimony did not affect Higgs' substantial rights. But he argues here that that determination should be reconsidered in light of the Supreme Court's holding in *Crawford v. Washington*, issued post Higgs' trial, where the Court found that the

Constitution*525 demands that "testimonial" statements trigger a right to confrontation. According to Higgs, because Haynes' confession fell within the core class of statements deemed "testimonial" by the Supreme Court, it should have been subject to confrontation.

Finally, Higgs argues that even if counsel's failure to object on Fifth and Sixth Amendment grounds is found not to be prejudicial, he is still entitled to relief because of the cumulative prejudicial impact of counsel's errors. In support of this proposition he cites *Williams*, 529 U.S. at 398-99, 120 S.Ct. 1495 (finding ineffective assistance where the entire postconviction record, viewed as a whole including the mitigation evidence, demonstrated prejudice with respect to a sentencing proceeding).

In response, the Government argues that counsel's failure to make an evidentiary objection on constitutional grounds is procedurally barred. In any event, the Government argues that the Fourth Circuit's holding that Higgs' substantial rights were not affected by the admission of Officer Rule's testimony forecloses the question of prejudice as a matter of law. The Government also argues that the Fourth Circuit has expressly rejected the cumulative impact argument in ineffective assistance cases. *Fisher v. Angelone*, 163 F.3d 835, 852 (4th Cir.1998). In sum, the Government submits that the claim of ineffective assistance lacks merit because Higgs has failed to demonstrate that his attorneys provided constitutionally deficient, much less prejudicial, representation.

**A.**

Higgs is procedurally barred from relitigating the question of counsel's failure to object to the testimony regarding Haynes' statement. Because he effectively litigated the prejudicial effect of the Haynes confession on direct appeal, he may not revisit the issue by way of collateral attack. *Boeckenhaupt v. United States*, 537 F.2d 1182, 1183 (4th Cir.1976).

**B.**

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

That said, on the merits the claim fails in any event. Higgs must establish that counsel's performance "fell below an objective standard of reasonableness," and that in the absence of the alleged error a reasonable probability exists that "the result of the proceeding would have been different." *See* *Strickland, 466 U.S. at 687-88, 104 S.Ct. 2052.*

The Court agrees that the Fourth Circuit's rationale on direct appeal has answered the fundamental question of the reasonable probability *vel non* that Rule's testimony affected the trial's outcome: "Given the cumulative nature of the precise evidence challenged, and the overwhelming evidence otherwise proffered in support of the obstruction aggravator, we cannot say that Rule's limited testimony regarding Haynes' statements affected Higgs' substantial rights." *Higgs I,* 353 F.3d at 324-325. Substantial rights are affected only where there is "a reasonable probability that, but for [the error claimed], the result of the proceeding would have been different." *United States v. Dominguez Benitez,* 542 U.S. 74, 83, 124 S.Ct. 2333, 159 L.Ed.2d 157 (2004) (quoting *Bagley,* 473 U.S. at 682, 105 S.Ct. 3375). In agreement with the Fourth Circuit, this Court is unable to find it reasonably probable that the testimony regarding Haynes' statement prejudiced the outcome of this case. *See* *Strickland,* 466 U.S. at 697, 104 S.Ct. 2052 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that *526 course should be followed."). [FN22]

> FN22. The lack of prejudice finding also definitively puts to rest any due process argument under the Fifth Amendment that Haynes' testimony was presumptively unreliable.

## C.

[37][38] Higgs has not, in any case, shown that his attorneys' conduct in omitting a Confrontation Clause objection to Haynes' confession fell below an objective standard of reasonableness. The Court "judge[s] the reasonableness of counsel's challenged conduct on the facts of a particular case, viewed as of the time of counsel's conduct." *Roe v. Flores-Ortega,* 528 U.S. 470,

477, 120 S.Ct. 1029, 145 L.Ed.2d 985 (2000) (citing *Strickland,* 466 U.S. at 690, 104 S.Ct. 2052). Courts are obliged to defer to counsel's tactical decisions at trial. *See Gardner v. Ozmint,* 511 F.3d 420 (4th Cir.2007).

Given the uncertainty of the state of the law at the time of trial as to whether the Confrontation Clause applies to capital sentencing proceedings, trial counsel were under no obligation to make such an objection. *See* *Strickland,* 466 U.S. at 688, 104 S.Ct. 2052. Indeed, the Fourth Circuit stated on direct appeal in this case that "[I]t is far from clear that the Confrontation Clause applies to a capital sentencing proceeding." *Higgs I,* 353 F.3d at 325. While the Fourth Circuit has yet to conclusively rule on the issue, two years after Higgs' trial the Seventh Circuit did, holding that while the Confrontation Clause applies to the guilt phase of trial, it does *not* apply to the sentencing phase, even when a death penalty proceeding is involved. *Szabo v. Walls,* 313 F.3d 392, 398 (7th Cir.2002).

Nor is Higgs persuasive in his argument that his lawyers had a duty to anticipate *Crawford* and object to Haynes' statement. *Crawford,* decided four years after Higgs' trial, broke new ground by distinguishing "testimonial" statements as a species of evidence particularly offensive to the Confrontation Clause. *Crawford,* 541 U.S. at 71-72, 124 S.Ct. 1354 (Rehnquist, C.J., concurring) (noting that the Court had never drawn a distinction between testimonial and nontestimonial statements). As a result, the Supreme Court held that *Crawford* is not to be applied retroactively to cases on collateral review. *Whorton v. Bockting,* 549 U.S. 406, 417-21, 127 S.Ct. 1173, 167 L.Ed.2d 1 (2007).[FN23] Trial counsel cannot therefore be found ineffective for failing to foresee this subsequent change in the law. *See* *United States v. Davies,* 394 F.3d 182, 189-91 (3d Cir.2005) (finding counsel had no duty to predict that arguments in an earlier case would become law and did not act unreasonably in failing to rely on its teachings); *See also* *United States v. Smith,* 241 F.3d 546, 548 (7th Cir.2001); *Parker v. Bowersox,* 188 F.3d 923, 929 (8th Cir.1999); *Pitts v. Cook,* 923 F.2d 1568, 1573 (11th Cir.1991).

> FN23. The cases relied upon by Higgs in support of the proposition that counsel should have foreseen the *Crawford* doctrine are unpersuasive.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

Though noting a need for greater reliability in capital sentencing proceedings, the Supreme Court gave no indication prior to Higgs' trial that its opinion in *Crawford* was in the offing; hence counsel had no reason to anticipate its arrival. *See Monge v. California,* 524 U.S. 721, 727-28, 118 S.Ct. 2246, 141 L.Ed.2d 615 (1998); *California v. Ramos,* 463 U.S. 992, 1013-14, 103 S.Ct. 3446, 77 L.Ed.2d 1171 (1983).

**D.**

[39] Higgs' final claim in this regard is that trial counsel provided ineffective assistance during the penalty hearing by limiting their mitigating evidence in response to the Government's decision to drop future dangerousness as an aggravating circumstance.\*527 He says, for example, that his counsel's closing argument barely addressed the influence of Higgs' childhood experiences on the direction of his life, as a result of which none of the jurors found that to be a mitigating factor.

The Fourth Circuit has been "highly deferential" to strategy decisions of lawyers, even indulging a presumption that "counsel's conduct falls within the wide range of reasonable professional assistance." *Byram,* 339 F.3d at 209 (quoting *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052). Here, trial counsel's strategic decision to limit mitigation evidence so as not to open the door to bad act rebuttal evidence was not unreasonable. The decision was made after counsel conducted a reasonable investigation into Higgs' admittedly traumatic childhood, then weighed the other negatives of his serious adult misconduct. Counsel's choice was strategic; in no sense was it substandard.

Higgs has also failed to demonstrate prejudice. No reasonable probability exists that further emphasis on Higgs' troubled childhood would have persuaded the jury to find it as a mitigating factor or that it would have persuaded a juror to vote for other than the death penalty.

**Claim 9: Victim Impact Evidence**

As a ninth claim, Higgs asserts that defense counsel was ineffective for failing to object to the admission of victim impact evidence that he contends violated his Eighth Amendment rights. Specifically, he maintains that: (1) the victim impact testimony, statements, photographs, and videotapes presented to the jury during the sentencing phase were highly emotional, rendering the sentencing proceedings inflammatory and fundamentally unfair; (2) the prosecutor's use of imagery and metaphor during closing argument was inflammatory and rendered trivial and meaningless any mitigating evidence submitted by the defendants; (3) the prosecutor improperly and unconstitutionally alluded to the sentencing preferences of family members; and (4) the Court failed to provide the jury with guidance as to how they should weigh the victim impact evidence among other aggravating and mitigating factors, which resulted in an unreliable death verdict in violation of the Eighth Amendment.

**A.**

The Court finds no deficiency in counsel's actions in the cited respects. In consequence, any objection by counsel to the victim impact evidence would have been futile.

**B.**

[40][41] The law concerning victim impact evidence is well settled. In a capital case, victim impact statements that identify the extent and scope of the injury and loss suffered by the victim and the victim's family members are admissible. *See* 18 U.S.C. § 3593(a); *see also Payne v. Tennessee,* 501 U.S. 808, 827, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991) (holding that the Eighth Amendment erects no *per se* bar to the admission of victim impact testimony during the sentencing phase of a defendant's capital trial). Moreover, the Eighth Amendment does not prohibit prosecutorial argument on the subject of victim impact. *Payne,* 501 U.S. at 827, 111 S.Ct. 2597. Only where victim impact evidence would be so unduly prejudicial as to render the defendant's trial unfair does due process mandate its exclusion. *See id.* at 825, 111 S.Ct. 2597. However, the bar for demonstrating undue prejudice is quite high. *See, e.g., United States v. Barnette,* 211 F.3d 803, 818-19 (4th Cir.2000) (allowing family members to present stories of victims' childhoods, family

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

experiences, and trauma resulting from victims' deaths, as *528 well as poems reflecting deep sadness and regret); *United States v. McVeigh,* 153 F.3d 1166, 1218-22 (10th Cir.1998), *overruled on other grounds by* 184 F.3d 1206 (10th Cir.1999) (permitting a total of 38 witnesses to recount, among other things: last contacts with victims, efforts to discover victims' fates, discovery of body parts months after victims' deaths, uncontrollable screaming and crying upon hearing of victims' deaths, victims' life histories and personal accomplishments, and innocence and unconditional love manifested by child victims).

[42] Here, the testimony of the victims' family members, though unquestionably emotional, was highly relevant to the impact that the murders had on the families. Several of the victims' relatives testified that they had suffered severe emotional anguish as a result of the murders. The mother of one victim testified that her marriage nearly dissolved in the wake of her daughter's murder. Another testified that she "fell to the ground and ... screamed" when the police informed her of her daughter's death. Some witnesses presented photographs and videotapes that chronicled the lives of the victims. The evidence in this case was wholly consistent with that found proper in *Barnette* and *McVeigh,* where family members recounted stories of the victims' lives, past family experiences, and the anguish they suffered after the victims' deaths. *Barnette,* 211 F.3d at 818; *McVeigh,* 153 F.3d at 1218-22. The Court concludes that the victim impact testimony and exhibits in this case were well within bounds. Counsel cannot be faulted for failing to object to them.

The Court also rejects the argument that the prosecutor's use of imagery and metaphor during closing argument-specifically, comparing the family members' anguish to the weight of a heavy rock-rendered trivial and meaningless any mitigating evidence submitted by the defendants. The use of poetic license by a prosecutor in a closing argument is not *per se* impermissible. *See, e.g., United States v. Fields,* 483 F.3d 313, 340-41 (5th Cir.2007) (permitting the use of a "picture in picture" metaphor in a capital sentencing closing, whereby the prosecutor invited the jury to imagine the victim's murder displayed on one "screen," and the actions of the defendant before, during, and after the murder on the other); *Bussard v. Lockhart,* 32 F.3d 322, 324 (8th Cir.1994) (permitting the poetic, metaphoric use of a

Biblical quote in a closing argument); *United States v. Canales,* 744 F.2d 413, 429-30 (5th Cir.1984) (finding no grounds for reversal where the prosecution implored the jury to "cut out" the "cancer" of vote buying in Duval County, where the larger matter of widespread vote buying was not at issue in the case). Indeed, the use of a simple rock metaphor while displaying an actual rock is hardly an inflammatory image. It does not begin to approach the level of egregiousness required to create undue prejudice. Counsel had no reasonable cause to object to the prosecution's argument.

The Court also finds groundless Higgs's argument that the prosecutor unconstitutionally alluded to the sentencing preferences of family members during sentencing. To be sure, the Eighth Amendment precludes the admission of a victim's family members' characterizations and opinions regarding the crime, the defendant, or the appropriate sentence, because such evidence could "inflame the jury and divert it from deciding the case on the relevant evidence concerning the crime and the defendant." *Booth v. Maryland,* 482 U.S. 496, 508, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), *overruled on other grounds by* 501 U.S. 808, 830, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991). Similarly, a prosecutor must *529 refrain from presenting family member opinions regarding the crime or the defendant. *See South Carolina v. Gathers,* 490 U.S. 805, 811, 109 S.Ct. 2207, 104 L.Ed.2d 876 (1989), *overruled on other grounds by* 501 U.S. 808, 830, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991) (holding that assertions that would violate *Booth* are not a permissible subject of prosecutorial argument). Here, however, Higgs's effort to construe the prosecutor's statement-"you ask each one of those family members here what they wouldn't give for their daughters to be in Lewisburg Penitentiary rather than where they are"-as a statement of the victims' family members' sentencing preferences is simply inaccurate. The prosecutor did not state or imply that the family members had any opinions with respect to an appropriate punishment for Higgs. Rather, she made the statement to counter defense counsel's assertion that life imprisonment would harshly and adequately punish the defendant for his crimes. To construe the statement as Higgs does, as an allusion to the sentencing preferences of the family members, calls for an inference that logic does not justify. Defense counsel had no reason to interpose an objection on these grounds.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

Finally, Higgs's assertion that the Court's instructions failed to provide the jury with guidance as to how it should weigh the victim impact evidence among other aggravating and mitigating factors has no basis in fact. True, in a capital sentencing proceeding, the judge's instructions to the jury should make it clear that the jurors must consider both mitigating and aggravating factors and in no event should a judge give the impression that the two need not be considered in tandem. *See Mills v. Maryland, 486 U.S. 367, 384, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988)*. However, the record shows that the Court gave the appropriate instructions with respect to the weighing of aggravating and mitigating factors:

> In carefully weighing the various factors at issue in this case, you are called upon to make a unique individualized judgment about the appropriateness of imposing either the death penalty or life imprisonment without the possibility of parole or release on the defendant for each count.... [Y]ou must consider the weight and the value of each factor in making your decision. Any one aggravating factor ... may outweigh several mitigating factors.... On the other hand, you must also recognize that a single mitigating factor ... may outweigh several aggravating factors.... At this final weighing stage in the process you are not called upon simply to find relevant factors. You are called upon to make a reasoned moral judgment based on all the evidence before you as to whether the death penalty is justified for the defendant and for the offense. After consideration of the aggravating and mitigating factors, you must unanimously determine [the penalty].

TT, Oct. 24, 2000 at 177-79. This instruction properly provided the jury with sufficient guidance as to the weighing of aggravating and mitigating factors.

Counsel were in no sense deficient in not objecting to the prosecution's use of victim impact evidence or the Court's jury instructions.

### Claim 10: Previous Conviction of a Violent Felony Involving a Firearm

#### A.

[43] Higgs contends that during the sentencing phase, when considering the aggravating factor of previous conviction for a violent felony involving a firearm, the jury improperly considered his involvement in the Cherry Lane shooting.

*530 In the Cherry Lane case, Higgs pleaded guilty to reckless endangerment and assault, neither crime necessarily involving the use of a firearm. Accordingly, he argues that the Cherry Lane event could not have formed the basis for the previous-firearm-conviction aggravating factor, according to the "categorical approach" adopted by the Fourth Circuit in *United States v. Washington* 404 F.3d 834 (4th Cir.2005), decided after its opinion on Higgs's direct appeal.[FN24]

> FN24. Higgs' direct appeal was denied by the Fourth Circuit on December 22, 2003. *See Higgs I,* 353 F.3d at 316. *Washington* was decided on April 15, 2005.

In *Washington,* the Fourth Circuit reversed a sentence that had been based on the defendant's prior conviction for breaking and entering, a crime which does not necessarily involve violence. *Id.* at 843. The court determined that, in order to comply with *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), the judge must determine a sentence using a "categorical approach;" he can only consider whether the elements of a defendant's previous crime, and not the facts behind the actual incident, meet the statutory requirements for a sentence enhancement. *See Washington,* 404 F.3d at 843.

There is no need to delve into the merits of this claim for two reasons. First, Higgs' claim fails because, as he concedes, he previously litigated this issue on direct appeal. *See Boeckenhaupt,* 537 F.2d at 1183. Second, the rule enunciated in *Washington* came into existence *after* his conviction became final and, as an evidentiary or procedural rule, it cannot be applied retroactively.

While Higgs relies on *Davis v. United States,* 417 U.S.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

333, 346, 94 S.Ct. 2298, 41 L.Ed.2d 109 (1974), _Davis_ considered retroactivity in the context of new _substantive_ laws only. Thus, in _Davis_ the court allowed retroactive application of an intervening law that decriminalized the conduct for which the defendant had been convicted and sentenced. _Davis v. United States,_ 417 U.S. 333, 346, 94 S.Ct. 2298, 41 L.Ed.2d 109 (1974). In so doing, the court reasoned that the "there can be no room for doubt that such a circumstance inherently results in a complete miscarriage of justice and presents exceptional circumstances that justify collateral relief under § 2255." _Id._ Generally, _Davis_ ' holding that intervening law can be applied retroactively covers only substantive, not procedural laws. _See Schriro v. Summerlin,_ 542 U.S. 348, 352, 124 S.Ct. 2519, 159 L.Ed.2d 442 (2004) (holding that substantive laws warrant retroactive application due to the "significant risk that a defendant stands convicted of an act that the law does not make criminal or faces a punishment that the law cannot impose").[FN25] However, in _Teague v. Lane,_ 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), in which the Supreme Court invalidated the retroactive application of a procedural rule, the Supreme Court held that procedural rules can be applied retroactively on collateral review, but only in "exceptional circumstances." _See also Schriro,_ 542 U.S. at 351, 124 S.Ct. 2519 ("when a decision ... results in a 'new rule', that rule applies to all criminal cases still pending on direct review. As to convictions that are already final, however, the rule applies only in limited circumstances").

> FN25. A procedural law "regulate[s] only the manner of determining the defendant's culpability," while a substantive law "alters the range of conduct or the class of persons that the law punishes." _Schriro,_ 542 U.S. at 353, 124 S.Ct. 2519.

[44] _Teague_ establishes a three-step analysis to determine whether a new rule *531 of criminal procedure should apply retroactively: first, the conviction for which the petitioner filed a § 2255 motion must have been final when the new law was enunciated; second, the new law must in fact be "new"; and third, the new rule must be of watershed magnitude. _United States v. Morris,_ 429 F.3d 65, 69-70 (4th Cir.2005) (citing _Teague v. Lane,_ 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989)).

[45] Proceeding directly to the third factor, the "categorical approach" rule of _Washington_ fails to satisfy the _Teague_ analysis because it was not a watershed decision. _See id._ at 71. To qualify as a watershed decision, the new rule must seriously diminish the likelihood of obtaining an accurate conviction and must alter one's understanding of the bedrock procedural elements essential to the fairness of a proceeding. _Id._ The possibility that _Washington_ was a watershed decision is foreclosed by the Fourth Circuit's decision in _United States v. Morris. See Morris,_ 429 F.3d at 71-72. There, the court held that the _Booker_ decision, which required that a sentence be based on the facts found by the jury alone, was not watershed because it did not implicate the "fundamental fairness that require [s] retroactive application on collateral attack." _Id._ The _Washington_ rule-a close relative of the one announced in _Booker_ and an extension of _Apprendi,_ which the Fourth Circuit has also decided was not of watershed magnitude, _United States v. Sanders,_ 247 F.3d 139, 146 (4th Cir.2001)-leads to a similar conclusion. The new rule limiting the ability of a court to stray from the bare elements of a previous conviction during sentencing did not alter the bedrock principles of fairness in criminal procedure. _See id.;_ _United States v. Sanders,_ 247 F.3d 139, 148 (4th Cir.2001). Accordingly, the _Washington_ rule does not apply retroactively and does not support Higgs's § 2255 motion.

