# EXHIBIT 4

Westlaw

663 F.3d 726

(Cite as: 663 F.3d 726)

H

United States Court of Appeals,

Fourth Circuit.
UNITED STATES of America,
Plaintiff–Appellee,
v.
Dustin John HIGGS, Defendant–Appellant.
No. 10–7.

Argued: Sept. 21, 2011.
Decided: Nov. 23, 2011.

**Background:** Defendant was convicted in the United States District Court for the District of Maryland, Peter J. Messitte, Senior District Judge, of first-degree premeditated murder, first-degree murder committed in the perpetration or attempted perpetration of a kidnapping, and kidnapping resulting in death, and was sentenced to death. Defendant appealed. The Court of Appeals, 353 F.3d 281, affirmed. Defendant moved for new trial. The District Court denied motion. Defendant appealed. The Court of Appeals, 95 Fed.Appx. 37, affirmed. Defendant filed motion to vacate. The District Court, Messitte, Senior District Judge, 711 F.Supp.2d 479, denied motion. Defendant appealed.

**Holdings:** The Court of Appeals, Traxler, Chief Judge, held that:

(1) government was not required, under *Brady*, to disclose two internal reports concerning validity of comparative bullet lead analysis (CBLA) evidence;

(2) defense counsel's handling of CBLA evidence did not rise to level of constitutionally deficient performance supporting claim of ineffective assistance of counsel;

(3) government's failure to produce CBLA reports, assuming it was required to do so, did not violate defendant's due process rights;

(4) defense counsel's handling of CBLA issue, even if deficient, did not result in prejudice required to establish ineffective assistance of counsel;

(5) defense counsel's failure to file motion for new trial based on post-trial CBLA studies did not establish constitutionally deficient performance; and

(6) defense counsel's failure to file motion for new trial based on post-trial CBLA studies did not prejudice defendant.

Affirmed.

West Headnotes

**[1] Constitutional Law 92 ⬿4594(1)**

92 Constitutional Law

    92XXVII Due Process
        92XXVII(H) Criminal Law
            92XXVII(H)4 Proceedings and Trial
                92k4592 Disclosure and Discovery

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

663 F.3d 726

(Cite as: 663 F.3d 726)

92k4594 Evidence
92k4594(1) k. In general.
Most Cited Cases

Under the Due Process Clause, the prosecution is required to disclose evidence favorable to an accused upon request where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution. U.S.C.A. Const.Amend. 6.

**[2] Criminal Law 110 ☞1991**

110 Criminal Law

110XXXI Counsel
110XXXI(D) Duties and Obligations of Prosecuting Attorneys
110XXXI(D)2 Disclosure of Information
110k1991 k. Constitutional obligations regarding disclosure. Most Cited Cases

To prevail on *Brady* disclosure claim, defendant must demonstrate (1) that evidence is favorable, either because it is exculpatory or impeaching, (2) that the government suppressed the evidence, and (3) that the evidence was material to the defense. U.S.C.A. Const.Amend. 6.

**[3] Criminal Law 110 ☞1991**

110 Criminal Law

110XXXI Counsel
110XXXI(D) Duties and Obligations of Prosecuting Attorneys
110XXXI(D)2 Disclosure of Information
110k1991 k. Constitutional obligations regarding disclosure. Most Cited Cases

Government's *Brady* duty to disclose favorable evidence to defendant does not require government to make available all evidence in its possession or within its reach. U.S.C.A. Const.Amend. 6.

**[4] Criminal Law 110 ☞2008**

110 Criminal Law

110XXXI Counsel
110XXXI(D) Duties and Obligations of Prosecuting Attorneys
110XXXI(D)2 Disclosure of Information
110k2008 k. Sanctions for failure to disclose. Most Cited Cases

Mere suppression of favorable evidence does not entitle defendant to relief based on violation of government's *Brady* disclosure obligation. U.S.C.A. Const.Amend. 6.

**[5] Criminal Law 110 ☞1995**

110 Criminal Law

110XXXI Counsel
110XXXI(D) Duties and Obligations of Prosecuting Attorneys
110XXXI(D)2 Disclosure of Information

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

663 F.3d 726

(Cite as: 663 F.3d 726)

110k1993 Particular Types of Information Subject to Disclosure

110k1995 k. Diligence on part of accused; availability of information. Most Cited Cases

There is no *Brady* violation, due to government's failure to disclose evidence favorable to defendant, if the evidence is available to the defense from other sources or the defense already possesses the evidence. U.S.C.A. Const.Amend. 6.

**[6] Criminal Law 110 ☜1992**

110 Criminal Law

110XXXI Counsel
110XXXI(D) Duties and Obligations of Prosecuting Attorneys
110XXXI(D)2 Disclosure of Information
110k1992 k. Materiality and probable effect of information in general. Most Cited Cases

No real violation of government's *Brady* disclosure obligation occurs unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict. U.S.C.A. Const.Amend. 6.

**[7] Criminal Law 110 ☜1992**

110 Criminal Law

110XXXI Counsel
110XXXI(D) Duties and Obligations of Prosecuting Attorneys

110XXXI(D)2 Disclosure of Information

110k1992 k. Materiality and probable effect of information in general. Most Cited Cases

A "reasonable probability" of a different result is shown, as required for relief due to violation of government's *Brady* disclosure obligation, when government's evidentiary suppression undermines confidence in the outcome of the trial. U.S.C.A. Const.Amend. 6.

**[8] Criminal Law 110 ☜1881**

110 Criminal Law

110XXXI Counsel
110XXXI(C) Adequacy of Representation
110XXXI(C)1 In General
110k1879 Standard of Effective Assistance in General
110k1881 k. Deficient representation and prejudice in general. Most Cited Cases

To succeed on a Sixth Amendment claim of ineffective assistance of counsel, defendant must demonstrate that defense counsel's performance fell below an objective standard of reasonableness measured by prevailing professional norms, and that counsel's deficient performance prejudiced his defense. U.S.C.A. Const.Amend. 6.

**[9] Criminal Law 110 ☜1883**

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

663 F.3d 726

(Cite as: 663 F.3d 726)

110 Criminal Law

110XXXI Counsel
110XXXI(C) Adequacy of Representation
110XXXI(C)1 In General
110k1879 Standard of Effective Assistance in General
110k1883 k. Prejudice in general. Most Cited Cases

To establish prejudice prong of claim of ineffective assistance of counsel, defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different, or that counsel's errors were so serious as to deprive defendant of a fair trial, meaning a trial the result of which is reliable. U.S.C.A. Const.Amend. 6.

**[10] Criminal Law 110 €—2001**

110 Criminal Law

110XXXI Counsel
110XXXI(D) Duties and Obligations of Prosecuting Attorneys
110XXXI(D)2 Disclosure of Information
110k1993 Particular Types of Information Subject to Disclosure
110k2001 k. Other particular issues. Most Cited Cases

Government had no *Brady* obligation to disclose two internal FBI reports concerning validity of comparative bullet lead analysis (CBLA) evidence in existence at time of capital murder trial; reports represented early attempts by FBI to quantify conclusions that could be drawn from lead analysis to counter criticisms then in existence and ultimately did little more than advise FBI that further study was warranted, and criticisms of CBLA were available to trial counsel prior to trial. U.S.C.A. Const.Amend. 6; 18 U.S.C.A. §§ 1111(a), 1201(a)(2).

