# EXHIBIT 5

UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | : |  |
| Respondent, | : | Criminal No. PJM-98-0520 |
| v. | : | Peter J. Messitte, U.S.D.J. |
| DUSTIN JOHN HIGGS, | : | Greenbelt Division |
| Petitioner. | : |  |

**PETITIONER'S MOTION FOR RELIEF FROM FINAL JUDGMENT
PURSUANT TO *HAZEL-ATLAS GLASS CO. v. HARTFORD-EMPIRE CO.* AND
FEDERAL RULE OF CIVIL PROCEDURE 60(d)**

Petitioner, Dustin John Higgs, hereby moves for relief from this Court's final judgments

denying him relief pursuant to 28 U.S.C. § 2255 or in the alternative pursuant to 28 U.S.C. §

2241 (Doc. 548); denying discovery (*id.*); denying a certificate of appealability (Doc. 560); and

denying his motion to alter or amend the judgment pursuant to Federal Rule of Civil Procedure

59(e) (Doc. 561). Mr. Higgs makes this motion pursuant to *Hazel-Atlas Glass Co. v. Hartford-*

*Empire Co.*, 322 U.S. 238 (1944), and Federal Rule of Civil Procedure 60(d). In support of this

motion, Mr. Higgs states the following:

## INTRODUCTION

Dustin Higgs is currently on death row, having been convicted and sentenced to death for

murder and related charges in this Court. Victor Gloria was the most important witness at Mr.

Higgs's trial. Indeed, in the opinion of the trial prosecutor, "the government could not have

proceeded and obtain[ed] a conviction against Mr. Higgs certainly without the assistance of Mr.

1

Gloria." Exhibit 1 at 4 (argument of AUSA Deborah Johnston during Mr. Gloria's sentencing hearing in support of a motion for downward departure due to Mr. Gloria's "substantial assistance to the government").

As part of the § 2255 proceedings in this Court challenging Mr. Higgs's convictions and sentences, Mr. Higgs alleged that the government did not turn over all of the material relating to Mr. Gloria that it was required to under *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), and their progeny. Specifically, Mr. Higgs alleged that Mr. Gloria was a suspect, but was never charged, in an unrelated homicide in Baltimore that was committed prior to the time of Mr. Higgs's trial. Doc. 492 at 33. Mr. Higgs further alleged that Mr. Gloria was not charged with this homicide at the behest of the government "in an effort to preserve his status as a testifying witness in this federal capital triple homicide case." *Id.* Mr. Higgs alleged that the government's failure to disclose this favorable treatment of Mr. Gloria violated Mr. Higgs's due process rights. *Id.*

The government responded to Mr. Higgs's § 2255 allegation regarding Mr. Gloria by denying that federal officials had any knowledge of or ability to influence any benefits conferred on Mr. Gloria by local authorities in Baltimore, dismissing the allegation as speculative, and urging the denial of relief. Doc. 520 at 85-88. This Court denied Mr. Higgs's claim, adopting the government's line of argument. The Court ruled that "pure speculation about supposed benefits cannot substitute for hard facts," and that "Higgs, quite simply, has failed to demonstrate any causal connection between Gloria's testimony in this federal case and whatever treatment he may have received in the state jurisdictions." *United States v. Higgs*, 711 F. Supp. 2d 479, 508 (D. Md. 2010).

2

Mr. Higgs has now obtained the Baltimore City Police file for the homicide in which he alleged Mr. Gloria was an uncharged suspect. The contents of the file reveal that: 1) Mr. Gloria was indeed a suspect in the Baltimore murder, having been identified as the killer by multiple eyewitnesses; 2) at least as early as February 2, 1999, Detective Joseph Green of the United States Park Police was aware that Mr. Gloria was a suspect in the murder; 3) on April 12, 1999, Assistant United States Attorney Deborah Johnston spoke with Mark Cohen, then the chief of the homicide division of the Baltimore City State's Attorney's Office, about the fact that Mr. Gloria was a suspect in the Baltimore homicide; 4) during this conversation, AUSA Johnston suggested to Mr. Cohen that it was possible Mr. Gloria did not commit the killing because, in her estimation, the eyewitnesses who identified him had a motive to lie; 5) the Baltimore City Police embraced AUSA Johnston's proffered theory of Mr. Gloria's innocence of the murder and declined to charge Mr. Gloria with any crime; and 6) the Baltimore City State's Attorney's Office would have charged Mr. Gloria with the murder absent the intervention of federal officials, including AUSA Johnston, Detective Green, Detective Rydi Abt of the Park Police, and Agent Bradlee Sheafe of the FBI. In sum, the government knew that Mr. Higgs's allegation was supported by "hard facts," but made false representations to this Court during the § 2255 litigation in order to prevail.

The government's representations during the course of the § 2255 proceedings therefore constitute fraud on the Court, and merit relief from the Court's final judgment denying discovery and post-conviction relief under *Hazel-Atlas* and Federal Rule of Civil Procedure 60(d)(3). Not only has the government now been engaged in a years-long *Brady* violation, but officers of this Court representing the government have made materially false statements in their continuing

3

attempt to cover up the violation. AUSA Johnston signed the government's pleading that faulted Mr. Higgs for failing to demonstrate any connection to federal officials regarding the "supposed" benefits obtained by Mr. Gloria. It is now clear that multiple federal officials, including AUSA Johnston, had intimate involvement in the conferring of these benefits, which were directly related to Mr. Gloria's testimony in this case. The government's misrepresentations to this Court in a death penalty case, which formed the basis for the Court's denial of relief, merit relief from the final judgments.

Mr. Higgs submits that this motion, and the exhibits thereto, demonstrate his entitlement to relief under Fourth Circuit and United States Supreme Court precedent. At a minimum, Mr. Higgs requests that he be granted an evidentiary hearing at which he will prove these serious allegations. Further, a probing inquiry is necessary into what additional undisclosed *Brady* and/or *Giglio* material remains in the hands of the government. Mr. Higgs therefore also requests to be heard on the renewed *Brady/Giglio* discovery request that he has filed contemporaneously with this motion.

## PROCEDURAL HISTORY

On December 21, 1998, Mr. Higgs, along with co-defendant Willis Haynes, was indicted on charges connected with the January 27, 1996, shooting deaths of Tanji Jackson, Tamika Black, and Mishann Chinn. On October 22, 1999, the government filed a notice of its intent to seek the death penalty against Mr. Higgs. On December 20, 1999, the grand jury returned a second superseding indictment, and the government thereafter filed an amended death notice.

The cases against Mr. Haynes and Mr. Higgs were severed for trial. Mr. Haynes – by all

accounts the person who actually killed Ms. Jackson, Ms. Black, and Ms. Chinn[1] – was tried first and sentenced to life in prison without release. Mr. Higgs was tried next, and on October 11, 2000, was found guilty of firearms charges and three counts each of first-degree premeditated murder, first-degree murder committed during a kidnapping, and kidnapping resulting in death. Following a sentencing hearing, the jury recommended death sentences on the nine death-eligible counts.

The Fourth Circuit upheld the convictions and sentences on direct appeal. *United States v. Higgs*, 353 F.3d 281 (4th Cir. 2003) (*Higgs-1*). While the direct appeal was pending, Mr. Higgs filed a motion for a new trial, alleging that the government had withheld *Brady* material relating to two witnesses. This Court denied the motion for new trial, and the Fourth Circuit again affirmed. *United States v. Higgs*, 95 Fed. Appx. 37 (4th Cir. 2004) (*Higgs-2*). Certiorari was denied with respect to each appeal. *Higgs v. United States*, 542 U.S. 999 (2004); *Higgs v. United States*, 543 U.S. 1004 (2004).

Mr. Higgs then filed his *Motion for Relief Pursuant to 28 U.S.C. Section 2255 or in the Alternative Pursuant to 28 U.S.C. 2241* on November 28, 2005. Doc. 492. He also moved for discovery and a hearing on several of his claims. *Id.*; *see also* Doc. 509. On April 7, 2010, this Court denied the § 2255 motion without argument, discovery, or a hearing. *United States v. Higgs*, 711 F. Supp. 2d 479 (D. Md. 2010) (*Higgs-3*); *see also* Doc. 548 (Final Judgment Order). The Court denied Mr. Higgs's motions for reconsideration and for a certificate of appealability (COA) on July 20, 2010. Docs. 560, 561.

---

[1]*See, e.g., United States v. Haynes*, 26 Fed. Appx. 123, 127 (4th Cir. 2001) (unpub.) (describing how "Haynes exited the vehicle and fired five shots, killing all three women").

5

Mr. Higgs then sought a COA from the Fourth Circuit on numerous issues, including that the government improperly suppressed the benefit Mr. Gloria received in avoiding a first degree murder charge in Baltimore. The Fourth Circuit denied a COA on all but one issue, regarding the government's withholding of exculpatory material relating to comparative bullet lead analysis and counsel's ineffectiveness in handling the issue, and subsequently denied relief. *United States v. Higgs*, 663 F.3d 726 (4th Cir. 2011) (*Higgs-4*). The United States Supreme Court denied certiorari on December 10, 2012. *Higgs v. United States*, 133 S.Ct. 787 (2012).