**B.**

[46] Higgs also submits that he is entitled to relief because counsel provided ineffective representation in failing to object when the Government submitted to the jury the previous-firearm-conviction aggravating factor based on his guilty plea to the Cherry Lane shooting.

Section 3592(c)(2) of Title 18 allows a jury to consider, as an aggravating factor, whether "the defendant has _previously_ been convicted of a Federal or State offense punishable by a term of imprisonment of more than 1 year, involving the use or attempted or threatened use of a firearm (as defined in Section 921) against another person" when sentencing a defendant to death. 18 U.S.C. § 3592(c) (2004) (emphasis added). Higgs contends that

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

counsel should have argued that the word "previously" refers only to convictions occurring before commission of the *crime* which is the subject of this prosecution, not convictions occurring before *sentencing* for that crime. Although the Cherry Lane shooting took place on December 10, 1995, approximately six weeks before the January 1996 murders in this case, Higgs was not convicted of assault and reckless endangerment for the Cherry Lane shooting until April 1997, over a year after the January, 1996 murders. Again, the jury returned its death sentence verdict in this case on October 26, 2000.

As a preliminary matter, Higgs is procedurally defaulted on this claim because he did not raise it before trial, at trial, or on direct appeal. *See Massaro,* 538 U.S. at 504, 123 S.Ct. 1690. Nor has he avoided the procedural bar, since his claim of ineffective assistance of counsel ultimately fails the *Strickland* test.

For counsel's failure to object to purportedly objectionable material to be constitutionally ineffective, the objection must *532 have been so obvious that it would have "struck those learned in the law like a bucket of ice water." *Humphries v. Ozmint,* 366 F.3d 266, 276 (4th Cir.2004). Here, arguing that the word "previously" referred only to convictions occurring prior to the pending capital offense (as opposed to prior to sentencing) was not an obvious choice for Higgs' counsel because, at the time, the law supporting that argument was not clear and obvious.[FN26]

> FN26. During the penalty phase of the trial, defense counsel did raise an objection to the use of Higgs's May 12, 1997, guilty plea to federal drug offenses to support a finding under 18 U.S.C. § 3592(c)(12) (2004), pertinent to the following aggravating factor: "The defendant had previously been convicted of violating title II or III of the Controlled Substances Act for which a sentence of 5 or more years may be imposed...." *Id.* Defense counsel argued that "had previously" meant previous to the murders and not the sentencing. However, counsel's decision to object to using the drug convictions has no bearing on the reasonableness of his failure to object to using the Cherry Lane shooting. The ineffective assistance reasonableness standard is

an objective, not a subjective, one. *See Strickland,* 466 U.S. at 688, 104 S.Ct. 2052 ("[T]he defendant must show that counsel's representation fell below an *objective* standard of reasonableness." (Emphasis added)); *United States v. Little,* 14 Fed.Appx. 200, 205 (4th Cir.2001) (holding that the subjective beliefs behind counsel's strategic decisions at trial are irrelevant to an ineffective assistance claim). It makes no difference if the objection should have occurred to Higgs's defense attorney. The proper question is whether it should have occurred to a reasonably able attorney.

Indeed, by the time of trial, the Fourth Circuit had issued two seemingly contradictory statements as to the meaning of the word "previously" for purposes of sentencing enhancement: in *United States v. Hobbs,* 136 F.3d 384, 387, n. 3 (4th Cir.1998), the court, in *dicta,* stated that the word "previous" in a § 922 sentencing provision referred only to convictions occurring prior to the subject offense. In contrast, in an unpublished opinion, *United States v. Hamilton,* No. 93-5393, 30 F.3d 131, 1994 WL 381735 (4th Cir. July 22, 1994), a separate Fourth Circuit panel had interpreted the same provision as including all previous convictions, regardless of when they were incurred.

But, says Higgs, using the post-dated Cherry Lane conviction to support the prior-firearm-conviction as an aggravating factor contradicted the established meaning of "previously," as set forth in decisions from other Circuits, albeit decisions establishing that the word "previously" in a different sentencing statute, 18 U.S.C. § 924(e), referred only to convictions occurring prior to the subject offense.[FN27] However, it is clear even if the other circuits had interpreted the specific statute at issue here, which was not the case, counsel was under no obligation to follow the law of other circuits, especially when the Fourth Circuit had yet to clarify its own position on the matter. *See United States v. Roane,* 378 F.3d 382, 397 (4th Cir.2004) (failing to follow another Circuit's law, when that law had not been adopted in the applicable Circuit was not unreasonable); *United States v. McNamara,* 74 F.3d 514, 517 (4th Cir.1996) (not ineffective assistance when counsel followed controlling circuit law at the time). Although the Fourth Circuit has since issued decisions that

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

arguably bring into question the continuing validity of a firearm conviction post-crime but pre-sentence as an aggravating*533 factor, *see United States v. Pressley,* 359 F.3d 347, 350 (4th Cir.2004); *United States v. Ryan,* 187 Fed.Appx. 287 (4th Cir.2006), counsel's failure to anticipate this new law did not constitute ineffective assistance. *See United States v. Stewart,* 36 Fed.Appx. 520, 521 (4th Cir.2002); *Honeycutt v. Mahoney,* 698 F.2d 213, 217 (4th Cir.1983). Nor was appellate counsel's failure to object to this aggravating factor on direct appeal objectively unreasonable. To constitute ineffective assistance of counsel for failing to raise an issue on appeal, counsel must have "omitted significant and obvious issues, while pursuing issues that were clearly and significantly weaker." *United States v. Fox,* No. 94-6710, 1996 WL 359574 at *2 (4th Cir. June 28, 1996) (quoting *Mayo v. Henderson,* 13 F.3d 528 (2nd Cir.1994)).

> FN27. The Armed Career Criminal Act, provides for enhancement of the sentence of a defendant who "has three *previous* convictions ... for a violent felony or a serious drug offense, or both." 18 U.S.C. § 924(e) (emphasis added). Under 18 U.S.C. § 3592(c), the statute in question here, a defendant is eligible for the death penalty if he "*has previously* been convicted of a Federal or state offense ... involving the use ... of a firearm." Emphasis added.

Given the Fourth Circuit's conflicting interpretations of the statute and the factual dissimilarities between the death penalty statute at issue here and the sentencing statute addressed in the other circuits' decisions, the prior firearm conviction issue was not "significant and obvious." *See Fox,* 1996 WL 359574 at *3 (holding that counsel did not provide ineffective assistance when he chose not to raise an issue on appeal because the law on the topic was unclear in a relevant circuit and decisions in the other circuits were factually dissimilar). Nor can it be said that counsel, especially appellate counsel, failed to pursue this issue in deference to, and significantly weaker, issues. Even granting that the issue had substance, counsel's failure to pursue it was not tantamount to ineffective assistance. *See Fox,* 1996 WL 359574 at *2 ("failure to raise all non-frivolous issues on appeal is not ineffective assistance").

## Claim 11: Previous Conviction of a Federal Drug Offense

Apart from raising it in the context of ineffective assistance, Higgs argues that the Fourth Circuit's decision in *Pressley* defining the word "previous" under the Armed Career Criminal statute constituted a relevant new rule which should apply retroactively to his case, vitiating one of the aggravating factors that led the jury to vote for the death penalty.

Since *Pressley* was decided while Higgs' conviction was on direct appeal, [FN28] Higgs is entitled to raise the issue at this time and no *Teague* analysis is required. *See Linkletter v. Walker,* 381 U.S. 618, 627, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965), *overruled on other grounds by* 479 U.S. 314, 320, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987) ("a change in law will be given effect while a case is on direct review"). But there are at least two reasons why the Court declines to embrace this argument.

> FN28. *Pressley* was decided on February 27, 2004, but Higgs' conviction did not become final until the Supreme Court denied his writ of certiorari on November 29, 2004. *See Clay v. United States,* 537 U.S. 522, 527, 123 S.Ct. 1072, 155 L.Ed.2d 88 (2003) (finding that a conviction becomes final when the Supreme Court affirms a conviction on the merits on direct review, denies a petition for a writ of certiorari, or the time for filing certiorari expires).

First, *Pressley* interprets a discrete provision of a *non-capital* sentencing statute, not the *death penalty* statute at issue here. *See Pressley,* 359 F.3d at 348. The fact that both statutes contain similar language is not dispositive, since the Fourth Circuit in *Pressley* was interpreting the issue there based on the specific Congressional intent embodied in the statute itself. *Id.* at 349. Arguably, then, the holding in *Pressley* is limited to the unique circumstances surrounding that statute, and cannot be extended to the death penalty context. Second, this Court has no authority *534 to overrule the Fourth Circuit's decision in *Higgs I,* 353 F.3d 281, 318 (4th Cir.2003), that relied on a different interpretation of "previous" to uphold the previous-drug-conviction

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

aggravating factor. *See Doe v. Charleston Area Medical Center, Inc.,* 529 F.2d 638, 642, (4th Cir.1975) (holding that findings by the Court of Appeals are binding upon a district court until they are considered *en banc* ). That decision, and not *Pressley,* remains the controlling authority on this issue. *Id.*

### Claim 12: Multiple Killings

Higgs argues that the Fourth Circuit erred in *Higgs I* when it chose not to overturn his death sentence despite the erroneous submission to the jury of the statutory aggravating factor alleging his involvement in multiple killings. *See* 18 U.S.C.A. § 3592(c)(16)

In *Higgs I,* the Fourth Circuit acknowledged that " 'multiple killings' was not added to the [Federal Death Penalty Act] as a statutory aggravating factor until April 1996, three months after the murders were committed." *Higgs I,* 353 F.3d at 300. Accordingly, it determined that "the 'multiple killings' aggravator was improperly submitted to the jury as a statutory aggravating factor." *Id.* at 319. Nevertheless, the court decided that the error was harmless and did not invalidate his death sentence because the jury had found additional aggravating factors beyond a reasonable doubt. *Id.*

Higgs challenges the Fourth Circuit's analysis as being inconsistent with *Stringer v. Black,* 503 U.S. 222, 237, 112 S.Ct. 1130, 117 L.Ed.2d 367 (1992), which held that a sentencer's reliance on an invalid aggravating factor in a "weighing" jurisdiction, such as the federal system, "invalidates the sentence and at the very least requires constitutional harmless-error analysis or reweighing...." In *Higgs I,* he claims, the Fourth Circuit improperly assumed that the invalid "multiple killings" aggravator made no difference to the weighing process.

Higgs also argues that the decision in *Higgs I* runs afoul of the Supreme Court's decision in *Brown v. Sanders,* 546 U.S. 212, 126 S.Ct. 884, 163 L.Ed.2d 723 (2006), which eliminated the distinction between "weighing" and "non-weighing" jurisdictions and held that in any jurisdiction "(a)n invalidated sentencing factor ... will render the sentence unconstitutional by reason of its

adding an improper element to the aggravation scale in the weighing process *unless* one of the other sentencing factors enables the sentencer to give aggravating weight to the same facts and circumstances." *Brown v. Sanders,* 546 U.S. 212, 220, 126 S.Ct. 884, 163 L.Ed.2d 723 (2006). Higgs submits that none of the other five sentencing factors found by the jury in his case would have permitted aggravating weight to be given to the evidence of multiple killings, and urges the Court to invalidate his sentence under Sanders, if not under Stringer.

#### A.

The Court begins by noting once again that it does not have the authority to review the Fourth Circuit's decision in *Higgs I. See Charleston Area Medical Center, Inc.,* 529 F.2d at 642. Higgs cannot raise an issue already litigated on direct appeal under the guise of a collateral attack. *See Withrow v. Williams,* 507 U.S. 680, 720-21, 113 S.Ct. 1745, 123 L.Ed.2d 407 (1993) (Scalia, J., concurring). Since the Fourth Circuit has already rejected the claim that the jury improperly relied upon the multiple murder aggravator, Higgs is not permitted to revisit the issue.

#### B.

[47] Even so, analyzing Higgs' claim under *Sanders* (which has substantially *535 superceded *Stringer* ) the Court would nonetheless find Higgs's death sentence constitutional. So long as some other sentencing factor enabled the jury to give aggravating weight to the multiple killings, the death sentence will stand. *Sanders,* 546 U.S. at 220, 126 S.Ct. 884. The nonstatutory aggravating factor of "victim impact" did just that, allowing the jury to consider the number of deaths in this case.

The penalty phase jury instructions framed the victim impact factor as follows:

"The defendant caused injury, harm, and loss to the victim and the victim's family because of the effect of the offense on the victim, the victim's personal characteristics as an individual human being and the impact of the death upon the victim and the victim's family." In proving this factor,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

the prosecution introduced testimony during the penalty phase from family members of each of the three victims-Tamika Black, Mishann Chinn, and Tanji Jackson. From this evidence alone, the jury could infer the existence of multiple killings, to say nothing of the evidence of multiple murders presented during the guilt phase of the trial. *See generally United States v. Flaharty,* 295 F.3d 182, 196 (2nd Cir.2002) (in determining facts material to sentencing, district court may rely on evidence admitted at trial); *United States v. Dailey,* 918 F.2d 747, 748 (8th Cir.1990) (same). Since, the victim impact factor alone "enable[d] the sentencer to give aggravating weight to the same facts and circumstances" as the arguably invalid multiple killings factor, Higgs' *Sanders* claim must fail. *Brown v. Sanders,* 546 U.S. 212, 220, 126 S.Ct. 884, 163 L.Ed.2d 723 (2006).

### Claim 13: Failure to Interview & Call Witnesses Gerald Vaughn and Kevin Anderson

Higgs argues that counsel were ineffective for failing to interview and call Kevin Darnell Anderson and Gerald Vaughn as witnesses during both the guilt and penalty phases of the trial. Both individuals were incarcerated with Haynes at the Charles County Detention Center and both claimed to have had conversations with him regarding the murders.[FN29]

> FN29. At Haynes' trial, which took place before Higgs' trial, Vaughn gave live testimony and the defense submitted written statements from the Government's May 2000 interview of Anderson.

Higgs suggests that the potential testimony of these witnesses would have supported the defense theory that Haynes shot the victims for his own reasons, not at the command of Higgs. According to Higgs, Anderson would have testified that Haynes told him he killed one of the women because she "set him up." Anderson would purportedly have said that he witnessed a confrontation between Haynes and another inmate, in which the inmate commented "you think [you're] big stuff because you killed [three] women" and Haynes responded "I'll kill whoever the f--- I want to kill." As for Vaughn, Higgs contends his testimony would have demonstrated that Haynes never accused Higgs of forcing him to kill the

victims. *See United States v. Haynes,* 26 Fed.Appx. 123, 128 (4th Cir.2001) (summarizing testimony of Vaughn at Haynes' trial). In fact, Higgs says, Vaughn's testimony would have shown that Haynes bragged about the murders, that Haynes told Vaughn he killed the women because one of them owed Haynes $250,000, and that Haynes later told Vaughn that he killed the women because they cheated on him. *See id.*

Higgs argues that during the guilt phase the Vaughn-Anderson testimony would have shown that Haynes, the actual triggerman,*536 was responsible for the murders. During the penalty phase, Higgs says, the evidence would have provided "powerful support for the mitigating factor advanced by the defense that an equally culpable co-defendant had received a life sentence." According to Higgs, counsel's failure to interview or call these witnesses amounted to ineffective assistance.

#### A.

To demonstrate ineffective assistance of counsel, a defendant must demonstrate both that (1) "counsel's performance was deficient," and (2) "the deficient performance prejudiced the defense." *See Strickland,* 466 U.S. at 687, 104 S.Ct. 2052 (1984). A criminal defendant is prejudiced by counsel's performance when there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. 2052. Under this standard, Higgs' claim fails.

#### B.

[48] Higgs is procedurally barred from relitigating the issue of whether the absence of Anderson's statements prejudiced his case. A litigant cannot, under the guise of a collateral attack, raise an issue already litigated. *See Withrow,* 507 U.S. at 720-21, 113 S.Ct. 1745 (Scalia, J., concurring) ("prior opportunity to litigate an issue should be an important equitable consideration in *any* habeas case, and should ordinarily preclude the court from reaching the merits of a claim, unless it goes to the fairness of the trial process or to the accuracy of the ultimate result"); *see also Boeckenhaupt,* 537 F.2d at 1183

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

(affirming that the petitioner may not "recast, under the guise of collateral attack, questions fully considered by [the] Court").

On direct appeal, Higgs' counsel argued for a new trial and sentencing based on the Government's failure to identify Anderson as a potential witness and to provide Higgs with a copy of the Government's notes of its May 2000 interview with Anderson. The Fourth Circuit found that Anderson's absence from the witness stand had no prejudicial effect on the outcome because Haynes' comments regarding the murders were unreliable. *Higgs II,* 95 Fed.Appx. at 43. The Fourth Circuit also stated that there was "no reasonable probability that the jury would not have convicted Higgs of the kidnappings and murders had they been aware of the undisclosed statements made by Haynes to Anderson," *id.,* since "the evidence set forth at Higgs's trial provides 'strong support for the conclusion that [Higgs] would have been convicted of capital murder and sentenced to death, even if Haynes' statement to Anderson had been introduced into evidence." *Id.* at 44 (citation omitted).

Though the Fourth Circuit's ruling was in the context of an alleged *Brady* violation, the relevance of its analysis in the current context is obvious because the same prejudice standard applies in a *Strickland* analysis. *See Strickland,* 466 U.S. at 687, 104 S.Ct. 2052. Anderson's statements cannot be relitigated here.

## C.

Procedural bar aside, counsel's decision not to call Anderson and Vaughn as witnesses at trial did not amount to ineffective assistance.

## 1.

With respect to Anderson, even if counsel knew of his existence, they would not have been deficient for failing to interview or call him as a witness. Whatever Higgs might make of Anderson's statements to suggest Haynes may have had his own motive for the murders, the Court agrees with the Fourth Circuit that Haynes' *537 statements were

thoroughly unreliable. *See Higgs II,* 95 Fed.Appx. at 43. At different times, Haynes gave multiple and inconsistent reasons for the killings,[FN30] such that anything he might have said to Anderson added nothing to his credibility. Counsel could reasonably have concluded that offering further evidence of Haynes' conflicting statements, subject as they would have been to strong impeachment, would have served no useful purpose. Moreover, as the Fourth Circuit recognized, Anderson's statements do not necessarily suggest that "Haynes acted alone or that Higgs was not involved" because they leave open the possibility that Haynes and Higgs shared a "joint motive" to kill the women. *See id.* at 43. Further, counsels' reference to Haynes' statement that he "will kill whoever the f--- [he] want[s] to kill" does not clearly relate to Haynes motive in the present case because the "tough guy" statements were made in the context of a blustery altercation with another inmate. *See id.* at 41.

> FN30. Haynes confessed to the police that he killed the women because he believed that had he not, Higgs would have done so. However, he apparently told Anderson that he killed one of the victims because she may have "set him up," then told Vaughn that he either killed the women because one owed him money or because they cheated on him.

Higgs also fails to demonstrate prejudice as a result of counsel's decision not to interview or call Anderson. As the Fourth Circuit noted, "the evidence of Higgs's involvement in the pursuit, kidnapping, and murders of the three women is overwhelming, as is the evidence of his predominant role in the events that took place that evening and early morning." *See Higgs II,* 95 Fed.Appx. at 44. There is no "reasonable probability" that the result of his trial would have been different had Anderson been called as a witness. *See Strickland,* 466 U.S. at 694, 104 S.Ct. 2052.