**[11] Criminal Law 110 €—1931**

110 Criminal Law

110XXXI Counsel
110XXXI(C) Adequacy of Representation
110XXXI(C)2 Particular Cases and Issues
110k1921 Introduction of and Objections to Evidence at Trial
110k1931 k. Experts; opinion testimony. Most Cited Cases

Defense counsel's handling of comparative bullet lead analysis (CBLA) evidence during capital murder trial did not rise to level of constitutionally deficient performance supporting claim of ineffective assistance of counsel, even though counsel did not ferret out two preliminary studies that were then available or present defense expert armed with same information; defense counsel conducted thorough and effective cross-examination of government's expert, demonstrating that they were well acquainted with criticisms of CBLA evidence, and went a long way toward impeaching uniqueness and homogeneity of lead

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

663 F.3d 726

(Cite as: 663 F.3d 726)

melts, as well as overall probative value of CBLA evidence, without unduly calling attention to evidence or making it appear to be of more importance than was warranted. U.S.C.A. Const.Amend. 6; 18 U.S.C.A. §§ 1111(a), 1201(a)(2).

**[12] Criminal Law 110 ☞1870**

110 Criminal Law

    110XXXI Counsel
        110XXXI(C) Adequacy of Representation
        110XXXI(C)1 In General
        110k1870 k. In general. Most Cited Cases

When considering a claim of deficient performance as part of claim alleging ineffective assistance of counsel, court must evaluate the conduct from counsel's perspective at the time. U.S.C.A. Const.Amend. 6.

**[13] Criminal Law 110 ☞1871**

110 Criminal Law

    110XXXI Counsel
        110XXXI(C) Adequacy of Representation
        110XXXI(C)1 In General
        110k1871 k. Presumptions and burden of proof in general. Most Cited Cases

In deciding whether counsel who allegedly provided ineffective assistance of counsel rendered constitutionally deficient performance, court indulges a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance and that, under the circumstances, the challenged action might be considered sound trial strategy. U.S.C.A. Const.Amend. 6.

**[14] Criminal Law 110 ☞1882**

110 Criminal Law

    110XXXI Counsel
        110XXXI(C) Adequacy of Representation
        110XXXI(C)1 In General
        110k1879 Standard of Effective Assistance in General
        110k1882 k. Deficient representation in general. Most Cited Cases

In addressing deficient performance prong of claim of ineffective assistance of counsel, question is whether attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom. U.S.C.A. Const.Amend. 6.

**[15] Constitutional Law 92 ☞4594(3)**

92 Constitutional Law

    92XXVII Due Process
        92XXVII(H) Criminal Law
        92XXVII(H)4 Proceedings and Trial
        92k4592 Disclosure and Discovery
        92k4594 Evidence
        92k4594(2) Particular Items or Information, Disclosure of

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

663 F.3d 726

(Cite as: 663 F.3d 726)

92k4594(3) k. In general. Most Cited Cases

**Criminal Law 110 ☞1931**

110 Criminal Law

110XXXI Counsel
110XXXI(C) Adequacy of Representation
110XXXI(C)2 Particular Cases and Issues
110k1921 Introduction of and Objections to Evidence at Trial
110k1931 k. Experts; opinion testimony. Most Cited Cases

**Criminal Law 110 ☞2001**

110 Criminal Law

110XXXI Counsel
110XXXI(D) Duties and Obligations of Prosecuting Attorneys
110XXXI(D)2 Disclosure of Information
110k1993 Particular Types of Information Subject to Disclosure
110k2001 k. Other particular issues. Most Cited Cases

Evidence other than comparative bullet lead analysis (CBLA) evidence enabled government's introduction of evidence of capital murder defendant's involvement in other shootings, and therefore neither government's failure to produce two internal reports raising questions about CBLA evidence, assuming it had *Brady* obligation to do so, nor counsel's alleged deficient performance in failing to obtain exclusion of CBLA evidence or further challenge it caused defendant prejudice required to establish either *Brady* due process violation or ineffective assistance of counsel under theory that, had CBLA evidence been excluded or discredited, other acts evidence would not have been admitted. U.S.C.A. Const.Amend. 6; 18 U.S.C.A. §§ 1111(a), 1201(a)(2); Fed.Rules Evid.Rule 404(b), 28 U.S.C.A.

**[16] Constitutional Law 92 ☞4594(3)**

92 Constitutional Law

92XXVII Due Process
92XXVII(H) Criminal Law
92XXVII(H)4 Proceedings and Trial
92k4592 Disclosure and Discovery
92k4594 Evidence
92k4594(2) Particular Items or Information, Disclosure of
92k4594(3) k. In general. Most Cited Cases

**Constitutional Law 92 ☞4745**

92 Constitutional Law

92XXVII Due Process
92XXVII(H) Criminal Law
92XXVII(H)6 Judgment and Sentence
92k4741 Capital Punishment; Death Penalty
92k4745 k. Proceedings. Most Cited Cases

**Criminal Law 110 ☞2001**

110 Criminal Law

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

663 F.3d 726

(Cite as: 663 F.3d 726)

110XXXI Counsel
110XXXI(D) Duties and Obligations of Prosecuting Attorneys
110XXXI(D)2 Disclosure of Information
110k1993 Particular Types of Information Subject to Disclosure
110k2001 k. Other particular issues. Most Cited Cases

There was no reasonable probability that trial court would have excluded comparative bullet lead analysis (CBLA) evidence had exclusion been sought, or that result in either guilt or penalty phase of capital murder trial would have been different had such evidence been excluded or further challenged, given the overwhelming evidence of guilt and defendant's predominant role in kidnappings and murders of three women, and therefore, assuming that government had *Brady* obligation to produce two internal reports raising issues about CBLA evidence, its failure to do so did not establish due process violation. U.S.C.A. Const.Amend. 6; 18 U.S.C.A. §§ 1111(a), 1201(a)(2).

**[17] Criminal Law 110 ☞1931**

110 Criminal Law

110XXXI Counsel
110XXXI(C) Adequacy of Representation
110XXXI(C)2 Particular Cases and Issues
110k1921 Introduction of and Objections to Evidence at Trial

110k1931 k. Experts; opinion testimony. Most Cited Cases
**Criminal Law 110 ☞1961**

110 Criminal Law

110XXXI Counsel
110XXXI(C) Adequacy of Representation
110XXXI(C)2 Particular Cases and Issues
110k1958 Death Penalty
110k1961 k. Presentation of evidence in sentencing phase. Most Cited Cases

No reasonable probability existed that district court would have excluded comparative bullet lead analysis (CBLA) evidence had exclusion been sought in capital murder trial, or that outcome of either guilt or penalty phase of trial would have been different had such evidence been excluded or expert testimony concerning that evidence been subjected to additional cross-examination, given overwhelming evidence of defendant's guilt and his predominant role in kidnappings and murders of three women, and therefore defense counsel's performance with respect to CBLA evidence, even if deficient, did not prejudice defendant, as required to establish ineffective assistance of counsel. U.S.C.A. Const.Amend. 6; 18 U.S.C.A. §§ 1111(a), 1201(a)(2).

**[18] Criminal Law 110 ☞1965**

110 Criminal Law

110XXXI Counsel

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

663 F.3d 726

(Cite as: 663 F.3d 726)

110XXXI(C) Adequacy of Representation

110XXXI(C)2 Particular Cases and Issues

110k1965 k. New trial motion. Most Cited Cases

Defense counsel's failure to file motion for new trial in capital murder case based on post-trial studies regarding comparative bullet lead analysis (CBLA) evidence was not constitutionally deficient, as required to establish ineffective assistance of counsel; post-trial studies were largely cumulative of criticisms of CBLA evidence known at time of trial and were at best impeachment evidence, and CBLA evidence played minor role during trial. U.S.C.A. Const.Amend. 6; 18 U.S.C.A. §§ 1111(a), 1201(a)(2); Fed.Rules Cr.Proc.Rule 33, 18 U.S.C.A.