## STATEMENT OF FACTS

### A.     Victor Gloria's Trial Testimony

During the early morning hours of January 27, 1996, Ms. Jackson, Ms. Black, and Ms. Chinn were found murdered along Route 197 in the Patuxent National Wildlife Refuge in Prince George's County, Maryland. Victor Gloria was the most significant witness at Mr. Higgs's trial on the charges arising from these murders. According to AUSA Johnston, the government "could not have proceeded and obtain[ed] a conviction against Mr. Higgs" without Mr. Gloria's testimony. Exhibit 1 at 4 (Gloria sentencing hearing). This Court concurred in that assessment. *Id.* at 16 (describing Mr. Gloria as "the critical link in the conviction of these two men," and finding that "[t]hat is the most important thing about [Gloria] at this point in the sentencing, and it overrides everything else"); *see also Higgs-1*, 353 F.3d at 289 (noting that "[m]ost of the facts surrounding the murders of the three women were obtained from [Gloria's] eyewitness testimony"); *Higgs-4*, 663 F.3d at 730 ("At trial, [Gloria] provided a detailed, eyewitness account of the kidnappings and murders"); *id.* at 741 ("Gloria's eyewitness testimony provided compelling and convincing details of the events of that evening and of Higgs's involvement in

6

them").

Mr. Gloria testified to a number of highly damaging facts relating to Mr. Higgs's involvement in the killings. Mr. Gloria testified, for example, that the three victims were socializing at Mr. Higgs's apartment on the night of the killings with Mr. Haynes, Mr. Gloria, and Mr. Higgs, when Mr. Higgs got into an argument with Ms. Jackson. *Higgs-1*, 353 F.3d at 289-90. According to Mr. Gloria, this argument led Mr. Higgs to want to have the victims killed. *Id.* Mr. Gloria testified that after the three women left the apartment following the fight, Mr. Higgs got a gun and told Mr. Haynes to get the three women into Mr. Higgs's vehicle. *Id.* at 290. Finally, Mr. Gloria testified that he then got in the back seat of Mr. Higgs's vehicle and observed Mr. Higgs drive the three women to a secluded location along Route 197 while having whispered conversations with Mr. Haynes, pull over, and hand Mr. Haynes the gun with which to carry out the killings. *Id.* Mr. Gloria was the only source of this direct, highly damaging testimony.

**B.     The Murder of Martrelle Creighton**

On July 18, 1998, approximately two and a half months prior to Mr. Gloria's arrest in this federal case, a man named Martrelle Creighton was murdered in the Inner Harbor area of Baltimore.[2] Exhibit 2 (Report of Baltimore Police Detective Robert L. Patton, 7/18/98). At approximately 2:00 a.m. on July 18, Mr. Creighton was found by police lying on the sidewalk near 301 Light Street, suffering from a single stab wound to the neck. *Id.*

As discussed below, the fatal wound was consistent with having been inflicted by a single

---

[2] Although law enforcement suspected the involvement of Mr. Gloria in the federal case early on in their investigation, Mr. Gloria was not arrested until almost three years after the Route 197 murders, on October 5, 1998. Thus, on the date of Mr. Creighton's murder, Mr. Gloria was not yet in custody.

7

blow, which could have appeared to onlookers to be a punch.  Witnesses told police that both Victor Gloria and Kevin Miller swung at the decedent during an altercation, and several said that Mr. Gloria was the first to run away.  Thus, either Mr. Gloria or Mr. Miller could have been the person who stabbed Mr. Creighton.

Mr. Creighton was immediately transported to the University of Maryland Shock Trauma Center for treatment, but was pronounced dead at approximately 2:30 a.m.  Exhibit 2.

Baltimore Police soon learned that Mr. Creighton's murder was precipitated by two groups of young men arguing over a group of young women.  *Id.*  One of the groups of men was comprised of Mr. Creighton and his friends.  *Id.*  The other group of men was comprised of Kevin Miller, twin brothers Keith and Kevin Scott, and Victor Gloria.  Exhibit 3 (Report of Report of Baltimore Police Detective Robert L. Patton, 2/2/99).

The trouble in the Inner Harbor began when Mr. Creighton's group attempted to strike up a conversation with the group of young women.  Exhibit 2.  The young women, who did not previously know anyone in Mr. Creighton's group, were not interested.  *Id.*  Shortly thereafter, the young women began talking with Mr. Gloria's group, who they also had not known previously.  *Id.*  Mr. Creighton apparently then became angry that the young women were talking to members of Mr. Gloria's group given that they had been uninterested in talking with Mr. Creighton's group.  *Id.*  As a result, Mr. Creighton began yelling at the young women as well as at Mr. Gloria's group.  *Id.*  With minor variations, every witness interviewed by Baltimore Police, which included members of Mr. Creighton's group, members of the group of young women, and Mr. Miller and the Scott twins, gave essentially the same account of the lead up to the stabbing.

8

At that point, however, the accounts began to differ somewhat. Clarence White, a friend of Mr. Creighton's, was interviewed by Baltimore Police on the night of the stabbing. Exhibit 4 (information sheet regarding interview of Clarence White, 7/18/98). Handwritten police notes from this unrecorded interview indicate that Mr. White described how once the altercation began, a man with "light skin" – a description consistent with Mr. Gloria – swung at Mr. Creighton, at which point Mr. Creighton "grabbed his neck and was bleeding bad." Exhibit 5 (handwritten notes from interview of Clarence White).[3] Mr. White also stated that there were three or four members of the stabber's group, who all ran away together after the stabbing. *Id.* Mr. White was reinterviewed nearly a year later, on June 11, 1999, at which point he changed his account to indicate that the stabber was "brown skinned," a description more consistent with Mr. Miller. Exhibit 6 (transcript of interview with Clarence White, 6/11/99). Mr. White also stated in the second interview that he definitely saw three people involved in the altercation with Mr. Creighton. *Id.* Mr. White identified the three individuals involved as the Scott twins and Mr. Miller at that time. *Id.*

David Bishop, another friend of Mr. Creighton's, was also interviewed on the night of the stabbing and said that he saw both a man matching the description of Mr. Miller and a man matching the description of Mr. Gloria punch Mr. Creighton. Exhibit 7 (transcript of interview with David Bishop, 7/18/98). Mr. Bishop did not initially realize that Mr. Creighton had been stabbed, although Mr. Bishop assumed once he realized that Mr. Creighton had been stabbed that it was Mr. Miller who did the stabbing. *Id.*

---

[3] Mr. White's description must refer to Mr. Gloria. While the Scott twins are also light skinned, none of the witnesses asserted that either of them punched Mr. Creighton.

Sisters Barbara and Charnetta Bailey, who were in the group of young women, were initially interviewed by police on July 29th, 1998, and August 12th, 1998, respectively. Exhibit 8 (transcript of interview with Barbara Bailey, 7/29/98); Exhibit 9 (transcript of interview with Charnetta Bailey, 8/12/98). Both women said that around the time the confrontation between the two groups of men started, they started to walk away. *Id.* Both women also stated that at the beginning of the altercation they saw Mr. Gloria run away and Mr. Creighton and Mr. Miller then engaged in a brief fistfight in which Mr. Miller punched Mr. Creighton. *Id.* Neither Bailey sister realized that Mr. Creighton had been stabbed. *Id.*

The Scott twins were first interviewed by police on February 2, 1999, when they were arrested in connection with the stabbing. The Scott twins each said that it was Mr. Gloria who stabbed Mr. Creighton, although they, too, did not initially realize that Mr. Creighton had been stabbed. Exhibit 10 (transcript of interview with Keith Scott, 2/2/99); Exhibit 11 (transcript of interview with Kevin Scott, 2/2/99). The Scott twins both said that Mr. Gloria punched Mr. Creighton and then ran away, and that they did not see Mr. Miller fighting with Mr. Creighton at all. *Id.*

Mr. Miller was arrested and interviewed by police on April 7, 1999. Mr. Miller also said that Mr. Gloria punched Mr. Creighton and then ran away. Exhibit 12 (transcript of interview with Kevin Miller, 4/7/99). Mr. Miller said that he himself then threw a punch at one of Mr. Creighton's friends, but never hit Mr. Creighton. *Id.* Mr. Miller denied stabbing Mr. Creighton and stated that he did not realize when he began fighting that Mr. Creighton had been stabbed. *Id.*

There is no indication that Baltimore Police ever interviewed or attempted to interview

Mr. Gloria, despite the fact that he had previously pled guilty to threatening a different individual with a knife during a fight. Exhibit 13 (Application for Statement of Charges, 9/28/96).

Baltimore Police were thus left with conflicting accounts of who stabbed Mr. Creighton. Some of the accounts tended to suggest that it was Mr. Gloria, and some of the accounts tended to suggest it was Mr. Miller. All of the accounts described a chaotic atmosphere, with almost no one initially having realized that Mr. Creighton had been stabbed.

## C.     The Involvement of Federal Authorities in the Investigation into Mr. Creighton's Murder

The first indication in the Baltimore Police file of federal authorities' knowledge of and involvement in the investigation into the Creighton murder is a handwritten note dated February 2, 1999 – the same day the Scott twins identified Mr. Gloria as the killer. Exhibit 14 (handwritten note, 2/2/99). That note lists the names of Detectives Rydi Abt and Joseph Green of the United States Park Police, along with Detective Green's office and pager numbers. *Id.* It also lists the number for the Park Police Criminal Investigations Bureau. *Id.* Immediately under the names and telephone numbers is the following notation: "JAN '96 – 3/B/F victims shot to death on BW Pkwy." *Id.* Under that notation is the notation "Dec '98 – 3 arrest made," followed by the names of Mr. Haynes, Mr. Higgs, and Mr. Gloria, along with certain other identifying information. *Id.* In other words, the very day that Mr. Gloria was named as the killer of Mr. Creighton, Baltimore authorities were in contact with the federal authorities responsible for Mr. Higgs's prosecution.

Detective Green had further contact with Baltimore Police the following day, February 3, 1999. On that date, Detective Green retrieved a photographic lineup previously created by the

Park Police, which included Mr. Gloria, and provided it to the Baltimore Police. Exhibit 15 (envelope, request form, and photo lineup provided by Detective Green, 2/3/99).