## 2.

With respect to Vaughn, Higgs' claim fails for similar reasons. Counsel's decision not to interview or call him was reasonable. His potential testimony-that Haynes killed the women either because one of them owed him money

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

(as Vaughn had testified in the Haynes trial) or because they cheated on Haynes (as Vaughn apparently told a defense investigator)-was of equally doubtful reliability. As with Anderson's statements, Vaughn's purported testimony would simply have multiplied the inconsistent explanations Haynes gave for why he supposedly committed the killings. *See Higgs II,* 95 Fed.Appx. at 43 (holding that the absence of Anderson's testimony did not prejudice the defense because it was unreliable). Vaughn's potential testimony would not necessarily have shown that Higgs did not coerce Haynes to commit the murders. It is entirely plausible, indeed highly probable, that it was Higgs who directed Haynes to murder the women, but, to impress his fellow inmates, Haynes subsequently took credit for them.

Regardless, Higgs cannot demonstrate prejudice as a result of counsel's decision not to interview or call Vaughn. The evidence against Higgs was overwhelming. Vaughn's testimony had no reasonable probability of changing the result of the trial. *See Strickland,* 466 U.S. at 694, 104 S.Ct. 2052.

#### Claim 14: Insufficiency of the Indictment

[49] Higgs contends that *Blakely v. Washington,* 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004) should be applied retroactively to invalidate his conviction on the grounds that his indictment failed to allege any of the intent or aggravating factors that were considered during the sentencing phase of his trial. He submits *538 that *Blakely* calls into question the Fourth Circuit's denial of this precise objection in *Higgs I* and therefore compels this Court to vacate his conviction and sentence.

On appeal, the Fourth Circuit found that the indictment in this case was constitutionally adequate, *Higgs I,* 353 F.3d at 295-304, and that the claimed defects with respect to it were harmless. *Id.* at 304-07. Because Higgs has previously litigated this claim, he is procedurally barred from relitigating it at this time. *Boeckenhaupt,* 537 F.2d at 1183.

On the merits, the claim also fails. Despite *Blakely, Higgs I* remains the controlling authority on the matter, obliging the Court to accept the decision that Higgs' indictment is constitutionally sound. *Etheridge v. Norfolk & Western Ry. Co.,* 9 F.3d 1087, 1090 (1993) ("a decision of a panel of [the Fourth Circuit] becomes the law of the circuit ... unless it is overruled"). But *Blakely* may be distinguishable in any event, since it addresses Sixth Amendment sentencing requirements, whereas here Higgs raises the issue in the context of Fifth Amendment indictment requirements. It may be doubted that *Blakely* established new law relevant to the present issue that would overrule *Higgs I.* But insofar as *United States v. Green,* 372 F.Supp.2d 168 (D.Mass.2005) holds to the contrary, the Court rejects that holding.

#### Claim 15: Reasonable Doubt Error in Jury Instructions

Higgs next challenges the omission of any jury instruction in the penalty phase to the effect that it could recommend a death sentence only in the event that it found the aggravating factors to outweigh the mitigating factors *beyond a reasonable doubt.*[FN31] He claims that the lack of a reasonable doubt instruction ran afoul of the Sixth Amendment as interpreted by the Supreme Court's decisions in *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), and *Ring v. Arizona,* 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002).

> FN31. In pertinent part, the jury was instructed to decide "whether all the aggravating factor or factors found to exist *sufficiently outweigh* all the mitigating factor or factors found to exist to justify a sentence of death, or, in the absence of a mitigating factor, whether the aggravating factor or factors alone are *sufficient* to justify a sentence of death." (Emphasis added)

Higgs challenges the omitted jury instruction by framing it as a § 2255 ineffective assistance of counsel claim, which triggers analysis under the *Strickland* test. However, Higgs submits that the alleged mistake amounts to a serious structural error that "necessarily render[ed] the trial fundamentally unfair," *Rose v. Clark,* 478 U.S. 570, 577, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986); *Sullivan v. Louisiana,* 508 U.S. 275, 281, 113 S.Ct. 2078, 124

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

L.Ed.2d 182 (1993), in consequence of which the Court should presume that his claim satisfies *Strickland's* prejudice requirement, leaving only *Strickland's* reasonableness inquiry to be pursued. *See Bell v. Jarvis*, 236 F.3d 149, 180 (4th Cir.2000) (holding that a structural error cannot be dismissed as harmless and therefore presumptively satisfies *Strickland's* prejudice requirement and requires scrutiny only under *Strickland's* reasonableness prong).

### A.

This claim is procedurally defaulted. As Higgs concedes, he has never before argued that his death sentence was obtained in violation of his constitutional rights by reason of the Court's failure to instruct the jury that it had to find that the aggravating factors outweighed the mitigating factors beyond a reasonable doubt before *539 they could return a death penalty verdict. Though a procedural default can be excused upon a demonstration of cause and prejudice, *see Massaro*, 538 U.S. at 504, 123 S.Ct. 1690, no such relief is warranted here. He has shown neither cause nor prejudice, nor is prejudice to be presumed.

### B.

[50] Beyond procedural default, Higgs' claim fails on the merits. Although the Supreme Court has stated that a faulty reasonable doubt instruction during the guilt phase of an ordinary criminal trial amounts to a structural error, *see Sullivan v. Louisiana*, 508 U.S. 275, 281, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993), it is by no means clear that that pronouncement applies to the sentencing phase of a death penalty proceeding. *See, e.g., Brice v. State*, 815 A.2d 314, 324-327 (Del.2003) (noting that the Supreme Court has employed structural error analysis only when reviewing constitutional errors occurring during the guilt/innocence phase of a trial and suggesting that such analysis does not apply to the sentencing phase). But assuming without deciding that a structural error occurred and that prejudice may be presumed, *see Bell*, 236 F.3d at 180, Higgs' motion would fail under the first prong of *Strickland;* counsel did not act unreasonably by failing to raise an *Apprendi* objection to the penalty phase jury instruction.

The alleged error at issue did not involve a straightforward and obvious application of *Apprendi's* principles that would have "struck those learned in the law like a bucket of ice water." *Humphries*, 366 F.3d at 276. Even since the trial in this case courts have refused to extend the Supreme Court's decisions in *Apprendi* and *Ring* to require a jury recommending capital punishment to find that aggravating factors outweigh mitigating factors *beyond a reasonable doubt. See e.g. Ritchie v. State*, 809 N.E.2d 258, 264-268 (Ind.2004) ("[Richie] contends that the trial court should have instructed the jury that it must apply a reasonable doubt standard in finding that the State proved that the aggravating circumstances outweigh the mitigating factors.... [W]e conclude that this process is not subject to a reasonable doubt standard."); *Brice*, 815 A.2d at 327 ("nothing in *Ring* suggests that the trial judge may not retain the responsibility of making the ultimate sentencing decision"); *Ex parte Waldrop*, 859 So.2d 1181, 1190 (Ala.2002); (" *Ring* and *Apprendi* do not require that a jury weigh the aggravating circumstances and the mitigating circumstances."); *but see Johnson v. State*, 118 Nev. 787, 59 P.3d 450, 460 (2002) (concluding that *Ring* requires a jury, and not a panel of judges, to find beyond a reasonable doubt that there are no mitigating circumstances sufficient to outweigh the aggravating circumstance or circumstances found).[FN32]

FN32. For post- *Apprendi* cases that do not discuss *Apprendi* or *Ring* in reaching the conclusion that the reasonable doubt standard does not apply to penalty phase weighing, *see e.g., United States v. Sampson*, 335 F.Supp.2d 166, 238 (D.Mass.2004) ("Although important to the defendant and society, the sentencing decision in a capital case is, in its most important respects, fundamentally different than any other task that a jury is called upon to perform in our criminal justice system. The jury is not acting as a finder of fact. Rather, it is exercising discretion in sentencing that is ordinarily exercised by judges. Whether a jury's sentencing decision is right or wrong is not something that is capable of proof in the traditional sense."); *State v. Rizzo*, 266 Conn. 171, 833 A.2d 363, 378 (2003) ("specific standards for balancing aggravating against mitigating circumstances are not constitutionally required" (quoting *Zant v. Stephens*, 462 U.S. 862, 875-76 n. 13, 103 S.Ct.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

2733, 77 L.Ed.2d 235 (1983) and *Jurek v. Texas,* 428 U.S. 262, 270, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976))).

For pre- *Apprendi* cases reaching the same conclusion, *see e.g. Ford v. Strickland,* 696 F.2d 804, 818 (11th Cir.1983) ("While the existence of an aggravating or mitigating circumstance is a fact susceptible to proof under a reasonable doubt or preponderance standard, the relative *weight* is not." (citations omitted)); *Fleenor v. State,* 514 N.E.2d 80, 92 (Ind.1987) ( "[T]he determination of weight to be accorded the aggravating and mitigating circumstances is not a 'fact' which must be proved beyond a reasonable doubt but is a balancing process." (citing *Daniels v. State,* 453 N.E.2d 160, 171 (Ind.1983))).

For a pre- *Apprendi* case finding that the reasonable doubt standard applies to penalty phase weighing, *see People v. Tenneson,* 788 P.2d 786, 793-94 (Colo.1990).

**\*540** In *Apprendi,* the Supreme Court held that "any *fact* that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi v. New Jersey,* 530 U.S. 466, 490, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000) (emphasis added). It does not necessarily follow that this rule should extend to the weighing process that takes place during the penalty phase of a capital trial. Whether the aggravating factors presented by the prosecution outweigh the mitigating factors presented by the defense is a *normative* question rather than a *factual* one. When jurors weigh aggravating and mitigating factors, they draw upon their sense of community norms in light of the totality of circumstances surrounding the criminal and the crime to determine a just punishment. In marked contrast, in order to find a first-order fact to be true, the jurors must evaluate the evidence presented to determine whether they believe in the truth of the fact beyond any reasonable doubt. In reaching this determination, jurors rely on their deductive and inductive reasoning and not upon normative considerations. While the line between facts and norms is not always a clear one,

the process of determining a just punishment rests securely at the normative end of the fact/norm continuum. As the Eleventh Circuit put it in *Ford v. Strickland,* "[P]etitioner confuses proof of *facts* with the weighing process undertaken by the sentencing jury and judge.... [T]he latter process is not a fact susceptible of proof under any standard...." 696 F.2d 804, 818-19 (11th Cir.1983) (citations omitted).

This is not to say that a state could not require that a jury recommending the death penalty must find that aggravating factors outweigh mitigating factors beyond a reasonable doubt. *See e.g. Tenneson,* 788 P.2d at 794 ("We are persuaded that the term 'beyond reasonable doubt' serves well to communicate to the jurors the degree of certainty that they must possess that any mitigating factors do not outweigh the proven statutory aggravating factors before arriving at the ultimate judgment that death is the appropriate penalty.").[FN33] But the point is that *Apprendi* and *Ring* do not require this. The Federal Death Penalty Act, which requires a jury recommending death to find that "the aggravating factor or factors found to exist *sufficiently* outweigh all the mitigating factor or factors," 18 U.S.C. 3593(e) (emphasis added), articulates a standard (sufficiency) that satisfies constitutional reliability requirement. At least one federal court has held under the Act that a reasonable doubt instruction is not required when a death penalty jury is weighing aggravating and mitigating factors. *See U.S. v. Lawrence,* 477 F.Supp.2d 864 (S.D.Ohio 2006). This Court sees no reason to take a different view.

> FN33. The Colorado death penalty statute considered in *Tenneson* did not specify any standard for weighing aggravating and mitigating factors. 788 P.2d at 789-90.

### C.

As for Higgs' claim that he was deprived of effective assistance when his counsel **\*541** failed to raise an *Apprendi* challenge to the lack of a reasonable doubt weighing instruction, the Court concludes that counsel were not ineffective. The attorney's performance must have fallen below an objective standard of reasonableness

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

and a reasonable probability must exist that Defendant was prejudiced by the deficient performance. *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052 (1984). Since the propriety *vel non* of a reasonable doubt instruction in regard to the weighing of aggravating and mitigating factors during the penalty phase of a death penalty case was (and remains) highly questionable, counsel's failure to pursue it did not amount to constitutionally deficient representation.

### Claim 16: Failure to Instruct Jury Regarding Parole Ineligibility as a Mitigating Factor

Higgs next argues that the Court's failure to instruct the jury that his ineligibility for parole could be found to be a mitigating factor, as requested by counsel during the penalty phase, violated his Eight Amendment rights. Following an objection by the Government, the Court declined to give the instruction on the grounds that parole ineligibility is not a "fact about [Higgs], not a fact about the crime. It's a fact about the punishment." The Court did, however, twice instruct the jurors that they had only two options: to sentence Higgs to death or to life without the possibility of parole. [FN34]

> FN34. Specifically, the Court told the jury, "You must ... answer the question as to whether or not the defendant, Dustin John Higgs, should be sentenced to death or life imprisonment without the possibility of parole or release. No other lesser sentence is authorized under the law for the offenses of which he has been convicted." On another occasion, the Court reiterated the jury's only two options, stating "you must now decide whether the appropriate sentence for the defendant is, one, death or two, life in prison without the possibility of parole or release."

Higgs contends that this general instruction was insufficient because a sentence of life imprisonment without parole would eliminate any risk of future danger from him. Consequently, the jury should have been allowed to expressly consider parole ineligibility as a mitigating factor.

Higgs also alleges ineffective assistance of counsel of

appellate counsel for failing to raise this issue on appeal.

### A.

[51] Higgs is procedurally barred from raising this claim because he failed to raise it on appeal. *See Massaro,* 538 U.S. at 504, 123 S.Ct. 1690. His argument that the Court should consider the merits of his claim because he can establish actual innocence as well as cause and prejudice is unpersuasive. *See Schlup,* 513 U.S. at 314-15, 327-30, 115 S.Ct. 851 (holding that a procedural default can be excused upon the requisite showing of actual innocence).

To demonstrate actual innocence, a movant must establish that based on the evidence, "it is more likely than not that no reasonable juror would have convicted him." *Id.* at 327-28, 115 S.Ct. 851. This remedy, however, is reserved for extremely "extraordinary" situations, where the defendant's conviction amounts to a constitutional violation. *See Murray v. Carrier,* 477 U.S. 478, 496, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986). Given the overwhelming evidence of Higgs' guilt and the fact that the Court twice instructed the jury that it might consider Higgs' parole ineligibility, Higgs falls well short of this standard.[FN35]

> FN35. As discussed previously in connection with Claims 1 and 4, *supra,* to the extent that Higgs argues that he is entitled to relief solely because he is actually innocent, the Court again notes that he has not met the "extraordinarily high" standard for such a claim, if such claim even exists. *Herrera,* 506 U.S. at 417, 113 S.Ct. 853.

*542 Higgs fails to demonstrate cause or prejudice on the basis of appellate counsel's failure to raise the issue on his parole eligibility as a mitigating factor. Appellate counsel may well have judged that the matter of whether Higgs' ineligibility for parole mitigated against the death penalty was adequately covered by the Court's instructions and/or by the arguments counsel would be making (and did make) in closing during the penalty phase. As for prejudice, Higgs offers nothing more than the assertion

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

that it is "reasonably likely that [his] death sentence would have been vacated on direct appeal."

**B.**

[52][53] The procedural bar aside, Higgs' claim also fails on the merits. A capital sentencing jury must unquestionably give effect to all relevant mitigating evidence, as required by the Eighth Amendment. *See Buchanan v. Angelone,* 522 U.S. 269, 276, 118 S.Ct. 757, 139 L.Ed.2d 702 (1998); *see also Skipper v. South Carolina,* 476 U.S. 1, 4, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986). The Supreme Court has made clear that mitigating evidence includes "any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *See Lockett v. Ohio,* 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). It remains doubtful, however, that parole ineligibility meets the criteria for being a mitigating factor, since it relates to neither to the defendant's character or record or any of the circumstances of the offense in question. *See id.*

Higgs is correct to argue that a court must inform a capital jury of a defendant's parole ineligibility if his future dangerousness is raised as an issue. *See Simmons v. South Carolina,* 512 U.S. 154, 168-69, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994) (holding that when the Government points to defendant's future dangerousness, due process requires that the defendant should have an opportunity to raise the fact that the alternative sentence is life without parole); *see also Townes v. Murray,* 68 F.3d 840, 850 (4th Cir.1995). But that requirement was satisfied here. When the Government raised the prospect of Higgs' future dangerousness in its closing statement, the Court satisfied the requirement articulated in *Simmons* when it twice told the jury that the only alternative sentence to death was life imprisonment without parole. *See Simmons,* 512 U.S. at 168-69, 114 S.Ct. 2187.

But Higgs claims that the Court should have specifically told the jury to list parole ineligibility as a mitigating factor on the verdict form and, in support of his argument, he cites two cases from state courts. *See Turner v. State,* 645 So.2d 444, 448 (Fla.1994) (reversing death sentence where the court overrode the jury's life sentence

recommendation because defendant's fifty-year minimum sentence was a mitigating issue upon which the jury "could have relied" when imposing a life sentence) *and State v. Henderson,* 109 N.M. 655, 789 P.2d 603, 606-07 (1990), *overruled on other grounds by* 118 N.M. 486, 882 P.2d 527 (1994) (finding error in the court's refusal to instruct the jury that the defendant would only be parole eligible after he served thirty years).

A close reading of *Turner* and *Henderson,* however, indicates that neither case addresses the specific issue of whether parole ineligibility must be listed on the verdict form as a mitigating factor. The Florida court in *Turner* found that there was ample mitigation evidence that the jury could have relied on when sentencing *543 the defendant to life imprisonment, including, among the factors, the defendant's parole ineligibility. 645 So.2d at 448. It did not, however, specifically instruct the jury to consider his parole ineligibility as a mitigating *factor. See id. Henderson* dealt only with the issue of whether an instruction regarding parole ineligibility is required. 789 P.2d at 607. The Court, moreover, is not persuaded that *Skipper,* cited by Higgs for the proposition that parole ineligibility must be specifically identified as a mitigating factor, actually stands for that proposition. There the Supreme Court held only that "evidence that the defendant would not pose a danger if spared (but incarcerated) must be considered potentially mitigating." *See Skipper,* 476 U.S. at 5, 106 S.Ct. 1669. None of the cases he cites teaches that parole ineligibility must be expressly *listed* as a mitigating factor. At most, they stand for the proposition that the jury must be made aware of this fact, which in this case they clearly and repeatedly were.

The Court finds that the jury received an appropriate instruction regarding Higgs' ineligibility for parole. He is not entitled to collateral relief based on this claim.

**C.**

Given that there was no error in the Court's ruling as to the requested instruction, appellate counsel cannot be faulted for failing to raise the issue.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

### Claim 17: Materiality under *Brady*

Higgs argues that the Fourth Circuit erred in its analysis of whether, under *Brady v. Maryland,* the Government's failure to turn over the names of certain witnesses was material to the outcome of his trial.

Apparently appellate counsel, while preparing Higgs' direct appeal to the Fourth Circuit, became aware of the existence of two witnesses the Government knew of, but had not disclosed during trial-Gerald Vaughn and Kevin Anderson. As discussed in connection with Claim 13, *supra,* both witnesses purportedly heard Co-Defendant Haynes make statements suggesting that Haynes' involvement in the murders was more extensive than indicated by the testimony of key Government witness Victor Gloria, who portrayed Higgs in the more culpable light. Arguing a violation of *Brady v. Maryland,* counsel filed motion for a new trial and new sentencing hearing. The Court denied the motion and the Fourth Circuit affirmed.

Higgs submits that the Fourth Circuit incorrectly applied *Brady* as it relates to the sentencing phase of trial when it wrote,

> [T]o establish materiality, Higgs was required to demonstrate a reasonable probability that the evidence would have persuaded a juror to reach the conclusion that Haynes was "equally culpable" to Higgs in the murders, *and* that this mitigating factor, combined with the others, would have tipped the balance and led the juror to also conclude that the mitigating factors outweighed the aggravating factors so as to foreclose the sentence of death.