**[19] Criminal Law 110 ⟲938(1)**

110 Criminal Law

110XXI Motions for New Trial
110k937 Newly Discovered Evidence
110k938 In General
110k938(1) k. In general. Most Cited Cases

To receive a new trial based on newly discovered evidence, defendant must show (1) that the evidence is newly discovered, (2) that he has been diligent in uncovering it, (3) that the evidence is not merely cumulative or impeaching, (4) that the evidence is material to the issues involved, and (5) that the evidence would probably produce an acquittal. Fed.Rules Cr.Proc.Rule 33, 18 U.S.C.A.

**[20] Criminal Law 110 ⟲1965**

110 Criminal Law

110XXXI Counsel
110XXXI(C) Adequacy of Representation
110XXXI(C)2 Particular Cases and Issues
110k1965 k. New trial motion. Most Cited Cases

Defense counsel's failure to file motion for new trial in capital murder case based on post-trial studies regarding comparative bullet lead analysis (CBLA) evidence did not prejudice defendant, as required to establish ineffective assistance of counsel, given overwhelming evidence of defendant's guilt, which precluded reasonable probability that post-trial studies or new trial would have produced different outcome in proceedings. U.S.C.A. Const.Amend. 6; 18 U.S.C.A. §§ 1111(a), 1201(a)(2); Fed.Rules Cr.Proc.Rule 33, 18 U.S.C.A.

*729 **ARGUED:** Angela Elleman, Federal Community Defender Office, Philadelphia, Pennsylvania, for Appellant. Sandra Wilkinson, Office of the United States Attorney, Baltimore, Maryland, for Appellee. **ON BRIEF:** Leigh Skipper, Chief Federal Defender, Matthew Lawry, Michael Wiseman, Assistant Federal Defenders, Federal Community Defender Office, Philadelphia, Pennsylvania; Stephen H. Sachs, Wilmer Cutler Pickering Hale & Dorr,

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

663 F.3d 726

(Cite as: 663 F.3d 726)

Baltimore, Maryland, for Appellant. Rod J. Rosenstein, United States Attorney, Deborah Johnston, Assistant United States Attorney, Office of the United States Attorney, Baltimore, Maryland, for Appellee.

Before TRAXLER, Chief Judge, and SHEDD and KEENAN, Circuit Judges.

Affirmed by published opinion. Chief Judge TRAXLER wrote the opinion, in which Judge SHEDD and Judge KEENAN joined.

**OPINION**

TRAXLER, Chief Judge:

Petitioner Dustin John Higgs was convicted of three counts each of first-degree premeditated murder, *see* 18 U.S.C. § 1111(a), first-degree murder committed in the perpetration or attempted perpetration of a kidnapping, *see id.,* and kidnapping resulting in death, *see* 18 U.S.C. § 1201(a)(2), arising out of the January 27, 1996, murders of three young women in the Patuxent National Wildlife Refuge. He received nine death sentences. We affirmed his convictions and sentences. *See* **\*730***United States v. Higgs,* 353 F.3d 281 (4th Cir.2003) (" *Higgs I* "). Higgs also filed a motion for a new trial, which was denied by the district court and affirmed on appeal. *See United States v. Higgs,* 95 Fed.Appx. 37 (4th Cir.2004) (" *Higgs II* ").

Presently before us is Higgs's motion for relief under 28 U.S.C. § 2255, which was denied by the district court. *See Higgs v. United States,* 711 F.Supp.2d 479 (D.Md.2010). We granted a certificate of appealability to consider Higgs's claim that his constitutional rights to due process of law and effective assistance of counsel were violated by the introduction of Comparative Bullet Lead Analysis ("CBLA") evidence at trial. We now affirm.

I.

The facts in this case have been well-documented in the two prior opinions of this court, from which we borrow heavily.

At approximately 4:30 a.m., on January 27, 1996, Tanji Jackson, Tamika Black, and Mishann Chinn were found dead in a roadway in the Patuxent National Wildlife Refuge in Prince George's County, Maryland. Jackson and Black had each been shot once in the chest and once in the back. Chinn had been shot once in the back of her head. A .38 caliber wadcutter bullet was found at the scene. Jackson's day planner was also found, in which she had written Higgs's nickname and telephone number. On a separate page, Jackson had also recorded the notation "13801 'MAZDA' 769GRY," which matched Higgs's address number on Briarwood Drive in Laurel, Maryland, and the license tag number for Higgs's blue Mazda MPV van. *Higgs I,* 353 F.3d at 291 (internal quotation marks omitted). Chinn's mother and a friend of the Jackson family each confirmed that the girls had been picked up for dates the previous evening by a man or men in a blue Mazda MPV van. There were additional witnesses who saw the women at Higgs's apartment complex during the early morning hours of the murders.

On March 21, 1996, Park Police Officers

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

663 F.3d 726

(Cite as: 663 F.3d 726)

interviewed Higgs at his apartment. Higgs admitted that he knew Jackson and that he may have spoken to her on the night before her murder but denied that she had ever been at his apartment and denied knowing where she lived. Higgs claimed that he first heard about the murders on January 27, 1996, while watching the ten o'clock news at the home of his girlfriend, Phyllis Smith, and that he commented to a guest at Smith's home that evening that he thought he knew " 'that Tanji girl.' " _Id._ The names and photographs of the victims, however, had not yet been released. During the search of Higgs's apartment, the police found cash, crack cocaine, a .380 semiautomatic firearm, and ammunition for .380, .45, and .38 caliber weapons. Higgs was arrested on federal drug charges, pled guilty, and was sentenced to seventeen years in prison.

In the fall of 1998, Victor Gloria was arrested on federal drug charges. Gloria admitted to authorities that he was with Higgs and Willis Mark Haynes on the night of the murders and agreed to cooperate with the authorities in the murder prosecutions. At trial, he provided a detailed, eyewitness account of the kidnappings and murders, which we summarized as follows:

> On Friday evening, January 26, 1996, Higgs, Willie Mark Haynes and Victor Gloria drove from Higgs's apartment at 13801 Briarwood Drive in Laurel, Maryland, to Washington D.C. to pick up [Jackson, Black, and Chinn]. Higgs knew Jackson and they had arranged dates for Haynes and Gloria with Black and Chinn. They were traveling in Higgs's blue Mazda MPV van. After stopping at a liquor store, the three *731 couples returned to Higgs's apartment to drink alcohol and listen to music. While there, the men also smoked marijuana.

> At some point during the early morning hours of January 27, Higgs and Jackson began to argue. Jackson retrieved a knife from the kitchen and Haynes, who had been in the bedroom with Black, heard the commotion and came out to break up the fight. Haynes talked to Jackson and got the knife away from her. However, Jackson was still angry and the three women left the apartment. According to Gloria, as Jackson was walking out, "[s]he stopped at the door and said something like I am going to get you all f——ed up or robbed" or made "some kind of threat." In response, Higgs commented to the other two men that Jackson "do know a lot of n——s." As Higgs was watching the women leave, he saw Jackson stop and appear to write down the license plate number of his van. This angered Higgs, who commented to Haynes and Gloria that Jackson was "writing down [his] sh——." Gloria interpreted Higgs's comments as concern that Jackson intended to retaliate against Higgs.