The Baltimore Police file also contains a handwritten note dated one week later, February 10, 1999, which includes the notation: "Case Agent for Victor Gloria S/A Brad Sheafe FBI Calverton Office." Exhibit 16 (collection of handwritten notes). Under this notation are two different telephone numbers. *Id.* Several additional, undated, handwritten notes also contain the names of Detective Green and Detective Abt, along with telephone numbers and information relating to the murders on Route 197. Exhibit 17 (undated handwritten note); Exhibit 18 (undated handwritten note); Exhibit 19 (undated handwritten to-do list).

At some point, a member of the Baltimore Police Department traveled, or at least planned to travel, to the physical office of the United States Park Police, presumably in order to meet with a Park Police officer regarding Mr. Gloria. Exhibit 20 (undated handwritten note with the words "Directions to U.S. Park Police" written across the top, underneath which are directions from Baltimore to the Park Police office).

The Creighton file further reveals that, not only were members of the Baltimore Police Department in contact with federal law enforcement agents, but the chief homicide prosecutor in the Baltimore City State's Attorney's Office, Mark Cohen, was in direct communication with AUSA Deborah Johnston, who prosecuted Mr. Higgs at trial and represented the government during Mr. Higgs's § 2255 proceedings. Exhibit 21 (handwritten note from Mark Cohen, 4/12/99). The note recounting the Johnson-Cohen conversation, authored by Mr. Cohen on April 12, 1999, reveals that Ms. Johnston on that date suggested to Mr. Cohen that Mr. Miller and the Scott twins might be falsely implicating Mr. Gloria. *Id.* The note also reveals that Mr. Cohen,

12

the person with the authority to bring charges against Mr. Gloria for the Baltimore homicide, was

inclined to charge Mr. Gloria, but deferred his decision until after he received "background"

information from federal agents regarding the unrelated investigation into the Route 197

homicides. *Id.* Mr. Cohen's note is reproduced here in full:

Bobby

Re Victor Gloria

1   I spoke to AUSA Deborah Johnston concerning Victor Gloria on 4/12/99.  She
told me that Gloria pled guilty to AAF in triple murder case + that his plea
agreement is sealed.  The two Co-Δ's Willis Haynes + Dustin Higgs have trial
date of 2-7-2000.  Because plea agreement is sealed, she could not tell me if
Gloria is going to testify agt. Co-Δ.

2   AUSA Johnston stated that it is possible that Co-Δ's - Scott, Scott + Miller are
blaming Gloria because they are friends of Δ's in her case especially Haynes.  She
suggested we talk to

①   Joe Green Park Police
     B - [phone number]

②   Brad Sheafe - FBI
     B - [phone number]

-they could give us background on case

3   After we talk to these officers, we will decide on next course of action, that is,
either writ Gloria + charge him or talk to his lawyer about the case.

4   Please call me

Mark Cohen

*Id.*

While Mr. Cohen reported in his memo that the United States Attorney's Office could not

share whether Mr. Gloria was going to testify against Mr. Higgs and Mr. Haynes because his plea

agreement was sealed, the reluctance to share this information was apparently short-lived. In a report dated April 21, 1999, Baltimore Police Detective Robert Patton noted that "[p]er the U.S. Attorney's office Victor Gloria had plead guilty and is slatted to testify against his co-defendants, Willis Haymes and Dustin Higgs who are reportedly are close friends with the Scott brothers and Kevin Miller." Exhibit 22 (Report of Detective Patton, 4/21/99) (text reproduced as it appears in original). Detective Patton's report continues by noting that the United States Attorney's Office conveyed to Baltimore authorities its belief, ostensibly based on the unrelated federal investigation, that all three eyewitnesses who identified Mr. Gloria as the murderer were falsely implicating him as a form of retaliation due to their friendship with Mr. Haymes and Mr. Higgs:

> The U.S. Attorney's Office was advised by A.S.A. Cohen that Kevin Miller and the Scott brothers had implicated Victor Gloria in the captioned Homicide. The U.S. Attorney reported that during course of their Investigation they received information that the Scott brothers and Kevin Miller were close friends with Victor Gloria's co-defendant, Willis Haymes and Dustin Higgs and were aware that Victor Gloria was a Federal witnesses and planed to testify against Hymes and Higgs. The U.S. Attorney believes that the implication of Victor Gloria by Kevin Miller and the Scott brothers is their form of retaliation against Gloria.

*Id.* (text reproduced as it appears in original).

The report then notes that:

> Your Investigators along A.S.A. Cohen believes that the A.U.S.A. is on track with their assumption. Your Investigators support is based on eyewitness information that Victor Gloria ran from the scene prior to the stabbing. The eyewitnesses identified Kevin Anthony Miller via photographic line up as the stabber and the only person seen engaging the victim in physical altercation.

> In an effort to finally discern who of the four listed suspects actually stabbed the victim. Your Investigator in concert with A.S.A. Cohen believe by aggressively re-interviewing the Scott brothers we could ultimately convince them to tell the complete truth. This would clear up the apparent inconsistencies in their statements and ultimately discern from them who the actual stabber was which would corroborate the other eyewitnesses.

14

*Id.* (text reproduced as it appears in original).

In sum, the intervention of federal officials had a direct impact on Mr. Gloria not being charged with first degree murder in the death of Mr. Creighton. Federal officials' only interest in intervening in the investigation of this quintessentially local crime was Mr. Gloria's status as a witness in a federal capital case.[4]

**D.      The Resolution of the Case Arising from Mr. Creighton's Murder**

As a result of the Baltimore Police Department's investigation of Mr. Creighton's murder, Mr. Miller and each of the Scott twins were charged with first degree murder. Exhibit 23 (Scott indictment); Exhibit 24 (Miller indictment). Mr. Gloria was the only member of this group not charged with first degree murder; he received no charges at all arising from this incident.

Each of the Scott twins entered pleas to second degree assault and were sentenced to time served. Exhibit 25 (Keith Scott docket); Exhibit 26 (Kevin Scott docket). They were released from custody on August 30, 1999, having served approximately seven months in jail. *Id.* Mr.

---

[4]Further, it is not clear what aspect of the federal investigation would have shed any light on the supposed friendships between Mr. Miller, the Scott twins, and either Mr. Haynes or Mr. Higgs. Neither the Scott twins nor Mr. Miller had any involvement in the Route 197 homicides. Mr. Higgs proffers, and will prove at a hearing if necessary, that Mr. Gloria was the source of this self-serving information, as federal officials specifically questioned Mr. Gloria about his involvement in the Baltimore homicide during the course of his cooperation with them.

Moreover, Mr. Higgs submits that the representations that AUSA Johnston made to Mr. Cohen about the supposed friendships were largely inaccurate. Mr. Higgs hereby represents to the Court that he was not, in fact, friends with either the Scott twins or Mr. Miller. And while it does appear that Mr. Miller was friends with Willis Haynes, the same cannot be said for the Scott twins. As such, AUSA Johnston's representations to Mr. Cohen do not provide a reasonable basis on which to conclude that the Scott twins and Mr. Miller went out of their way to falsely implicate Mr. Gloria as a form of retaliation.

Miller pled guilty to second degree murder, however pursuant to a negotiated plea agreement he received an extraordinarily low sentence given that he supposedly killed a man in the middle of downtown by stabbing him in the neck: twenty years, with all but five years suspended. Exhibit 27 (Kevin Miller docket). This five-year sentence was made concurrent to any other sentence, with credit for time already served. *Id.*; Exhibit 28 (Kevin Miller sentencing worksheet); Exhibit 29 (Kevin Miller commitment record). Mr. Miller also received three years of probation upon release. *Id.* The judge who sentenced Mr. Miller, Judge Quarles (then a judge for the Circuit Court for Baltimore City), justified his extreme downward departure from the guidelines range as follows: "muddled factual statement leaves few things clear: someone died and the Def. was involved." Exhibit 28.

Mr. Miller did not serve his full five-year term; he was released from prison in July, 2002, three years and three months after he was first arrested. Exhibit 30 (Memorandum from Maryland Department of Public Safety and Correctional Services).

**E.    Mr. Higgs's Discovery and *Brady* Requests at Trial and During § 2255 Proceedings**

Mr. Higgs made his first *Brady* request at the time of trial, by entering into a joint written agreement with the government. In that agreement, which is signed by both of Mr. Higgs's defense attorneys and by AUSAs Deborah Johnston and Sandra Wilkinson, the government agreed to provide *Jencks* and *Giglio* material no later than one week prior to trial. The government further agreed to provide *Brady* material not otherwise covered by Fed. R. Crim. P. 16, *Jencks*, or *Giglio*, "if and when discovered." Exhibit 31 (Discovery agreement, 1/21/99).[5]

---

[5]Immediately prior to trial, AUSA Johnston acknowledged the importance of each party making timely and full disclosures in discovery:

During § 2255 proceedings, Mr. Higgs made another request for discovery and for *Brady*

material. Doc. 509. In that motion, Mr. Higgs specifically referenced Mr. Gloria's involvement

in the Baltimore homicide. *Id.* at 11-12. Mr. Higgs requested any information in the possession

of the Baltimore City State's Attorney's Office "regarding Mr. Gloria's participation in and/or

non-prosecution for the above described homicide." *Id.* at 12. Mr. Higgs also made a more

general request for "all relevant and exculpatory witness and law enforcement statements" not

previously provided. *Id.* at 17.

At no point, either at trial or during § 2255 proceedings, did the government disclose the

fact that Mr. Gloria had been identified by multiple eyewitnesses as the killer of Mr. Creighton,

that federal authorities had been in contact with state authorities responsible for the Baltimore

murder investigation, or that Mr. Gloria was not charged in the Baltimore homicide, almost

certainly as a result of federal authorities' intervention.