*Higgs II,* 95 Fed.Appx. 37, 43 (4th Cir.2004) (emphasis in original). Focusing on the word "outweighed," Higgs submits that the Fourth Circuit deviated from the statute, which requires the jury, in order to impose a death judgment, to determine whether all the aggravating "factors found to exist *sufficiently* outweigh all the mitigating ... factors found to exist." 18 U.S.C. § 3593(e) (emphasis added). Higgs argues that it is reasonably probable that the introduction of evidence casting Haynes

in a light equally culpable with Higgs would have resulted in at least one *544 juror finding that the aggravating factors did not *sufficiently* outweigh the mitigating factors, causing the juror to oppose the death penalty. Higgs thus reasons that the Fourth Circuit erred in affirming this Court's denial of his motion for a new sentencing hearing.

#### A.

As stated previously, a habeas court does not ordinarily consider issues that have already been resolved and decided on direct review. *Boeckenhaupt,* 537 F.2d at 1183.

Higgs raised this *Brady* violation claim in the course of his direct appeal to the Fourth Circuit. *Higgs II,* 95 Fed.Appx. at 43. Therefore, this Court need not reach the merits of the claim.

#### B.

Still, lest there be any doubt, the Court accepts that the Fourth Circuit applied the correct legal standard. As the Fourth Circuit opined, the Supreme Court has held that "[e]vidence is 'material' for purposes of the *Brady* inquiry 'only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.' " *Higgs II,* 95 Fed.Appx. at 41 (quoting *Bagley,* 473 U.S. at 682, 105 S.Ct. 3375).[FN36] In the present case, the Fourth Circuit did not simply find that the mitigating factors would not have outweighed the aggravating factors. It referred to the necessity of the mitigating factors "tipp[ing] the balance ... so as to foreclose the sentence of death." *Higgs II,* 95 Fed.Appx. at 43. This additional language is in accord with the statutory standard for imposition of a death sentence, i.e., that the aggravation must "sufficiently outweigh" the mitigation.

> FN36. At one point, the Government, citing Higgs' Brief, characterizes his claim to be that "the materiality test does not require a showing that it is reasonably probable that the result of the proceeding would have been different, had the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

evidence been disclosed to the defense." This characterization of Higgs' claim seems to be inconsistent with other parts of Higgs' Brief, which correctly state that the " *Brady* materiality analysis does require a showing that it is reasonably probable that the result of the proceeding would have been different, had the evidence been disclosed to the defense."

As for this Court's denial of Higgs' request for a new sentencing and the Fourth Circuit's affirmance of that decision, the appellate court found that this Court did not abuse its discretion because, as is true throughout, "the evidence set forth at Higgs' trial provides 'strong support for the conclusion that [Higgs] would have been convicted of capital murder and sentenced to death even if' " the witness statements had been introduced into evidence. *Higgs II*, 95 Fed.Appx. at 44 (citing *Strickler v. Greene*, 527 U.S. 263, 294, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999)).[FN37] There is no basis for disturbing this ruling.

> FN37. There is obviously no basis for an ineffective assistance of counsel claim in this regard since counsel raised and the Fourth Circuit decided the issue.

### Claim 18: Post-Arrest Silence

Higgs next contends that the testimony of Government witness Domenick Williams regarding Higgs' post-arrest silence during a police interview violated Higgs' rights under the Fifth and Sixth Amendments.

Williams, facing charges of his own, was incarcerated with Higgs prior to Higgs' trial. At trial, Williams testified that Higgs told him of an instance in which police officers approached Higgs, who was at the time incarcerated, in an attempt to get Higgs to cooperate against Haynes. *545 Higgs told Williams that he refused to discuss the case with the officers.

Higgs argues that Williams' testimony about Higgs' silence when questioned by the police violated Higgs' Fifth Amendment right to remain silent and his Sixth Amendment right to counsel. Higgs says that the use of his post-arrest silence against him, following the administration of *Miranda* warnings by the police, violated his right against self-incrimination and his right to due process. *Doyle v. Ohio*, 426 U.S. 610, 619, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976); *United States v. Quinn*, 359 F.3d 666, 677 (4th Cir.2004) (" *Doyle* forbids the government to use a defendant's silence against him at trial where the government implicitly or explicitly advised the defendant upon arrest that he should keep silent."). Higgs also claims his trial and appellate counsel were ineffective for failing to raise this issue.

### A.

Both the Fifth and Sixth Amendment claims are procedurally defaulted. Higgs concedes that he has not previously argued that Williams' testimony violated these rights. As recognized throughout, though a procedural default can be excused upon a demonstration of cause and prejudice, *see Massaro*, 538 U.S. at 504, 123 S.Ct. 1690, Higgs merely posits that his counsel's ineffective assistance constitutes "cause." *Murray v. Carrier*, 477 U.S. 478, 488, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986) (noting that ineffective assistance is "cause" for a procedural default), and submits that he was prejudiced as a result. He has demonstrated neither.

### B.

[54] Procedural default aside, Higgs' claims fail on the merits. In *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the Supreme Court held that the privilege against self-incrimination protects individuals from "informal compulsion exerted by law-enforcement officers during in-custody questioning." In *Doyle*, the Court extended the privilege to preclude admission of evidence that a defendant exercised his right to remain silent during an interrogation, as defined by *Miranda*. *Doyle*, 426 U.S. at 618, 96 S.Ct. 2240. "Interrogation" is defined as actual "questioning initiated by law enforcement officers," *Miranda*, 384 U.S. at 444, 86 S.Ct. 1602, or "its functional equivalent." *Arizona v. Mauro*, 481 U.S. 520, 526, 107 S.Ct. 1931, 95 L.Ed.2d 458 (1987) (citing *Rhode Island v. Innis*, 446 U.S. 291, 301,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

100 S.Ct. 1682, 64 L.Ed.2d 297 (1980)). Courts have interpreted the "functional equivalent" to include "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Innis*, 446 U.S. at 301, 100 S.Ct. 1682; *see also Illinois v. Perkins*, 496 U.S. 292, 296, 110 S.Ct. 2394, 110 L.Ed.2d 243 (1990); *United States v. Wright*, 991 F.2d 1182, 1186 (4th Cir.1993) ( *Miranda* only applies while "the defendant is being interrogated"). On the other hand, "[v]olunteered statements of any kind are not barred by the Fifth Amendment." *Innis*, 446 U.S. at 300, 100 S.Ct. 1682 (citing *Miranda*, 384 U.S. at 478, 86 S.Ct. 1602).

Insofar as his statements to Williams were concerned, Higgs was not in police custody at the time. *See Doyle*, 426 U.S. at 618, 96 S.Ct. 2240. Williams was neither a police officer nor a person that police were using to elicit an incriminating response from Higgs. In fact, Williams had not even asked Higgs a question; Higgs volunteered the information about his silence. Thus, even if Williams had been a police officer, this volunteered *546 statement would not have been barred by the Fifth Amendment. *See Innis*, 446 U.S. at 300, 100 S.Ct. 1682.

### C.

Higgs submits that trial and appellate counsel's failure to object to or otherwise litigate these issues violated his Sixth Amendment right to effective counsel because, he says, there could have been no strategy behind the failure to object. The Court disagrees. Where an objection to evidence would have been futile, counsel is not constitutionally ineffective for failing to make the objection. *See Harris v. United States*, 204 F.3d 681, 683 (6th Cir.2000). Because, as demonstrated above, any Fifth and Sixth Amendment objections on this point would have failed, counsel's failure not to make them did not violate Higgs' Sixth Amendment right to effective representation.[FN38]

FN38. It is not clear whether Higgs is also arguing that, when approached by the police officers, he was denied a Sixth Amendment right to counsel. To the extent that he is, the point is academic because Higgs made no statement to the officers.

### Claim 19: Jury Instruction Challenge

Higgs argues that his Fifth Amendment rights were violated when the Court failed *sua sponte* to instruct the jurors at the close of the penalty phase that they were not permitted to draw adverse inferences of guilt based on Higgs' decision not to testify. While he concedes that the Court gave a no-adverse inference instruction during the guilt phase, he believes the risk of a juror drawing an improper inference from the Court's failure to provide this instruction in the penalty phase was heightened. He argues that trial counsel's failure to request this instruction during the penalty phase, as well as appellate counsel's failure to raise the issue on appeal, constituted ineffective assistance.

### A.

This claim is procedurally barred. Higgs concedes that counsel failed to timely raise it at either the trial level or on appeal which, unless excused, precludes its subsequent litigation. *See United States v. Frady*, 456 U.S. 152, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982). Again, a procedural default may be excused where the defendant establishes a cause for the omission and prejudice. *Massaro*, 538 U.S. at 504, 123 S.Ct. 1690. Higgs has shown neither.

He argues that counsel's ineffectiveness constitutes cause but, as discussed below, the Court finds counsel's performance to have been adequate. *See Murray*, 477 U.S. at 488, 106 S.Ct. 2639 ("So long as a defendant is represented by counsel whose performance is not constitutionally ineffective under the standard established in *Strickland v. Washington, supra*, we discern no inequity in requiring him to bear the risk of attorney error that results in procedural default.") In any event, Higgs has not shown a "substantial likelihood" that the Court's failure to provide a non-adverse-inference instruction during the penalty phase, after having given the instruction in the guilt phase, prejudiced the outcome. *Frady*, 456 U.S. at 174, 102 S.Ct. 1584.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

**B.**

On the merits, this claim fails.

**1.**

[55] The Court had no obligation to *sua sponte* provide a cautionary jury instruction regarding Higgs' failure to testify during the penalty phase.

To be sure, under the Fifth Amendment, a defendant's silence at trial cannot be used as evidence of his guilt. U.S.C.A. **\*547** Const. Amend. V; *see also Griffin v. California*, 380 U.S. 609, 615, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965) (the Fifth Amendment "forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt"); *Malloy v. Hogan*, 378 U.S. 1, 8, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964) (the Fifth Amendment protects a defendant's right to remain silent "unless he chooses to speak in the unfettered exercise of his own will") The right to remain silent extends to the sentencing phase. *Mitchell v. United States*, 526 U.S. 314, 327, 119 S.Ct. 1307, 143 L.Ed.2d 424 (1999) (a defendant may assert the privilege against self-incrimination in sentencing proceedings); *Estelle v. Smith*, 451 U.S. 454, 462-63, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981) (there is no basis for distinguishing "between the guilt and penalty phases of respondent's trial so far as the protection of the Fifth Amendment privilege is concerned"). To protect this right, a defendant may request that the court instruct the jury not to draw any adverse inference from his silence. *United States v. Francis*, 82 F.3d 77, 78 (4th Cir.1996) (upon request the court gave the customary instruction regarding defendant's right not to testify and that no adverse inference could be drawn from the exercise of that right). However, in the absence of such a request, the court has no obligation to provide such an instruction. *See Carter v. Kentucky*, 450 U.S. 288, 305, 101 S.Ct. 1112, 67 L.Ed.2d 241 (1981) (state trial judge was required to give the jury an adverse inference instruction only "upon proper request")

Higgs admits that counsel failed to request a no-adverse-inference instruction during the penalty phase. Accordingly, the Court had no duty to provide one. *See*

*Carter,* 450 U.S. at 305, 101 S.Ct. 1112. Beyond that, however, a cautionary instruction during the penalty phase was wholly unnecessary because the Court made clear to the jury during the penalty phase that its instructions during the guilt phase carried over into the penalty phase and such an instruction had been given during the guilt phase. *See Wilson v. State,* 271 Ga. 811, 525 S.E.2d 339, 347 (1999), *overruled on other grounds by* 284 Ga. 758, 670 S.E.2d 388, 398 (2008) (holding that the jury understands continuing applicability of jury instructions throughout the duration of the trial); *See also People v. Wharton,* 53 Cal.3d 522, 280 Cal.Rptr. 631, 809 P.2d 290, 339 (1991) (a reasonable jury would correctly assume "generic" instructions continued to apply); *State v. Wessinger,* 736 So.2d 162, 193-194 (La.1999) (finding no error in failure to repeat cautionary guilt phase instruction during sentencing phase); *People v. Sanders,* 11 Cal.4th 475, 46 Cal.Rptr.2d 751, 905 P.2d 420, 469 (1995) (court was not required to repeat at penalty phase instruction on credibility of witnesses and circumstantial evidence which were given at guilt phase).

Thus, during the guilt phase, the Court instructed the jury as follows:

The defendant did not testify in this case. Under the United States Constitution he has no obligation to testify or to present any other evidence because it is the Government's burden to prove the defendant guilty beyond a reasonable doubt. [¶] The burden remains with the prosecution throughout the entire trial. It never shifts to the defendant. Any defendant is never required to prove that he is innocent, and you may not attach any significance to the fact that the defendant did not testify. No adverse inference against him may be drawn by you because he did not take the witness stand. You may not consider this against the defendant in any way in your deliberations in the jury room.

**\*548** During the penalty phase the Court informed the jury:

The instructions that I gave you earlier in the case about witness credibility and so on and so forth still apply, so keep those in mind. But there are some specific

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

instructions that I now direct to you in this phase of the case.

Since the Court made clear that the penalty phase instructions were *in addition* to those provided at the guilt phase, it strains credulity to suggest that the jurors might infer that they were now free to draw inferences of guilt from Higgs' silence during the penalty phase. A redundant jury instruction would have served no purpose. *See United States v. Soria,* 959 F.2d 855, 857 (10th Cir.1992) (finding no general requirement for redundant instructions).

**2.**

As for the ineffective assistance of counsel claim relative to this issue, counsel's failure to request a cautionary instruction did not constitute ineffective assistance. For a conviction to be reversed on the grounds of ineffective assistance, a defendant must show that (1) the attorney's representation fell below an objective standard of reasonableness, and (2) the deficient performance prejudiced him. *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052. There is no basis to criticize trial counsel for not requesting a redundant instruction or appellate counsel for deciding not to raise the issue on appeal.

**Claim 20: Occurrence of the Offenses Within the Special Maritime and Territorial Jurisdiction of the United States**

Higgs claims that the Government failed to establish federal jurisdiction over the Patuxent Wildlife Refuge where the killings occurred; that the Court improperly instructed the jury regarding the matter of jurisdiction; and that counsel's failure to object to these alleged errors constituted ineffective assistance.

**A.**

Higgs begins by arguing that the Government failed to provide sufficient evidence that the Wildlife Refuge falls "within the special maritime and territorial jurisdiction of

the United States," as required by 18 U.S.C. § 1111(b).

The term "special maritime and territorial jurisdiction of the United States" includes land "under the exclusive or concurrent jurisdiction of the United States." 18 U.S.C. § 7(3). To prove jurisdiction in this case, the Government offered the testimony of Douglas Vandergraft, Chief Cartographer for the United States Fish and Wildlife Service. Vandergraft's testimony, says Higgs, was objectionable because he was never qualified as an expert, but was permitted to render a number of expert opinions with respect to jurisdiction. *See* Fed.R.Evid. 701 (barring lay opinions based on "scientific, technical or other specialized knowledge"). Higgs takes particular issue with Vandergraft's reliance on Fish and Wildlife maps of the Refuge. Those maps, according to Higgs, showed *ownership* of the Refuge, but not *jurisdiction*. Higgs contends that Vandergraft's reliance on the maps was improper because he never testified that the maps were accurate, stating only that the maps were "hopefully" up-to-date.

The Government rejects Higgs' arguments in every respect and the Court does as well. Higgs' challenge to Vandergraft's testimony qua expert is procedurally barred since it could have been raised on direct appeal. *United States v. Frady,* 456 U.S. 152, 165, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982). While this procedurally barred claim may be considered if Higgs can show "cause" for the default and "prejudice" as a result, again he has shown neither.

*549 [56] A court considering the sufficiency of evidence underlying a conviction will uphold a guilty verdict and deny habeas relief if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *see also Williams v. Ozmint,* 494 F.3d 478, 489 (4th Cir.2007) (applying *Jackson* standard to habeas petition to determine sufficiency of evidence sustaining state court conviction); *Arigbede v. United States,* 732 F.Supp. 615, 621-22 (D.Md.1990) (applying *Jackson* standard to habeas petition to determine sufficiency of evidence sustaining district court conviction). Courts defer to the jury's determination of credibility and view the record "in the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

light most favorable to the prosecution." *Jackson, 443 U.S. at 319, 99 S.Ct. 2781.*

[57] Assuming Vandergraft's testimony was offered as lay testimony, it was properly admitted. A lay witness may testify about information from records of which he has personal knowledge and over which he maintains personal control. *MCI Telecomms. Corp. v. Wanzer,* 897 F.2d 703, 706 (4th Cir.1990) (holding that a lay witness may testify to conclusions about "records ... predicated on her personal knowledge and perception" and is not required to be identified as an "expert" witness). Vandergraft stated that he had worked in the Cartography Office of Fish and Wildlife for 15 years and that he personally maintained the Fish and Wildlife maps. Referring to those maps, he testified that the crime scene was within the Government's territorial ownership and jurisdiction. Indeed, Vandergraft specifically affirmed that the maps "accurately reflect the ownership, as well as the jurisdiction" of the Patuxent Wildlife Research Center as of January 1996, which directly refutes Higgs' argument that Vandergraft testified only to Government ownership, as opposed to jurisdiction.

Nor is it accurate to state that Vandergraft failed to authenticate the maps. While Vandergraft did state that Fish and Wildlife maps were "hopefully" up-to-date, he later testified that he had conducted a search to ensure that the particular maps he relied on with respect to the Refuge were accurate. [FN39]

> FN39. As properly authenticated public records, the maps themselves were admissible on the issue of Government ownership of the land, *see* Fed.R.Evid. 803(8).

Under the *Ozmint* and *Jackson* standards, Vandergraft's testimony, buttressed by the maps themselves, sufficed to establish that the Refuge was within the "special maritime and territorial jurisdiction of the United States." 18 U.S.C. § 1111(b).

**B.**

Higgs nonetheless maintains that the Court's instructions regarding jurisdiction confused the jury. This is what the Court told the jury:

> The second element with regard to the first degree murder charge that the Government must prove beyond a reasonable doubt is that the killings occurred within the maritime and territorial jurisdiction of the Untied States. The Government has offered evidence that the killings occurred on the grounds of the Patuxent National Wildlife Refuge and that the Patuxent National Wildlife Refuge is owned by the federal government and is within its special maritime and territorial jurisdiction.

> Thus, if you find that the killing occurred in the Patuxent National Wildlife Refuge, then you should consider the remaining elements. If, however, you find that the killing did not occur, killings, the killings [sic] did not occur in *550 the Patuxent National Wildlife Refuge, or if you have a reasonable doubt as to this element, then it is your duty to find the defendant not guilty.

According to Higgs, this language on the one hand instructed the jury to find that the offenses occurred within the special maritime and territorial jurisdiction of the United States, but on the other hand merely required that the jury find the offenses occurred within the Refuge.

This argument lacks merit. To begin, the claim is procedurally defaulted for the same reason that the claim with respect to Vandergraft's testimony is procedurally defaulted; it could have been raised on direct appeal. Apart from the default, the claim is still deficient. While the jury is obliged to make the factual determination of whether the crime at issue occurred on a particular piece of property, the court, as a matter of law, has the authority to determine whether federal jurisdiction extends to a particular piece of property. *United States v. Bridges,* No. 94-5130, 1994 WL 687301, at *1 (4th Cir. Dec. 9, 1994) (finding that it is "well established that a court may determine, as a matter of law, the existence of federal jurisdiction over the geographic area, but the locus of the offense within that area is for the trier of fact"); *United States v. Roberts,* 185 F.3d 1125, 1139 (10th Cir.1999)

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

(finding that it is the role of the trial court to decide jurisdiction of a specific area).

Accordingly, the Court in this case had the authority to determine, and did in fact determine, that the Refuge was "within the special maritime and territorial jurisdiction of the United States," 18 U.S.C. § 1111(b), while leaving the jury to decide whether "the killing[s] occurred in the Patuxent National Wildlife Refuge." There was no jury confusion with respect to the Court's instructions.