> At that point, "Higgs said f—— that, and grabbed his coat and said come on." He also retrieved a silver .38 caliber firearm from the end table drawer and put it in his pocket. The three men got into Higgs's van, with Higgs driving, Haynes in the front passenger seat, and Gloria sitting behind Higgs. Higgs drove

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

663 F.3d 726

(Cite as: 663 F.3d 726)

the van to where the three women were walking on the side of the road and told Haynes to get them in the vehicle. After Haynes spoke to them, the three women got into the back seat of the vehicle and Higgs started driving towards Washington, D.C. Neighbors in the area heard and saw the three girls laughing and talking around 3:30 that morning.

According to Gloria, while en route to Washington, D.C., Higgs and Haynes leaned towards each other and engaged in a quiet conversation that Gloria could not hear. The women were whispering in the back of the van and apparently believed they were being taken home. Higgs, however, drove past the Baltimore—Washington Parkway exit, which would have taken them directly into Washington, D.C., and instead drove the van into the Patuxent National Wildlife Refuge, a federal property within the jurisdiction of the United States Park Police. Eventually, Higgs pulled over at a secluded location. One of the girls asked if they were trying to "make [them] walk from [t]here," and Higgs responded, "something like that." After the women got out of the van, Higgs pulled out the pistol and handed it to Haynes, who put it behind his back and also exited the van. Within moments, Gloria heard a gunshot and wiped the mist off the back window in time to see Haynes shoot one of the women in the chest. Gloria turned to ask Higgs what he was doing, but saw Higgs holding the steering wheel and watching the shootings from the rearview mirror. Gloria put his head down, heard more shots, and

heard a woman screaming.

After firing a few more shots, Haynes got into the van and closed the door. According to Gloria, either Higgs or Haynes then commented that they had to "get rid of the gun," and Higgs drove to the Anacostia River where, according to Gloria, either Higgs or Haynes got out and threw the gun into the water. Higgs then drove back to his apartment where the three men began to clean up. Among other things, they wiped down the patio doors and "everything else, the bathroom, the doorknobs, the stereo," *732 and threw away any items the women might have touched, such as liquor bottles, CDs, and rented videotapes. The men then left the apartment and dropped the trash by a dumpster. Higgs and Haynes dropped Gloria off at a fast food restaurant, where he was told by Higgs to "keep [his] mouth shut."

*Higgs I,* 353 F.3d at 289–90 (footnote and citations omitted).

At trial, Higgs's counsel did not challenge the government's evidence that Higgs knew Jackson prior to the murders, that the women were present at Higgs's apartment complex that evening, or that Haynes was the triggerman. Rather, Higgs's counsel argued that the government had failed to prove that Higgs was a principal in the kidnappings and murders. *See* 18 U.S.C. § 2 ("Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission," or who "willfully causes an act to

663 F.3d 726

(Cite as: 663 F.3d 726)

be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal."). In particular, Higgs challenged the government's evidence that he had been in prior possession of a .38 caliber weapon and that he handed the .38 caliber murder weapon to Haynes that night to carry out the murders.[FN1]

> FN1. Higgs and Haynes were jointly indicted for the kidnappings and murders in December 1998. Haynes was convicted of the murders several months before Higgs's trial, but the jury did not recommend the death penalty for Haynes. At Haynes's trial, defense counsel also admitted that Haynes was the triggerman but argued "that Haynes' actions were not truly voluntary because he was effectively controlled by his older, dominant co-defendant, Dustin John Higgs." *Haynes v. United States, 451 F.Supp.2d 713, 717 (D.Md.2006).*

The government presented overwhelming evidence of Higgs's guilt, as well as of his predominant role in the murders. Although Gloria was an important witness for the government, substantial additional testimony and evidence corroborated Gloria's testimony. Of particular note was Jackson's day planner and its references to Higgs's identifying information, which corroborated Gloria's testimony that Higgs commented that Jackson was " 'writing down [his] sh——,' " just after his violent argument with Jackson and just prior to his retrieving his gun and pursuing the women.

*Higgs I, 353 F.3d at 290* (alteration in original).

In addition, Higgs made a number of incriminating statements after the murders. Phyllis Smith testified that Higgs had her tell the authorities that he was with her at the time of the murders; however, she recanted when she learned that the alibi was for the murders instead of drug charges. Similarly, Ednisia Darby, the mother of Higgs's child, testified that when she asked Higgs about the murders, he made an effort to remind her that they were together at the hospital that evening, which was not true. Darby testified that Higgs later admitted that he was with Haynes when the women were murdered. He also told Darby that Jackson had been invited over to his apartment that night because she had been " 'snitching on one of them,' " and that " 'the other two girls ... were just for his friends.' " *Id.* at 292.

Higgs also discussed matters with Domenick Williams, a fellow inmate and jailhouse lawyer who was housed with Higgs at the D.C. jail between August 1998 and January 1999. When Higgs told Williams that he had refused to cooperate against Haynes in the murder investigation, Williams told Higgs that the authorities would likely offer Haynes the same deal. In response, "Higgs told Williams 'that his youngan would hold up,' and 'that the government wouldn't offer a deal to the trigger man.' " *Id.* at 293 (citation omitted). *733 Williams also related conversations that he had with Higgs about Gloria. Higgs asked Williams what his chances of defeating the murder charges "would be 'if the witness after the fact

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

663 F.3d 726

(Cite as: 663 F.3d 726)

wasn't there.' " *Id.* Williams told Higgs "that 'his chances would be good.' " *Id.* Higgs later told Williams " 'that he wasn't worrying about the [murder] case' " because two of the former inmates at the jail, Melvin Grayson and T, " 'would be out there,' " and " '[t]hat Mel would be out there to handle anything that he needed and that he could rely on him.' " *Id.* (alteration in original). Concerned that a conspiracy to harm Gloria might be in the works and that he might be implicated, Williams reported these conversations to the authorities. Williams also produced letters that Higgs had written to him, which stated "that Higgs had not heard from 'T', but that 'Mel has been in my corner.' " *Id.* Visitation records confirmed that Grayson visited Higgs in the D.C. jail in February and March of 1999.

The government also introduced evidence of a taped telephone conversation between Higgs and Grayson in May 2000. During the conversation, Higgs and Grayson discussed Haynes's conviction for the murders and Higgs told Grayson that the attorney had " 'got[ten] the whole joint twisted.' " *Id.* at 309. When Grayson subsequently read Higgs a newspaper article reporting that Haynes had claimed that he shot the women only because he was afraid of Higgs, Higgs made no response at all. Later, Higgs told Grayson that the lawyers were trying to make it seem like the murders were over something petty. Thus, Higgs made no attempt to refute his involvement in the crimes during his conversation with Grayson and instead implied that the authorities were mistaken about the motive.

As noted above, Gloria testified that either Higgs or Haynes disposed of the murder weapon in a nearby river while en route back to Higgs's apartment. The authorities never found the .38 caliber murder weapon.[FN2] However, the government presented evidence that Higgs was involved in two other shootings during the two-month period leading up to the murders, both of which involved a .38 caliber handgun.

> FN2. During the sentencing phase, portions of Haynes's statements to the authorities were admitted, further corroborating Gloria's account of the events that occurred that evening. Haynes confirmed that Higgs was driving the van that night. In addition, Haynes advised the authorities that he threw the gun in the river.