## F.   Mr. Higgs's Allegations During § 2255 Proceedings

During the course of Mr. Higgs's initial investigation during § 2255 proceedings, Mr.

Higgs's counsel learned that Mr. Gloria had been a suspect in a Baltimore murder, but was not

---

The other issue is in regard to discovery, and there are two issues.
Yesterday Mr. Sullivan delivered to us after the close of court a letter saying that
they were compiling their evidence, the documents and tangible objects that they
are required to provide to the government under the reciprocal rule, 16(b)(1)(A).
    We have not gotten anything. The whole purpose of these rules and
reciprocal discovery is so that no one should go into trial without having that
discovery provided to them. Here we are Friday and the trial is scheduled to begin
on Tuesday and we have not received any of those materials.
    I mentioned this to Mr. Sullivan this morning while the Court was
conducting its sentencing hearing. So Mr. Sullivan is aware of our concerns.
Like a defendant should not be tried by ambush, neither should the government.

Tr. 9/22/00 at 136-37.

17

prosecuted because he was to be the star witness in two federal capital cases. In light of this information, Mr. Higgs alleged that the government did not turn over all of the material relating to Mr. Gloria that it was required to under *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), and their progeny. Specifically, Mr. Higgs alleged that Mr. Gloria was a suspect, but was never charged, in an unrelated homicide in Baltimore. Doc. 492 at 33. Mr. Higgs further alleged that Mr. Gloria was not charged with this homicide at the behest of the government, "in an effort to preserve his status as a testifying witness in this federal capital triple homicide case," and that the government's failure to disclose this consideration violated Mr. Higgs's due process rights. *Id.*

**G.     The Government's Representations to This Court in Response to Mr. Higgs's Claim**

In its response to Mr. Higgs's § 2255 motion, the government made several materially false and/or misleading representations. The government argued that Mr. Higgs's "vague descriptions of the supposed benefits conferred on Gloria largely fail to demonstrate any connection to this trial or federal officials." Doc. 520 at 88. The government described Mr. Higgs's allegations regarding the undisclosed leniency afforded to Mr. Gloria as mere "speculation about the Government's knowledge or actions." *Id.* The government further argued that "[c]ertainly, the Constitution required the prosecutors to disclose any consideration promised to Gloria in exchange for his testimony; the prosecutors, however, had no duty or ability to predict, much less inform Higgs of benefits, or acts of grace, that coincidentally flowed to the witness after this trial." *Id.* at 86. The government also resisted Mr. Higgs's discovery and *Brady/Giglio* requests pertaining to Mr. Gloria, arguing that "there is no evidence that [Gloria] was promised anything other than that which he admitted at trial." Doc. 513 at 5.

18

Each of the above statements in the government's pleadings faulted Mr. Higgs for his failure to prove his *Brady* claim, when the government all the while was in possession of the evidence that, in all likelihood, would have proved it. Given that the government has a constitutional and ethical duty to disclose *Brady* and *Giglio* material, the government's representations created the false impression that federal authorities had no knowledge of or involvement in Baltimore authorities' investigation into or treatment of Mr. Gloria for an unrelated crime. AUSA Johnston, who, as noted, was in direct contact with the Baltimore authorities prior to Mr. Higgs's trial, signed her name to the government's opposition to the § 2255 motion, as well as to the government's opposition to the discovery motion. Doc. 520 at 1; Doc. 513 at 8.

## H.     Mr. Higgs's Attempts to Obtain and Ultimate Acquisition of the Baltimore Police File

Mr. Higgs's post-conviction counsel first learned of Mr. Gloria's involvement in the Baltimore homicide during their investigation in advance of filing Mr. Higgs's § 2255 motion. While Mr. Higgs possessed some information about Mr. Gloria's involvement and the federal government's intervention, he did not at the time of the § 2255 proceedings have documentary evidence to confirm the federal government's direct involvement in the investigation into Mr. Creighton's murder. As such, Mr. Higgs sought to obtain documentary evidence to confirm the information he had. Mr. Higgs sought to do so both through his own investigative efforts and via specific discovery requests in this post-conviction litigation. Mr. Higgs sent a written request for the complete investigation file to the Baltimore Police and filed a discovery motion in the § 2255 litigation. Mr. Higgs was unsuccessful, however, as the Baltimore Police only turned over a one-

page summary report and the government opposed Mr. Higgs's § 2255 discovery requests, which this Court denied.

In the spring of 2012, Mr. Higgs attempted, a second time, to obtain the Baltimore Police file via written request. Whereas the Baltimore Police responded to Mr. Higgs's first written request by turning over a one-page summary report, they responded to his second written request by turning over their entire investigative file, with some information redacted.[6] Mr. Higgs came into possession of the file in September, 2012.

Mr. Higgs has simultaneously been attempting to obtain – also since 2012 – a copy of the United States Park Police file relating to the murders on Route 197 via the Freedom of Information Act (FOIA). Given the seriousness of the accusations Mr. Higgs is now leveling against the government, and the lack of a time restriction for filing motions under Rule 60(d)(3), Mr. Higgs has endeavored to exhaust his attempts to obtain the Park Police file (and thereby confirm the full extent of the government's knowledge and actions) prior to filing this motion. Mr. Higgs submits that, given the contents of the Baltimore Police file, the Park Police file will almost certainly contain confirmation of the connection between federal and local officials in the investigation into Mr. Creighton's murder and will likely provide additional evidence of government misconduct.

The Park Police have been extraordinarily dilatory in their response to the FOIA request. It has now been almost 3 years since Mr. Higgs made his request. The Park Police initially responded by seeking to charge over $11,000 to copy and produce the investigative file. When

---

[6]There is no apparent reason why the two requests were handled so differently by the Baltimore Police.

counsel for Mr. Higgs protested that such fees were excessive and clearly precluded by the FOIA statute, the Park Police refused to reconsider and directed Mr. Higgs to file an administrative appeal if he was unhappy with the fees. Mr. Higgs did so, and given that the law clearly precluded the Park Police from attempting to charge such extreme fees, he succeeded in his initial appeal.

Upon remand to the Park Police, Mr. Higgs paid the much lower fee that the Park Police was legally entitled to charge. The Park Police then took over a year to respond to the substance of the request, despite numerous follow-up attempts by counsel in the interim. In its brief eventual response, the Park Police informed Mr. Higgs that it would be withholding its investigative file *in toto*. Mr. Higgs yet again filed an administrative appeal challenging this determination. The FOIA appeals officer took an additional ten months before finally ruling on the appeal in September, 2014. The most recent appeal ruling indicated that, not only had the Park Police failed to fully review the contents of its file during the year-plus in which it was supposedly considering Mr. Higgs's request, they had also substantially miscalculated the number of documents that were responsive to the request. The FOIA appeals office yet again remanded to the Park Police to conduct an appropriate review.

In light of the extreme delay in responding that has characterized the Park Police's activities to date, the most recent appeal opinion directed that the Park Police would have twenty (20) workdays in which to offer its initial response to Mr. Higgs regarding the FOIA request. The Park Police have completely ignored that deadline. Despite further follow-up from counsel, it has become apparent at this point that the Park Police simply are not going to respond to the FOIA request in a remotely timely fashion. While Mr. Higgs would prefer to obtain the Park

Police file before filing this motion, thereby permitting him to create a full record of the government's misconduct, such an eventuality is extraordinarily unlikely given the Park Police's conduct. As such, Mr. Higgs is filing this motion based on the information known to him at this moment. As noted above, Mr. Higgs is simultaneously filing a renewed *Brady*/discovery motion to enlist the Court's assistance in obtaining additional documents related to this violation.

## ARGUMENT

I.   **RELIEF IS APPROPRIATE UNDER *HAZEL-ATLAS* AND RULE 60(D)(3) AS A RESULT OF THE GOVERNMENT'S FRAUD ON THIS COURT.**

Federal Rule of Civil Procedure 60(d)(3) vests in courts the power to "set aside a judgment for fraud on the court." The fraud on the court doctrine derives from the United States Supreme Court's decision in *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238 (1944). In *Hazel-Atlas*, the Court set aside a fraudulently obtained ruling that was the product of one party's procurement and presentation of false evidence and misrepresentations to the court. *Id.* at 239-43. As the Court described it, the fraud was the product of a "deliberately planned and carefully executed scheme" that severely undermined the "integrity of the judicial process." *Id.* at 245-46. The Court set aside the ruling where the fraud perpetuated "a wrong against the institutions set up to protect and safeguard the public, institutions in which fraud cannot complacently be tolerated consistently with the good order of society." *Hazel-Atlas*, 322 U.S. at 246.

The Fourth Circuit has discussed the fraud on the court doctrine in additional depth. The Fourth Circuit recently made clear that fraud on the court within the meaning of *Hazel-Atlas* "is not your 'garden-variety fraud.'" *Fox v. Elk Run Coal Co.*, 739 F.3d 131, 135 (4th Cir. 2014)

22

(quoting *George P. Reintjes Co. v. Riley Stoker Corp.*, 71 F.3d 44, 48 (1st Cir. 1995)). Instead, it applies to situations "in which the integrity of the court and its ability to function impartially is directly impinged." *Id.* at 136 (quoting *Great Coastal Express, Inc. v. International Brotherhood of Teamsters*, 675 F.2d 1349, 1356 (4th Cir. 1982)). A party that alleges "ordinary" fraud as a basis for setting aside a final judgment typically must move for relief under Fed. R. Civ. P. 60(b)(3), which requires that a motion be filed within one year of the entry of the final judgment. *Id.*; *see also* Fed. R. Civ. P. 60(c)(1). But, "as often happens with a rule, there is an exception." *Fox*, 739 F.3d at 135. The "savings clause in Rule 60(d)(3) permits a court to exercise its inherent equitable powers to obviate a final judgment after one year for 'fraud on the court.'" *Id.* at 135-36. Rule 60(d)(3) fraud is the type of fraud with which *Hazel-Atlas* is concerned.