## C.

Finally, Higgs claims trial counsel were ineffective for failing to object to Vandergraft's testimony and the jury instruction, and for failing to move for judgment of acquittal pursuant to Fed.R.Crim.P. 29. He also claims that appellate counsel were ineffective for failing to challenge the jury instruction.

Higgs must show both that (1) his attorney's performance fell below an objective standard of reasonableness and (2) there is a reasonable probability that he was prejudiced by that performance. Strickland, 466 U.S. at 687, 104 S.Ct. 2052. Where an objection would have been futile, counsel is not constitutionally ineffective for failing to make such an objection. See Harris, 204 F.3d at 683. Since any objection to Vandergraft's testimony or the Court's instruction on jurisdiction would have been futile, it follows that Higgs' counsel-trial and appellate-were not constitutionally ineffective.

## Claim 21: Government's Failure to Provide All Park Police and FBI Witness Statements and Reports

Higgs contends that, in violation of his Fifth Amendment due process rights, the Government withheld evidence in the form of witness statements and reports collected by the Park Police and FBI. While he concedes that he is not making any "specific allegation that the Government failed to disclose particular law enforcement reports or witness statements," he suggests that somewhere there may be some undisclosed documents that would have materially affected his guilt and mitigated his punishment. He warns

against prosecutors who "tack too close to the wind" by disclosing less material evidence than required. Kyles, 514 U.S. at 439, 115 S.Ct. 1555 (finding that prudent prosecutors who are uncertain regarding how much evidence*551 to disclose should disclose more information rather than less). He therefore requests that the Court order the Government to review its evidence for any relevant documents that might have been Brady or Giglio in nature, but which were not disclosed.[FN40]

> FN40. Higgs states that at a later time he will move for discovery of all witness statements and reports generated during the investigation of these murders.

## A.

Higgs is procedurally barred from litigating this issue since it was not preserved at trial or raised on direct appeal. See Massaro, 538 U.S. at 504, 123 S.Ct. 1690. Again, while Higgs may bypass procedural default upon a showing of either actual innocence or cause and prejudice, he has failed to demonstrate either. See Bousley v. United States, 523 U.S. 614, 622, 118 S.Ct. 1604, 140 L.Ed.2d 828 (1998).

## B.

[58] Higgs' argument is devoid of merit. Under Brady, the Government is only required to disclose evidence that would be "material" to the defense. 373 U.S. at 87, 83 S.Ct. 1194. The Supreme Court has defined as material evidence that would create a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." United States v. Bagley, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). Here Higgs offers absolutely no facts, not even a slight suspicion, that the Government failed to turn over material evidence.

[59] As the Government correctly notes, a petitioner making § 2255 claims must set forth specific facts in support of each ground of relief asserted. See Blackledge v. Allison, 431 U.S. 63, 74, 97 S.Ct. 1621, 52 L.Ed.2d 136

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

(1977) (holding that a habeas petitioner must make specific allegations; "conclusory allegations unsupported by specifics," or "contentions that in the face of the record are wholly incredible" will not entitle one to discovery or a hearing); *see also Taylor v. United States,* 287 F.3d 658, 661 (7th Cir.2002) (finding that a mere impression of what happened, rather than specific allegations, does not satisfy the requirements for a collateral attack).

The "belief" of Higgs' habeas attorneys that trial counsel may not have been furnished with all exculpatory evidence that was available and their supposition that an error may have occurred finds no anchor in fact or law. Absent facts tending to show that relevant information was not turned over, the Court cannot possibly conclude that undisclosed "evidence" may have been material to his defense or that he was prejudiced as a result of the withholding.

### Claim 22: Cumulative Errors

Nearing the finish, Higgs argues that the cumulative effect of counsels' errors, as well as the alleged prosecutorial and Court errors, marred the fairness of his trial and sentencing proceedings. As a result, he says, his conviction and sentence should be overturned or, alternatively, that his sentence should be vacated. The Court rejects this claim.

In the first place, the Court has found no errors of counsel, the prosecution, or the Court in this case.

But the cumulative error argument itself is not recognized in this Circuit.

As for ineffective assistance of counsel claims, the Fourth Circuit has emphasized that it evaluates such claims on an individual rather than cumulative basis. *Compare* **\*552** *Fisher v. Angelone,* 163 F.3d 835, 852 (4th Cir.1998) (finding that "ineffective assistance of counsel claims, like claims of trial court error, must be reviewed individually, rather than collectively"), *with Kubat v. Thieret,* 867 F.2d 351, 370 (7th Cir.1989) (finding the consideration of combined errors to be appropriate). The same goes for alleged cumulative errors of the trial court. *See Arnold v.*

*Evatt,* 113 F.3d 1352, 1364 (4th Cir.1997) (rejecting a claim of cumulative effect of trial court's errors based on rejection of each of the individual court error claims), *cert. denied,* 522 U.S. 1058, 118 S.Ct. 715, 139 L.Ed.2d 655 (1998); *Mohr v. United States,* No. 03-2893, 2007 WL 2903235, at *10 (D.Md. Sept. 30, 2007) (holding that once the court found no attorney error, there could be no cumulative error); *Robinson v. Conroy,* No. 01-1671, 2002 WL 32785545, at *4 (D.Md. Jan. 16, 2002) ("Because none of the issues raised by Robinson could be considered error, he cannot string them together in hopes of forming a constitutional violation.") Here, because Higgs has failed to prove individual constitutional errors by counsel, his claim of cumulative error would fail, even if the law of this Circuit recognized the cumulative error argument. *See Fisher,* 163 F.3d at 852 ("Having just determined that none of counsel's actions could be considered constitutional error ... it would be odd ... to conclude that those same actions, when considered collectively, deprived [the defendant] of a fair trial."). The same goes for alleged cumulative errors of the Court.

The Supreme Court cases Higgs cites do not require a contrary conclusion. In *Kyles v. Whitley,* 514 U.S. 419, 436-37, 441, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995), the Court held that, on habeas review, when evaluating whether the evidence is material in violation of *Brady v. Maryland,* suppressed evidence should be considered cumulatively. But the materiality of suppressed evidence is not the issue here. Moreover, in *Taylor v. Kentucky,* 436 U.S. 478, 487-88, 98 S.Ct. 1930, 56 L.Ed.2d 468 (1978), the Court found reversible error on a *direct appeal* based on the cumulative effect of trial court and prosecutorial errors that might otherwise be individually harmless. *See also United States v. Martinez,* 277 F.3d 517, 532-33 (4th Cir.2002) (recognizing that under "cumulative error doctrine," defendant could establish reversible error on direct appeal through the combined effect of otherwise harmless errors). *Taylor* and *Martinez* are therefore distinguishable. Higgs' has already exhausted his direct appeals and is now seeking collateral relief. But, as noted, in the context of collateral relief the Fourth Circuit has clearly stated that individual constitutional errors must exist before a court can consider cumulative relief. *Fisher,* 163 F.3d at 852; *see also Greene v. Hoke,* No. 08-294, 2009 WL 774491, at *6 (S.D.W.Va. Mar. 20, 2009) (adopting magistrate judge's holding that petitioner was not entitled to cumulative relief where petitioner failed to

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

establish individual errors committed by either trial court or counsel); *Aldridge v. Ballard,* No. 05-827, 2009 WL 772933, at *6 (S.D.W.Va. Mar. 18, 2009) (confirming magistrate judge's finding that cumulative error cannot be found where there are "no error[s] of federal law, constitutional or otherwise"). Higgs' claim of cumulative error in this habeas proceeding is without merit.

### Claim 23: Request for Evidentiary Hearing

[60] Higgs argues that because he has alleged a multitude of facts supportive of his request for relief, he is entitled to an opportunity to prove them in an evidentiary hearing. The Court thinks not. A court may grant a motion for an evidentiary hearing when the defendant has pled facts that, if established, entitle him to relief, and there is a material dispute regarding*553 those facts. *See Townsend v. Sain,* 372 U.S. 293, 312, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963), *overruled on other grounds by* 504 U.S. 1, 112 S.Ct. 1715, 118 L.Ed.2d 318 (1992) (holding that a federal court has the power to try facts anew if the petitioner "alleges facts, which if proved, would entitle him to relief"). Higgs acknowledges the wide discretion vested in courts during § 2255 proceedings in respect of matters involving disputed material facts. However, as the Government correctly argues, most of Higgs' claims "suffer from some procedural flaw that should prove fatal" and those that survive procedural challenge do not allege any facts which are "either potentially credible or, if taken as true, would merit relief." *See Engelen v. United States,* 68 F.3d 238, 240 (8th Cir.1995) (holding that a habeas "petition can be dismissed without a hearing if (1) the petitioner's allegations, accepted as true, would not entitle the petitioner to relief, or (2) the allegations cannot be accepted as true because they are contradicted by the record, inherently incredible, or conclusions rather than statements of fact"). The Court finds no reason to hold an evidentiary hearing and the request for such a hearing is denied.

### Claim 24: Juror Misconduct

Higgs contends that his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments were violated based on juror misconduct during trial.

He argues that this misconduct included, but was not limited to, improper consideration of matters extraneous to the trial, improper exposure to publicity and community sentiment, improper exposure to witnesses and others who claimed to have knowledge or opinions about Higgs and the case, false or misleading responses of jurors on the voir dire, improper biases which infected the jury's deliberations, improper exposure to the prejudicial opinions of third parties, improper communications with third parties and/or the trial judge, and improper prejudging of the guilt/innocence and penalty phases of Higgs' trial. Higgs also argues that his rights to a fair trial and due process were violated when the jury was not sequestered to avoid contact with the public. He claims that trial and appellate counsel were ineffective for failing to raise these issues. He asks for leave to interview jurors to prove the basis for these claims, arguing that his request is justified by the need for heightened standards for reliability in death penalty cases.

#### A.

These juror misconduct claims are procedurally defaulted. As Higgs concedes, until now he has never argued that juror misconduct violated his Fifth, Sixth, Eighth, and Fourteenth Amendment rights. He has shown neither cause nor prejudice to excuse the default.

#### B.

[61] Nor is the claim valid on the merits. While due process requires that a jury consider only the evidence developed before it at trial, and not information received from outside sources, *see Davis v. Zahradnick,* 432 F.Supp. 444, 447 (W.D.Va.), *aff'd en banc on other grounds,* 601 F.2d 153 (4th Cir.1979), and 646 F.2d 123 (4th Cir.1981), Higgs alleges no specific incident to support his assertion that there was juror misconduct, sending up trial balloons of unsupported claims of misconduct. Given this lack of specificity, including a total failure to demonstrate how the lack of a sequestration order prejudiced him, there is no basis to grant him relief or discovery. *See Taylor v. United States,* 287 F.3d 658, 661 (7th Cir.2002) ( "[A § 2255] motion 'shall specify all the *554 grounds for relief which are available to the movant and of which he has or, by the exercise of

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

reasonable diligence, should have knowledge and shall set forth in summary form the facts supporting each of the grounds thus specified.' ").

Higgs would apparently have the Court find that, because of the severity and irreversibility of the death penalty, the Eighth Amendment requires a heightened standard for determining that death is the appropriate punishment, and for that reason it should permit him to conduct juror interviews. This theory finds no support in the law. While courts have surely required a heightened standard for determining that death is the appropriate punishment for certain crimes, *see Woodson v. North Carolina*, 428 U.S. 280, 305, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976), no authority supports the proposition that juror interviews may be undertaken post-trial in death-penalty cases in a hunt for facts that might demonstrate juror misconduct.

Higgs argues that, under the American Bar Association Guidelines, "it is clear that, *where permitted*, post-conviction counsel have a duty to interview jurors." ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, 10.15.1, commentary, pg. 123 (rev. ed.2003) (emphasis added). For good reason, however, post-trial interviews of jurors are highly restricted in this District pursuant to Local Rule 107.16, which states, "[u]nless *permitted* by the presiding judge, no attorney or party shall directly or through an agent interview or question any juror, alternate juror, or prospective juror, with respect to that juror's service." L.R. 107.16 (emphasis added). This District takes the position that jurors should not have to account to interested parties, especially those who may be disposed to challenge the verdict and press the jurors to explain how and why they decided as they did. The Court, finding that the underlying claim is factually baseless, denied the request to interview jurors once before; it has no reason to modify its decision at this time.

## C.

While Higgs submits that trial and appellate counsel's failure to litigate these issues violated his Sixth Amendment right to effective counsel, he has not and cannot show that counsel's performance fell below an objective standard of reasonableness or that a reasonable

probability exists that he was prejudiced by their allegedly deficient performance. *See Strickland*, 466 U.S. at 687, 104 S.Ct. 2052. Because the underlying claims would have failed, counsel's decision not to litigate the issues in the trial court or raise them on direct appeal did not amount to ineffective assistance.

## Claim 25: Lethal Injection as Cruel and Unusual Punishment

Higgs' final argument is that execution by lethal injection, which he faces in Maryland, violates the Eighth Amendment prohibition against cruel and unusual punishment, and that both the U.S. Government Execution Protocol and the Maryland Execution Protocol exceed their respective statutory authorities.

### A.

With respect to the Eighth Amendment argument, Higgs argues that the potentially insufficient administration of the anesthetizing agent during the execution process, combined with the administration of a muscle paralyzing agent, may lead him to suffer an agonizing death without the ability to communicate any consciousness or feeling. He further argues that the procedures used to administer the lethal injection, including the lack of expertise of the personnel performing the procedure, substantially*555 increase the risk of painful death.

### 1.

[62] This claim is not yet ripe for review because the instant Petition and appeals from it remain and Higgs has not yet been given an execution date. U.S. Const. art. III, § 2; *see Kennedy v. Block*, 784 F.2d 1220, 1222 (4th Cir.1986). Moreover, litigation may modify the Maryland Protocol prior to Higgs' actual execution. Accordingly, there is no "direct and immediate dilemma for the parties" that compels judicial resolution of the issue at this time. *See New Mexicans for Bill Richardson v. Gonzales*, 64 F.3d 1495, 1500 (10th Cir.1995).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

This claim also fails because it is improperly brought as a § 2255 claim. Under § 2255, federal courts have jurisdiction to consider errors leading to a criminal conviction and those committed at sentencing, but they do not have the jurisdiction to determine the legality of the rules for implementing that judgment. *United States v. Addonizio*, 442 U.S. 178, 185, 99 S.Ct. 2235, 60 L.Ed.2d 805 (1979). Higgs is not contesting the validity of his conviction or sentence; he only attacks the method of imposing his sentence. Such a challenge, when timely, would properly be brought pursuant to 28 U.S.C. § 2241, *United States v. Little*, 392 F.3d 671, 679 (4th Cir.2004).

**2.**

Even if the present claim were properly before the Court, it is of highly doubtful prospect. The Supreme Court has decided that capital punishment is constitutional, *Gregg v. Georgia*, 428 U.S. 153, 177, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), and, since Higgs' trial, that the three-drug protocol for execution used by the Federal Government and the State of Maryland does not constitute cruel and unusual punishment. *Baze v. Rees*, 553 U.S. 35, 128 S.Ct. 1520, 1532-34, 170 L.Ed.2d 420 (2008). As explained in *Baze*, to prevail on an Eighth Amendment claim, a defendant must show that there is a " 'substantial risk of serious harm,' an 'objectively intolerable risk of harm' that prevents prison officials from pleading that they were 'subjectively blameless for purposes of the Eighth Amendment.' " *Id.* at 1531 (citing *Farmer v. Brennan*, 511 U.S. 825, 842, 846, and n. 9, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)). Although the risk of future harm can qualify as cruel and unusual punishment, the Constitution "does not demand the avoidance of all risk of pain in carrying out executions." *Baze*, 128 S.Ct. at 1529, 1530.

Referring specifically to the three-drug protocol, the Supreme Court observed that "it is difficult to regard a practice as 'objectively intolerable' when it is in fact widely tolerated." *Baze*, 128 S.Ct. at 1532 (recognizing that thirty-six states that sanction capital punishment have adopted lethal injection as the means and that thirty of those states as well as the Federal Government use the same three-drug protocol).

to speculative dangers, such as the possibility that the drug will not achieve its intended effect or that human error may occur during administration of the procedure. *Baze*, 128 S.Ct. at 1533-34. It held that the potential of the execution to cause pain due to an accident, without the suggestion of malevolence, "does not establish the sort of 'objectively intolerable risk of harm' that qualifies as cruel and unusual." *Id.* at 1531; *see also Walker v. Johnson*, 448 F.Supp.2d 719, 723 (E.D.Va.2006) (citing *Louisiana ex rel. Francis v. Resweber*, 329 U.S. 459, 464, 67 S.Ct. 374, 91 L.Ed. 422 (1947) (holding that the possibility of an accident in the process of execution cannot constitute substantial *556 risk of harm)). Thus, although definitive resolution of the issue must await imminent application of the challenged procedure, the Government and Maryland Execution Protocols do not appear to present an Eighth Amendment problem. *See Baze*, 128 S.Ct. at 1532-34.

**B.**

Higgs also argues that the U.S. Government Execution Protocol is not statutorily authorized. He reasons thus: Pursuant to 18 U.S.C. § 3596(a), a death sentence should be implemented "in the manner prescribed by the law of the State in which the sentence is imposed." 18 U.S.C. § 3596(a) (2006). The Department of Justice has violated this provision by delegating to the Director of the Bureau of Prisons responsibility for promulgating the Bureau's own Protocol for the execution of federal prisoners, *see* 28 C.F.R. § 26.3(a)(4), instead of following procedures prescribed by Maryland law. Indeed, says Higgs, Congress specifically rejected an amendment to 18 U.S.C. § 3596(a) that would have authorized the Attorney General to prescribe a uniform method of execution for federal prisoners. *See* H.R. Rep. 104-879 at 204 (1997). Higgs suggests that the Government Protocol is a "rule" that should have been, but was not subject to the notice and comment provisions of the Administrative Procedure Act. *See* 5 U.S.C. § 553 (2006).

As with the challenge to the method of execution, this claim is improperly raised in a § 2255 action and should, when timely, be brought under 28 U.S.C. § 2241. *See United States v. Little*, 392 F.3d 671, 679 (4th Cir.2004).[FN41]

The Supreme Court explicitly rejected Higgs' argument as

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

FN41. Whether a *Bivens* action or a federal civil rights claim pursuant to 42 U.S.C. § 1983 are alternative avenues of challenge, is not before the Court. *See Bivens v. Six Unknown Fed. Narcotics Agents,* 403 U.S. 388, 397, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971); *Hill v. McDonough,* 547 U.S. 573, 580, 126 S.Ct. 2096, 165 L.Ed.2d 44 (2006).

Here too, the challenge to the Government would ultimately seem to be weak on the merits. Article 18 U.S.C. § 3596 requires that execution be implemented in the "manner prescribed by the law of the State in which the sentence is imposed." 18 U.S.C. § 3596(a) (2006). Significantly, the statute only speaks to the "manner" of implementing the sentence without reference to "procedure." The *manner* of execution authorized by Maryland law is lethal injection. Md.Code Ann., Correctional Services, § 3-905. Because lethal injection has been deemed permissible, *see Baze,* 128 S.Ct. at 1532-34, the Government appears to be in compliance with the authorizing statute.

### C.

Higgs' final contention is that the Maryland Protocol, which he says should be implemented in place of the Government Protocol pursuant to 18 U.S.C. § 3596(a), goes beyond what the underlying Maryland statute, Md. Corr. Serv. section 3-905, authorizes. But again he travels beyond the bounds of a proper federal *habeas* petition, which does not extend to claims that state rules violate state statutes. *See* 28 U.S.C. § 2255(a) (2006) (a petitioner in a *habeas corpus* proceeding must allege that "his sentence was imposed in violation of the Constitution or laws of the United States"); *see also Carrizales v. Wainwright,* 699 F.2d 1053, 1055 (11th Cir.1983) (citing *Bronstein v. Wainwright,* 646 F.2d 1048, 1050 (5th Cir.1981) (holding a state's interpretation of its rules provides no basis for federal *habeas corpus* relief because no constitutional question is involved)). Accordingly, Higgs challenge to the Maryland Protocol is also rejected.