The first shooting was on November 20, 1995, at the Chaconia Nightclub in Washington, D.C. Wondwossen Kabtamu testified that Higgs got into an argument outside the club, and that Higgs shot out the windows of a vehicle in a drive-by shooting while Kabtamu drove Higgs's Mazda MPV van. Kabtamu threw the gun out of the window shortly afterwards, but Higgs insisted that they return to get it. A .38 caliber bullet was recovered by the police from the vehicle targeted by Higgs. Williams testified that Higgs also discussed the Chaconia shooting with him, and that Higgs said that he could not plead guilty to the Chaconia charge because the authorities would try to use the gun in another case. When Williams learned that Higgs was

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

663 F.3d 726

(Cite as: 663 F.3d 726)

being indicted for the triple murders, "Higgs commented to Williams, " 'you see why I can't plead guilty to that charge?' " " *Id.* at 293.

The second shooting was on December 10, 1995, on Cherry Lane in Laurel, Maryland. This shooting involved both Higgs and Haynes. Rodney Simms testified that Haynes came to his home and began arguing with him. During the argument, Haynes pulled a gun and began shooting *734 at Simms from the front of the house. Higgs came out from a nearby shed and also began shooting. Police recovered 9mm bullet casings from the front of the house, where the eyewitnesses placed Haynes, and a .38 caliber bullet from inside the house. In April 1997, Higgs pled guilty to his involvement in the Cherry Lane shooting. During the plea proceedings, the prosecutor stated that Haynes had fired the 9mm handgun and that Higgs had fired the .38 caliber handgun. Higgs offered no contest to his involvement in the shooting but claimed that he had fired the 9mm handgun and that Haynes had fired the .38 caliber handgun.

Finally, the government presented two categories of forensic evidence to corroborate the eyewitness testimony and crime scene evidence from the murder scene and the two prior shootings. The government presented experts in the area of firearms examination, comparison, and identification, who testified that the .38 caliber bullets recovered from the Chaconia shooting, the Cherry Lane shooting, and the murders all shared the same rifling characteristics. As we previously explained in *Higgs I,*

"lands and grooves" refer to the rifling marks that are "pressed onto a bullet when it travels down a barrel of a firearm." Because "[d]ifferent manufacturers will have different numbers of lands and grooves, different directions of twist, right or left, and different sizes," the marks allow forensic investigators to compare firearms with fired bullets and cartridge cases, and to compare fired bullets and cartridge cases from different crime scenes to one another.

*Id.* (citations omitted, alteration in original). The .38 caliber bullets recovered from the three crime scenes were all fired from a firearm with five lands and grooves with a right twist.

The government also presented CBLA evidence through the testimony of Kathleen Lundy, an examiner with the Elemental Analysis Group of the FBI laboratory. Lundy compared the elemental composition of the .38 caliber bullets recovered from the three crime scenes and from Higgs's apartment. According to Lundy, the lead composition of the .38 caliber bullet recovered from the Chaconia shooting matched the lead composition of eighteen of the .38 caliber bullets found at Higgs's apartment. In addition, the lead composition of the .38 caliber bullet recovered from the Cherry Lane crime scene matched the lead composition of the .38 caliber bullet recovered from the murder scene.

II.

Higgs contends that his due process rights

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

663 F.3d 726

(Cite as: 663 F.3d 726)

under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), were violated by the government's failure to produce two reports that he asserts could have been used to either exclude or further impeach the CBLA evidence presented by Lundy. In the alternative, Higgs contends that his trial counsel were constitutionally ineffective under *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), because they failed to discover the reports on their own or present comparable and available expert testimony to challenge the CBLA evidence. He contends that his post-trial counsel were also ineffective because they failed to file a motion for a new trial on the basis of newly discovered studies on CBLA evidence.

A.

[1][2] Under the Due Process Clause, the prosecution is required to disclose evidence favorable to an accused upon request, "where the evidence is material either*735 to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87, 83 S.Ct. 1194. To prevail on a *Brady* claim, the defendant must demonstrate (1) that the evidence is favorable, either because it is exculpatory or impeaching; (2) that the government suppressed the evidence; and (3) that the evidence was material to the defense. *See Strickler v. Greene*, 527 U.S. 263, 281–82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999); *Giglio v. United States*, 405 U.S. 150, 154–55, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972) (including impeachment evidence within the scope of materials that the prosecution must disclose).

[3][4][5][6][7] The duty to disclose favorable evidence, however, does not require the government to make available all evidence in its possession or within its reach. Nor does the mere suppression of favorable evidence entitle the defendant to relief. *See Kyles v. Whitley*, 514 U.S. 419, 437, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). There is no *Brady* violation if the evidence is available to the defense from other sources or the defense already possesses the evidence. *See United States v. Roane*, 378 F.3d 382, 402 (4th Cir.2004); *Fullwood v. Lee*, 290 F.3d 663, 686 (4th Cir.2002) ("The *Brady* rule does not compel the disclosure of evidence available to the defendant from other sources, including diligent investigation by the defense." (internal quotation marks omitted)). And, while "the term ' *Brady* violation' is sometimes used to refer to any breach of the broad obligation to disclose exculpatory [or impeachment] evidence ..., strictly speaking, there is never a real ' *Brady* violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." *Strickler*, 527 U.S. at 281, 119 S.Ct. 1936; *see also United States v. Bagley*, 473 U.S. 667, 677, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985) (Supreme Court precedent does not "automatically require a new trial whenever a combing of the prosecutors' files after the trial has disclosed evidence possibly useful to the defense but not likely to have changed the verdict." (internal quotation marks omitted)). A "reasonable probability" of a different result is shown "when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.' " *Kyles*, 514 U.S. at 434,

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

663 F.3d 726

(Cite as: 663 F.3d 726)

115 S.Ct. 1555 (quoting *Bagley,* 473 U.S. at 678, 105 S.Ct. 3375).

B.

[8][9] To succeed on a Sixth Amendment claim of ineffective assistance of counsel, the defendant must satisfy the two-prong test set forth in *Strickland.* The defendant must demonstrate that defense counsel's performance "fell below an objective standard of reasonableness" measured by "prevailing professional norms," *Strickland,* 466 U.S. at 688, 104 S.Ct. 2052, and that the "deficient performance prejudiced [his] defense," *id.* at 687, 104 S.Ct. 2052. The standard for *Strickland* prejudice is the same as for *Brady* materiality. *See id.; Kyles,* 514 U.S. at 434, 115 S.Ct. 1555; *Tice v. Johnson,* 647 F.3d 87, 110 (4th Cir.2011). The defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052, or "that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable," *id.* at 687, 104 S.Ct. 2052.

III.

In order to properly evaluate Higgs's challenges to the CBLA evidence in the context of his *Brady* and *Strickland* *736 claims, we begin with some background on CBLA evidence and the developments that took place before and after Higgs's trial.

A. *The Pre–Trial Reports*

From the late 1960s until at least 2004, CBLA was performed by the FBI to compare bullets found at or associated with a crime scene to bullets associated with a defendant, usually in cases where a fired bullet could not be matched to a particular firearm because the firearm was not recovered or the fired bullets were too mutilated for comparison of physical markings. CBLA evidence, when introduced at trial, generally consisted of two components: (1) the scientific test used to measure the elemental composition of the lead in bullets; and (2) the conclusions drawn by the examiner based upon the similarities or differences in the elemental compositions of the compared bullets.