The government's conduct during these § 2255 proceedings meets the stringent standard for fraud on the court set forth in *Hazel-Atlas* and *Fox*. In response to Mr. Higgs's very specific *Brady* claim, the government offered misrepresentations intended to cover up its own past misconduct and persuade this Court to uphold a death sentence. That represents a "deliberately planned and carefully executed scheme" to defraud this Court. The government was not faced merely with a vague allegation that they failed to turn over all available *Brady* evidence; it was faced with a highly specific claim that Victor Gloria was a suspect in a homicide in Baltimore, but was not charged due to his status as a federal witness and the intervention of the federal government. It is now virtually certain that these allegations are accurate. The government, knowing that the allegations were accurate, denied them in written pleadings. Thus, the government's conduct caused a "subversion of the legal process . . . that we cannot necessarily expect to be exposed by the normal adversary process." *Great Coastal*, 675 F.2d at 1357.

This gambit was successful. The government's misrepresentations induced this Court to rule that Mr. Higgs's constitutional claim failed because "pure speculation about supposed benefits cannot substitute for hard facts," and because "Higgs, quite simply, has failed to demonstrate any causal connection between Gloria's testimony in this federal case and whatever treatment he may have received in the state jurisdictions." *Higgs-3*, 711 F. Supp. 2d at 508. It certainly is difficult to envision the Court making such rulings had it been presented with the arguments and evidence contained in this motion during the pendency of the § 2255 proceedings. In other words, "[p]roof of the scheme, and of its complete success up to this date, is conclusive." *Hazel-Atlas*, 322 U.S. at 246.[7]

The law of other circuits regarding the fraud on the court doctrine is both consistent with Fourth Circuit law and instructive here. In an opinion joined by then-Judge Alito, the Third Circuit set forth a four-factor test for establishing fraud on the court. In the Third Circuit's formulation, a Rule 60(d)(3) movant must establish: "(1) an intentional fraud; (2) by an officer of the court; (3) which is directed at the court itself; and (4) in fact deceives the court." *Herring v.*

---

[7]In addition to holding that Mr. Higgs could not establish a causal connection between federal authorities and the decision not to prosecute Mr. Gloria for the murder, the Court also held that Mr. Higgs could not demonstrate prejudice. *Higgs-3*, 711 F. Supp. 2d at 508-09. The Court should revisit this determination as well, given that it was also influenced by the government's fraud.

At this juncture, the full extent of the government's misconduct is not yet known. As noted above however, the government has conceded that it could not have prosecuted Mr. Higgs, let alone secured a conviction or death sentence, without the testimony of Mr. Gloria. This Court agreed in that assessment, describing Mr. Gloria as the "critical link" in the conviction of Mr. Higgs. Tr. 11/22/00 at 4. If evidence demonstrating that the keystone witness literally got away with murder due to the intervention of the prosecution does not rise to the level of a reasonable probability of a different outcome, then *Giglio* is a dead letter.

Moreover, undersigned counsel have provided the information gleaned from the Baltimore Police file to trial counsel, who confirms that counsel would have used this information to impeach Mr. Gloria at trial. Exhibit 32 (Affidavit/Declaration of Harry Trainor).

24

*United States*, 424 F.3d 384, 386 (3d Cir. 2005); *see also Demjanjuk v. Petrovsky*, 10 F.3d 338, 348 (6th Cir. 1993) (five-factor test requiring conduct: "1. On the part of an officer of the court; 2. That is directed to the 'judicial machinery' itself; 3. That is intentionally false, willfully blind to the truth, or is in reckless disregard for the truth; 4. That is a positive averment or is concealment when one is under a duty to disclose; 5. That deceives the court.").

Without specifically setting forth multi-factor tests, several other courts of appeals also require misdeeds on the part of an officer of the court to establish fraud within the meaning of *Hazel-Atlas. See, e.g., Reintjes* 71 F.3d at 47-48 ("*Hazel-Atlas Glass* thus expanded the range of the fraud exception for untimely requests for relief . . . to include fraud committed by 'officers of the court'"); *Pumphrey v. Thompson Tool Co.*, 62 F.3d 1128, 1130 (9th Cir. 1995) ("one species of fraud upon the court occurs when an 'officer of the court' perpetrates fraud affecting the ability of the court of jury to impartially judge a case"); *Weese v. Schukman*, 98 F.3d 542, 553 (10th Cir. 1996) ("fraud on the court should embrace only that species of fraud which does or attempts to, subvert the integrity of the court itself, or is a fraud perpetrated by officers of the court so that the judicial machinery cannot perform in the usual manner its impartial task of adjudging cases that are presented for adjudication"); *Kerwit Med. Prods., Inc., v. N. & H. Instruments, Inc.*, 616 F.2d 833, 837 (11th Cir. 1980) (same).

The fraud at issue here thus meets both the Fourth Circuit's more general formulation and its sister circuits' more specific tests. During Mr. Higgs's § 2255 proceedings, (1) an Assistant United States Attorney; (2) made intentional misstatements; (3) directed to the Court itself; (4) that in fact deceived the Court in its adjudication of Mr. Higgs's claim.

Moreover, as in *Hazel-Atlas*, the government's misdeeds here "involve[d] far more than

an injury to a single litigant." *Hazel-Atlas*, 322 U.S. at 246. First, the federal government's intrusion into the business of the Baltimore City State's Attorney's Office has affected numerous individuals involved with Mr. Creighton's murder. The Baltimore Police, without the outside pressure applied to it by federal authorities, may well have come to the conclusion that Mr. Gloria was in fact the person who murdered Mr. Creighton. As such, not only did Mr. Miller and the Scott twins unfairly take the blame for the killing, but Mr. Creighton's friends and family members were deprived of justice for their loved one.

More globally, however, the fraud here constitutes "a wrong against the institutions set up to protect and safeguard the public, institutions in which fraud cannot complacently be tolerated consistently with the good order of society." *Hazel-Atlas*, 322 U.S. at 246. The "United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done." *Berger v. United States*, 295 U.S. 78, 88 (1935). The United States Attorney "is in a peculiar and very definite sense the servant of the law." *Id.* While "[s]he may strike hard blows, [s]he is not at liberty to strike foul ones." *Id.*

The attempt by an officer of the United States government to secure a citizen's execution by deception certainly "touch[es] on the public interest in a way that fraud between individual parties generally does not." *Fox*, 739 F.3d at 136. As such, the "public welfare demands that the agencies of public justice be not so impotent that they must always be mute and helpless victims of deception and fraud," and the Court should remedy the injustice. *Hazel-Atlas*, 322 U.S. at 246.

II.     **THIS MOTION IS PROPERLY BROUGHT UNDER** *HAZEL-ATLAS* **AND RULE 60(D)(3); IT IS NOT SUBJECT TO THE "SECOND OR SUCCESSIVE" PETITION RESTRICTIONS OF 28 U.S.C. § 2244(B).**

In *Gonzalez v. Crosby*, 545 U.S. 524, 526 (2005), the Supreme Court granted certiorari to decide "whether, in a habeas case, [Rule 60] motions are subject to the additional restrictions that apply to 'second or successive' habeas corpus petitions under the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA)." After considering the relevant language of the Federal Rules of Civil Procedure and AEDPA, the Court held that some Rule 60 motions should be treated as "second or successive" habeas petitions under AEDPA, but others should not. The Court concluded that "a Rule 60(b)(6) motion in a § 2254 case is not to be treated as a successive habeas petition if it does not assert, or reassert, claims of error in the movant's state conviction." *Id.* at 538.[8]

The Court made plain that a Rule 60 motion that "attacks, not the substance of the federal court's resolution of a claim on the merits, but some defect in the integrity of the federal habeas proceedings," is not barred from review by the second or successive prohibition in AEDPA. The Court specifically ruled that "[f]raud on the federal habeas court is one example of such a defect." *Id.* at 532 n.5 (citing *Rodriguez v. Mitchell*, 252 F.3d 191, 199 (2d Cir. 2001) (a witness's allegedly fraudulent basis for refusing to appear at a federal habeas hearing "relate[d] to the integrity of the federal habeas proceeding, not to the integrity of the state criminal trial.")).

Here, the fraud being alleged represents a defect in the § 2255 proceedings themselves,

---

[8]The *Gonzalez* decision addressed only motions under Rule 60(b), rather than 60(d), and specifically noted that it was limiting its consideration to § 2254, rather than § 2255, cases. *Gonzalez*, 545 U.S. at 529 n.3. It is thus unclear whether the decision impacts motions brought under *Hazel-Atlas* and Rule 60(d)(3) in a § 2255 case. Mr. Higgs includes this discussion in the event that this Court should find that it does.

not in the substance of this Court's prior merits ruling. As such, the fraud falls squarely within the ambit of footnote 5 in *Gonzalez*. The Assistant United States Attorney's knowing misrepresentations in her habeas filings caused this Court to issue a § 2255 ruling based on inaccurate information. *Gonzalez* therefore does not bar consideration of this motion.

## CONCLUSION AND PRAYER FOR RELIEF

As one prominent Court of Appeals judge recently observed in a case involving a *Brady* violation due to the government's failure to provide impeachment material regarding its star witness: "When a public official behaves with such casual disregard for his constitutional obligations and the rights of the accused, it erodes the public's trust in our justice system, and chips away at the foundational premises of the rule of law. When such transgressions are acknowledged yet forgiven by the courts, we endorse and invite their repetition." *United States v. Olsen*, 737 F.3d 625, 632 (9th Cir. 2013) (Kozinski, C.J., dissenting from the denial of en banc review).