**\*557 CONCLUSION**

Having considered Higgs' various challenges to his conviction and sentence and finding merit in none of them, the Court **DENIES** his Motion for Relief, as well as his Motion for Discovery.

A separate Order will issue.

### *FINAL ORDER OF JUDGMENT*

For the reasons set forth in the accompanying Opinion, it is, this 6th day of April, 2010,

**ORDERED**

1. The Government's Motion to Strike Procedurally Defective Claims [Paper No. 519] is **DENIED;**

2. Petitioner Higgs' Motion for Discovery [Paper No. 509] is **DENIED;**

3. Petitioner Higgs' Motion for Relief Pursuant to 28 U.S.C. § 2255 or in the Alternative Pursuant to 28 U.S.C. § 2241 [Paper No. 492] is **DENIED;**

4. Final Judgment is **ENTERED** in favor of the Government and against Petitioner Higgs; and

5. The Clerk of the Court is directed to **CLOSE** the case.

D.Md.,2010.
Higgs v. U.S.
711 F.Supp.2d 479

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

663 F.3d 726

(Cite as: 663 F.3d 726)

H

United States Court of Appeals,

Fourth Circuit.
UNITED STATES of America,
Plaintiff–Appellee,
v.
Dustin John HIGGS, Defendant–Appellant.
No. 10–7.

Argued: Sept. 21, 2011.
Decided: Nov. 23, 2011.

**Background:** Defendant was convicted in the United States District Court for the District of Maryland, Peter J. Messitte, Senior District Judge, of first-degree premeditated murder, first-degree murder committed in the perpetration or attempted perpetration of a kidnapping, and kidnapping resulting in death, and was sentenced to death. Defendant appealed. The Court of Appeals, 353 F.3d 281, affirmed. Defendant moved for new trial. The District Court denied motion. Defendant appealed. The Court of Appeals, 95 Fed.Appx. 37, affirmed. Defendant filed motion to vacate. The District Court, Messitte, Senior District Judge, 711 F.Supp.2d 479, denied motion. Defendant appealed.

**Holdings:** The Court of Appeals, Traxler, Chief Judge, held that:

(1) government was not required, under *Brady*,

to disclose two internal reports concerning validity of comparative bullet lead analysis (CBLA) evidence;

(2) defense counsel's handling of CBLA evidence did not rise to level of constitutionally deficient performance supporting claim of ineffective assistance of counsel;

(3) government's failure to produce CBLA reports, assuming it was required to do so, did not violate defendant's due process rights;

(4) defense counsel's handling of CBLA issue, even if deficient, did not result in prejudice required to establish ineffective assistance of counsel;

(5) defense counsel's failure to file motion for new trial based on post-trial CBLA studies did not establish constitutionally deficient performance; and

(6) defense counsel's failure to file motion for new trial based on post-trial CBLA studies did not prejudice defendant.

Affirmed.

West Headnotes

**[1] Constitutional Law 92 ☞4594(1)**

92 Constitutional Law

    92XXVII Due Process
        92XXVII(H) Criminal Law
            92XXVII(H)4 Proceedings and Trial
                92k4592 Disclosure and Discovery

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

663 F.3d 726

(Cite as: 663 F.3d 726)

92k4594 Evidence
92k4594(1) k. In general.
Most Cited Cases

Under the Due Process Clause, the prosecution is required to disclose evidence favorable to an accused upon request where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution. U.S.C.A. Const.Amend. 6.

**[2] Criminal Law 110 ⟜1991**

110 Criminal Law

110XXXI Counsel
110XXXI(D) Duties and Obligations of Prosecuting Attorneys
110XXXI(D)2 Disclosure of Information
110k1991 k. Constitutional obligations regarding disclosure. Most Cited Cases

To prevail on *Brady* disclosure claim, defendant must demonstrate (1) that evidence is favorable, either because it is exculpatory or impeaching, (2) that the government suppressed the evidence, and (3) that the evidence was material to the defense. U.S.C.A. Const.Amend. 6.

**[3] Criminal Law 110 ⟜1991**

110 Criminal Law

110XXXI Counsel
110XXXI(D) Duties and Obligations of Prosecuting Attorneys
110XXXI(D)2 Disclosure of Information
110k1991 k. Constitutional obligations regarding disclosure. Most Cited Cases

Government's *Brady* duty to disclose favorable evidence to defendant does not require government to make available all evidence in its possession or within its reach. U.S.C.A. Const.Amend. 6.

**[4] Criminal Law 110 ⟜2008**

110 Criminal Law

110XXXI Counsel
110XXXI(D) Duties and Obligations of Prosecuting Attorneys
110XXXI(D)2 Disclosure of Information
110k2008 k. Sanctions for failure to disclose. Most Cited Cases

Mere suppression of favorable evidence does not entitle defendant to relief based on violation of government's *Brady* disclosure obligation. U.S.C.A. Const.Amend. 6.

**[5] Criminal Law 110 ⟜1995**

110 Criminal Law

110XXXI Counsel
110XXXI(D) Duties and Obligations of Prosecuting Attorneys
110XXXI(D)2 Disclosure of Information

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

663 F.3d 726

(Cite as: 663 F.3d 726)

110k1993 Particular Types of Information Subject to Disclosure

110k1995 k. Diligence on part of accused; availability of information. Most Cited Cases

There is no *Brady* violation, due to government's failure to disclose evidence favorable to defendant, if the evidence is available to the defense from other sources or the defense already possesses the evidence. U.S.C.A. Const.Amend. 6.

**[6] Criminal Law 110 ⟝1992**

110 Criminal Law

110XXXI Counsel

110XXXI(D) Duties and Obligations of Prosecuting Attorneys

110XXXI(D)2 Disclosure of Information

110k1992 k. Materiality and probable effect of information in general. Most Cited Cases

No real violation of government's *Brady* disclosure obligation occurs unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict. U.S.C.A. Const.Amend. 6.

**[7] Criminal Law 110 ⟝1992**

110 Criminal Law

110XXXI Counsel

110XXXI(D) Duties and Obligations of Prosecuting Attorneys

110XXXI(D)2 Disclosure of Information

110k1992 k. Materiality and probable effect of information in general. Most Cited Cases

A "reasonable probability" of a different result is shown, as required for relief due to violation of government's *Brady* disclosure obligation, when government's evidentiary suppression undermines confidence in the outcome of the trial. U.S.C.A. Const.Amend. 6.

**[8] Criminal Law 110 ⟝1881**

110 Criminal Law

110XXXI Counsel

110XXXI(C) Adequacy of Representation

110XXXI(C)1 In General

110k1879 Standard of Effective Assistance in General

110k1881 k. Deficient representation and prejudice in general. Most Cited Cases

To succeed on a Sixth Amendment claim of ineffective assistance of counsel, defendant must demonstrate that defense counsel's performance fell below an objective standard of reasonableness measured by prevailing professional norms, and that counsel's deficient performance prejudiced his defense. U.S.C.A. Const.Amend. 6.

**[9] Criminal Law 110 ⟝1883**

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

663 F.3d 726

(Cite as: 663 F.3d 726)

110 Criminal Law

110XXXI Counsel
110XXXI(C) Adequacy of Representation
110XXXI(C)1 In General
110k1879 Standard of Effective Assistance in General
110k1883 k. Prejudice in general. Most Cited Cases

To establish prejudice prong of claim of ineffective assistance of counsel, defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different, or that counsel's errors were so serious as to deprive defendant of a fair trial, meaning a trial the result of which is reliable. U.S.C.A. Const.Amend. 6.

**[10] Criminal Law 110 ⟜2001**

110 Criminal Law

110XXXI Counsel
110XXXI(D) Duties and Obligations of Prosecuting Attorneys
110XXXI(D)2 Disclosure of Information
110k1993 Particular Types of Information Subject to Disclosure
110k2001 k. Other particular issues. Most Cited Cases

Government had no *Brady* obligation to disclose two internal FBI reports concerning validity of comparative bullet lead analysis (CBLA) evidence in existence at time of capital murder trial; reports represented early attempts by FBI to quantify conclusions that could be drawn from lead analysis to counter criticisms then in existence and ultimately did little more than advise FBI that further study was warranted, and criticisms of CBLA were available to trial counsel prior to trial. U.S.C.A. Const.Amend. 6; 18 U.S.C.A. §§ 1111(a), 1201(a)(2).

**[11] Criminal Law 110 ⟜1931**

110 Criminal Law

110XXXI Counsel
110XXXI(C) Adequacy of Representation
110XXXI(C)2 Particular Cases and Issues
110k1921 Introduction of and Objections to Evidence at Trial
110k1931 k. Experts; opinion testimony. Most Cited Cases

Defense counsel's handling of comparative bullet lead analysis (CBLA) evidence during capital murder trial did not rise to level of constitutionally deficient performance supporting claim of ineffective assistance of counsel, even though counsel did not ferret out two preliminary studies that were then available or present defense expert armed with same information; defense counsel conducted thorough and effective cross-examination of government's expert, demonstrating that they were well acquainted with criticisms of CBLA evidence, and went a long way toward impeaching uniqueness and homogeneity of lead

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

663 F.3d 726

(Cite as: 663 F.3d 726)

melts, as well as overall probative value of CBLA evidence, without unduly calling attention to evidence or making it appear to be of more importance than was warranted. U.S.C.A. Const.Amend. 6; 18 U.S.C.A. §§ 1111(a), 1201(a)(2).

**[12] Criminal Law 110 ⟊1870**

110 Criminal Law

    110XXXI Counsel
        110XXXI(C) Adequacy of Representation
        110XXXI(C)1 In General
            110k1870 k. In general. Most Cited Cases

When considering a claim of deficient performance as part of claim alleging ineffective assistance of counsel, court must evaluate the conduct from counsel's perspective at the time. U.S.C.A. Const.Amend. 6.

**[13] Criminal Law 110 ⟊1871**

110 Criminal Law

    110XXXI Counsel
        110XXXI(C) Adequacy of Representation
        110XXXI(C)1 In General
            110k1871 k. Presumptions and burden of proof in general. Most Cited Cases

In deciding whether counsel who allegedly provided ineffective assistance of counsel rendered constitutionally deficient performance, court indulges a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance and that, under the circumstances, the challenged action might be considered sound trial strategy. U.S.C.A. Const.Amend. 6.

**[14] Criminal Law 110 ⟊1882**

110 Criminal Law

    110XXXI Counsel
        110XXXI(C) Adequacy of Representation
        110XXXI(C)1 In General
            110k1879 Standard of Effective Assistance in General
                110k1882 k. Deficient representation in general. Most Cited Cases

In addressing deficient performance prong of claim of ineffective assistance of counsel, question is whether attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom. U.S.C.A. Const.Amend. 6.

**[15] Constitutional Law 92 ⟊4594(3)**

92 Constitutional Law

    92XXVII Due Process
        92XXVII(H) Criminal Law
        92XXVII(H)4 Proceedings and Trial
            92k4592 Disclosure and Discovery
            92k4594 Evidence
                92k4594(2) Particular Items or Information, Disclosure of

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

663 F.3d 726

(Cite as: 663 F.3d 726)

92k4594(3) k. In general. Most Cited Cases
**Criminal Law 110 ☞1931**

110 Criminal Law

110XXXI Counsel
110XXXI(C) Adequacy of Representation
110XXXI(C)2 Particular Cases and Issues
110k1921 Introduction of and Objections to Evidence at Trial
110k1931 k. Experts; opinion testimony. Most Cited Cases
**Criminal Law 110 ☞2001**

110 Criminal Law

110XXXI Counsel
110XXXI(D) Duties and Obligations of Prosecuting Attorneys
110XXXI(D)2 Disclosure of Information
110k1993 Particular Types of Information Subject to Disclosure
110k2001 k. Other particular issues. Most Cited Cases

Evidence other than comparative bullet lead analysis (CBLA) evidence enabled government's introduction of evidence of capital murder defendant's involvement in other shootings, and therefore neither government's failure to produce two internal reports raising questions about CBLA evidence, assuming it had *Brady* obligation to do so, nor counsel's alleged deficient performance in failing to obtain exclusion of CBLA evidence or further challenge it caused defendant prejudice required to establish either *Brady* due process violation or ineffective assistance of counsel under theory that, had CBLA evidence been excluded or discredited, other acts evidence would not have been admitted. U.S.C.A. Const.Amend. 6; 18 U.S.C.A. §§ 1111(a), 1201(a)(2); Fed.Rules Evid.Rule 404(b), 28 U.S.C.A.

**[16] Constitutional Law 92 ☞4594(3)**

92 Constitutional Law

92XXVII Due Process
92XXVII(H) Criminal Law
92XXVII(H)4 Proceedings and Trial
92k4592 Disclosure and Discovery
92k4594 Evidence
92k4594(2) Particular Items or Information, Disclosure of
92k4594(3) k. In general. Most Cited Cases
**Constitutional Law 92 ☞4745**

92 Constitutional Law

92XXVII Due Process
92XXVII(H) Criminal Law
92XXVII(H)6 Judgment and Sentence
92k4741 Capital Punishment; Death Penalty
92k4745 k. Proceedings. Most Cited Cases
**Criminal Law 110 ☞2001**

110 Criminal Law

663 F.3d 726

(Cite as: 663 F.3d 726)

110XXXI Counsel

110XXXI(D) Duties and Obligations of Prosecuting Attorneys

110XXXI(D)2 Disclosure of Information

110k1993 Particular Types of Information Subject to Disclosure

110k2001 k. Other particular issues. Most Cited Cases

There was no reasonable probability that trial court would have excluded comparative bullet lead analysis (CBLA) evidence had exclusion been sought, or that result in either guilt or penalty phase of capital murder trial would have been different had such evidence been excluded or further challenged, given the overwhelming evidence of guilt and defendant's predominant role in kidnappings and murders of three women, and therefore, assuming that government had *Brady* obligation to produce two internal reports raising issues about CBLA evidence, its failure to do so did not establish due process violation. U.S.C.A. Const.Amend. 6; 18 U.S.C.A. §§ 1111(a), 1201(a)(2).

**[17] Criminal Law 110 ⊜1931**

110 Criminal Law

110XXXI Counsel

110XXXI(C) Adequacy of Representation

110XXXI(C)2 Particular Cases and Issues

110k1921 Introduction of and Objections to Evidence at Trial

110k1931 k. Experts; opinion testimony. Most Cited Cases
**Criminal Law 110 ⊜1961**

110 Criminal Law

110XXXI Counsel

110XXXI(C) Adequacy of Representation

110XXXI(C)2 Particular Cases and Issues

110k1958 Death Penalty

110k1961 k. Presentation of evidence in sentencing phase. Most Cited Cases

No reasonable probability existed that district court would have excluded comparative bullet lead analysis (CBLA) evidence had exclusion been sought in capital murder trial, or that outcome of either guilt or penalty phase of trial would have been different had such evidence been excluded or expert testimony concerning that evidence been subjected to additional cross-examination, given overwhelming evidence of defendant's guilt and his predominant role in kidnappings and murders of three women, and therefore defense counsel's performance with respect to CBLA evidence, even if deficient, did not prejudice defendant, as required to establish ineffective assistance of counsel. U.S.C.A. Const.Amend. 6; 18 U.S.C.A. §§ 1111(a), 1201(a)(2).

**[18] Criminal Law 110 ⊜1965**

110 Criminal Law

110XXXI Counsel

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

663 F.3d 726

(Cite as: 663 F.3d 726)

110XXXI(C) Adequacy of Representation

110XXXI(C)2 Particular Cases and Issues

110k1965 k. New trial motion. Most Cited Cases

Defense counsel's failure to file motion for new trial in capital murder case based on post-trial studies regarding comparative bullet lead analysis (CBLA) evidence was not constitutionally deficient, as required to establish ineffective assistance of counsel; post-trial studies were largely cumulative of criticisms of CBLA evidence known at time of trial and were at best impeachment evidence, and CBLA evidence played minor role during trial. U.S.C.A. Const.Amend. 6; 18 U.S.C.A. §§ 1111(a), 1201(a)(2); Fed.Rules Cr.Proc.Rule 33, 18 U.S.C.A.

**[19] Criminal Law 110 ⬅938(1)**

110 Criminal Law

110XXI Motions for New Trial
110k937 Newly Discovered Evidence
110k938 In General
110k938(1) k. In general. Most Cited Cases

To receive a new trial based on newly discovered evidence, defendant must show (1) that the evidence is newly discovered, (2) that he has been diligent in uncovering it, (3) that the evidence is not merely cumulative or impeaching, (4) that the evidence is material to the issues involved, and (5) that the evidence would probably produce an acquittal. Fed.Rules Cr.Proc.Rule 33, 18 U.S.C.A.

**[20] Criminal Law 110 ⬅1965**

110 Criminal Law

110XXXI Counsel
110XXXI(C) Adequacy of Representation
110XXXI(C)2 Particular Cases and Issues
110k1965 k. New trial motion. Most Cited Cases

Defense counsel's failure to file motion for new trial in capital murder case based on post-trial studies regarding comparative bullet lead analysis (CBLA) evidence did not prejudice defendant, as required to establish ineffective assistance of counsel, given overwhelming evidence of defendant's guilt, which precluded reasonable probability that post-trial studies or new trial would have produced different outcome in proceedings. U.S.C.A. Const.Amend. 6; 18 U.S.C.A. §§ 1111(a), 1201(a)(2); Fed.Rules Cr.Proc.Rule 33, 18 U.S.C.A.

**\*729 ARGUED:** Angela Elleman, Federal Community Defender Office, Philadelphia, Pennsylvania, for Appellant. Sandra Wilkinson, Office of the United States Attorney, Baltimore, Maryland, for Appellee. **ON BRIEF:** Leigh Skipper, Chief Federal Defender, Matthew Lawry, Michael Wiseman, Assistant Federal Defenders, Federal Community Defender Office, Philadelphia, Pennsylvania; Stephen H. Sachs, Wilmer Cutler Pickering Hale & Dorr,

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

663 F.3d 726

(Cite as: 663 F.3d 726)

Baltimore, Maryland, for Appellant. Rod J. Rosenstein, United States Attorney, Deborah Johnston, Assistant United States Attorney, Office of the United States Attorney, Baltimore, Maryland, for Appellee.

Before TRAXLER, Chief Judge, and SHEDD and KEENAN, Circuit Judges.

Affirmed by published opinion. Chief Judge TRAXLER wrote the opinion, in which Judge SHEDD and Judge KEENAN joined.

**OPINION**

TRAXLER, Chief Judge:

Petitioner Dustin John Higgs was convicted of three counts each of first-degree premeditated murder, *see* 18 U.S.C. § 1111(a), first-degree murder committed in the perpetration or attempted perpetration of a kidnapping, *see id.,* and kidnapping resulting in death, *see* 18 U.S.C. § 1201(a)(2), arising out of the January 27, 1996, murders of three young women in the Patuxent National Wildlife Refuge. He received nine death sentences. We affirmed his convictions and sentences. *See* *730*United States v. Higgs,* 353 F.3d 281 (4th Cir.2003) (" *Higgs I* "). Higgs also filed a motion for a new trial, which was denied by the district court and affirmed on appeal. *See United States v. Higgs,* 95 Fed.Appx. 37 (4th Cir.2004) (" *Higgs II* ").

Presently before us is Higgs's motion for relief under 28 U.S.C. § 2255, which was denied by the district court. *See Higgs v. United States,* 711 F.Supp.2d 479 (D.Md.2010). We granted a certificate of appealability to consider Higgs's claim that his constitutional rights to due process of law and effective assistance of counsel were violated by the introduction of Comparative Bullet Lead Analysis ("CBLA") evidence at trial. We now affirm.

I.

The facts in this case have been well-documented in the two prior opinions of this court, from which we borrow heavily.