The primary source of bullet lead is recycled car batteries. Secondary lead smelters melt and mix the lead with smaller lead sources and other chemicals in large vats, and these smelters then harden the lead into a solid form suitable for sale to bullet manufacturers. The manufacturers, in turn, process the lead into bullets. Due to impurities in the source material and the changes that are made to it, the elemental composition of lead melts varies. Bullets that share the same elemental composition were deemed by CBLA examiners to be analytically indistinguishable, creating the inference that the compared bullets originated from the same lead melt.

The first document at issue in this case derives from a presentation at an FBI conference in 1991 (the "FBI Report"), reporting that CBLA matches had been found in bullets taken from boxes manufactured seven months apart and fifteen months apart. Higgs claims that this report should have been disclosed to him

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

663 F.3d 726

(Cite as: 663 F.3d 726)

because it raised a question as to whether lead melts are unique in their elemental compositions.

The second document at issue is a May 2000 study performed by the Iowa State University Department of Statistics and Ames Laboratory (the "Iowa State Study"). This study was performed at the request of the FBI, with the goal of "develop[ing] a means for assessing bullet evidence, especially to be able to quantify the significance of matching bullet lead." J.A. 522. The available data necessary to do so, however, was felt to be insufficient and additional study was deemed necessary. The study specifically suggested that further research be done on bullet manufacturing, distribution, and usage, noting that "[b]ullets manufactured from different batches of raw material may end up in the same box of bullets; similarly bullets manufactured from the same batch can end up in different boxes" and that it had "been difficult from the limited data available to estimate the relative frequency of these events." J.A. 522. Higgs contends that this study should also have been disclosed to him because it called into question the premise that lead melts are unique and homogeneous in their elemental compositions.

### B. *The Post-trial Reports*

Higgs's trial was completed in October 2000. In the ensuing years, the FBI and the scientific community collaborated their efforts to quantify the significance of bullet lead matches from CBLA. *See Clemons v. Maryland,* 392 Md. 339, 896 A.2d 1059, 1076–78 (2006) (discussing the various studies released in 2002 that questioned the value of CBLA evidence and recommended further study of the issue). At the request of the FBI, the National Research Council ("NRC") of the National *737 Academy of Sciences undertook a study of the issue and, in 2004, released its recommendations in a report entitled "Forensic Analysis: Weighing Bullet Lead Evidence." J.A. 491 (internal quotation marks omitted). The NRC reported that "the FBI Laboratory's analytical instrumentation is appropriate and the best available technology with respect to precision and accuracy for the elements analyzed" and "that the elements selected by the FBI for this analysis are appropriate." J.A. 491. However, "[t]he NRC expressed concerns ... relating to the interpretation of the results of bullet lead examinations." J.A. 491. "Although the NRC stated that the FBI Laboratory did not need to suspend bullet lead examinations while undertaking [its] review [of the recommendations], the FBI elected to do so while the review was pending." J.A. 491. On September 1, 2005, the FBI announced that it would no longer perform CBLA because "neither scientists nor bullet manufacturers [had been] able to definitively attest to the significance of an association made between bullets in the course of a bullet lead examination." J.A. 491. Prior to doing so, however, "the FBI Laboratory ha[d] not determined that previously issued bullet lead reports were in error." J.A. 492.

Because Higgs's convictions and sentences were imposed prior to these additional studies and the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

663 F.3d 726

(Cite as: 663 F.3d 726)

FBI's response, Higgs claims that his defense counsel were also ineffective post-trial for failing to investigate and present the ongoing developments in a motion for a new trial under Rule 33 of the Federal Rules of Criminal Procedure.

## IV.

Higgs claims that the FBI Study and Iowa State Study, both of which were in existence at the time of his trial, were internal studies performed by or at the request of the FBI and, therefore, were not reasonably available to trial counsel. Accordingly, he asserts that the government violated its *Brady* obligations by failing to produce them. In the alternative, Higgs contends that his trial counsel were constitutionally ineffective for failing to independently discover the studies, or present comparable impeachment material that was reasonably available in the public domain through an expert. *See* Brief of Appellant at 41 (arguing that "[e]ven without the information withheld by the [g]overnment, reasonable counsel would still have had much at their disposal to exclude CBLA, impeach Lundy or persuade the jury that her testimony lacked probative value").

The district court rejected the *Brady* claim, holding that the government was not required to disclose the studies because:

(1) the studies' strongest critiques of CBLA were available in at least one published study which was publicly available at the time of Higgs' trial, strongly suggesting that, through the exercise of reasonable diligence, Higgs could have obtained identical or nearly identical information; (2) the studies' remaining critiques do not consist of strong, definitive conclusions, but at most suggest areas for possible additional study; (3) by his own admission, Higgs could have called live witnesses capable of offering conclusions nearly identical to those offered in the Government's studies; and (4) other evidence presented at trial provided a firm link between Higgs and the bullets found at the murder scene.

*Higgs,* 711 F.Supp.2d at 498. With regard to Higgs's *Strickland* claim, the district court assumed that counsel's performance was deficient, but "conclude[d] that there was no reasonable probability that, absent **\*738** counsel's alleged errors, the result of the proceeding would have been different. The multiplicity and the strength of the evidence ... establish that proposition beyond peradventure." *Id.* at 502.

## A.

As the government correctly observes, CBLA evidence was widely admitted into evidence in various courts in this country at the time of Higgs's trial and up until at least 2003, when the NRC began its review of the issue and ultimately recommended further study. *See, e.g., United States v. Davis,* 103 F.3d 660, 673–74 (8th Cir.1996); *Haynes v. United States,* 451 F.Supp.2d 713, 720 (D.Md.2006); *State v. Noel,* 157 N.J. 141, 723 A.2d 602, 605–06 (1999). [FN3]

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

663 F.3d 726

(Cite as: 663 F.3d 726)

However, it seems equally clear, as Higgs has acknowledged, that the criticisms of CBLA were already present in the public domain at the time of Higgs's trial, even if the FBI Study and the Iowa State Study might not have been.

> FN3. In the wake of the scientific community's more recent reports about CBLA evidence, courts have, in appropriate cases, granted new trials or reversed convictions that hinged upon it. *Compare Ragland v. Commonwealth,* 191 S.W.3d 569, 582 (Ky.2006); (overturning murder conviction where CBLA was the only conclusive evidence linking defendant to the murder bullet), *Clemons v. State,* 392 Md. 339, 896 A.2d 1059, 1078 (2006) (reversing the trial court's denial of defendant's motion to exclude CBLA evidence because "a genuine controversy exists within the relevant scientific community about the reliability and validity of CBLA" and "[t]he only consensus that can be derived from [the scientific studies] is that more studies must be conducted"), and *New Jersey v. Behn,* 375 N.J.Super. 409, 868 A.2d 329, 345 (App.Div.2005) (granting new trial where the proof was "far from overwhelming" and the CBLA evidence was not cumulative or merely impeaching), *with United States v. Berry,* 624 F.3d 1031, 1041 (9th Cir.2010) (rejecting § 2255 claim based upon CBLA evidence because "while ... the studies may caution against widespread usage of [CBLA] evidence," they did not "establish that [CBLA]

evidence is so fundamentally unreliable that its introduction at [defendant's] trial violated his due process rights"), and *In re Berkley,* 375 Fed.Appx. 413, 415 (5th Cir.2010) (denying request to file successive application for habeas relief from capital conviction based upon CBLA criticism because, even assuming that the petitioner could not have discovered the flaws in the CBLA evidence through the exercise of reasonable diligence, he failed to "show [ ] that but for the flawed bullet analysis, no reasonable factfinder would have found him guilty of capital murder").