The government's conduct in this litigation was egregious. It committed a serious *Brady* violation at trial by concealing devastating impeachment material regarding its star witness and then deliberately covered up the violation during post-conviction proceedings. This is not an attenuated violation where one hand did not realize what the other was doing; where the prosecutor, for example, was not aware of the actions of some other law enforcement agency even though she had a duty to learn of them. This is a case where *the trial prosecutor* spoke directly to *the person with the authority and inclination to charge her star witness with first degree murder* and talked him out of it.

When confronted with this allegation during § 2255 proceedings, she perpetrated a fraud on this Court. She signed her name to two different documents, denying in each that any such machinations had taken place. The fraud was successful, as these misrepresentations formed the basis for this Court's decision denying relief.

Mr. Higgs respectfully submits that the allegations and evidence contained in this motion

and the exhibits demonstrate his entitlement to relief.  At a minimum, however, he requests that the Court grant him leave to fully uncover the extent of the government's misconduct and that the Court provide the opportunity to present argument and evidence at a hearing on the matter.

WHEREFORE, Petitioner, Dustin Higgs, hereby requests that this Court:

A.      Direct the government to respond to this motion;

B.      Permit Petitioner to submit a reply to the government's response;

C.      Schedule oral argument and a hearing;

D.      Set aside the judgment in these proceedings under Fed. R. Civ. P. 60; and

E.      Grant all other and further relief that the Court might deem just, proper, and equitable.


Respectfully Submitted,


/s/ Matthew C. Lawry
Matthew C. Lawry
Federal Community Defender Office
    for the Eastern District of Pennsylvania
Curtis Center, Suite 545-West
601 Walnut Street
Philadelphia, PA 19106
215-928-0520
Matthew_Lawry@fd.org

/s/ Stephen H. Sachs
Stephen H. Sachs
WilmerHale LLP
Five Roland Mews
Baltimore, MD 21210
(410) 532-8405
Steve.Sachs@wilmerhale.com


Dated: December 4, 2014

30

**CERTIFICATE OF SERVICE**

I, Matthew C. Lawry, hereby certify that on this 4th day of December, 2014, I

electronically filed the foregoing motion using the Court's CM/ECF system. Electronic notice

will be provided to the following individuals:

> Deborah A. Johnston
> Sandra Wilkinson
> Assistant United States Attorneys
> Office of the United States Attorney
> 6500 Cherrywood Lane, Suite 400
> Greenbelt, MD 20770-1249

> /s/ Matthew C. Lawry
> Matthew C. Lawry

# Exhibit 1[1]

---

[1]Many of the exhibits included herein originated in the Baltimore Police file pertaining to the murder of Martrelle Creighton. Counsel for Mr. Higgs received the file in partially redacted format. Counsel have made further redactions of their own in order to comply with the Court's privacy policy. Should the Court wish to view the documents in the state in which they were originally received, counsel for Mr. Higgs will gladly file another set of exhibits under seal.

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND

SOUTHERN DIVISION

UNITED STATES OF AMERICA

VS.                              CRIMINAL NO. PJM-98-482

VICTOR GLORIA

DEFENDANT

Greenbelt, Maryland

November 22, 2000

The above-entitled case came on for sentencing
before the Honorable Peter J. Messitte, United States
District Judge

A P P E A R A N C E S

For the Government:

Deborah A. Johnston, AUSA
Sandra Wilkinson, AUSA

For the Defendant:

Paul Kemp, Esquire

Gail A. Simpkins, RPR
Official Court Reporter

PROCEEDINGS

THE CLERK:  The matter now pending before this Court is Criminal Action Number PJM-98-0482, United States of America versus Victor Gloria.  The matter now comes before this Court for sentencing.

THE COURT:  All right.  Counsel for the government identify yourselves and then defendant.

MS. JOHNSTON:  Your Honor, Deborah Johnston and Sandra Wilkinson for the government.  Seated with us at counsel table is Captain Robert Rule.

MR. KEMP:  And Paul Kemp for Mr. Gloria, who is present in Court, Your Honor.

THE COURT:  All right.  We are here for sentencing this morning.  Are there any issues with the presentence report, other than a possible 5K1.1 motion?

All right.  The --

MR. KEMP:  Not by the defendant, Your Honor.

THE COURT:  All right.  The Court then adopts. the factual findings and Guideline application in the presentence report.  The total adjusted offense level would be 30, a Criminal History Category IV.  The custody range is 100 to 125 months.  The fine range is 12,500 to $125,000.

All right.  Ms. Johnston.

3

MS. JOHNSTON: Yes, Your Honor. Pursuant to the terms of the plea agreement, the government is moving under the Sentencing Guidelines, 5K1.1, for a downward departure for substantial assistance to the government. We are asking the Court to reduce Mr. Gloria's offense level by two, resulting in a criminal offense level of 25, with a sentencing range of 84 to 105 months.

The Court has seen Mr. Gloria testify in both the trials of Mr. Haynes and Mr. Higgs. The government cannot emphasize enough to the Court that Mr. Gloria came forward -- didn't come forward with this information and didn't act as quickly as he should have after the events of January 1996 and, in fact, initially was not cooperative with authorities and lied in terms of where he was the night of the crime.

But in October of 1998, when law enforcement officers confronted him about his involvement, he provided them with a statement acknowledging that he was there, acknowledging what he saw happen that night, and he made that acknowledgment to law enforcement officers when he was not facing any charges in this case, although he had been arrested on a state drug offense, that drug offense being his

4

acting as a lookout for Mr. Haynes' approximately two gram sale of crack cocaine to undercover Officer Mark Coulter.

After being -- after making that statement and being released on the state charges, he was then arrested on a federal charge, came in and immediately agreed to cooperate with the government.

As the Court knows from seeing Mr. Gloria's testimony here in court, and hearing the evidence in this case, the government could not have proceeded and obtain a conviction against Mr. Higgs certainly without the assistance of Mr. Gloria. Of course with Mr. Haynes' case we did have Mr. Haynes' confession, but Mr. Gloria's testimony was instrumental there as well.

For those reasons we believe that he has provided substantial assistance and is entitled, or the government believes it's justified that he receive some reduction in his criminal offense level, and we believe that a two-level reduction is appropriate. We would move the Court to reduce his Guideline range by two levels.

THE COURT: Mr. Kemp.

MR. KEMP: Your Honor, obviously we certainly don't oppose that motion, and I would like to talk at

5

the appropriate time about the sentence within the range.

THE COURT:  All right.  Let's hold off one moment.

Does the custody range change at all -- not the custody range.  Does the supervised release range change at all?  It's still three?

MS. JOHNSTON:  I don't believe -- the supervised release doesn't change.  The fine range does.

THE COURT:  The fine range does, though?

MS. JOHNSTON:  Yes, Your Honor.  I believe the fine range becomes 10,000 to 100,000.

THE COURT:  The government has moved for a two-level downward departure pursuant to Sentencing Guideline 5K1.1 based on defendant's substantial assistance to authorities.

The Court considers the factors that are set out in that Sentencing Guideline, evaluating the significance and usefulness of the defendant's assistance and particularly, the government's evaluation of that assistance, also the truthfulness, completeness and reliability of any information or testimony provided by the defendant and the extent of his assistance, any injury or risk of injury or danger resulting from his assistance, and the timeliness of

6

the defendant's assistance.

Obviously the Court sat through the two death penalty proceedings involving Mr. Haynes and Mr. Higgs, and there is no question that Mr. Gloria's assistance in that regard was critical to their convictions, which was important, and that he was in these proceedings truthful, complete and reliable in regard to what he said.

Obviously there was some risk involved. That became apparent in the course of the trials. Even though there might have not been immediately timeliness, it was timely enough for purposes of this testimony given.

So the Court finds that there is full and adequate reasons to grant the two-level downward departure, which would then, with a total offense level of 25 and a criminal history category of four, result in a custody range of 84 to 105 months, a supervised release range of still the two to three years, and a fine range of 10,000 to $100,000.

All right. On disposition?

MS. JOHNSTON: Thank you, Your Honor.

Under the terms of the plea agreement, the government has reserved the right to recommend any sentence within the Sentencing Guideline range. I'm

7

not really going to talk about Mr. Gloria's testimony because I think the Court, in granting that two-level downward departure, has taken into account the assistance he has provided to the government, but I would like to share with the Court the government's experience in terms of Mr. Gloria.

He has been incarcerated since October of 1998. Since that time we have had occasion to meet with Mr. Gloria initially a couple of times in 1998, and then again this past year in getting him ready to testify in those two trials.

Between the time that Mr. Gloria was arrested in October of 1998 until his testimony in the Haynes trial, he was in the general population over in the Montgomery County Detention Center. And in preparation for the Haynes trial and anticipating possible cross-examination of him, we did obtain his detention, his records from the Montgomery County Detention Center.

While I don't have them here today, in reviewing them I noted that he had successfully completed a number of programs there, that he in fact was a representative in his dorm and served in that capacity for those individuals.

Since his testimony in the Haynes case, he has

8

been in protective custody. As a result of his testimony, as a result of the publicity concerning his testimony, he has been in protective custody. And in meeting with him after that --

Some inmates might resent, some defendants, cooperators might resent the fact that they were being put in protective custody, thinking of it as punishment when they have done something for the government.

But Mr. Gloria's attitude was not of that sort. Instead, he said that he in essence didn't mind being in protective custody. It gave him an opportunity to read and do some other things that he hadn't had a chance to do before.