At approximately 4:30 a.m., on January 27, 1996, Tanji Jackson, Tamika Black, and Mishann Chinn were found dead in a roadway in the Patuxent National Wildlife Refuge in Prince George's County, Maryland. Jackson and Black had each been shot once in the chest and once in the back. Chinn had been shot once in the back of her head. A .38 caliber wadcutter bullet was found at the scene. Jackson's day planner was also found, in which she had written Higgs's nickname and telephone number. On a separate page, Jackson had also recorded the notation "13801 'MAZDA' 769GRY," which matched Higgs's address number on Briarwood Drive in Laurel, Maryland, and the license tag number for Higgs's blue Mazda MPV van. *Higgs I,* 353 F.3d at 291 (internal quotation marks omitted). Chinn's mother and a friend of the Jackson family each confirmed that the girls had been picked up for dates the previous evening by a man or men in a blue Mazda MPV van. There were additional witnesses who saw the women at Higgs's apartment complex during the early morning hours of the murders.

On March 21, 1996, Park Police Officers

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

663 F.3d 726

(Cite as: 663 F.3d 726)

interviewed Higgs at his apartment. Higgs admitted that he knew Jackson and that he may have spoken to her on the night before her murder but denied that she had ever been at his apartment and denied knowing where she lived. Higgs claimed that he first heard about the murders on January 27, 1996, while watching the ten o'clock news at the home of his girlfriend, Phyllis Smith, and that he commented to a guest at Smith's home that evening that he thought he knew " 'that Tanji girl.' " *Id.* The names and photographs of the victims, however, had not yet been released. During the search of Higgs's apartment, the police found cash, crack cocaine, a .380 semiautomatic firearm, and ammunition for .380, .45, and .38 caliber weapons. Higgs was arrested on federal drug charges, pled guilty, and was sentenced to seventeen years in prison.

In the fall of 1998, Victor Gloria was arrested on federal drug charges. Gloria admitted to authorities that he was with Higgs and Willis Mark Haynes on the night of the murders and agreed to cooperate with the authorities in the murder prosecutions. At trial, he provided a detailed, eyewitness account of the kidnappings and murders, which we summarized as follows:

On Friday evening, January 26, 1996, Higgs, Willie Mark Haynes and Victor Gloria drove from Higgs's apartment at 13801 Briarwood Drive in Laurel, Maryland, to Washington D.C. to pick up [Jackson, Black, and Chinn]. Higgs knew Jackson and they had arranged dates for Haynes and Gloria with Black and Chinn. They were traveling in Higgs's blue Mazda MPV van. After stopping at a liquor store, the three *731 couples returned to Higgs's apartment to drink alcohol and listen to music. While there, the men also smoked marijuana.

At some point during the early morning hours of January 27, Higgs and Jackson began to argue. Jackson retrieved a knife from the kitchen and Haynes, who had been in the bedroom with Black, heard the commotion and came out to break up the fight. Haynes talked to Jackson and got the knife away from her. However, Jackson was still angry and the three women left the apartment. According to Gloria, as Jackson was walking out, "[s]he stopped at the door and said something like I am going to get you all f——ed up or robbed" or made "some kind of threat." In response, Higgs commented to the other two men that Jackson "do know a lot of n——s." As Higgs was watching the women leave, he saw Jackson stop and appear to write down the license plate number of his van. This angered Higgs, who commented to Haynes and Gloria that Jackson was "writing down [his] sh——." Gloria interpreted Higgs's comments as concern that Jackson intended to retaliate against Higgs.

At that point, "Higgs said f—— that, and grabbed his coat and said come on." He also retrieved a silver .38 caliber firearm from the end table drawer and put it in his pocket. The three men got into Higgs's van, with Higgs driving, Haynes in the front passenger seat, and Gloria sitting behind Higgs. Higgs drove

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

663 F.3d 726

(Cite as: 663 F.3d 726)

the van to where the three women were walking on the side of the road and told Haynes to get them in the vehicle. After Haynes spoke to them, the three women got into the back seat of the vehicle and Higgs started driving towards Washington, D.C. Neighbors in the area heard and saw the three girls laughing and talking around 3:30 that morning.

According to Gloria, while en route to Washington, D.C., Higgs and Haynes leaned towards each other and engaged in a quiet conversation that Gloria could not hear. The women were whispering in the back of the van and apparently believed they were being taken home. Higgs, however, drove past the Baltimore—Washington Parkway exit, which would have taken them directly into Washington, D.C., and instead drove the van into the Patuxent National Wildlife Refuge, a federal property within the jurisdiction of the United States Park Police. Eventually, Higgs pulled over at a secluded location. One of the girls asked if they were trying to "make [them] walk from [t]here," and Higgs responded, "something like that." After the women got out of the van, Higgs pulled out the pistol and handed it to Haynes, who put it behind his back and also exited the van. Within moments, Gloria heard a gunshot and wiped the mist off the back window in time to see Haynes shoot one of the women in the chest. Gloria turned to ask Higgs what he was doing, but saw Higgs holding the steering wheel and watching the shootings from the rearview mirror. Gloria put his head down, heard more shots, and heard a woman screaming.

After firing a few more shots, Haynes got into the van and closed the door. According to Gloria, either Higgs or Haynes then commented that they had to "get rid of the gun," and Higgs drove to the Anacostia River where, according to Gloria, either Higgs or Haynes got out and threw the gun into the water. Higgs then drove back to his apartment where the three men began to clean up. Among other things, they wiped down the patio doors and "everything else, the bathroom, the doorknobs, the stereo," *732 and threw away any items the women might have touched, such as liquor bottles, CDs, and rented videotapes. The men then left the apartment and dropped the trash by a dumpster. Higgs and Haynes dropped Gloria off at a fast food restaurant, where he was told by Higgs to "keep [his] mouth shut."

*Higgs I,* 353 F.3d at 289–90 (footnote and citations omitted).

At trial, Higgs's counsel did not challenge the government's evidence that Higgs knew Jackson prior to the murders, that the women were present at Higgs's apartment complex that evening, or that Haynes was the triggerman. Rather, Higgs's counsel argued that the government had failed to prove that Higgs was a principal in the kidnappings and murders. *See* 18 U.S.C. § 2 ("Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission," or who "willfully causes an act to

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

663 F.3d 726

(Cite as: 663 F.3d 726)

be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal."). In particular, Higgs challenged the government's evidence that he had been in prior possession of a .38 caliber weapon and that he handed the .38 caliber murder weapon to Haynes that night to carry out the murders.[FN1]

> FN1. Higgs and Haynes were jointly indicted for the kidnappings and murders in December 1998. Haynes was convicted of the murders several months before Higgs's trial, but the jury did not recommend the death penalty for Haynes. At Haynes's trial, defense counsel also admitted that Haynes was the triggerman but argued "that Haynes' actions were not truly voluntary because he was effectively controlled by his older, dominant co-defendant, Dustin John Higgs." *Haynes v. United States,* 451 F.Supp.2d 713, 717 (D.Md.2006).

The government presented overwhelming evidence of Higgs's guilt, as well as of his predominant role in the murders. Although Gloria was an important witness for the government, substantial additional testimony and evidence corroborated Gloria's testimony. Of particular note was Jackson's day planner and its references to Higgs's identifying information, which corroborated Gloria's testimony that Higgs commented that Jackson was " 'writing down [his] sh——,' " just after his violent argument with Jackson and just prior to his retrieving his gun and pursuing the women.

*Higgs I,* 353 F.3d at 290 (alteration in original).

In addition, Higgs made a number of incriminating statements after the murders. Phyllis Smith testified that Higgs had her tell the authorities that he was with her at the time of the murders; however, she recanted when she learned that the alibi was for the murders instead of drug charges. Similarly, Ednisia Darby, the mother of Higgs's child, testified that when she asked Higgs about the murders, he made an effort to remind her that they were together at the hospital that evening, which was not true. Darby testified that Higgs later admitted that he was with Haynes when the women were murdered. He also told Darby that Jackson had been invited over to his apartment that night because she had been " 'snitching on one of them,' " and that " 'the other two girls ... were just for his friends.' " *Id.* at 292.

Higgs also discussed matters with Domenick Williams, a fellow inmate and jailhouse lawyer who was housed with Higgs at the D.C. jail between August 1998 and January 1999. When Higgs told Williams that he had refused to cooperate against Haynes in the murder investigation, Williams told Higgs that the authorities would likely offer Haynes the same deal. In response, "Higgs told Williams 'that his youngan would hold up,' and 'that the government wouldn't offer a deal to the trigger man.' " *Id.* at 293 (citation omitted). *733 Williams also related conversations that he had with Higgs about Gloria. Higgs asked Williams what his chances of defeating the murder charges "would be 'if the witness after the fact

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

663 F.3d 726

(Cite as: 663 F.3d 726)

wasn't there.' " *Id.* Williams told Higgs "that 'his chances would be good.' " *Id.* Higgs later told Williams " 'that he wasn't worrying about the [murder] case' " because two of the former inmates at the jail, Melvin Grayson and T, " 'would be out there,' " and " '[t]hat Mel would be out there to handle anything that he needed and that he could rely on him.' " *Id.* (alteration in original). Concerned that a conspiracy to harm Gloria might be in the works and that he might be implicated, Williams reported these conversations to the authorities. Williams also produced letters that Higgs had written to him, which stated "that Higgs had not heard from 'T', but that 'Mel has been in my corner.' " *Id.* Visitation records confirmed that Grayson visited Higgs in the D.C. jail in February and March of 1999.

The government also introduced evidence of a taped telephone conversation between Higgs and Grayson in May 2000. During the conversation, Higgs and Grayson discussed Haynes's conviction for the murders and Higgs told Grayson that the attorney had " 'got[ten] the whole joint twisted.' " *Id.* at 309. When Grayson subsequently read Higgs a newspaper article reporting that Haynes had claimed that he shot the women only because he was afraid of Higgs, Higgs made no response at all. Later, Higgs told Grayson that the lawyers were trying to make it seem like the murders were over something petty. Thus, Higgs made no attempt to refute his involvement in the crimes during his conversation with Grayson and instead implied that the authorities were mistaken about the motive.

As noted above, Gloria testified that either Higgs or Haynes disposed of the murder weapon in a nearby river while en route back to Higgs's apartment. The authorities never found the .38 caliber murder weapon.[FN2] However, the government presented evidence that Higgs was involved in two other shootings during the two-month period leading up to the murders, both of which involved a .38 caliber handgun.

> FN2. During the sentencing phase, portions of Haynes's statements to the authorities were admitted, further corroborating Gloria's account of the events that occurred that evening. Haynes confirmed that Higgs was driving the van that night. In addition, Haynes advised the authorities that he threw the gun in the river.

The first shooting was on November 20, 1995, at the Chaconia Nightclub in Washington, D.C. Wondwossen Kabtamu testified that Higgs got into an argument outside the club, and that Higgs shot out the windows of a vehicle in a drive-by shooting while Kabtamu drove Higgs's Mazda MPV van. Kabtamu threw the gun out of the window shortly afterwards, but Higgs insisted that they return to get it. A .38 caliber bullet was recovered by the police from the vehicle targeted by Higgs. Williams testified that Higgs also discussed the Chaconia shooting with him, and that Higgs said that he could not plead guilty to the Chaconia charge because the authorities would try to use the gun in another case. When Williams learned that Higgs was

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

663 F.3d 726

(Cite as: 663 F.3d 726)

being indicted for the triple murders, "Higgs commented to Williams, " 'you see why I can't plead guilty to that charge?' " " *Id.* at 293.

The second shooting was on December 10, 1995, on Cherry Lane in Laurel, Maryland. This shooting involved both Higgs and Haynes. Rodney Simms testified that Haynes came to his home and began arguing with him. During the argument, Haynes pulled a gun and began shooting *734 at Simms from the front of the house. Higgs came out from a nearby shed and also began shooting. Police recovered 9mm bullet casings from the front of the house, where the eyewitnesses placed Haynes, and a .38 caliber bullet from inside the house. In April 1997, Higgs pled guilty to his involvement in the Cherry Lane shooting. During the plea proceedings, the prosecutor stated that Haynes had fired the 9mm handgun and that Higgs had fired the .38 caliber handgun. Higgs offered no contest to his involvement in the shooting but claimed that he had fired the 9mm handgun and that Haynes had fired the .38 caliber handgun.

Finally, the government presented two categories of forensic evidence to corroborate the eyewitness testimony and crime scene evidence from the murder scene and the two prior shootings. The government presented experts in the area of firearms examination, comparison, and identification, who testified that the .38 caliber bullets recovered from the Chaconia shooting, the Cherry Lane shooting, and the murders all shared the same rifling characteristics. As we previously explained in *Higgs I,*

"lands and grooves" refer to the rifling marks that are "pressed onto a bullet when it travels down a barrel of a firearm." Because "[d]ifferent manufacturers will have different numbers of lands and grooves, different directions of twist, right or left, and different sizes," the marks allow forensic investigators to compare firearms with fired bullets and cartridge cases, and to compare fired bullets and cartridge cases from different crime scenes to one another.

*Id.* (citations omitted, alteration in original). The .38 caliber bullets recovered from the three crime scenes were all fired from a firearm with five lands and grooves with a right twist.

The government also presented CBLA evidence through the testimony of Kathleen Lundy, an examiner with the Elemental Analysis Group of the FBI laboratory. Lundy compared the elemental composition of the .38 caliber bullets recovered from the three crime scenes and from Higgs's apartment. According to Lundy, the lead composition of the .38 caliber bullet recovered from the Chaconia shooting matched the lead composition of eighteen of the .38 caliber bullets found at Higgs's apartment. In addition, the lead composition of the .38 caliber bullet recovered from the Cherry Lane crime scene matched the lead composition of the .38 caliber bullet recovered from the murder scene.

II.

Higgs contends that his due process rights

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

663 F.3d 726

(Cite as: 663 F.3d 726)

under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), were violated by the government's failure to produce two reports that he asserts could have been used to either exclude or further impeach the CBLA evidence presented by Lundy. In the alternative, Higgs contends that his trial counsel were constitutionally ineffective under *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), because they failed to discover the reports on their own or present comparable and available expert testimony to challenge the CBLA evidence. He contends that his post-trial counsel were also ineffective because they failed to file a motion for a new trial on the basis of newly discovered studies on CBLA evidence.

### A.

[1][2] Under the Due Process Clause, the prosecution is required to disclose evidence favorable to an accused upon request, "where the evidence is material either\*735 to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady,* 373 U.S. at 87, 83 S.Ct. 1194. To prevail on a *Brady* claim, the defendant must demonstrate (1) that the evidence is favorable, either because it is exculpatory or impeaching; (2) that the government suppressed the evidence; and (3) that the evidence was material to the defense. *See Strickler v. Greene,* 527 U.S. 263, 281–82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999); *Giglio v. United States,* 405 U.S. 150, 154–55, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972) (including impeachment evidence within the scope of materials that the prosecution must disclose).

[3][4][5][6][7] The duty to disclose favorable evidence, however, does not require the government to make available all evidence in its possession or within its reach. Nor does the mere suppression of favorable evidence entitle the defendant to relief. *See Kyles v. Whitley,* 514 U.S. 419, 437, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). There is no *Brady* violation if the evidence is available to the defense from other sources or the defense already possesses the evidence. *See United States v. Roane,* 378 F.3d 382, 402 (4th Cir.2004); *Fullwood v. Lee,* 290 F.3d 663, 686 (4th Cir.2002) ("The *Brady* rule does not compel the disclosure of evidence available to the defendant from other sources, including diligent investigation by the defense." (internal quotation marks omitted)). And, while "the term ' *Brady* violation' is sometimes used to refer to any breach of the broad obligation to disclose exculpatory [or impeachment] evidence ..., strictly speaking, there is never a real ' *Brady* violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." *Strickler,* 527 U.S. at 281, 119 S.Ct. 1936; *see also United States v. Bagley,* 473 U.S. 667, 677, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985) (Supreme Court precedent does not "automatically require a new trial whenever a combing of the prosecutors' files after the trial has disclosed evidence possibly useful to the defense but not likely to have changed the verdict." (internal quotation marks omitted)). A "reasonable probability" of a different result is shown "when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.' " *Kyles,* 514 U.S. at 434,

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

663 F.3d 726

(Cite as: 663 F.3d 726)

115 S.Ct. 1555 (quoting *Bagley,* 473 U.S. at 678, 105 S.Ct. 3375).

B.

[8][9] To succeed on a Sixth Amendment claim of ineffective assistance of counsel, the defendant must satisfy the two-prong test set forth in *Strickland.* The defendant must demonstrate that defense counsel's performance "fell below an objective standard of reasonableness" measured by "prevailing professional norms," *Strickland,* 466 U.S. at 688, 104 S.Ct. 2052, and that the "deficient performance prejudiced [his] defense," *id.* at 687, 104 S.Ct. 2052. The standard for *Strickland* prejudice is the same as for *Brady* materiality. *See id.; Kyles,* 514 U.S. at 434, 115 S.Ct. 1555; *Tice v. Johnson,* 647 F.3d 87, 110 (4th Cir.2011). The defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052, or "that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable," *id.* at 687, 104 S.Ct. 2052.

III.

In order to properly evaluate Higgs's challenges to the CBLA evidence in the context of his *Brady* and *Strickland* *736 claims, we begin with some background on CBLA evidence and the developments that took place before and after Higgs's trial.

A. *The Pre–Trial Reports*

From the late 1960s until at least 2004, CBLA was performed by the FBI to compare bullets found at or associated with a crime scene to bullets associated with a defendant, usually in cases where a fired bullet could not be matched to a particular firearm because the firearm was not recovered or the fired bullets were too mutilated for comparison of physical markings. CBLA evidence, when introduced at trial, generally consisted of two components: (1) the scientific test used to measure the elemental composition of the lead in bullets; and (2) the conclusions drawn by the examiner based upon the similarities or differences in the elemental compositions of the compared bullets.

The primary source of bullet lead is recycled car batteries. Secondary lead smelters melt and mix the lead with smaller lead sources and other chemicals in large vats, and these smelters then harden the lead into a solid form suitable for sale to bullet manufacturers. The manufacturers, in turn, process the lead into bullets. Due to impurities in the source material and the changes that are made to it, the elemental composition of lead melts varies. Bullets that share the same elemental composition were deemed by CBLA examiners to be analytically indistinguishable, creating the inference that the compared bullets originated from the same lead melt.

The first document at issue in this case derives from a presentation at an FBI conference in 1991 (the "FBI Report"), reporting that CBLA matches had been found in bullets taken from boxes manufactured seven months apart and fifteen months apart. Higgs claims that this report should have been disclosed to him

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

663 F.3d 726

(Cite as: 663 F.3d 726)

because it raised a question as to whether lead melts are unique in their elemental compositions.

The second document at issue is a May 2000 study performed by the Iowa State University Department of Statistics and Ames Laboratory (the "Iowa State Study"). This study was performed at the request of the FBI, with the goal of "develop[ing] a means for assessing bullet evidence, especially to be able to quantify the significance of matching bullet lead." J.A. 522. The available data necessary to do so, however, was felt to be insufficient and additional study was deemed necessary. The study specifically suggested that further research be done on bullet manufacturing, distribution, and usage, noting that "[b]ullets manufactured from different batches of raw material may end up in the same box of bullets; similarly bullets manufactured from the same batch can end up in different boxes" and that it had "been difficult from the limited data available to estimate the relative frequency of these events." J.A. 522. Higgs contends that this study should also have been disclosed to him because it called into question the premise that lead melts are unique and homogeneous in their elemental compositions.