[10] Having reviewed the record presented by Higgs on this issue, we cannot conclude that the government violated its *Brady* obligations by failing to disclose the two internal reports in existence at the time of Higgs's trial. The reports represent early attempts by the FBI to quantify the conclusions that could be drawn from lead analysis to counter the criticisms that were in existence at the time and ultimately did little more than advise the FBI that further study was warranted. Additionally, the criticisms of CBLA appear to have been available to trial counsel prior to trial.

[11] Higgs also failed to demonstrate that his trial counsels' handling of the CBLA issue rose to the level of constitutionally deficient performance under *Strickland.* Defense counsel conducted a thorough and effective cross-examination of Lundy, demonstrating that Higgs's counsel were well acquainted with the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

663 F.3d 726

(Cite as: 663 F.3d 726)

criticisms of CBLA, and we see little that could have been gained by calling a defense expert to offer comparable criticisms. For example, Lundy admitted that CBLA evidence is far different from fingerprint analysis and DNA analysis, which provide narrow or unique identifiers. She testified that all bullets come from the same six secondary smelters, that they all share some similarities in elemental composition,*739 that an exact replication of elemental compositions can never be achieved, and that there is always uncertainty in measurements. She testified that Remington, the bullet manufacturer in this case, would have manufactured approximately five million bullets in 1995, and that there would be many, many other bullets with the same elemental composition as those matched in this case. She also testified that bullets within the same box of ammunition may be found to have different elemental compositions.

[12][13][14] When considering a claim of deficient performance, courts must evaluate the conduct from counsel's perspective at the time. *See Strickland,* 466 U.S. at 690, 104 S.Ct. 2052. We "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," *Roach v. Martin,* 757 F.2d 1463, 1476 (4th Cir.1985), and "that, under the circumstances, the challenged action, might be considered sound trial strategy," *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052 (internal quotation marks omitted). "The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom."

*Harrington v. Richter,* —— U.S. ——, 131 S.Ct. 770, 788, 178 L.Ed.2d 624 (2011).

Here, Higgs has failed to demonstrate that defense counsel's handling of the CBLA evidence at trial was constitutionally ineffective simply because counsel did not ferret out the two preliminary studies or present a defense expert armed with the same information. On the contrary, counsel went a long way towards impeaching the uniqueness and homogeneity of lead melts, as well as the overall probative value of the CBLA evidence, demonstrating that counsel was well-versed in the subject and able to obtain important concessions. And counsel did so without unduly calling attention to the evidence, or making it appear to be of more importance than was warranted. Such decisions by experienced, capital defense counsel fall squarely within the class of those to which we give deference.

B.

Nevertheless, even if we were to assume that the government violated its *Brady* obligation by failing to produce the two reports to Higgs's counsel, or that the performance of Higgs's counsel was constitutionally deficient, Higgs is not entitled to relief because he has also failed to demonstrate that he was prejudiced by the government's failure to disclose the reports to him prior to trial or by the admission of the CBLA evidence at trial.

1.

In this appeal, Higgs's counsel attempts to

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

663 F.3d 726

(Cite as: 663 F.3d 726)

establish prejudice in two ways: (1) by claiming that the CBLA evidence provided the crucial link between "Higgs ['s] bullets taken from the [murder] scene" and the bullets taken from "Higgs's apartment"; and (2) by claiming that it was the CBLA evidence that "enabled the [g]overnment to introduce prejudicial Rule 404(b) evidence" of Higgs's involvement in the Chaconia and the Cherry Lane shootings. Brief of Appellant at 45; *see* Fed.R.Evid. 404(b). Neither assertion, however, is accurate.

First, Higgs asserts that the CBLA evidence permitted the government "to put the .38 caliber handgun in Higgs's possession" prior to the murders by "showing that a bullet recovered from the Chaconia incident matched the chemical composition of the bullets recovered from Cherry Lane and the capital killings." Brief of Appellant at 45. In the absence of the CBLA evidence, Higgs claims, "there would have *740 been no unimpeached evidence linking Higgs's bullets taken from the crime scene to Higgs's apartment." *Id.; see also* Reply Brief at 1 (arguing that "Higgs's convictions and death sentences are tainted" by the CBLA evidence because it "purport[s] to 'match' bullets taken from Higgs's apartment with those found at the scene of the homicide, and two unrelated shooting incidents"); *id.* at 21 (contending that "*only* the CBLA evidence purported to draw a connection between the bullets Higgs owned and those fired at the homicide scene and the other shooting incidents") (emphasis added).

However, the CBLA evidence did not match the bullets from Higgs's apartment or the Chaconia shooting to the murder bullet; it only linked the Cherry Lane bullet to the murder bullet. In fact, Lundy did not even bother to test the Chaconia bullet or the majority of the bullets found in Higgs's apartment for comparison to the murder bullets because they were of a different type, and the only .38 caliber wadcutter bullet that was found in Higgs's apartment did not match the wadcutter bullets found at the murder scene or at Cherry Lane.

[15] Higgs's claim that it was the CBLA evidence that enabled the government to introduce the 404(b) evidence of the Cherry Lane and Chaconia shootings is also inaccurate. On direct appeal, Higgs challenged the district court's admission of the Chaconia shooting under Rule 404(b), which, in contrast to the Cherry Lane shooting, involved a different type of bullet than the murder bullet and a crime to which Higgs had not pled guilty. We held as follows:

The bullet recovered from the Chaconia shooting was forensically similar to those recovered from the Patuxent murder scene and the victims, in that they shared the same *rifling* characteristics—five lands and grooves with a right twist. Thus, the evidence of Higgs's participation in the Chaconia Nightclub shooting was properly introduced by the government as a means to link Higgs to the same caliber weapon that Gloria testified Higgs owned and retrieved from the drawer on the night of the murders, and one which shared the same rifling characteristics as did the murder weapon.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

663 F.3d 726

(Cite as: 663 F.3d 726)

*Higgs I*, 353 F.3d at 311–12 (emphasis added). In doing so, we made no mention of the CBLA evidence, which is unsurprising given that the CBLA evidence did not match the Chaconia bullet to the murder bullet at all. Rather, the testimony and forensic evidence of rifling characteristics alone demonstrated the relevance and admissibility of the prior shootings under Rule 404(b). The district court's admission of the Chaconia shooting did not rest upon the CBLA evidence, and while the CBLA evidence could have provided an additional basis upon which to admit the Cherry Lane shooting had it been challenged, it was neither critical nor necessary.

2.

[16][17] Finally, we have carefully considered the materiality of the CBLA evidence that was introduced, and the question of whether there is a reasonable probability that the result of the proceedings would have been different had the government produced the studies at issue or had trial counsel handled the CBLA issue in different way. We are satisfied that there is not.[FN4]

> FN4. We may summarily dispose of Higgs's claim that the production of the preliminary studies or the presentation of comparable information would have resulted in the district court's exclusion of CBLA evidence at trial. Higgs's counsel has conflated the criticisms of CBLA that were present at the time of trial with the criticisms that followed. We evaluate the obligations of the government and the conduct of defense counsel at the time of trial and have no difficulty concluding that there is no reasonable probability that the trial court would have excluded the CBLA evidence in October of 2000.