In addition to that, between the time that the government first met with Mr. Gloria in, I believe it was November of 1998, late October of 1998, up until his testimony in the Higgs case, which was the last time we had occasion to meet with him, it is appropriate to say that Mr. Gloria has matured significantly during these two years that he spent in jail. My observations of him were that indeed, he has an appreciation for what had occurred.

I will tell the Court that Mr. Gloria sat in our office at one point and cried over what had happened.

He expressed remorse for what had happened to these three young ladies, acknowledged the fact that at least one of them would not have been there if he hadn't been there that night and feels directly responsible in that regard.

Mr. Gloria has a criminal history. There is no disputing that. The government hopes that with this time in prison Mr. Gloria will develop the trades, some trades and some skills so that when he gets out of prison, he will find a way to support himself without being involved in criminal conduct again.

For all of those reasons, the government is going to recommend that he receive a sentence at the low end.

THE COURT: Mr. Kemp.

MR. KEMP: Thank you, Your Honor.

Obviously I will join with the government in that and feel very strongly about it.

First of all, insofar as the fine is concerned, I think based on paragraphs 94 and 95 of the presentence investigative report, the Court make a finding that he is not capable or not able to make, pay any kind of a fine under the circumstances. I just want to deal with that more as a housekeeping issue than anything else.

10

But in line with what the government proffered, at the time he had to be placed in protective custody, he was in several programs which had to be terminated. One of those was a self-awareness program known as More Recognition Therapy.  He was in the anger management program, and was taking a spousal abuse seminar, not that he had ever been involved in anything of that ilk, but it was a program that was available to him and he had begun taking it.  That all had to be terminated when he was moved to the PC wing of the Montgomery County Detention Center.

In addition to the normal taunts I think that go along with any person cooperating with the government and then word gets out, and then it hits the press and the TV's, which are on constantly over at the detention center or any of the detention centers, resulting in Mr. Gloria receiving inmate taunts, there were even some taunts that came from jail guards that I'm going to take issue with after Mr. Gloria has left that institution because it's very upsetting to me that someone who would set out to do this is receiving trash talk not just from inmates, but from jail guards.  That is the kind of thing that I just think should not occur, and I'm going to bring it to the attention of the Internal Affairs Division of the

11

Montgomery County Police and/or the Marshal's Division, Marshal's Department, whoever is the more appropriate agency.

The remorse which he has shown throughout this from my involvement in this case, beginning I guess in late October of 1998, after I was appointed. There was never any story, there was no game playing. By that point he had given a statement to one of the government agents involved in this case that admitted his involvement it in.

I think it's important to point out that he never tried to soft sell his presence, his attempt to, in his drunken state, help them wipe the apartment clean after the time of the commission of this horrible crime, and insofar as his participation was concerned, just was very forthcoming with that.

So there wasn't that normal wall that I have to break through or that defense attorneys commonly have to break through at the very outset of a case, well, how is this going to help me, how is this going to help me? He was much more concerned at that point with the enormity of the crime and his remorse, insofar as I can tell, is very genuine, even though he was not obviously the primary actor in any of the horrible events which took place on that night.

12

Because he has been in protective custody, he may only have visitation after 9 p.m. at night and as a result of that, he has not been able to see his two children. He has one child who is eight and another child who is much younger, and they cannot come to the detention center at that hour. And so because of protective custody, that is something that he has sorely missed.

His eight year old child, whose name is Aja, A J A, after he was arrested in this case essentially shut down and became uncommunicative. I spoke with the mother of that child, whose name is Katrina Haviland. There have been significant problems, and for that he feels particularly guilty. This is a situation, as he knows, of his own making and yet, it's being visited upon his eight year old child.

He is a very sensitive young man and I think his honestly is his leading characteristic. It is rare that somebody just in the middle of a conference thanks a court-appointed attorney but for no reason other than I think he genuinely felt it.

He thanked me a couple of weeks ago when we were getting ready for today and appreciated all the efforts that I had made, which have been, frankly, with a defendant like him, minimal. He's just an easy

13

client to represent.

He was concerned, unlike so many people, with doing the right thing, given the horrible facts of this case, to try and show his remorse in connection with it.

I would implore the Court to impose a sentence at the lowest end of the Guidelines under the circumstances of this case.

He knows -- he has had a prior record, obviously nothing like this, much more of a record that bespeaks either a drug user, a drug seller at a certain point.

He was involved in the fight down in Marion, Virginia, which had a lot of mitigating circumstances, but nevertheless stands as a conviction.

THE COURT:  There are a number of detainers out, though, as I see.

MR. KEMP:  There is really only one operative detainer.  Well, there is a violation of probation from Marion, Virginia that I think he is going to have to go back and answer for at some point.  That may serve as a detainer.

He has the detainer -- there should be a detainer from Prince George's County for the pending drug charge, and I think that's the totality of it, if I'm not mistaken.

14

It's going to interrupt the time he would have normally in a Bureau of Prisons installation, which has already -- for 25 months he has been kept in local incarceration as part of his preparation for trial on these cases, and that's a long period of time, as long as any that I have seen for somebody who is incarcerated pretrial, Your Honor.

I am going to ask the Court to consider a recommendation both for boot camp -- he would like that. He has heard about it, and I would like that recommendation to be made. I know that the Bureau of Prisons will make that consistent with his security needs insofar as this case is concerned and with the problems that he has had in this case that the Court has already alluded to potentially from other defendants.

Then the Intensive Drug Confinement Program I think would have particular application. The people at Annapolis Junction tell me he would qualify for that, that this offense does not in his case involve use of a weapon. So he is not precluded from entering into that. So I am going to ask the Court to make that recommendation.

I've already mentioned the fine, and I would ask the Court to make a specific finding that he is not

15

capable of paying a fine under the circumstances of this case. Other than that, I would submit it to the Court's discretion.

THE COURT:  Mr. Gloria, you have an opportunity to address the Court at this time, and I'll hear from you.

THE DEFENDANT:  At first my intentions was to come in and tell you how much I love my family and how much I feel they need me, but I mean even the government is aware of that.

So I just want to right now just apologize to the victims and their families and apologize for being a coward.  I mean maybe if I had done anything, we wouldn't all be here right now.

I want to apologize for not jumping in front of the gun or not walking away, I mean anything, something that could have changed it.  I just want to say I'm sorry.  I never, I never meant for anything like this to happen, you know.  I just pray they can get through it.  That's it.

THE COURT:  All right.  Mr. Gloria, obviously yours is a typical case.  You've got a criminal record, and I can't congratulate you for that obviously.  I mean you come to a very sorry point in your life where, as a young man, you have done enough.

16

You went right to the brink in this case.

I understand you were not a participant as far as conceiving this idea or executing it.  You were there and maybe you could have done something, but you ran with some pretty bad people, and they have contributed significantly to some real loss in your own life.

Maybe you will get straight.  It sounds to me like in the last couple of years some things have gone right for you.  They sure weren't going right up to that point and, as I say, it got worse and worse, until you found yourself in this truly terrible situation.

Having said that, I mean the fact is you were the critical link in the conviction of these two men, who deserved to be convicted.  I understand that's at some sacrifice to yourself, and I cannot ignore that.  That is the most important thing about you at this point in the sentencing, and it overrides everything else.

I'm going to sentence you to 84 months incarceration and recommend boot camp and the Intensive Drug Confinement Program, and then place you on supervised release for a period of three years thereafter, subject to the standard terms and

17

conditions of supervised release.

You are to commit no crimes, federal, state or local, possess no firearm or dangerous weapon, and you shall satisfactorily participate in any treatment program approved by your probation officer during your supervised release period relating to substance and/or alcohol abuse. This may include evaluation, counseling and testing, as deemed necessary by your probation officer.

I will impose no fine by reason of inability to pay, but there is a $100 --

MS. JOHNSTON: Your Honor, I believe it is $50 because of when the crime occurred.

THE COURT: All right. I will impose no fine by reason of inability to pay, but the special assessment, I'm advised, is $50, which is due and payable immediately.

You are obviously in custody and continue to be. You've waived your right of appeal in this case. Any further matters in that regard, you can take up with Mr. Kemp.

Is there anything more to be said, Ms. Johnston?

MS. JOHNSTON: Your Honor, no. I think this was a single count --

MR. KEMP: It was.

18

MS. JOHNSTON:  -- indictment that the defendant pled guilty to.  There is another pending criminal case, but that's not before the Court, and we will resolve that by documentation.

THE COURT:  All right.  Mr. Gloria, you will have to live with yourself now.  Maybe your life will take a turn for the better.  A small beginning.  Many years ahead.  See what happens.  All right.

(The proceedings concluded.)

– – – – – – – – – –

REPORTER'S CERTIFICATE

I hereby certify that the foregoing transcript in the matter of United States of America vs. Victor Gloria, Defendant, Criminal No. PJM-98-482, before the Honorable Peter J. Messitte, United States District Judge, on November 22, 2000 is true and accurate.

_____
Gail A. Simpkins
Official Court Reporter

# Exhibit 2

**POLICE DEPARTMENT**
**BALTIMORE, MARYLAND**
**18 JULY 1998**

**TO:** Major Kathleen T. Patek
Commanding Officer
Crimes Against Persons Section

**FROM:** Detective Robert L. Patton
Detective Kirk Hastings
Homicide Unit

**SUBJECT:** HOMICIDE BY STABBING
MARTRELLE LAMAR CREIGHTON
M/B/20 DOB █████████

██ █████████████ ▟█ ████████████████
OCC: 18 JULY 1998 @ 0200 HOURS
301 LIGHT STREET ( SIDE WALK AREA)
CC# 98-1G13258 H-98-172

**SIR:**

## SYNOPSIS OF INCIDENT:

On the captioned date at 0206 hours Officer Moore was dispatched to the listed location for a reported stabbing. Upon arrival the Officer found the listed victim laying on the side walk suffering from an apparent stab wound to right neck area. Emergency medical Units arrived on the scene and the victim was ultimately transported to University of Maryland Shock Trauma Center by Medic # 12 Unit. Once at the trauma center the victim received emergency medical treatment and ultimately expired from his wound and was pronounced dead at 0230 hours.