B. *The Post-trial Reports*

Higgs's trial was completed in October 2000. In the ensuing years, the FBI and the scientific community collaborated their efforts to quantify the significance of bullet lead matches from CBLA. *See Clemons v. Maryland,* 392 Md. 339, 896 A.2d 1059, 1076–78 (2006) (discussing the various studies released in 2002 that questioned the value of CBLA evidence and recommended further study of the issue). At the request of the FBI, the National Research Council ("NRC") of the National *737 Academy of Sciences undertook a study of the issue and, in 2004, released its recommendations in a report entitled "Forensic Analysis: Weighing Bullet Lead Evidence." J.A. 491 (internal quotation marks omitted). The NRC reported that "the FBI Laboratory's analytical instrumentation is appropriate and the best available technology with respect to precision and accuracy for the elements analyzed" and "that the elements selected by the FBI for this analysis are appropriate." J.A. 491. However, "[t]he NRC expressed concerns ... relating to the interpretation of the results of bullet lead examinations." J.A. 491. "Although the NRC stated that the FBI Laboratory did not need to suspend bullet lead examinations while undertaking [its] review [of the recommendations], the FBI elected to do so while the review was pending." J.A. 491. On September 1, 2005, the FBI announced that it would no longer perform CBLA because "neither scientists nor bullet manufacturers [had been] able to definitively attest to the significance of an association made between bullets in the course of a bullet lead examination." J.A. 491. Prior to doing so, however, "the FBI Laboratory ha[d] not determined that previously issued bullet lead reports were in error." J.A. 492.

Because Higgs's convictions and sentences were imposed prior to these additional studies and the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

663 F.3d 726

(Cite as: 663 F.3d 726)

FBI's response, Higgs claims that his defense counsel were also ineffective post-trial for failing to investigate and present the ongoing developments in a motion for a new trial under Rule 33 of the Federal Rules of Criminal Procedure.

## IV.

Higgs claims that the FBI Study and Iowa State Study, both of which were in existence at the time of his trial, were internal studies performed by or at the request of the FBI and, therefore, were not reasonably available to trial counsel. Accordingly, he asserts that the government violated its *Brady* obligations by failing to produce them. In the alternative, Higgs contends that his trial counsel were constitutionally ineffective for failing to independently discover the studies, or present comparable impeachment material that was reasonably available in the public domain through an expert. *See* Brief of Appellant at 41 (arguing that "[e]ven without the information withheld by the [g]overnment, reasonable counsel would still have had much at their disposal to exclude CBLA, impeach Lundy or persuade the jury that her testimony lacked probative value").

The district court rejected the *Brady* claim, holding that the government was not required to disclose the studies because:

(1) the studies' strongest critiques of CBLA were available in at least one published study which was publicly available at the time of Higgs' trial, strongly suggesting that, through the exercise of reasonable diligence, Higgs could have obtained identical or nearly identical information; (2) the studies' remaining critiques do not consist of strong, definitive conclusions, but at most suggest areas for possible additional study; (3) by his own admission, Higgs could have called live witnesses capable of offering conclusions nearly identical to those offered in the Government's studies; and (4) other evidence presented at trial provided a firm link between Higgs and the bullets found at the murder scene.

*Higgs,* 711 F.Supp.2d at 498. With regard to Higgs's *Strickland* claim, the district court assumed that counsel's performance was deficient, but "conclude[d] that there was no reasonable probability that, absent **\*738** counsel's alleged errors, the result of the proceeding would have been different. The multiplicity and the strength of the evidence ... establish that proposition beyond peradventure." *Id.* at 502.

## A.

As the government correctly observes, CBLA evidence was widely admitted into evidence in various courts in this country at the time of Higgs's trial and up until at least 2003, when the NRC began its review of the issue and ultimately recommended further study. *See, e.g., United States v. Davis,* 103 F.3d 660, 673–74 (8th Cir.1996); *Haynes v. United States,* 451 F.Supp.2d 713, 720 (D.Md.2006); *State v. Noel,* 157 N.J. 141, 723 A.2d 602, 605–06 (1999).[FN3]

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

663 F.3d 726

(Cite as: 663 F.3d 726)

However, it seems equally clear, as Higgs has acknowledged, that the criticisms of CBLA were already present in the public domain at the time of Higgs's trial, even if the FBI Study and the Iowa State Study might not have been.

> FN3. In the wake of the scientific community's more recent reports about CBLA evidence, courts have, in appropriate cases, granted new trials or reversed convictions that hinged upon it. *Compare Ragland v. Commonwealth,* 191 S.W.3d 569, 582 (Ky.2006); (overturning murder conviction where CBLA was the only conclusive evidence linking defendant to the murder bullet), *Clemons v. State,* 392 Md. 339, 896 A.2d 1059, 1078 (2006) (reversing the trial court's denial of defendant's motion to exclude CBLA evidence because "a genuine controversy exists within the relevant scientific community about the reliability and validity of CBLA" and "[t]he only consensus that can be derived from [the scientific studies] is that more studies must be conducted"), and *New Jersey v. Behn,* 375 N.J.Super. 409, 868 A.2d 329, 345 (App.Div.2005) (granting new trial where the proof was "far from overwhelming" and the CBLA evidence was not cumulative or merely impeaching), *with United States v. Berry,* 624 F.3d 1031, 1041 (9th Cir.2010) (rejecting § 2255 claim based upon CBLA evidence because "while ... the studies may caution against widespread usage of [CBLA] evidence," they did not "establish that [CBLA]

evidence is so fundamentally unreliable that its introduction at [defendant's] trial violated his due process rights"), and *In re Berkley,* 375 Fed.Appx. 413, 415 (5th Cir.2010) (denying request to file successive application for habeas relief from capital conviction based upon CBLA criticism because, even assuming that the petitioner could not have discovered the flaws in the CBLA evidence through the exercise of reasonable diligence, he failed to "show [ ] that but for the flawed bullet analysis, no reasonable factfinder would have found him guilty of capital murder").

[10] Having reviewed the record presented by Higgs on this issue, we cannot conclude that the government violated its *Brady* obligations by failing to disclose the two internal reports in existence at the time of Higgs's trial. The reports represent early attempts by the FBI to quantify the conclusions that could be drawn from lead analysis to counter the criticisms that were in existence at the time and ultimately did little more than advise the FBI that further study was warranted. Additionally, the criticisms of CBLA appear to have been available to trial counsel prior to trial.

[11] Higgs also failed to demonstrate that his trial counsels' handling of the CBLA issue rose to the level of constitutionally deficient performance under *Strickland.* Defense counsel conducted a thorough and effective cross-examination of Lundy, demonstrating that Higgs's counsel were well acquainted with the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

663 F.3d 726

(Cite as: 663 F.3d 726)

criticisms of CBLA, and we see little that could have been gained by calling a defense expert to offer comparable criticisms. For example, Lundy admitted that CBLA evidence is far different from fingerprint analysis and DNA analysis, which provide narrow or unique identifiers. She testified that all bullets come from the same six secondary smelters, that they all share some similarities in elemental composition,*739 that an exact replication of elemental compositions can never be achieved, and that there is always uncertainty in measurements. She testified that Remington, the bullet manufacturer in this case, would have manufactured approximately five million bullets in 1995, and that there would be many, many other bullets with the same elemental composition as those matched in this case. She also testified that bullets within the same box of ammunition may be found to have different elemental compositions.

[12][13][14] When considering a claim of deficient performance, courts must evaluate the conduct from counsel's perspective at the time. *See Strickland,* 466 U.S. at 690, 104 S.Ct. 2052. We "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," *Roach v. Martin,* 757 F.2d 1463, 1476 (4th Cir.1985), and "that, under the circumstances, the challenged action, might be considered sound trial strategy," *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052 (internal quotation marks omitted). "The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom."

*Harrington v. Richter,* —— U.S. ——, 131 S.Ct. 770, 788, 178 L.Ed.2d 624 (2011).

Here, Higgs has failed to demonstrate that defense counsel's handling of the CBLA evidence at trial was constitutionally ineffective simply because counsel did not ferret out the two preliminary studies or present a defense expert armed with the same information. On the contrary, counsel went a long way towards impeaching the uniqueness and homogeneity of lead melts, as well as the overall probative value of the CBLA evidence, demonstrating that counsel was well-versed in the subject and able to obtain important concessions. And counsel did so without unduly calling attention to the evidence, or making it appear to be of more importance than was warranted. Such decisions by experienced, capital defense counsel fall squarely within the class of those to which we give deference.

B.

Nevertheless, even if we were to assume that the government violated its *Brady* obligation by failing to produce the two reports to Higgs's counsel, or that the performance of Higgs's counsel was constitutionally deficient, Higgs is not entitled to relief because he has also failed to demonstrate that he was prejudiced by the government's failure to disclose the reports to him prior to trial or by the admission of the CBLA evidence at trial.

1.

In this appeal, Higgs's counsel attempts to

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

663 F.3d 726

(Cite as: 663 F.3d 726)

establish prejudice in two ways: (1) by claiming that the CBLA evidence provided the crucial link between "Higgs ['s] bullets taken from the [murder] scene" and the bullets taken from "Higgs's apartment"; and (2) by claiming that it was the CBLA evidence that "enabled the [g]overnment to introduce prejudicial Rule 404(b) evidence" of Higgs's involvement in the Chaconia and the Cherry Lane shootings. Brief of Appellant at 45; *see* Fed.R.Evid. 404(b). Neither assertion, however, is accurate.

First, Higgs asserts that the CBLA evidence permitted the government "to put the .38 caliber handgun in Higgs's possession" prior to the murders by "showing that a bullet recovered from the Chaconia incident matched the chemical composition of the bullets recovered from Cherry Lane and the capital killings." Brief of Appellant at 45. In the absence of the CBLA evidence, Higgs claims, "there would have *740 been no unimpeached evidence linking Higgs's bullets taken from the crime scene to Higgs's apartment." *Id.; see also* Reply Brief at 1 (arguing that "Higgs's convictions and death sentences are tainted" by the CBLA evidence because it "purport[s] to 'match' bullets taken from Higgs's apartment with those found at the scene of the homicide, and two unrelated shooting incidents"); *id.* at 21 (contending that "*only* the CBLA evidence purported to draw a connection between the bullets Higgs owned and those fired at the homicide scene and the other shooting incidents") (emphasis added).

However, the CBLA evidence did not match the bullets from Higgs's apartment or the Chaconia shooting to the murder bullet; it only linked the Cherry Lane bullet to the murder bullet. In fact, Lundy did not even bother to test the Chaconia bullet or the majority of the bullets found in Higgs's apartment for comparison to the murder bullets because they were of a different type, and the only .38 caliber wadcutter bullet that was found in Higgs's apartment did not match the wadcutter bullets found at the murder scene or at Cherry Lane.

[15] Higgs's claim that it was the CBLA evidence that enabled the government to introduce the 404(b) evidence of the Cherry Lane and Chaconia shootings is also inaccurate. On direct appeal, Higgs challenged the district court's admission of the Chaconia shooting under Rule 404(b), which, in contrast to the Cherry Lane shooting, involved a different type of bullet than the murder bullet and a crime to which Higgs had not pled guilty. We held as follows:

> The bullet recovered from the Chaconia shooting was forensically similar to those recovered from the Patuxent murder scene and the victims, in that they shared the same *rifling* characteristics—five lands and grooves with a right twist. Thus, the evidence of Higgs's participation in the Chaconia Nightclub shooting was properly introduced by the government as a means to link Higgs to the same caliber weapon that Gloria testified Higgs owned and retrieved from the drawer on the night of the murders, and one which shared the same rifling characteristics as did the murder weapon.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

663 F.3d 726

(Cite as: 663 F.3d 726)

*Higgs I,* 353 F.3d at 311–12 (emphasis added). In doing so, we made no mention of the CBLA evidence, which is unsurprising given that the CBLA evidence did not match the Chaconia bullet to the murder bullet at all. Rather, the testimony and forensic evidence of rifling characteristics alone demonstrated the relevance and admissibility of the prior shootings under Rule 404(b). The district court's admission of the Chaconia shooting did not rest upon the CBLA evidence, and while the CBLA evidence could have provided an additional basis upon which to admit the Cherry Lane shooting had it been challenged, it was neither critical nor necessary.

2.

[16][17] Finally, we have carefully considered the materiality of the CBLA evidence that was introduced, and the question of whether there is a reasonable probability that the result of the proceedings would have been different had the government produced the studies at issue or had trial counsel handled the CBLA issue in different way. We are satisfied that there is not.[FN4]

> FN4. We may summarily dispose of Higgs's claim that the production of the preliminary studies or the presentation of comparable information would have resulted in the district court's exclusion of CBLA evidence at trial. Higgs's counsel has conflated the criticisms of CBLA that were present at the time of trial with the criticisms that followed. We evaluate the obligations of the

government and the conduct of defense counsel at the time of trial and have no difficulty concluding that there is no reasonable probability that the trial court would have excluded the CBLA evidence in October of 2000.

*741 As we have twice concluded, the evidence of Higgs's guilt and of his predominant role in the brutal kidnappings and murders of the three women was overwhelming, as was the evidence, irrespective of the CBLA evidence, that linked Higgs to the .38 caliber weapon and to .38 caliber ammunition.

Gloria's eyewitness testimony provided compelling and convincing details of the events of that evening and of Higgs's involvement in them. Jackson's day planner, containing Higgs's name, telephone number, address and vehicle license tag number, corroborated Gloria's testimony regarding Higgs's words and actions in the wake of his violent argument with Jackson and the threat she made as she was leaving his apartment. And, as the government pointed out in closing arguments, Gloria's inability to recall every precise detail, such as who disposed of the gun, could well have bolstered his credibility.

For his part, Higgs admitted to the authorities that he knew Tanji Jackson and claimed that he commented to a guest at his girlfriend's house the following evening that he knew "that Tanji girl," even though the names of the victims had not yet been released to the press. *Id.* at 291 (internal quotation marks omitted). And after unsuccessfully attempting to

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

663 F.3d 726

(Cite as: 663 F.3d 726)

establish an alibi through Smith and Darby, Higgs admitted to Darby that he was with Haynes on the night of the murder, that the women were killed because Jackson was "snitching" on one of them, and that the other two women were just along "for his friends." *Id.* at 292 (internal quotation marks omitted).

As we previously summarized, there was overwhelming evidence confirming that:

> it was Higgs who set up the "dates" with the girls, Higgs who got into the violent argument with Jackson, Higgs who observed Jackson writing down his license plate number, Higgs who retrieved the .38 caliber murder weapon (which he owned) and told the other two men to come along, Higgs who told Haynes to "trick" the women into getting into the van, Higgs who drove the van past the route back to their homes and into the Patuxent National Wildlife Refuge, Higgs who handed the murder weapon to Haynes moments before Haynes shot and killed the women, and Higgs who orchestrated the destruction of the physical evidence at his apartment after the murders.

*Higgs II*, 95 Fed.Appx. at 44.

With regard to the Chaconia and Cherry Lane shootings, the eyewitness testimony and forensic evidence, irrespective of the CBLA, easily place a .38 caliber weapon in Higgs's possession in the two months prior to the murders. The rifling evidence alone, unlike the CBLA evidence, demonstrated a consistency in the bullets fired at all three crime scenes and corroborated the eyewitness testimony that Higgs possessed, used, or directed the use of a .38 caliber weapon in connection with all three crimes. Higgs's incriminating statements made in connection with the two prior shootings are particularly significant. Higgs conveyed to Williams that he could not plead guilty to the Chaconia shooting (in which Haynes was *not* involved) because the authorities might use the gun in connection with the murder case. And Higgs gratuitously advised the court during his plea to the Cherry Lane shooting *742 (in which Haynes *was* involved) that Haynes had fired the .38 caliber weapon and that Higgs had fired the 9mm weapon. Finally, Higgs's reference to Haynes as his "youngan," who would "hold up" if offered a deal to turn on him, revealed much about how Higgs viewed his relationship with his younger companion. *Higgs I*, 353 F.3d at 293 (internal quotation marks omitted).

Given this overwhelming evidence of Higgs's role in the murders, we are satisfied that the CBLA evidence did not affect the outcome of the verdicts. The CBLA evidence matching the Chaconia bullet to the bullets in Higgs's apartment merely corroborated the eyewitness testimony of Kabtamu, the crime scene evidence from the Chaconia shooting, including the rifling evidence, and Higgs's statements to Williams, all of which placed the .38 caliber weapon in Higgs's hands on the night of that shooting. Unlike the rifling evidence, however, there was no CBLA match between the ammunition used in the Chaconia shooting or the ammunition at Higgs's home and the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

663 F.3d 726

(Cite as: 663 F.3d 726)

ammunition used in the murders. Similarly, the CBLA evidence matching the Cherry Lane bullet to the murder bullet merely corroborated the eyewitness testimony of Simms and others at Cherry Lane and the crime scene evidence from that shooting, including the rifling evidence that also matched the Cherry Lane bullet and the murder bullet. However, there was no match between the Cherry Lane bullet and the bullets associated with Higgs's apartment, and Higgs and Haynes were both involved in the Cherry Lane shooting and in the murders. Higgs did not contest that Haynes was the triggerman, or that Haynes used a .38 caliber weapon to murder the women. And, as defense counsel pointed out to the jury, there was substantial evidence that Haynes had equal if not more access to Higgs's apartment. Thus, while the CBLA evidence matched the bullet from Cherry Lane with the murder bullet, it was cumulative to other evidence but not inconsistent with Higgs's defense.

Having reviewed the challenged evidence in the context of the entire case, we conclude there is no reasonable probability that the district court would have excluded the CBLA testimony at Higgs's trial had it been challenged, or that the outcome of the guilt or sentencing phase would have been different had the CBLA evidence been excluded or subjected to additional cross-examination.

V.

[18] Higgs's final claim is that his defense counsel were ineffective because they failed to file a motion for a new trial under Rule 33 of the Federal Rules of Criminal Procedure within three years of the verdict, based upon the CBLA studies that were published thereafter.

After his trial was concluded, Higgs requested and was granted a substitution of counsel for one of his two defense attorneys for the purpose of pursuing an appeal and other post-conviction relief. Higgs's counsel did not challenge the admission of the CBLA evidence on direct appeal, and although defense counsel did file a new trial motion based upon other evidence discovered in connection with a fresh review of the case, they did not file a similar motion on the basis of the more recent CBLA studies. Higgs contends that defense counsels' failure to also challenge the CBLA evidence in a motion for a new trial amounted to constitutionally deficient performance, and that he was prejudiced as a result.

[19] To receive a new trial based on newly discovered evidence, a defendant must show that the evidence is newly discovered; that he has been diligent in uncovering it; that the evidence is not merely cumulative or impeaching; that the evidence is material to the issues involved; and that the evidence would probably*743 produce an acquittal. *See United States v. Chavis,* 880 F.2d 788, 793 (4th Cir.1989). Unless the defendant demonstrates all five of these factors, the motion should be denied. *See id.* To obtain relief in this proceeding, Higgs must demonstrate that counsel's failure to file the motion constituted deficient performance and that he was prejudiced as a result. *See Strickland,* 466 U.S. at 687–88, 104 S.Ct. 2052.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

663 F.3d 726

(Cite as: 663 F.3d 726)

[20] Higgs has failed to demonstrate that defense counsel were constitutionally ineffective for failing to file a motion for a new trial based upon the post-trial studies. The post-trial studies published in 2002 and 2003 were largely cumulative of the criticisms known at the time of trial and were at best merely impeachment evidence. *Cf. Berry,* 624 F.3d at 1043 (concluding that even "the [NRC] report and the FBI's discontinued use of [CBLA] evidence were no more than impeaching evidence of the [CBLA] testimony introduced at [defendant's] trial"). And, as discussed above, there is no reasonable probability that the post-trial studies or a new trial would have resulted in a different verdict. We cannot say that the post-trial defense counsel team was constitutionally ineffective simply because they did not pursue a new trial motion on the basis of the CBLA developments, particularly in view of the cross-examination that was conducted and the minor role that the evidence played during the trial, or that Higgs was prejudiced as a result.

## VI.

For the foregoing reasons, we affirm the district court's order denying Higgs's motion under 28 U.S.C. § 2255.
*AFFIRMED*

C.A.4 (Md.),2011.

U.S. v. Higgs
663 F.3d 726
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.