*741 As we have twice concluded, the evidence of Higgs's guilt and of his predominant role in the brutal kidnappings and murders of the three women was overwhelming, as was the evidence, irrespective of the CBLA evidence, that linked Higgs to the .38 caliber weapon and to .38 caliber ammunition.

Gloria's eyewitness testimony provided compelling and convincing details of the events of that evening and of Higgs's involvement in them. Jackson's day planner, containing Higgs's name, telephone number, address and vehicle license tag number, corroborated Gloria's testimony regarding Higgs's words and actions in the wake of his violent argument with Jackson and the threat she made as she was leaving his apartment. And, as the government pointed out in closing arguments, Gloria's inability to recall every precise detail, such as who disposed of the gun, could well have bolstered his credibility.

For his part, Higgs admitted to the authorities that he knew Tanji Jackson and claimed that he commented to a guest at his girlfriend's house the following evening that he knew "that Tanji girl," even though the names of the victims had not yet been released to the press. *Id.* at 291 (internal quotation marks omitted). And after unsuccessfully attempting to

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

663 F.3d 726

(Cite as: 663 F.3d 726)

establish an alibi through Smith and Darby, Higgs admitted to Darby that he was with Haynes on the night of the murder, that the women were killed because Jackson was "snitching" on one of them, and that the other two women were just along "for his friends." *Id.* at 292 (internal quotation marks omitted).

As we previously summarized, there was overwhelming evidence confirming that:

it was Higgs who set up the "dates" with the girls, Higgs who got into the violent argument with Jackson, Higgs who observed Jackson writing down his license plate number, Higgs who retrieved the .38 caliber murder weapon (which he owned) and told the other two men to come along, Higgs who told Haynes to "trick" the women into getting into the van, Higgs who drove the van past the route back to their homes and into the Patuxent National Wildlife Refuge, Higgs who handed the murder weapon to Haynes moments before Haynes shot and killed the women, and Higgs who orchestrated the destruction of the physical evidence at his apartment after the murders.

*Higgs II,* 95 Fed.Appx. at 44.

With regard to the Chaconia and Cherry Lane shootings, the eyewitness testimony and forensic evidence, irrespective of the CBLA, easily place a .38 caliber weapon in Higgs's possession in the two months prior to the murders. The rifling evidence alone, unlike the CBLA evidence, demonstrated a consistency in the bullets fired at all three crime scenes and corroborated the eyewitness testimony that Higgs possessed, used, or directed the use of a .38 caliber weapon in connection with all three crimes. Higgs's incriminating statements made in connection with the two prior shootings are particularly significant. Higgs conveyed to Williams that he could not plead guilty to the Chaconia shooting (in which Haynes was *not* involved) because the authorities might use the gun in connection with the murder case. And Higgs gratuitously advised the court during his plea to the Cherry Lane shooting *742 (in which Haynes *was* involved) that Haynes had fired the .38 caliber weapon and that Higgs had fired the 9mm weapon. Finally, Higgs's reference to Haynes as his "youngan," who would "hold up" if offered a deal to turn on him, revealed much about how Higgs viewed his relationship with his younger companion. *Higgs I,* 353 F.3d at 293 (internal quotation marks omitted).

Given this overwhelming evidence of Higgs's role in the murders, we are satisfied that the CBLA evidence did not affect the outcome of the verdicts. The CBLA evidence matching the Chaconia bullet to the bullets in Higgs's apartment merely corroborated the eyewitness testimony of Kabtamu, the crime scene evidence from the Chaconia shooting, including the rifling evidence, and Higgs's statements to Williams, all of which placed the .38 caliber weapon in Higgs's hands on the night of that shooting. Unlike the rifling evidence, however, there was no CBLA match between the ammunition used in the Chaconia shooting or the ammunition at Higgs's home and the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

663 F.3d 726

(Cite as: 663 F.3d 726)

ammunition used in the murders. Similarly, the CBLA evidence matching the Cherry Lane bullet to the murder bullet merely corroborated the eyewitness testimony of Simms and others at Cherry Lane and the crime scene evidence from that shooting, including the rifling evidence that also matched the Cherry Lane bullet and the murder bullet. However, there was no match between the Cherry Lane bullet and the bullets associated with Higgs's apartment, and Higgs and Haynes were both involved in the Cherry Lane shooting and in the murders. Higgs did not contest that Haynes was the triggerman, or that Haynes used a .38 caliber weapon to murder the women. And, as defense counsel pointed out to the jury, there was substantial evidence that Haynes had equal if not more access to Higgs's apartment. Thus, while the CBLA evidence matched the bullet from Cherry Lane with the murder bullet, it was cumulative to other evidence but not inconsistent with Higgs's defense.

Having reviewed the challenged evidence in the context of the entire case, we conclude there is no reasonable probability that the district court would have excluded the CBLA testimony at Higgs's trial had it been challenged, or that the outcome of the guilt or sentencing phase would have been different had the CBLA evidence been excluded or subjected to additional cross-examination.

V.

[18] Higgs's final claim is that his defense counsel were ineffective because they failed to file a motion for a new trial under Rule 33 of the Federal Rules of Criminal Procedure within three years of the verdict, based upon the CBLA studies that were published thereafter.

After his trial was concluded, Higgs requested and was granted a substitution of counsel for one of his two defense attorneys for the purpose of pursuing an appeal and other post-conviction relief. Higgs's counsel did not challenge the admission of the CBLA evidence on direct appeal, and although defense counsel did file a new trial motion based upon other evidence discovered in connection with a fresh review of the case, they did not file a similar motion on the basis of the more recent CBLA studies. Higgs contends that defense counsels' failure to also challenge the CBLA evidence in a motion for a new trial amounted to constitutionally deficient performance, and that he was prejudiced as a result.

[19] To receive a new trial based on newly discovered evidence, a defendant must show that the evidence is newly discovered; that he has been diligent in uncovering it; that the evidence is not merely cumulative or impeaching; that the evidence is material to the issues involved; and that the evidence would probably*743 produce an acquittal. *See United States v. Chavis,* 880 F.2d 788, 793 (4th Cir.1989). Unless the defendant demonstrates all five of these factors, the motion should be denied. *See id.* To obtain relief in this proceeding, Higgs must demonstrate that counsel's failure to file the motion constituted deficient performance and that he was prejudiced as a result. *See Strickland,* 466 U.S. at 687–88, 104 S.Ct. 2052.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

663 F.3d 726

(Cite as: 663 F.3d 726)

[20] Higgs has failed to demonstrate that defense counsel were constitutionally ineffective for failing to file a motion for a new trial based upon the post-trial studies. The post-trial studies published in 2002 and 2003 were largely cumulative of the criticisms known at the time of trial and were at best merely impeachment evidence. *Cf. Berry,* 624 F.3d at 1043 (concluding that even "the [NRC] report and the FBI's discontinued use of [CBLA] evidence were no more than impeaching evidence of the [CBLA] testimony introduced at [defendant's] trial"). And, as discussed above, there is no reasonable probability that the post-trial studies or a new trial would have resulted in a different verdict. We cannot say that the post-trial defense counsel team was constitutionally ineffective simply because they did not pursue a new trial motion on the basis of the CBLA developments, particularly in view of the cross-examination that was conducted and the minor role that the evidence played during the trial, or that Higgs was prejudiced as a result.

VI.

For the foregoing reasons, we affirm the district court's order denying Higgs's motion under 28 U.S.C. § 2255.
    *AFFIRMED*

C.A.4 (Md.),2011.

U.S. v. Higgs
663 F.3d 726
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.