Officer Moore in concert with backup Units secured the crime scene, made the appropriate notifications and were able to locate witnesses who were ultimately transported to the Homicide office for interview. Your Investigators ultimately found that the listed victim had been engaged in a argument and altercation with three unidentified black males and was stabbed once in the right neck area. The unidentified males then ran from the scene and were last seen running in the direction of Pratt Street. The victim next of kin, Ms. Judy Creighton of ███ ██████████████ was notified and given the appropriate information.

## NOTIFICATION OF INCIDENT:

On the 18th of July 1998 at approximately 0215 hours Officer Kevin Moore Unit 7629 contacted the Homicide Units and reported the following information . Officer Moore reported that he was currently investigating a serious stabbing incident that occurred on the side walk area in front of Phillips Inn harbor restaurant located at 301 Light Street and requested assistance from the Homicide Unit.

**PAGE # 2**
**OFFICE REPORT**
**18 JULY 1998**
**H-98-172**

Based on this request your Investigators responded to the scene and initiated a preliminary investigation and ultimately interviewed the primary Officers and witnesses at the scene.

**CASE STATUS:**    Open.

**MOTIVE:**    Argument / Altercation.

**VICTIM:**    **MARTRELLE LAMAR CREIGHTON**
**M/B/20 DOB** ▆▆▆▆▆

On the captioned date and time the above victim is found suffering from an apparent stab wound to the right front neck area. The victim is transported to University of Maryland Shock trauma Center where he received emergency medical treatment and ultimately expired from his wound and was pronounced dead at 0230 hours. On this same date the victims body was transported to the O.C.M.E. where a post mortem examination was performed by Doctor David Fowler . Doctor Fowler reported at the conclusion of his examination that the victim sustained a single stab wound to the right front neck area. He added that the single wound lacerated the victims artery which was the cause of death. Doctor Fowler ruled the manner of death was Homicide by stabbing. One vial of the victims blood was recovered and submitted to E.C.S.

**FIRST OFFICERS REPORT:**

Officer Kevin W. Moore, Tactical Unit 7629 reported that on the captioned date and time he was dispatched to the captioned location for a reported stabbing. Upon arrival he found the listed victim suffering from an apparent single stab wound to the neck. Emergency medical assistance was requested and the victim was ultimately transported to university of Maryland Shock Trauma Center by Medic # 12 Unit. Officer Moore reported that he secured the crime scene , located and retained witnesses and made the appropriate notifications and requested assistance from the Homicide Unit.

**PAGE # 3**
**OFFICE REPORT**
**18 JULY 1998**
**H-98-172**

### CRIME SCENE EXAMINATION:

   The crime scene in reference to the captioned incident is confined to the side walk area in front of Phillips Inn harbor restaurant located at 301 Light Street. In this area your Investigators observed several small pools of blood and the victims red baseball cap. The aforementioned area was photographed by the crime lad Unit and the victim baseball cap was recovered and submitted to E.C.S.

### WITNESSES:

DAVID BISHOP
M/B/24 DOB

410-

KEVIN SMITH
M/B/23 DOB

NO HOME TELEPHONE

CLARENCE FREDERICK WHITE
M/B/15 DOB

410-

   The above listed witnesses are located at the crime scene and all indicated that they were friends with the listed victim and witnessed the captioned stabbing. All three witnesses stated that they were all at the Inner harbor and in concert with the listed victim had been talking to three unidentified black females. The witnesses indicated that the victim became upset when the unidentified females began talking to another group of black males who the witnesses believe were from the Washington D. C. area . The witnesses indicated that they bases their assumption that the unidentified males were from the Washington D.C. area Solly based on the way they were dressed. The witnesses indicated that the listed victim approached the unidentified males and engaged them in a argument which ultimately lead to a physical altercation. The witnesses indicated that during the altercation the victim was stabbed once in the neck . The witnesses stated that after the victim was stabbed the unidentified males ran from the area in the direction of Pratt. The witnesses indicated that they remained on the scene until emergency medical personnel and Police arrived on the scene.

**PAGE # 4**
**OFFICE REPORT**
**18 JULY 1998**
**H-98-172**

### SUSPECTS:

**(1)** BLACK MALE, 20'S
MEDIUM TO DARK COMPLEXION
THIN BUILD, TALL, LAST SEEN
WEARING , A WHITE TEE-SHIRT AND
SHORTS, REPORTEDLY FROM
WASHINGTON DC, NFD.

**(2)** BLACK MALE, 20'S
LIGHT BROWN COMPLEXION, 5'7"
MEDIUM BUILD, ONE GOLD TOOTH,
SILVER OR HAZEL CONTACT LENSES,
BLACK HAIR THAT IS CUT CLOSE,
ALMOST BALLED. REPORTEDLY FROM
WASHINGTON DC, LAST SEEN
WEARING , A WHITE TEE-SHIRT AND
SHORTS, NFD.

**(3)** MIXED RACE BLACK MALE, 20'S, VERY
LIGHT COMPLEXION, MEDIUM HEIGHT,
MEDIUM BUILD, CURLEY SANDY BLOND
HAIR, AND POSSIBLY A PORTO RICAN ,
SAME IS THE TWIN BROTHER OF SUSPECT
# 4. REPORTEDLY FROM WASHINGTON DC,
LAST SEEN
WEARING , A WHITE TEE-SHIRT AND
SHORTS, NFD.

**(4)** MIXED RACE BLACK MALE, THE TWIN
BOTHER OF SUSPECT # 3, VERY LIGHT
COMPLEXION, CURLEY SANDY BLOND
HAIR BREADED TO THE BACK, MEDIUM
BUILD, MEDIUM HEIGHT , POSSIBLY
PORTO RICAN REPORTEDLY FROM
WASHINGTON DC, LAST SEEN
WEARING , A WHITE TEE-SHIRT AND
SHORTS, NFD.

### FOLLOW UP INVESTIGATION:

In reference to the follow up investigation your Investigators will
attempt to identify the unidentified females and attempt to identify the listed
suspects, see follow up reports.

**PAGE # 5**
**OFFICE REPORT**
**18 JULY 1998**
**H-98-172**

INVESTIGATION TO CONTINUE

SUPERVISOR

DETECTIVE ROBERT PATTON
C.I.B. HOMICIDE UNIT

# Exhibit 3

POLICE DEPARTMENT
BALTIMORE, MARYLAND

2 FEBRUARY 1999

TO:         Major Jeffrey Rosen
            Commanding Officer
            Crimes Against Persons Section

FROM:       Detective Robert L. Patton
            Detective Kirk Hastings
            Homicide Unit

SUBJECT:    HOMICIDE BY STABBING
            MARTRELLE LAMAR CREIGHTON
            M/B/20 DOB █████████
            ████ ██████████████ ██ ████████████████
            OCC: 18 JULY 1998 @ 0200 HOURS
            301 LIGHT STREET ( SIDE WALK AREA)
            CC# 98-1G13258 H-98-172

SIR:

## FOLLOW UP INVESTIGATION/ ARREST OF SUSPECTS

SUSPECTS:       **KEITH MICHAEL SCOTT**
                M/B/23 DOB█████
                ████████████████
                ( ARRESTED)

                **KEVIN LEE SCOTT**
                M/B/23 DOB █████
                █████████████████
                (ARRESTED)

                **KEVIN ANTHONY MILLER**
                AKA "KEVIN"
                B/M/22 DOB █████
                ████████████
                S.I.D # 1628168

PAGE TWO
FOLLOW UP INVESTIGATION/
ARREST OF SUSPECTS
2 FEBRUARY 1999
H-98-172

VICTOR GLORIA
AKA "VIC."
B/M/24

S.I.D. # 1565443

On the 2nd of February 1999 at 1515 hours Detective Daza of the F.B.I. Fugitive Task Force, Calverton Office contacted the Homicide office and reported the following information. Detective Daza reported on this date at 1500 hours the listed suspects were and arrested in the 200 block of Red Clay Road, Anne Arundel County Maryland. Detective Daza said that the listed suspects were currently being detained at the M.S.P. Waterloo Barracks awaiting transport to Baltimore City.

Based on this information Detective John Thanner in concert with Detective Kirk Hastings responded to the Waterloo Barracks where they took custody of the listed suspects and ultimately transported them to the Baltimore City Homicide office for interview. Once at the Homicide office both suspects waived their rights to counsel and provided statements in which the following information concerning the captioned investigation was gleaned.

Concerning **Keith Michael Scott** he said during his taped interview. That he and his twin brother, Kevin Lee Scott and a third individual identified as **Kevin Anthony Miller, SID # 1628168** left Laurel Maryland together and drove to the Inner Harbor area on the date in question. He stated that his brother Kevin Scott was driving and that they were operating a white late model Chrysler or Plymouth four door vehicle that Kevin Scott had purchased from an individual known as "Paul." Keith Scott continued and stated when they arrived they parked their vehicle within blocks of the Inner Harbor and walked the rest of the way on foot. He said that they arrived sometime after 2100 hours and they walked to several drinking establishments in the vicinity.

Keith Scott continued and stated that several hours later they were walking down the promenade in the direction of where their vehicle was parked. He stated it was during this time they meet and individual known as "Vic.", **Victor Gloria S.I.D. # 1565443** , a friend from Laurel Maryland who was walking in the opposite direction.